No. 22-55982

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARISSA KEEBAUGH, et al.,

*Plaintiffs-Appellees,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-CV-01272 | Honorable Maame Ewusi-Mensah Frimpong

## APPELLANT'S OPENING BRIEF

Christopher Chorba
Jeremy S. Smith
Patrick J. Fuster
Adrienne M. Liu
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Attorneys for Defendant-Appellant Warner Bros. Entertainment Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned states that Defendant-Appellant Warner Bros. Entertainment Inc. is a wholly owned, indirect subsidiary of Warner Bros. Discovery, Inc., a publicly traded corporation.  No other publicly held corporation owns 10% or more of the stock of Warner Bros. Discovery, Inc.


Dated: March 1, 2023                    GIBSON, DUNN & CRUTCHER LLP

                                        By:   /s/ Christopher Chorba

                                        *Attorneys for Defendant-Appellant*
                                        *Warner Bros. Entertainment Inc.*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ....................................... 4

STATEMENT OF THE ISSUES ............................................ 4

STATEMENT OF FACTS .................................................... 5

SUMMARY OF ARGUMENT ............................................ 19

STANDARD OF REVIEW .................................................. 23

ARGUMENT .................................................................... 24

I.    Warner Bros.' screens meet this Court's test for inquiry
      notice of terms and conditions. ................................... 24

      A.    *Game of Thrones: Conquest* provides reasonably
            conspicuous notice of the terms of use ................. 26

      B.    Plaintiffs unambiguously assented by tapping the
            "Play" button. ................................................... 38

II.   The decision below conflicts with both California law of
      contract formation and the Federal Arbitration Act. ..... 40

      A.    The district court misread California law to require a
            formal sign-up process to form an arbitration
            agreement. ........................................................ 41

      B.    The district court treated arbitration agreements worse
            than other contracts under California law in violation
            of the FAA's equal-footing principle. ................... 52

      C.    The district court also erred in relying on a minor
            typographical discrepancy that did not defeat the
            conspicuous notice provided by the screen. ........... 62

CONCLUSION ................................................................. 66

CERTIFICATE OF COMPLIANCE ..................................... 67

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995)................................................................53

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)................................................................15

*B.D. v. Blizzard Ent., Inc.*,
76 Cal. App. 5th 931 (2022) .................................. 22, 39, 46, 48, 49, 60

*Be In, Inc. v. Google Inc.*,
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ......................................64

*Berman v. Freedom Fin. Network, LLC*,
2020 WL 5210912 (N.D. Cal. Sept. 1, 2020)......................................36

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ....................................................*passim*

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)................................................................53

*Cal. State Auto Ass'n Inter-Ins. Bureau v. Barrett Garages, Inc.*,
257 Cal. App. 2d 71 (1967)........................................................56

*Cape Flattery Ltd. v. Titan Maritime, LLC*,
647 F.3d 914 (9th Cir. 2011)......................................................15

*Cerneka v. Russell No. 8 Santa Monica Properties, LLC*,
2018 WL 3154565 (Cal. Ct. App. June 28, 2018) ................................63

*Chamber of Commerce v. Bonta*,
— F.4th —, 2023 WL 2013326 (9th Cir. Feb. 15, 2023)...............59, 60

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003)................................................................53

*Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Commc'ns Int'l Union, AFL-CIO,*
  20 F.3d 750 (7th Cir. 1994) .................................................................. 64

*Colgate v. JUUL Labs., Inc.,*
  402 F. Supp. 3d 728 (N.D. Cal. 2019) .................................................. 36

*Cornell v. Desert Fin. Credit Union,*
  2022 WL 742724 (D. Ariz. Mar. 11, 2022) .......................................... 25

*Cunningham v. Int'l Comm. of Young Men's Christian Ass'ns,*
  51 Cal. App. 487 (1921) ....................................................................... 57

*DIRECTV, Inc. v. Imburgia,*
  577 U.S. 47 (2015) ......................................................................... 52, 59

*Doctor's Assocs., Inc. v. Casarotto,*
  517 U.S. 681 (1996) ....................................................................... 60, 61

*Dohrmann v. Intuit, Inc.,*
  823 F. App'x 482 (9th Cir. 2020) ................................................... 64, 65

*Employers Ins. of Wausau v. Granite State Ins. Co.,*
  330 F.3d 1214 (9th Cir. 2003) ............................................................. 63

*Epic Games, Inc. v. Apple Inc.,*
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ........................................... 50, 51

*Epic Sys. Corp. v. Lewis,*
  138 S. Ct. 1612 (2018) ......................................................................... 54

*First Options of Chicago, Inc. v. Kaplan,*
  514 U.S. 938 (1995) ....................................................................... 24, 54

*Ford v. Netgear, Inc.,*
  No. 216-2019-CV-704 (N.H. Super. Mar. 9, 2020) ............................. 25

*H.S. Crocker Co. v. McFaddin,*
  148 Cal. App. 2d 639 (1957) ............................................................... 63

iv

*Hendrick v. Lindsay*,
  93 U.S. 143 (1876).................................................................55

*Homedics, Inc. v. Valley Forge Ins. Co.*,
  315 F.3d 1135 (9th Cir. 2003)............................................24

*Kindred Nursing Centers L.P. v. Clark*,
  581 U.S. 246 (2017)........................................ 22, 52, 54, 55

*Larrus v. First Nat'l Bank of San Mateo County*,
  122 Cal. App. 2d 884 (1954).................................. 27, 35, 58

*Long v. Provide Commerce, Inc.*,
  245 Cal. App. 4th 855 (2016) ..................... 23, 47, 56, 58, 62

*Melo v. Zumper, Inc.*,
  439 F. Supp. 3d 683 (E.D. Va. 2020) .................................25

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ........................................ *passim*

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014)...................22, 24, 30, 31, 36, 38, 49, 59

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ..............................................28

*Oberstein v. Live Nation Ent., Inc.*,
  — F.4th —, 2023 WL 1954688 (9th Cir. Feb. 13, 2023)............ *passim*

*Oberstein v. Live Nation Ent., Inc.*,
  2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) ......................33

*Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*,
  55 Cal. 4th 223 (2012).......................................................49

*R.A. v. Epic Games, Inc.*,
  2019 WL 6792801 (C.D. Cal. July 30, 2019) ......................25

*Raffles v. Wichelhaus*,
  2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864) .....................64

*Seaton v. Henson*,
2 Lev. 220, 83 Eng. Rep. 527 (K.B. 1679)...........................................55

*Selden v. Airbnb, Inc.*,
4 F.4th 148 (D.C. Cir. 2021) ............................20, 27, 29, 30, 35, 50, 65

*Sellers v. JustAnswer LLC*,
73 Cal. App. 5th 444 (2021) ....................................................... *passim*

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ...............................................................56

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) .............................................................27

*Taussig v. Bode & Haslett*,
134 Cal. 260 (1901) .........................................................................57

*U Drive & Tour v. System Auto Parks*,
28 Cal. App. 2d Supp. 782 (1937) ...............................................57, 58

*Viamontes v. Adriana's Ins. Servs., Inc.*,
2016 WL 826148 (Cal. Ct. App. Mar. 3, 2016) ..................................63

*West v. Uber Techs.*,
2018 WL 5848903 (C.D. Cal. Sept. 5, 2018)......................................36

*Wilson v. Huuuge, Inc.*,
944 F.3d 1212 (9th Cir. 2019).....................................................25, 31

## Statutes

9 U.S.C. § 2 ...............................................................................53, 54, 61

9 U.S.C. § 16 .....................................................................................4

28 U.S.C. § 1332 ..................................................................................4

Automatic Renewal Law,
Cal. Bus. & Prof. Code § 17600 *et seq.*................................................42

Cal. Bus. & Prof. Code § 17601 .......................................................43, 46

Cal. Bus. & Prof. Code § 17602 ................................................................ 43

Cal. Civ. Code § 19 ................................................................................. 56

Cal. Civ. Code § 6700 ............................................................................. 18

California Consumers Legal Remedies Act,
    Cal. Civ. Code § 1750 *et seq.* ............................................................ 14

California False Advertising Law,
    Cal Civ. Code § 17501 ...................................................................... 14

California Unfair Competition Law,
    Cal. Bus. & Prof. Code § 17200 *et seq.*................................................ 13

Mont. Code Ann. § 27-5-114(4)................................................................ 60

N.Y Gen. Bus. Law § 349 ...................................................................... 14

N.Y Gen. Bus. Law § 350 ...................................................................... 14

New Hampshire Regulation of Business Practices for Consumer
    Protection Act, N.H. Rev. Stat. § 358-A:1 *et seq.* .............................. 14

Washington Consumer Protection Act,
    Wash. Rev. Code § 19.86.020 *et seq.* ................................................ 14

**Rules**

Fed. R. App. P. 32.................................................................................. 37

**Other Authorities**

*Game of Thrones: Conquest*, Apple Store Preview,
    https://tinyurl.com/yxzrhc45................................................................ 5

*Official Opening Credits: Game of Thrones (HBO)*, YouTube (Apr. 21,
    2011), https://tinyurl.com/2p9dp43j .................................................. 29

*Privacy Policy*, Warner Bros. (last updated Dec. 14, 2022),
    https://tinyurl.com/WB-Privacy-Policy ................................................ 8

*Terms of Use*, Warner Bros. (last updated Jan. 30, 2023),
    https://tinyurl.com/WB-TOU ............................................................. 8

Y. Bababekova et al., *Font Size and Viewing Distance of Handheld
    Smart Phones*, 88 Optometry & Vision Sci. 795 (2011),
    https://pubmed.ncbi.nlm.nih.gov/21499163/ ..................................... 37

## INTRODUCTION

The underlying case here is about the marketing of virtual items, such as gold and dragon food, in *Game of Thrones: Conquest*, a multiplayer strategy game available on mobile devices. But this appeal is about Plaintiffs' agreement to arbitrate their claims against Warner Bros. Entertainment Inc. on an individual basis.

Upon downloading *Game of Thrones: Conquest*, Plaintiffs visited an uncluttered sign-in screen with a single, readily apparent sentence that informed them that, by tapping the "Play" button, they would accept Warner Bros.' terms and conditions. The screen in fact hardly does anything else *other* than give notice of terms, a way to access them, and a way to accept them. And each Plaintiff necessarily tapped "Play" before being granted access to the game. Under the test set forth by this Court in *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022), the simple layout on the sign-in screen—an affirmation of terms, a hyperlink to those terms, and a button for accepting the terms, all next to each other—ensured that Plaintiffs received a reasonably conspicuous notice of terms and took an affirmative act that unambiguously manifested their assent.

1

One of the specific terms of use that Plaintiffs accepted by clicking the "Play" button is that Plaintiffs must arbitrate claims arising from or relating to their use of the app, such as their purchase of the virtual items that they have challenged in this putative class action. Nevertheless, Plaintiffs filed their claims in district court. When Warner Bros. then moved to compel Plaintiffs' claims to arbitration, the district court did not apply the standard for reasonably conspicuous notice under *Berman*. The district court instead charted its own course—away from this Court's precedent and from both sides' arguments—to a novel bright-line rule that users cannot be on notice of a mobile app's terms "[i]n the absence of a formal sign-up process" within the app. 1-ER-13. The court then denied the motion to compel because Plaintiffs could "freely play" *Game of Thrones: Conquest* "by simply pressing the 'Play' button" without having to "create an account *with Warner Bros.*" 1-ER-13.

This requirement of a formal sign-up process for terms and conditions is legally flawed and would turn the entire process for accessing apps on its head. It has no basis in the only case, *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021), on which the district court relied. It departs from the general approach to inquiry notice under

California law, which does not require a formal registration process for other contracts, and therefore treats the arbitration agreement here worse in violation of the equal-footing principle of the Federal Arbitration Act. And it unsettles the marketplace for mobile apps by requiring third-party app developers that want to enforce terms and conditions for use of their intellectual property to solicit users to share sensitive personal and financial information as part of a formal account-creation process—private data that otherwise need not be shared.

The district court also pointed to a minor typographical discrepancy—that the sentence on one of the two sign-in layouts referred to the "Terms of Use," while the hyperlink's title was "Terms of Service." But these terms are synonyms. In context, too, the hyperlink could refer back to nothing other than the terms described in the sentence immediately above the hyperlink and in fact led to a document entitled "Terms of Use." The district court's reliance on this minor discrepancy conflicts with the reasonableness standard applicable to contract formation.

Because the district court erred on this threshold ground of contract formation (and did not reach any of Plaintiffs' other arguments), this

Court should vacate the denial of the motion to compel and remand to the district court.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because the putative class satisfies the Class Action Fairness Act's minimal-diversity requirement and alleges claims that in aggregate exceed the amount-in-controversy requirement of $5 million. 2-ER-244. This Court has jurisdiction under 9 U.S.C. § 16(a)(1)(B) over Warner Bros.' appeal from the order denying its motion to compel arbitration on October 13, 2022. 1-ER-13. Warner Bros. timely noticed its appeal one week later on October 20, 2022. 3-ER-320.

## STATEMENT OF THE ISSUES

Parties form a contract online when "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Here, the app's sign-in screen conspicuously informed Plaintiffs that they would accept Warner Bros.' terms and conditions by

4

tapping the "Play" button, and Plaintiffs then tapped that button. Did the district court misapply *Berman* and violate the Federal Arbitration Act's equal-footing principle in holding that Warner Bros. and Plaintiffs had not formed a contract in the absence of a formal sign-up process?

## STATEMENT OF FACTS

### I.  Warner Bros. offered *Game of Thrones: Conquest* subject to terms and conditions requiring arbitration.

One of HBO's tentpole television shows is *Game of Thrones*, a story of quarreling family houses, dragons, and the pursuit of the Iron Throne. Since 2017, these battles have raged not only on flat screens but also mobile devices. HBO's affiliate Warner Bros. Entertainment Inc. used this highly recognizable intellectual property to develop a mobile strategy application called *Game of Thrones: Conquest*. 2-ER-245–46. Each player in the game has a "keep" (really, a castle) and can raise dragons to defend their realm against attacks by other players. *Game of Thrones: Conquest*, Apple Store Preview, https://tinyurl.com/yxzrhc45. Through gameplay or in-app purchases, players can obtain materials like gold, building material, and dragon food to upgrade their abilities in *Game of Thrones: Conquest*. 2-ER-246.

5

Warner Bros. has made *Game of Thrones: Conquest* available for free download through the Apple App Store and Google Play Store. 2-ER-245–46.  A person with an iPhone or iPad, for example, could access *Game of Thrones: Conquest* by downloading the game in the Apple App Store, as shown below.



2-ER-63.

The first thing that a new player sees after downloading *Game of Thrones: Conquest* is the sign-in screen.  2-ER-172.  Although the

6

background art has varied, *Game of Thrones: Conquest* has used only two different layouts of text and hyperlink buttons, one until December 2019 and one thereafter. 2-ER-172; *see* 2-ER-122. Those two layouts are:

 

2-ER-235; 2-ER-69; *see also, e.g.*, 2-ER-237.

Both layouts have three buttons and one disclosure. No player can access *Game of Thrones: Conquest* unless they first press the "Play"

button on the sign-in screen. 2-ER-172. Right below the "Play" button, each screen informs the user either that "By tapping 'Play,' I agree to the Terms of Service" or "By tapping 'Play,' I accept the Terms of Use and acknowledge the Privacy Policy." 2-ER-172–73. The "Privacy Policy" button takes players to Warner Bros.' privacy policy. *Privacy Policy*, Warner Bros. (last updated Dec. 14, 2022), https://tinyurl.com/WB-Privacy-Policy. The "Terms of Service" button takes players to a document called "Terms of Use." *Terms of Use*, Warner Bros. (last updated Jan. 30, 2023), https://tinyurl.com/WB-TOU. The game periodically requires players to go through the sign-in screen again—for example, when Warner Bros. has updated the terms and conditions for using the mobile app. 2-ER-173.

The terms of use address many aspects of the ongoing relationship between Warner Bros. and players. A handful of examples:

- To protect Warner Bros.' valuable intellectual-property rights, the terms grant players only a non-exclusive and fully revocable license to access and use *Game of Thrones: Conquest*. 2-ER-175–76; 2-ER-188–89; 2-ER-203; 2-ER-219.

8

- Because players have the option to purchase virtual items in *Game of Thrones: Conquest*, the terms also govern payment processing (a function handled by third-party platforms like Apple and Google) and explain when and how players can lose access to virtual items. 2-ER-177–79; 2-ER-190–92; 2-ER-205–06; 2-ER-221–23.

- The terms protect other players by prohibiting users from posting illegal, infringing, harassing, or exploitative content in *Game of Thrones: Conquest*. 2-ER-180; 2-ER-193; 2-ER-207–08; 2-ER-224–25.

- The terms protect children by requiring players to represent "that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parental or guardian consent to do so." 2-ER-175; 2-ER-188; 2-ER-202; 2-ER-219.

The terms of use also contain an agreement to arbitrate. The *very first paragraph* of the 2018 version conspicuously discloses that the terms require individualized arbitration:

PLEASE READ THESE TERMS OF USE ("Terms," "Terms of Use," or "Agreement") CAREFULLY—THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, AND INCLUDE WAIVERS OF RIGHTS, LIMITATIONS OF LIABILITY, AND YOUR INDEMNITY TO US. THESE TERMS ALSO REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, WAIVING YOUR RIGHT TO A JURY TRIAL AND CLASS ACTION RELIEF.

2-ER-175. The terms then provide that, "[w]ith the exception of class actions, small claims court filings, or actions for preliminary injunctive relief (as further discussed below), any other dispute of any kind between you and Warner arising under this Agreement or in connection with your use of the Service . . . will be resolved by binding arbitration." 2-ER-182. The terms further require players to agree "that disputes will be resolved on an individual basis and that any claims brought under these Terms of Use or in connection with the [game] must be brought in the parties' individual capacities, and not as a plaintiff or class member in any putative class, collective, or representative proceeding." 2-ER-183 (capitalization omitted).

The later versions of the terms are much the same as to arbitration. They begin with a similar disclosure, in the very first paragraph:

FIRST, AN IMPORTANT MESSAGE: PLEASE READ THESE TERMS OF USE ("Terms", "Terms of Use", or

10

"Agreement") CAREFULLY BEFORE USING THIS ONLINE ENTERTAINMENT SERVICE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, WAIVERS OF RIGHTS, LIMITATION OF LIABILITY, AND YOUR INDEMNITY TO US. **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS, AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE**.

2-ER-188; 2-ER-202; 2-ER-218. Like the 2018 version, every subsequent version has required users to "agree to arbitrate all disputes and claims" with Warner Bros., including "claims arising out of or relating to any aspect of the relationship between [them]." 2-ER-196 (emphasis omitted); 2-ER-211; 2-ER-228. And this bilateral agreement between Warner Bros. and each player also provided that "you and we agree that each may bring claims against the other only in your or our individual capacity, and not as a plaintiff or class member in any purported class, representative, or private attorney general proceeding." 2-ER-198 (capitalization and emphasis omitted); 2-ER-213; 2-ER-230.

## II. Plaintiffs alleged that *Game of Thrones: Conquest* misleadingly marketed packs of virtual items.

*Game of Thrones: Conquest* has hundreds of thousands of users. 2-ER-241. Among them are Charissa Keebaugh, Stephanie Neveu,

11

Heather Mercieri, Sophia Nicholson, and P.W. (a minor)—residents of Washington, Arizona, New Hampshire, New York, and Virginia, respectively. 2-ER-244–45. Although the purchase of virtual items is not necessary to play the free-to-download game, each elected to purchase "packs" of virtual items, which range in price from $0.99 to $99.99 each. 2-ER-244–46. A pack offer could, for example, look like this:



2-ER-254–55.

Even though the terms of use require bilateral arbitration, these five players filed this action in district court, claiming that some of the packs they purchased were misleadingly marketed in two ways. Their

first contention focused on the strikethrough graphic above, which shows players that they receive a bulk discount on gold in more expensive packs relative to $0.99 packs. But according to Plaintiffs, a reasonable consumer would think that the strikethrough graphic instead means that the same $99.99 pack (for example, the "Black Friday Special" pack depicted above) was previously sold with only 10,000 gold rather than 130,000 gold. 2-ER-250–53.

Their second assertion was that *Game of Thrones: Conquest* had marketed some packs as being a time-limited "special" or "sale" pack even though non-special packs in circulation allegedly contained identical virtual items. 2-ER-254–57. Plaintiffs alleged that the "strikethrough" and "special" graphics were deceptive and that they would not have purchased the packs without this marketing. 2-ER-253–54; 2-ER-257.

Plaintiffs raised nine claims based on these allegations about the "strikethrough" and "sale" graphics. Six were statutory claims under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; the California False Advertising Law, *id.* § 17501; the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*; the New Hampshire Regulation of Business Practices for Consumer Protection

13

Act, N.H. Rev. Stat. § 358-A:1 *et seq.*; the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020 *et seq.*; and N.Y Gen. Bus. Law §§ 349 and 350. 2-ER-267–75; 2-ER-278–81. Plaintiffs also alleged claims for common-law fraud and negligent misrepresentation. 2-ER-275–76. And they asserted a claim for a declaratory judgment setting forth minors' rights to "disaffirm" (that is, rescind) in-app purchases. 2-ER-276–78.

Despite the representative-action waiver in the terms of use, Plaintiffs sought to represent a putative global class, a putative nationwide subclass of minors, and putative subclasses of Washington, Arizona, New Hampshire, and New York residents. 2-ER-261–65.

## III. Warner Bros. moved to compel arbitration.

Although the complaint does not include exact dates when Plaintiffs started playing *Game of Thrones: Conquest* (and omits P.W.'s date altogether), the allegations, taken as true, would establish that Ms. Neveu and Ms. Mercieri tapped through the pre-December 2019 sign-in layout. 2-ER-245. Ms. Keebaugh and Ms. Nicholson tapped through the post-December 2019 sign-in layout, as would have Ms. Neveu and Ms. Mercieri if they continued playing after December 2019.

2-ER-244–45; *see* 2-ER-122. But regardless of when they started playing, each Plaintiff had to accept the terms of use to access *Game of Thrones: Conquest* on one of two materially identical sign-in layouts. 2-ER-172; *see supra*, p. 7. Warner Bros. therefore moved to compel Plaintiffs' claims to arbitration.

Warner Bros. argued that the sign-in screens met the two elements for contract formation: (1) the affirmation and hyperlinks provided reasonably conspicuous notice of the terms of use and (2) Plaintiffs unambiguously assented by tapping the "Play" button after being put on notice of the terms. 2-ER-161–63 (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). This broad agreement to arbitrate all disputes arising out of or relating to their use of *Game of Thrones: Conquest* encompasses the marketing claims here. 2-ER-166–68 (citing *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011)). And the Supreme Court—in a case involving an identically worded class-action waiver—has held that the Federal Arbitration Act requires courts to enforce agreements to arbitrate on an individual basis. 2-ER-168–69 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011)).

Plaintiffs did not dispute that the arbitration agreement would cover their claims and that *Concepcion* requires the enforcement of the agreement's class-action waiver. Instead, they argued principally that they had never accepted the terms of use. The screens' disclosure of the terms, according to Plaintiffs, was not reasonably conspicuous because the font was too small; because the "screen plays the Game of Thrones theme song"; and because the user would be distracted by "the outsized Play button directly below the striking graphic image of dragons." 2-ER-103–04. Plaintiffs also argued that users would not know that the box labeled "Terms of Service" was a hyperlink absent blue font or underlining. 2-ER-104–05. In addition to challenging the visual conspicuousness of the terms, Plaintiffs contended that they did not unambiguously accept the terms because the affirmation on the second sign-in layout referred to "Terms of Use" whereas the button was labeled as "Terms of Service." 2-ER-107–08. Plaintiffs lastly argued that the arbitration agreement is unconscionable, 2-ER-108–11; may not be enforced against a valid request for public injunctive relief, 2-ER-111–12; and does not bind P.W. because he had since disaffirmed the terms of use, 2-ER-112–17.

16

In reply, Warner Bros. contended that its sign-in layouts satisfied the conspicuousness requirement because the screens had very little clutter, set out white text against a black background, displayed the affirmation right below the "Play" button, and used standalone clickable boxes to signify hyperlinks, as is standard for mobile apps. 2-ER-77–78. Warner Bros. also pointed out that Plaintiffs had submitted low-resolution images that did not accurately show how the text and buttons would appear on a phone screen with much higher resolution. 2-ER-79; *see* 2-ER-88. And no reasonable user, Warner Bros. added, would think that the "Terms of Service" hyperlink would lead anywhere other than the "Terms of Use" in the affirmation. 2-ER-80. Finally, Warner Bros. responded to Plaintiffs' arguments about unconscionability, public injunctions, and minor disaffirmance. 2-ER-81–85.

## IV. The district court denied the motion to compel arbitration.

The district court held that Warner Bros. and Plaintiffs had never formed an agreement to arbitrate—but for reasons not argued by Plaintiffs. The court concluded that Warner Bros. had established three of the four elements of contract formation: that Plaintiffs were capable of contracting, that arbitration is a lawful object, and that the mutual

promises to arbitrate counted as consideration for a contract. 1-ER-9–10 (citing Cal. Civ. Code § 6700). But the district court held that Plaintiffs had not accepted the terms of use because the sign-in screens (which the court called the "Opening Screen," 1-ER-4) failed to provide reasonably conspicuous notice of the terms of use. While "observ[ing] that both Warner Bros. and the Plaintiffs only address the visual elements of the Opening Screen to argue the issue of notice," the court cited language in *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021), that courts should consider notice in the "context of the transaction." 1-ER-11.

The district court concluded that the relevant context here was that Plaintiffs were "not required to create an account before playing the game" but instead "could freely play [*Game of Thrones: Conquest*] by simply pressing the 'Play' button." 1-ER-12–13. "In the absence of a formal sign-up process—which would convey to users that they were entering into an ongoing relationship with Warner Bros.," the court could not "reasonably expect [*Game of Thrones: Conquest*] users to click the link to the [terms of use] and be placed on inquiry notice." 1-ER-13. The court added that those plaintiffs who signed in using the second layout "would have an even lower expectation of being bound" because the

18

affirmation refers to "'Terms of *Use*'" but "the hyperlink below is entitled, 'Terms of *Service*.'" 1-ER-12 (bolding omitted). The court denied Warner Bros.' motion to compel without reaching the parties' additional arguments. 1-ER-13.

The district court later granted the parties' joint stipulation to stay proceedings pending this appeal. 2-ER-15–16.

## SUMMARY OF ARGUMENT

The district court decided this case on the theory that Warner Bros. and Plaintiffs never formed an agreement to arbitrate. 1-ER-10–13. But the decision below disregarded the governing two-part test for contract formation through inquiry notice under California law (which the Federal Arbitration Act incorporates here). Just last year, this Court held that an online contract requires only that "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). This case is straightforward under that test.

First, Warner Bros. provided reasonably conspicuous notice of terms on the sign-in screen. Each screen has a "simple design" with just one sentence—the affirmation informing users that they would accept the terms by tapping the "Play" button. *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021). That affirmation is directly below the "Play" button, which ensures that the notice of terms will come within the user's field of vision before progressing beyond the sign-in screen. *Oberstein v. Live Nation Ent., Inc.*, — F.4th —, 2023 WL 1954688, at *8 (9th Cir. Feb. 13, 2023). And that affirmation is directly above a button that is hyperlinked to the applicable terms, which creates the opportunity for users to review the terms if they so wish. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017). All of these features of the sign-in process—contained in a single screen without any need for scrolling, *id.* at 78—ensured that Plaintiffs received reasonably conspicuous notice of Warner Bros.' terms of use.

Second, Plaintiffs each tapped the "Play" button after being told either "By tapping 'Play,' I agree to the Terms of Service" or "By tapping 'Play,' I accept the Terms of Use and acknowledge the Privacy Policy." 2-ER-172–73. This Court in *Berman* approved a materially identical

mechanism for securing unambiguous assent—"[a] user's click of a button" once "the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." 30 F.4th at 857–58; *accord Oberstein*, — F.4th —, 2023 WL 1954688, at *9.

But rather than apply *Berman*, the district court interposed two formalistic obstacles to contract formation that have no basis in California's reasonableness standard for inquiry notice. The court's first objection was that Plaintiffs could "freely play" *Game of Thrones: Conquest* "by simply pressing the 'Play' button." 1-ER-13. "In the absence of a formal sign-up process," the court reasoned, users would not "click the link to the [terms of use] and be placed on inquiry notice." 1-ER-13. The second objection was that the affirmation on one of the sign-in screens refers to "Terms of Use," while the button's title is "Terms of Service." 1-ER-12.

The district court's requirement of a formal sign-up process conflicts with its purported source: *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021). *Sellers* nowhere held that contract formation requires a formal sign-in process, much less that the district court should have stopped its analysis without even considering the visual

21

conspicuousness of the notice here. And since *Sellers*, the Court of Appeal has held that online video games *are* the type of transaction where users reasonably expect an ongoing relationship governed by terms and conditions. *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 950–51 (2022).

Even if the district court correctly interpreted *Sellers*, the Federal Arbitration Act requires the arbitration agreement here to be put on equal footing with other contracts under generally applicable principles of contract formation, not one-off outliers. *Kindred Nursing Centers L.P. v. Clark*, 581 U.S. 246, 254–55 (2017). Under California law, parties can form contracts by, for example, displaying terms on a receipt, posting them on a sign, and printing an incorporation of terms on a card. These same principles apply to online contracts. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). By ratcheting up formality based on *Sellers* (a case that also concerned an arbitration agreement), the district court violated the FAA's equal-footing principle.

The district court's suggestion that Plaintiffs would have been confused by the difference between "Terms of Use" and "Terms of Service" violates the rule that contractual offers must be given a "reasonable

meaning" in light of context. *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016). Because terms of use and terms of service are generic synonyms for online contracts, no reasonable user would have thought that Warner Bros. had linked an irrelevant set of terms rather than the set of terms described in the affirmation immediately above the hyperlink. *Meyer*, 868 F.3d at 80.

This Court should hold that Warner Bros. and Plaintiffs formed an arbitration agreement, vacate the order denying Warner Bros.' motion to compel arbitration, and remand for the district court to consider Plaintiffs' defenses to enforcement in the first instance.

## STANDARD OF REVIEW

This Court "review[s] *de novo* the denial of a motion to compel arbitration, while underlying factual findings are reviewed for clear error." *Berman*, 30 F.4th at 855. The conspicuousness of the notice of contractual terms presents a "'pure question of law.'" *Oberstein*, — F.4th —, 2023 WL 1954688, at *9.

23

## ARGUMENT

## I. Warner Bros.' screens meet this Court's test for inquiry notice of terms and conditions.

In general, the Federal Arbitration Act borrows "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). This Court applies "the law of the forum state—here, California—when making choice of law determinations." *Nguyen*, 763 F.3d at 1175. This choice-of-law analysis selects California law unless the parties "identif[y] a meaningful conflict between California law and the law of another state." *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1138 (9th Cir. 2003).

This Court has recently addressed the test for contract formation under California law. In *Berman*, the Court explained that contract formation through inquiry notice requires two things: that "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." 30 F.4th at 856. Decisions since *Berman* have

further entrenched this "two-part reasonableness test" for contract formation. *Oberstein*, — F.4th —, 2023 WL 1954688, at *7.*

The sign-in screens here satisfy the two elements of inquiry notice in a straightforward manner. The screens conspicuously disclosed that terms and conditions govern Plaintiffs' use of *Game of Thrones: Conquest*. In fact, the two layouts consist of little other than the notice of and hyperlink to the terms of use. And Plaintiffs unambiguously manifested assent: They tapped "Play" after being told that the legal significance of that action was accepting Warner Bros.' terms.

---

\* The states where Plaintiffs reside—Washington, Arizona, New Hampshire, New York, and Virginia, 2-ER-244–45—likewise appear to require only (1) that Warner Bros. provided reasonably conspicuous notice of terms and (2) that Plaintiffs objectively manifested their assent in some way. *See Berman*, 30 F.4th at 855 (describing New York law as "substantially similar"); *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1219 (9th Cir. 2019) (applying Washington law); *Ford v. Netgear, Inc.*, No. 216-2019-CV-704, at *5, *11 (N.H. Super. Mar. 9, 2020); *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 696–98 (E.D. Va. 2020). Only Arizona law does not address the notice standard for online contracts. *Cornell v. Desert Fin. Credit Union*, 2022 WL 742724, at *7 (D. Ariz. Mar. 11, 2022) (certifying issue of online contract formation to Arizona Supreme Court). But if the law of any of these states meaningfully departs from California law, choice-of-law principles would require this Court to "apply the law of the state where the contract was formed with respect to issues concerning contract formation." *R.A. v. Epic Games, Inc.*, 2019 WL 6792801, at *5 (C.D. Cal. July 30, 2019).

A.   ***Game of Thrones: Conquest* provides reasonably conspicuous notice of the terms of use.**

Warner Bros. has satisfied the first element of the two-part reasonableness test as a matter of law.  Both sign-in screens for *Game of Thrones: Conquest* provide conspicuous notice of terms that "a reasonably prudent Internet user would have seen."  *Berman*, 30 F.4th at 856:




2-ER-235; 2-ER-69.

As the images above demonstrate, the notice of terms and the hyperlinks are clear and conspicuous. Neither layout is "cluttered with diverse text" that could have distracted Plaintiffs from noticing the affirmation that they were accepting Warner Bros.' terms. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019). Instead, the screens have just 20 and 24 words respectively: the game's title (four), the notice of terms (10 and 14), the "Privacy Policy" button (two), and the "Terms of Service" button (three). A reasonably prudent user would not fail to notice that the "only sentence" on the screens "was an express acceptance" of the terms of use. *Larrus v. First Nat'l Bank of San Mateo County*, 122 Cal. App. 2d 884, 889 (1954); *see, e.g.*, *Selden*, 4 F.4th at 156 (approving a similarly "simple design" under California law).

The conspicuousness of the affirmation and hyperlinks are heightened here because the sign-in screens "spatially coupled" them with the "Play" button. *Meyer*, 868 F.3d at 78 (applying California law). Websites and apps give users reasonable notice of terms and conditions when, as here, the disclosure and hyperlink are located next to the "action button" for accepting the terms. *Oberstein*, — F.4th —, 2023 WL

1954688, at *8.  So this case is not like *Sellers*, for example, where the disclosure of terms was "in extremely small print and not immediately adjacent to the 'Start my trial' button."  73 Cal. App. 5th at 482; *see id.* at 454–56 (reproducing images).  In light of the affirmation's placement on the screens here, the notice of terms unavoidably would have come within each Plaintiff's field of vision before tapping the "Play" button.

Nor do any "other elements on the screen clutter or otherwise obscure the textual notice."  *Sellers*, 73 Cal. App. 5th at 473.  This factor also distinguishes cases like *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220 (2d Cir. 2016), in which the webpage had "between fifteen and twenty-five links on the Order Page, and various text is displayed in at least four font sizes and in six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements."  *Id.* at 237.  A user doesn't have inquiry notice if a website "directs the user's attention everywhere else" but the disclosure of terms.  *Berman*, 30 F.4th at 857.  But that isn't an issue here:  Warner Bros.' screens "incorporate[] a simple, streamlined design that sufficiently draws a user's attention to" the only sentence on the screen (the notice of terms) directly below the

28

only way to proceed past the screen (the "Play" button). *Selden*, 4 F.4th at 157; *accord Oberstein*, — F.4th —, 2023 WL 1954688, at *9.

Plaintiffs argued below that users would have been distracted by the background art—in their words, "the striking graphic image of dragons"—and the background music of the *Game of Thrones* theme song. 2-ER-104; *see* 2-ER-138. But they identified no authority (and Warner Bros. is aware of none) suggesting that sign-in screens must be devoid of sights and sounds. Plus, Warner Bros. displayed the affirmation against a black background to ensure that the graphic did not "obscure the textual notice." *Sellers*, 73 Cal. App. 5th at 473. And the instrumental theme music (which is available online if this Court wishes to hear it) did not affect the visual conspicuousness of the notice—if anything, it would encourage the user to linger over the screen's text to hear more of the music. *See Official Opening Credits: Game of Thrones (HBO)*, YouTube (Apr. 21, 2011), https://tinyurl.com/2p9dp43j.

Warner Bros.' screens also informed Plaintiffs how they would become bound by the terms of use. In *Nguyen*, this Court held that "where a website makes its terms of use available via a conspicuous hyperlink" but does not prompt users "to take any affirmative action to

29

demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." 763 F.3d at 1179. Warner Bros. designed its screen to provide the required notice through affirmations that stated clearly and conspicuously that "By tapping 'Play,' I agree to the Terms of Service" and "By tapping 'Play,' I accept the Terms of Use and acknowledge the Privacy Policy." 2-ER-172–73. This is just the kind of affirmation that this Court and other circuits have deemed sufficient under California law. *Oberstein*, — F.4th —, 2023 WL 1954688, at *8; *see, e.g.*, *Selden*, 4 F.4th at 156; *Meyer*, 868 F.3d at 80.

In addition, the sign-in screens provided Plaintiffs the necessary opportunity to review the terms before accepting them. *Meyer*, 868 F.3d at 79–80. This Court has held that "it is permissible to disclose terms and conditions through a hyperlink," so long as the "reasonably prudent Internet user" would know that a hyperlink is present. *Berman*, 30 F.4th at 857. Typically, a hyperlink is more user-friendly than squeezing a fine-print contract onto an app's sign-in page. And the screens here included two clearly defined hyperlink buttons ("Terms of Service" and "Privacy Policy"), both of which appear directly below the only other

30

button ("Play"). 2-ER-69; 2-ER-234–239. The "Terms of Service" button leads directly to terms of use that emphasize in the very first paragraph that the contract requires arbitration on an individual basis. 2-ER-188; 2-ER-202; 2-ER-218. Given this user-friendly layout, Plaintiffs can hardly claim that they were required to "aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" *Berman*, 30 F.4th at 857 (quoting *Nguyen*, 763 F.3d at 1179). They could simply aim a finger at the obvious hyperlink labeled "Terms of Service."

Warner Bros. put the full package of information giving rise to inquiry notice—the affirmation and the hyperlinks—on a single screen that did not require Plaintiffs to scroll to uncover hidden terms and conditions. This layout eliminates the possibility that the notice will not appear "in a place the user would necessarily see." *Wilson*, 944 F.3d at 1220. In *Wilson*, for example, the "user would need to click on an ambiguous button to see the app's full profile page and scroll through multiple screen-lengths of similar-looking paragraphs" to find any reference to the terms. *Id.* at 1221. Warner Bros. eliminated this risk by ensuring "[t]he entire screen is visible at once," such that "the user does

31

not need to scroll beyond what is immediately visible to find notice of the Terms of Service." *Meyer*, 868 F.3d at 78.

The webpages in *Oberstein*—this Court's latest examination of inquiry notice—show that the sign-in screens here clear "the baseline requirements for constructive notice" with room to spare. — F.4th —, 2023 WL 1954688, at *10. The following is an excerpt of the Ticketmaster sign-in flow at issue in *Oberstein*, which the Court upheld as valid:



*Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *2 (C.D. Cal. Sept. 20, 2021).

Despite the notice's relatively small font and the textual clutter on the webpages, this Court held that the Ticketmaster webpages satisfied the two-part *Berman* test because (1) the "notice is conspicuously displayed directly above or below the action button," (2) the webpage "clearly denotes that continued use" will accept the terms, and (3) the hyperlink to the terms "is conspicuously distinguished from the surrounding text in bright blue font." *Oberstein*, — F.4th —, 2023 WL 1954688, at *8 (quotation marks omitted). Warner Bros.' screens here have the same three features: notice of terms next to the "Play" button, a clear affirmation that continued use equals acceptance, and a conspicuous button hyperlink in a high-contrast font color.

On the other hand, the deficient webpages in *Berman* are instructive counterpoints to the sign-in screens here. One plaintiff had visited the left-side webpage below on her desktop computer. 30 F.4th at 853, 859. The other plaintiff visited a different (and very wordy) webpage on her phone, shown on the right below. *Id.* at 854, 861.

33





34

This Court held that these webpages "did not provide reasonably conspicuous notice of the terms and conditions for two reasons." *Berman*, 30 F.4th at 856. First, the notice was "in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Id.* at 856–57. Second, the defendant had not used any "[c]ustomary design elements denoting the existence of a hyperlink," such as blue font or all caps. *Id.* at 857.

The screens for *Game of Thrones: Conquest* avoid both of these problems. To begin with, the font and design choices did not "tend[] to conceal the fact" that tapping the "Play" button was "an express acceptance" of Warner Bros.' terms. *Larrus*, 122 Cal. App. 2d at 889. The affirmation, though in a fairly "small font," is the only sentence on the screen and uses a white font that "contrasts with the [black] background." *Meyer*, 868 F.3d at 78; *see, e.g.*, *Selden*, 4 F.4th at 156. And again, the screens followed the best practice of "spatially coupl[ing]" the notice and hyperlinks with the mechanism for progressing beyond the opening screen—the "Play" button. *Meyer*, 868 F.3d at 78; *see Oberstein*, — F.4th —, 2023 WL 1954688, at *8. This design choice was intended to

"'capture the user's attention and secure her assent'" by ensuring that she could not proceed past the screen without first noticing that terms and conditions govern her use of the app. *Berman*, 30 F.4th at 857 (quoting *Nguyen*, 763 F.3d at 1178 n.1).

Warner Bros. also used "[c]ustomary design elements" when displaying the hyperlinks as clickable buttons. *Berman*, 30 F.4th at 857. Courts have recognized that a "stand-alone rectangular box" on a mobile app signifies a hyperlink. *West v. Uber Techs.*, 2018 WL 5848903, at *3–4 (C.D. Cal. Sept. 5, 2018); *see, e.g.*, *Colgate v. JUUL Labs., Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019). Although Plaintiffs argued below that Warner Bros. should have used blue font, ALL CAPS, or underlining for the text within the button, they relied exclusively on cases addressing *website* hyperlinks. 2-ER-104. Plaintiffs' argument that a box on a mobile app needs something "extra" (blue font, capitalization, etc.) improperly presumes "that the user has never before encountered an app or entered into a contract using a smartphone." *Meyer*, 868 F.3d at 77.

Below, Plaintiffs relied on the district court's decision in *Berman* for the notion that text should be larger on "a mobile device" than a computer monitor. *Berman v. Freedom Fin. Network, LLC*, 2020 WL

5210912, at *3 (N.D. Cal. Sept. 1, 2020); *see* 2-ER-102. But this Court did not embrace this reasoning in *Berman*. 30 F.4th at 856–57. Nor is this logic defensible given the commonly known and empirically tested fact that people hold smartphones closer to their faces than hard-copy text or computer monitors. *E.g.*, Y. Bababekova et al., *Font Size and Viewing Distance of Handheld Smart Phones*, 88 Optometry & Vision Sci. 795, 797 (2011), available at https://pubmed.ncbi.nlm.nih.gov/21499163/. If a judge is reading this brief on 8½ by 11 inch paper or an amply sized monitor, 14-point font makes sense. Fed. R. App. P. 32(a)(5)(A). But if someone prefers to read this brief on a 6 by 3 inch phone screen with much higher resolution, 2-ER-88, the brief would be unreadable at its current size with only a few words visible on the screen, and that person would use their fingers to shrink down the displayed text to a more comfortable (but still legible) size.

At bottom, if the screens here do not provide conspicuous notice, then app developers like Warner Bros. are hard-pressed to decipher what they must do under *Berman* to enforce their terms. The lone sentence on the screens identifies the existence of terms. Immediately below lies the hyperlink to those terms. And immediately above lies the mechanism for

37

accepting the terms.  As a matter of law, Plaintiffs had inquiry notice of Warner Bros.' terms of use.

## B. Plaintiffs unambiguously assented by tapping the "Play" button.

The sign-in screens for *Game of Thrones: Conquest* also satisfy the second part of the contract-formation test: that each Plaintiff "t[ook] some action, such as clicking a button or checking a box, that unambiguously manifested his or her assent to [the] terms." *Berman*, 30 F.4th at 856.

The affirmation and "Play" button work together to guarantee an unambiguous manifestation of assent.  The first step is that Warner Bros. included "an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Nguyen*, 763 F.3d at 1177. Again, the layouts told Plaintiffs either "By tapping 'Play,' I agree to the Terms of Service" or "By tapping 'Play,' I accept the Terms of Use and acknowledge the Privacy Policy."  2-ER-172–73.  And the second step is that Plaintiffs could access the game only by tapping the "Play" button. 2-ER-172.  This button prompted an "affirmative action to demonstrate assent."  *Nguyen*, 763 F.3d at 1179.  Because each necessarily went through this sign-in flow to access the game, 2-ER-172, Plaintiffs all have

38

"unambiguously manifested their assent to be bound by the terms and conditions," *Berman*, 30 F.4th at 857.

Some courts have called this contract-formation scenario—where the user accepts the terms by clicking or tapping a button (such as "play" or "sign up") that also serves another purpose—a sign-in wrap agreement. *E.g.*, *Sellers*, 73 Cal. App. 5th at 464. This terminology distinguishes a pure clickwrap agreement where the user clicks an "I agree" box for the terms. *Meyer*, 868 F.3d at 75–76. So long as the screen provides conspicuous notice that terms exist and that the button is the way to accept them, sign-in wrap is a valid way to form a contract. *E.g.*, *Oberstein*, — F.4th —, 2023 WL 1954688, at *9; *Blizzard*, 76 Cal. App. 5th at 950–51.

This Court has twice endorsed a materially identical mechanism for securing assent to terms and conditions. In *Oberstein*, this Court approved webpages that "explicitly alert[ed] the user that by creating an account, signing in, or purchasing a ticket, and proceeding to the next page, the user 'agrees to our Terms of Use.'" — F.4th —, 2023 WL 1954688, at *9. And in *Berman*, the Court found insufficient a "continue" button that did not inform the users of the "legal significance" of the

39

button, but explained the "notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the Terms & Conditions.'" 30 F.4th at 858.

The affirmations here comply with *Berman* and *Oberstein* almost down to the letter. 2-ER-172–73. Because the screens provided conspicuous notice of the terms and hyperlinks, and because Plaintiffs unambiguously assented through the affirmative act of tapping the "Play" button, Plaintiffs agreed to arbitrate their claims against Warner Bros.

## II. The decision below conflicts with both California law of contract formation and the Federal Arbitration Act.

The district court did not take issue with anything that Warner Bros. has argued up to this point. Instead of addressing the "visual elements" of the sign-in screens, the court focused on the question whether "the context of the transaction" put Plaintiffs on notice that terms governed their use of *Game of Thrones: Conquest*. 1-ER-11. The court then held that, because Plaintiffs were "not required to create an account before playing the game," the app did not involve the "'sort of continuing relationship . . . that would require some terms and conditions.'" 1-ER-12 (quoting *Sellers*, 73 Cal. App. 5th at 480). "In the

40

absence of a formal sign-up process," the court refused to find that Plaintiffs could be on notice of the terms of use. 1-ER-13.

The district court's novel requirement of a "formal sign-up" process rests on a misreading of the California Court of Appeal's decision in *Sellers*. It also put Warner Bros.' arbitration agreement on unequal footing with other contracts in violation of the Federal Arbitration Act. And the court's only other objection—that the second layout's affirmation refers to "Terms of Use" while the hyperlink's title is "Terms of Service," 1-ER-12—was yet another invented technicality that defies the rule that words must be given a reasonable interpretation in light of context.

## A. The district court misread California law to require a formal sign-up process to form an arbitration agreement.

The district court's analysis unfolded in three steps. First, the court limited its analysis of inquiry notice to a pair of California cases—*Sellers* and *Blizzard*—that specifically addressed so-called "sign-in wrap" agreements, where the user presses a button that both manifests assent and performs some other action (like "continue" or "play"). 1-ER-11. Second, the court disregarded the question whether the sign-in screen provided a reasonably conspicuous notice of terms, instead limiting its

focus to the "context of the transaction." 1-ER-11. And third, the court determined that the relevant context is that Plaintiffs "could freely play [*Game of Thrones: Conquest*] by simply pressing the 'Play' button" without creating a separate "account *with Warner Bros.*" or undergoing "a formal sign-up process." 1-ER-13. Only this type of formal registration, the court concluded, "would convey to users that they were entering into an ongoing relationship with Warner Bros." and cause "users to click the link to the [terms of use]." 1-ER-13.

The district court's only support for this bright-line requirement of a formal sign-up process was *Sellers*. 1-ER-11–13. There, plaintiffs alleged that a website called JustAnswer had snookered them into paid subscriptions. JustAnswer provided a service where "users can ask 'experts' to answer questions on a wide variety of topics." *Sellers*, 73 Cal. App. 5th at 454. The alleged bait-and-switch tactic was that JustAnswer offered plaintiffs the option to "Start my trial" for "just $5" but in fact enrolled them in a $46/month subscription. *Id.* at 454–55. When the plaintiffs sued under the Automatic Renewal Law (or ARL for short, Cal. Bus. & Prof. Code § 17600 *et seq.*), JustAnswer moved to compel arbitration based on the hyperlink to its terms of service beneath the

42

"Start my trial" button.  *Sellers*, 73 Cal. App. 5th at 458–59.  The trial court denied that motion, and the Court of Appeal affirmed for two reasons.

First, the Court of Appeal explained that "the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms."  *Sellers*, 73 Cal. App. 5th at 477.  The relevant context there was that the plaintiffs had brought claims under the Automatic Renewal Law to challenge the contract-formation process for their paid subscriptions.  *Id.* at 477–80.  The ARL statute requires "clear and conspicuous" notice of automatically renewing subscriptions.  Cal. Bus. & Prof. Code § 17602(a)(1).  The statute also defines "clear and conspicuous" in that context as "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  *Id*. § 17601(c).  Although these requirements apply only to subscriptions (not arbitration agreements), the Court of Appeal held that "a textual notice of the existence of contractual terms that limit the consumer's ability to address

ARL violations should, in our view, be at least as conspicuous as the notice required by the statute in the first instance." *Sellers*, 73 Cal. App. 5th at 480. Because JustAnswer's notice of contractual terms fell short of these ARL requirements, the court declined to enforce JustAnswer's arbitration agreement. *Id.* at 479–82.

Second, *Sellers* held that, even apart from the statutory notice requirements, JustAnswer's screen was not visually conspicuous. The court again started with "the context of the transaction," pointing out that plaintiffs were "invited to 'Start my trial' and get the answer to a single question for a one-time fee of $5." 73 Cal. App. 5th at 480. Because this transaction did not "'contemplate[] some sort of continuing relationship,'" the court reasoned that Plaintiffs "would not likely be scrutinizing the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms." *Id.* The court then assessed that a "typical consumer" would not have "notice[d] the relatively inconspicuous notice of contractual terms" for several visual reasons: the font was too small, the notice was outside the payment box, and the hyperlink was not sufficiently denoted. *Id.* at 480–81. The image below illustrates these defects:

44



*Id.* at 455.

The district court misread *Sellers* to establish that all sign-in wrap agreements require a "formal sign-up process" to put users on notice of an "ongoing relationship." 1-ER-13. The "foremost" consideration in *Sellers* was the "statutory notice requirements" for subscription services

45

under the Automatic Renewal Law. *Blizzard*, 76 Cal. App. 5th at 948. Those statutory requirements, which are irrelevant here, addressed only the content and visual conspicuousness of the notice of automatic renewals—not the formality of any registration process. Cal. Bus. & Prof. Code § 17601(b)–(c).

Nor did *Sellers* elsewhere suggest that JustAnswer had to create a formal registration process to put users on inquiry notice of its terms of service. 73 Cal. App. 5th at 480–82. As this Court has explained, the concern in *Sellers* was that JustAnswer had masqueraded a subscription as a one-off trial, which would cause users to drop their guard and be "less likely" to "scrutinize the page for small text outside the payment box" for a textual reference to terms and conditions. *Oberstein*, — F.4th —, 2023 WL 1954688, at *8 (cleaned up). In other words, the deficiency in *Sellers* was not the lack of formal process—it was simply that the webpage's façade of a one-off trial lowered the expectation that the plaintiffs were entering into the type of "ongoing relationship" that would be governed by contractual terms.

More broadly, the district court's formalistic emphasis on account creation also conflicts with the "objective, totality-of-the-circumstances

standard" applied by this Court. *Oberstein*, — F.4th —, 2023 WL 1954688, at \*6. The existence of a "full registration process," to be sure, might be one circumstance among many that can put a user on notice of terms and conditions. *Id.* at \*8. But Warner Bros. has followed many of the best design practices: an uncluttered screen, a clear affirmation immediately below the "Play" button, and a conspicuous button hyperlinked to the terms. General principles of inquiry notice—the same ones articulated by this Court in *Berman*—therefore establish that Warner Bros. provided reasonably conspicuous notice of the terms of use, taking account of all the circumstances. 30 F.4th at 856; *see supra*, pp. 26–38. Nevertheless, on the district court's reasoning, Warner Bros. cannot enforce its own terms—no matter how conspicuous the notice on the screen—unless it sets up a formal sign-in process.

The district court not only displaced the governing reasonableness standard with an inflexible rule, but also misunderstood what *Sellers* meant by "the context of the transaction." 73 Cal. App. 5th at 480. California courts have identified "the sale of a single item, such as a pair of socks," as "a transaction in which most consumers would not expect to be bound by contractual terms." *Id.* at 465; *see Long*, 245 Cal. App. 4th

47

at 866. A multiplayer strategy application is not a one-off transaction where users are less likely to be on notice of terms and conditions, as the Court of Appeal has made clear since *Sellers*.

In *Blizzard*, the Court of Appeal reversed a trial court's refusal to compel a minor and his father to arbitrate their claims against a video game studio, Blizzard. 76 Cal. App. 5th at 941–42, 960. Not only was the notice of terms visually conspicuous, *id.* at 951–54, but the transactional context enhanced the notice. The minor had "accessed Blizzard's online platform to interact with other players in a videogame he alleges he 'spent approximately 50 hours playing . . . over the course of approximately two years'"—circumstances where, the Court of Appeal observed, a reasonable user "'contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions." *Id.* at 950–51 (quoting *Sellers*, 73 Cal. App. 5th at 471).

The district court attempted to distinguish *Blizzard* on the ground that the opinion's background section noted that the plaintiff had created a separate account with Blizzard. 1-ER-12 (citing *Blizzard*, 76 Cal. App. 5th at 937). But that wasn't the "context of the transaction," as California courts have used that term. The relevant context in *Blizzard*

48

(and here) is that the plaintiff accessed a multiplayer strategy game, spent dozens of hours playing the game, purchased virtual items, and interacted with other players—all activities that one would reasonably expect to be governed by terms and conditions. 76 Cal. App. 5th at 950–51. This case is just like *Blizzard* in that respect. *See supra*, pp. 8–9, 12.

The district court revealed another misunderstanding about inquiry notice when it stated that it "cannot reasonably expect [*Game of Thrones: Conquest*] users to click the link to the [terms of use]" absent "a formal sign-up process." 1-ER-13. As this Court has cautioned in words that *Sellers* itself repeated, the "'failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.'" 73 Cal. App. 5th at 470 (quoting *Nguyen*, 763 F.3d at 1179). The question for inquiry notice is simply whether Plaintiffs had a reasonable opportunity to review the terms, not whether they were adequately motivated to follow the conspicuous hyperlink to the terms of use. *Blizzard*, 76 Cal. App. 5th at 943 (citing *Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012)). No doubt, "many users will not bother reading" the terms and conditions, but "that is the choice the user makes; the user is still on inquiry notice."

Case: 22-55982, 03/01/2023, ID: 12665482, DktEntry: 10, Page 59 of 76


*Meyer*, 868 F.3d at 79; *accord Selden*, 4 F.4th at 157. The district court legally erred in holding otherwise.

In fact, the district court's emphasis on account creation and formal registration is geared less to *notice* than to what a user must do to *assent* to the terms—the second step of *Berman*. But we know from *Berman* and *Oberstein* that users can accept terms when the screen "explicitly notif[ies] a user of the legal significance of the action she must take to enter into a contractual agreement." *Berman*, 30 F.4th at 858; *accord Oberstein*, — F.4th —, 2023 WL 1954688, at *9. That action can be clicking a "Continue" button, as in *Berman*, or tapping a "Play" button, as here. *See supra*, pp. 38–40.

If allowed to stand, the district court's requirement of a formal sign-up process would destabilize the app marketplace. Users currently create accounts with platforms (Apple and Google) that provide them secure access to a wide range of third-party apps, developed by a host of app developers around the world, ranging in size and reliability. In 2019, for instance, users could access 300,000 game apps through the Apple App Store. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 942–43 (N.D. Cal. 2021). *Game of Thrones: Conquest*, like many other apps, does

not route users through its own formal account-creation process because in-app transactions and game-related data are managed through the Apple or Google ecosystems.

Requiring a formal sign-up process before an app could apply terms and conditions would have far-ranging and perverse results. "As a result of having a trusted app environment" where platforms handle personal information and payment processing, "users make greater use of their devices, including by storing sensitive data and downloading new apps." *Epic Games*, 559 F. Supp. 3d at 1007. Holding that every app with terms and conditions (*i.e.*, almost every app) must collect private information from users to establish separate accounts would scuttle these benefits by requiring users to provide personal information on an app-by-app basis, potentially undermining the users' privacy and security. To be clear, Warner Bros.' argument is not, as the district court mistakenly stated, that creating an account with Apple or Google put Plaintiffs on notice of Warner Bros.' terms. 1-ER-12. The argument is that smartphone users do not need to establish separate user accounts with each and every app they use to know that they are entering into the type of relationship with

51

an online entertainment service that is likely subject to terms and conditions..

In the end, the additional requirements imposed by the decision below benefits no one—not Warner Bros., nor the players who gain a free license to play the game, and protection against "abusing, harassing, or threatening" communications under the terms of use, 2-ER-193, nor any app users who wish to minimize how often they share sensitive information with apps. This misguided innovation of requiring a formal sign-up process to accept terms of use is nowhere in *Sellers*, but instead comes from the district court alone. This Court should reject the district court's novel standard and hold that Plaintiffs accepted the terms of use under the two-step reasonableness standard from *Berman* and *Oberstein*.

## B. The district court treated arbitration agreements worse than other contracts under California law in violation of the FAA's equal-footing principle.

If the district court were right about *Sellers*, its reading would only create a new problem for Plaintiffs. The Federal Arbitration Act lays down a command "to place arbitration agreements 'on equal footing with all other contracts.'" *Kindred Nursing*, 581 U.S. at 248 (quoting *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015)). Because California

law does not generally require a "formal sign-up process" to enter into a contract, 1-ER-13, the FAA preempts the district court's application of *Sellers* to erect this additional hurdle for Warner Bros.' arbitration agreement.

To start, the FAA applies here. The terms of use provide as much. *E.g.*, 2-ER-183; *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442–44 (2006). And even if this Court looks beyond the parties' incorporation of the FAA, the FAA sweeps in all "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2. This case fits that bill: The terms of use are a "multistate" agreement between Warner Bros. (a citizen of California and Delaware) and Plaintiffs (citizens of different States) about the use of an online game that can involve purchases of virtual items. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74, 282 (1995); *see* 2-ER-244–45. At minimum, such agreements have an effect on interstate commerce "in the aggregate." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 57 (2003) (per curiam).

The conclusion that the FAA applies here has consequences for the district court's analysis of California law on contract formation. Courts look to "*ordinary* state-law principles that govern the formation of

contracts" in FAA cases. *First Options*, 514 U.S. at 944 (emphasis added).
But there is a catch for *unusual* state-law principles that do not provide
an even playing field for arbitration agreements as compared to all other
contracts. When state law treats arbitration agreements worse, courts
must instead follow the federal-law rule, established by the FAA, that
arbitration agreements are "valid, irrevocable, and enforceable, save
upon such grounds as exist at law or in equity for the revocation of any
contract." 9 U.S.C. § 2. This equal-footing principle tells courts to
disregard interpretations of state law that "target arbitration either by
name or by more subtle methods." *Epic Sys. Corp. v. Lewis*, 138 S. Ct.
1612, 1622 (2018).

In *Kindred Nursing*, the Supreme Court confirmed that the equal-
treatment principle of § 2 applies to contract *formation*, no less than
defenses to contract *enforcement* like unconscionability. The plaintiffs
there had sought to avoid arbitration on the theory that Kentucky law
required a "clear statement" in a power of attorney before a
representative could waive jury-trial rights. 581 U.S. at 250–51. The
Court easily saw through this argument. Because arbitrations don't have
juries, this no-jury-trial-waiver rule was just another way of saying that

Kentucky law demands a clear statement before an agent can enter into an arbitration agreement on behalf of the principal. *Id.* at 251–52. But the plaintiffs resisted this conclusion, arguing that § 2 applies only to contract defenses and that the FAA takes state-law principles of contract formation as it finds them. *Id.* at 254. The Court disagreed: "A rule selectively finding arbitration contracts invalid because improperly formed fares no better under the Act than a rule selectively refusing to enforce those agreements once properly made." *Id*. at 254–55. If § 2 contained a loophole for contract formation, it would be "trivially easy for States to undermine the Act—indeed, to wholly defeat it." *Id.* at 255.

Longstanding principles of contract formation confirm that the district court violated the FAA's equal-footing principle. As it construed *Sellers*, California law insists on a "formal sign-up process" before users can be on inquiry notice that they are entering into a contract over the internet. 1-ER-13. That sort of reasoning is a throwback to a bygone era when courts would not enforce contracts unless they were sealed with wax. *E.g.*, *Seaton v. Henson*, 2 Lev. 220, 83 Eng. Rep. 527, 528 (K.B. 1679). But the last gasps of such hyper-technical formalities expired long ago. *Hendrick v. Lindsay*, 93 U.S. 143, 149 (1876). In 20th- and 21-

century California, a formal registration process has not been a prerequisite to contract formation.

Plaintiffs formed an arbitration agreement with Warner Bros. if they were on inquiry notice of the terms of use for *Game of Thrones: Conquest*. *Long*, 245 Cal. App. 4th at 863. As detailed above, *see supra*, pp. 26–32, California law defines inquiry notice in functional (not formal) terms: "'actual notice of circumstances sufficient to put a prudent man upon inquiry.'" *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 n.14 (2d Cir. 2002) (quoting *Cal. State Auto Ass'n Inter-Ins. Bureau v. Barrett Garages, Inc.*, 257 Cal. App. 2d 71, 77 (1967)); *see* Cal. Civ. Code § 19. So all Warner Bros. had to show was "reasonably conspicuous notice of the terms and conditions"—that a "reasonably prudent Internet user" should have noticed the disclosure before tapping the "Play" button. *Berman*, 30 F.4th at 856.

No general principle of contract formation forced Plaintiffs to create an account or go through a registration process before forming an arbitration agreement with Warner Bros. Consider just a few examples showing that inquiry notice does not require parties to jump through formal hoops:

- In *Taussig v. Bode & Haslett*, 134 Cal. 260 (1901), the plaintiffs stored barrels of whiskey at a warehouse. *Id.* at 263. The warehouse issued the plaintiffs a receipt stating that they would bear the risk of leakage. *Id.* at 265 (reproducing image of receipt). When the plaintiffs sued the warehouse to recover for leaky barrels, the California Supreme Court held that they had agreed to the limitation of liability because the notice was "printed plainly on the face of the receipt," which made it their "duty" to read "its contents, if they had the opportunity, and their opportunity was ample." *Id.* at 265–66; *accord, e.g.*, *Cunningham v. Int'l Comm. of Young Men's Christian Ass'ns*, 51 Cal. App. 487, 489–91 (1921) (baggage-claim receipt).

- In *U Drive & Tour v. System Auto Parks*, 28 Cal. App. 2d Supp. 782 (1937), the plaintiff accepted the contractual terms of a parking lot when the attendant handed him a "piece of cardboard" that listed terms limiting the lot's liability for theft. *Id.* at 787, *disapproved on other grounds by Gardner v. Downtown Porsche Audi*, 180 Cal. App. 3d 713, 720–21 (1986). Because "the parking lot was well lighted," and because the

plaintiff "accepted without objection and retained such ticket," he had "constructive notice" of the terms and accepted them by parking his car "without objection." *Id.* at 787–88.

- In *Larrus*, the plaintiffs formed a contract with a bank when they returned cards with a printed statement that their accounts would be governed by the bank's rules. 122 Cal. App. 2d at 886. The bank only later gave them a savings passbook containing the rules. *Id.* at 886–87. The Court of Appeal held that the bank could enforce the rules for overdrafts, even though the plaintiffs received the rules after accepting them, because they "had the opportunity to read the short text just above the space for their signatures and to ask for the rules and regulations it referred to if they did not wish to subject themselves to them in ignorance of their contents." *Id.* at 889–90.

The informal methods of inquiry notice approved in these cases are no less valid for arbitration agreements formed through mobile applications. *Long*, 245 Cal. App. 4th at 862. On the contrary, "elemental principles of contract formation apply with equal force to contracts formed online." *Berman*, 30 F.4th at 855–56. Although the internet has

created "new situations" for contract formation, "it has not fundamentally changed the principles of contract"—namely, that "mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen*, 763 F.3d at 1175; *see, e.g.*, *Oberstein*, — F.4th —, 2023 WL 1954688, at *5. That "the internet is different" is no excuse to make up special arbitration-disfavoring rules of contract formation.

The district court identified only *Sellers* to support its ruling that Warner Bros. must require players "to create an account before playing the game" if it wishes to be able to enforce its terms and conditions. 1-ER-10–13. Yet there are two federal-law problems with interpreting *Sellers* as a departure from the bedrock notice principles of contract formation applied in case after case. *See supra*, pp. 26–38.

First, the requirement that users must first register for accounts with Warner Bros. would be "unique" to *Sellers*—a craggy island of formality in a sea of reasonable notice. *DIRECTV*, 577 U.S. at 55. The FAA resolves any such conflict by instructing this Court to follow the "general principle" of conspicuousness under California law. *Id.* at 56. In *Chamber of Commerce v. Bonta*, — F.4th —, 2023 WL 2013326 (9th

Cir. Feb. 15, 2023), for example, this Court explained that FAA preempts state-law rules that, "'as applied, impose[] burdens on arbitration agreements that do not apply to contracts generally'" and adds obstacles beyond what "California law generally allows" for contract formation. *Id.* at *10. A requirement of a formal sign-up process is such an obstacle as applied here.

Second, to the extent that *Sellers* demanded a higher degree of notice, that is only because that decision imported concepts from the Automatic Renewal Law into agreements to arbitrate violations under that statute. *Blizzard*, 76 Cal. App. 5th at 948; *see supra*, pp. 43–44. But the Supreme Court's decision in *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681 (1996), establishes that the FAA requires the application of California's baseline rules of inquiry notice, not heightened rules applicable only to automatic renewals. There, the Court considered a Montana law that prevented parties from forming arbitration agreements unless the notice of arbitral terms was "'typed in underlined capital letters on the first page of the contract.'" *Id.* at 684 (citing Mont. Code Ann. § 27-5-114(4)). Because this "arbitration-specific limitation" went beyond the general rule that "[u]nexpected provisions in adhesion

60

contracts must be conspicuous," the FAA preempted the statute as an improper attempt to "place[] arbitration agreements in a class apart from 'any contract.'" 517 U.S. at 687–88 & n.3 (quoting 9 U.S.C. § 2).

As in *Doctor's Associates*, so too here. The general principle that parties must provide "reasonably conspicuous notice of the terms," *Berman*, 30 F.4th at 856, is not a blank check for a state court—or for a district court interpreting state law—to issue a specialized diktat that users can't enter into agreements to arbitrate unless Warner Bros. first steers them through "a formal sign-up process." 1-ER-13. Instead, the FAA forbids States to subject arbitration agreements to any "special notice requirement not applicable to contracts generally." *Doctor's Assocs.*, 517 U.S. at 687.

In short, no generally applicable principle of contract law requires parties to formally create accounts before forming an agreement. *Sellers* did not break with well-recognized notice principles and return to formalities that have long since been swept into the dustbin of history. But if the district court is correct that the California Court of Appeal took that step for arbitration agreements formed through sign-in wrap, the FAA preempts *Sellers* as applied here.

**C. The district court also erred in relying on a minor typographical discrepancy that did not defeat the conspicuous notice provided by the screen.**

The district court not only grounded its decision in the lack of a formal sign-up process, but also suggested that "players who viewed the Opening Screens" with the second sign-in layout "would have an even lower expectation of being bound by Warner Bros.' terms due to the typographical error in the text." 1-ER-12. Specifically, the court observed that "the statement below the 'Play' button states, 'By tapping "Play" I accept the Terms of *Use* and acknowledge the Privacy Policy,' while the hyperlink below is entitled, 'Terms of *Service*.'" 1-ER-12 (bolding omitted) (quoting 2-ER-237; 2-ER-239). This discrepancy—which the district court did not treat as sufficient alone to defeat inquiry notice—would affect only those plaintiffs who first signed in after December 2019: Ms. Keebaugh, Ms. Nicholson, and possibly P.W. 2-ER-244–45; *see* 2-ER-122.

The district court again seized on a technicality when California law takes a more functional approach. Contract formation is an "objective standard" that determines mutual assent based on "the reasonable meaning" of the parties' words. *Long*, 245 Cal. App. 4th

62

at 862 (quotation marks omitted). As its name suggests, "reasonable meaning" is not hyperliteral and obtuse, but instead takes account of "the context or the surrounding circumstances and conduct of the parties." *H.S. Crocker Co. v. McFaddin*, 148 Cal. App. 2d 639, 645 (1957). As the California Court of Appeal has held, "obvious typographical errors clearly cannot be the basis for invalidating an agreement to arbitrate," *Viamontes v. Adriana's Ins. Servs., Inc.*, 2016 WL 826148, at *2 n.1 (Cal. Ct. App. Mar. 3, 2016), so long as "it is clear from context" what the agreement meant, *Cerneka v. Russell No. 8 Santa Monica Properties, LLC*, 2018 WL 3154565, at *7 (Cal. Ct. App. June 28, 2018). *See Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) (approving consideration of "unpublished state decisions").

The typographical discrepancy here did not prevent an objective meeting of the minds between Warner Bros. and Plaintiffs. Inquiry notice takes "the perspective of a reasonable smartphone user," not a user who "has never before encountered an app or entered into a contract using a smartphone." *Meyer*, 868 F.3d at 77. And the phrases "terms of use" and "terms of service" are generic synonyms for the terms and

conditions governing Plaintiff's *use* of the app and the corresponding *service* provided by Warner Bros. *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).

In effect, the district court suggested that Ms. Keebaugh and Ms. Nicholson would have noticed the reference to a "Terms of Use" in the affirmation, then seen the hyperlink titled "Terms of Service," and concluded that *Game of Thrones: Conquest* had nonsensically included a hyperlink that led to irrelevant terms. 1-ER-12. Yet this is not the type of case where the parties could have been confused by dueling sets of terms; it's nothing like the ships with the same name leaving the same port on different dates, as in that staple of first-year Contracts class. *Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Commc'ns Int'l Union, AFL-CIO*, 20 F.3d 750, 752 (7th Cir. 1994) (citing *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)). Put another way, every reasonable user would have put two and two together that the "linked terms pertain to the action the user is about to take." *Meyer*, 868 F.3d at 80.

In *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020), this Court upheld contract formation despite a similar discrepancy. The

webpage there told users that "'By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement.'" *Id.* at 484 (emphasis omitted). The "TurboTax Terms of *Use*" hyperlink led to a "copy of the 'Intuit Terms of *Service* for TurboTax Online Tax Preparation Services.'" *Id.* (emphasis added). But this Court nevertheless held that the webpage "provided sufficient notice to a reasonably prudent internet user of its Terms of Use." *Id.*

Here, the sign-in screen conspicuously notified Plaintiffs that tapping the "Play" button would accept the "Terms of Use" and provided a "Terms of Service" button below that led to a document titled 'Terms of Use." 2-ER-175; 2-ER-188; 2-ER-202; 2-ER-218. "Aesthetic judgments aside" about any typographic discrepancy, a reasonably prudent user was on inquiry notice that terms and conditions governed their use of *Game of Thrones: Conquest* and would have understood that the hyperlink was the way to access them. *Selden*, 4 F.4th at 157. That is all California law demands.

65

## CONCLUSION

This Court should hold that Warner Bros. and Plaintiffs formed an arbitration agreement, vacate the order denying Warner Bros.' motion to compel arbitration, and remand for the district court to consider Plaintiffs' other defenses to enforcement in the first instance.

Dated: March 1, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____/s/ Christopher Chorba_____

*Attorneys for Defendant-Appellant
Warner Bros. Entertainment Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-55982

I am the attorney or self-represented party.

**This brief contains** | 13,278 | **words,** including | 1,090 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Christopher Chorba | **Date** | March 1, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*