No. 22-55982

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHARISSA KEEBAUGH, et al.,

*Plaintiffs-Appellees,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-CV-01272 | Honorable Maame Ewusi-Mensah Frimpong

**APPELLANT'S EXCERPTS OF RECORD: VOLUME 1 OF 3**

Christopher Chorba
Jeremy S. Smith
Patrick J. Fuster
Adrienne M. Liu
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: (213) 229-7000
Facsimile:  (213) 229-7520

*Attorneys for Defendant-Appellant Warner Bros. Entertainment Inc.*

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARISSA KEEBAUGH, et al., | Case No.: 2:22-cv-01272-MEMF (AGRx) |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANT WARNER BROS. ENTERTAINMENT INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS [ECF NO. 41]** |
| WARNER BROS. ENTERTAINMENT INC., | |
| Defendant. | |

Before the Court is the Motion to Compel Arbitration and Stay Proceedings filed by Defendant Warner Bros. Entertainment Inc. ECF No. 41. For the reasons provided below, the Court DENIES the Motion.

/ / /

/ / /

1

I. **Background**

A. Factual Background[1]

Defendant Warner Bros. Entertainment Inc. ("Warner Bros.") developed a mobile application game based upon the HBO television series, "Game of Thrones," called Game of Thrones Conquest ("GOTC"). FAC ¶ 25. The game is free to initially download but later offers players the option to purchase "packs" to help players advance in the game. *Id.* ¶ 27. The in-app purchases, or "microtransactions," include "gold, building material, crafting material, armor, and other valuables, and the add-ons are necessary to level up one's account." *Id.* An "in-app purchase" refers to the "financial transaction initiated from within the mobile application itself. These in-app purchases, or 'packs,' range in price from $0.99 to $99.99 each" in real currency. *Id.* ¶¶ 27, 31. Each time a player logs into a game, a pop-up advertisement for a $99.99 pack fills the entire screen. *Id.* ¶ 32. The player may purchase the pack or close the advertisement by pressing an "X" in the corner. *Id.*

Plaintiffs Charissa Keebaugh ("Keebaugh"), Stephanie Neveu ("Neveu"), Heather Mercieri ("Mercieri"), Sophia Nicholson ("Nicholson"), and P.W. (collectively, "Plaintiffs") all played GOTC and made in-app purchases. *See generally id.* Keebaugh began playing GOTC in May 2020 and purchased several packs. *Id.* ¶ 19. Neveu began playing GOTC in June 2019 and purchased numerous packs from June or July 2019 until October 2021. *Id.* ¶ 20. Mercieri began playing GOTC in July 2018 and purchased several packs. *Id.* ¶ 21. Nicholson began playing GOTC in June 2020 and purchased several packs. *Id.* ¶ 22. P.W., a minor, used his parents' credit card to make approximately $6,200 in in-app purchases on GOTC. *Id.* ¶ 67. Warner Bros. deceived Plaintiffs, and other consumers like them, by falsely advertising discounts on in-app purchases. *Id.* ¶ 3.

B. Procedural History

On February 24, 2022, Plaintiffs Keebaugh, Neveu, and Mercieri filed this putative class action against Warner Bros. ECF No. 1. On May 23, 2022, Plaintiffs Keebaugh, Neveu, Mercieri, Nicholson, and P.W., by and through his guardian Joie Weiher ("Weiher") filed a First Amended

---

[1] All factual allegations are taken from Plaintiffs First Amended Complaint unless otherwise noted. ("FAC") ECF No. 39.

2

Complaint against Warner Bros., alleging nine causes of action: (1) violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*; (2) violation of California's False Advertising Law, CAL. BUS. & PROF. CODE § 17500, *et seq.*; (3) violation of the California Consumers Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.*; (4) fraud; (5) negligent misrepresentation; (6) declaratory judgment; (7) violation of New Hampshire's Regulation of Business Practices for Consumer Protection Act; (8) violation of Washington's Consumer Protection Act, RCW 19.86.020; and (9) violation of N.Y. GEN. BUS. LAW §§ 349 & 350. *See generally* FAC.

The Complaint identifies a Global Class of: "[a]ll persons, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate." *Id.* ¶ 78. P.W. additionally identifies a "Minor subclass" of "[a]ll persons, within the applicable statute of limitations, who, while under the age of 18, purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate." *Id.* ¶ 79. The remaining Plaintiffs also identify subclasses of "[a]ll persons . . . within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate," in Washington, Arizona, New Hampshire, and New York. *Id.* ¶¶ 80–83.

On June 13, 2022, Warner Bros. filed this Motion to Compel Arbitration.[2] ECF No. 41 ("Mot."). The Motion was fully briefed on August 11, 2022. ECF Nos. 46 ("Opp'n"), 48 ("Reply"). The Court heard oral argument on the Motion on October 6, 2022. During the hearing, the Court asked Warner Bros. to submit images relating to the downloading of GOTC and the Opening Screens. Following the hearing, Warner Bros. submitted these supplemental exhibits to the Court, which the Court considered in reaching its decision. ECF No. 51.

### C. GOTC Application and Terms of Use ("TOU")

Upon opening the GOTC application, new players, as well as players who re-download the game will see an Opening Screen, such as those featured in Exhibits 5–7 ("Opening Screens"). ECF

---

[2] Warner Bros. also submitted an iPhone 12 containing the GOTC application in support of its Motion. ECF No. 49, Exhibit 8. The Court returned the Exhibit to counsel at the October 6, 2022 hearing.

No. 41-1 ¶ 6. Although the graphic art has varied over time, the Opening Screen has always included one of following two statements printed below the blue "Play" button: (1) "By tapping Play I agree to the Terms of Service;" (2) "By tapping Play I agree to the Terms of Use and acknowledge the Privacy Policy." *Id.* ¶¶ 7–9. Below the "Play" button and the statement relating to GOTC's terms are two hyperlinks in the bottom left and bottom right corner of the screen. *See* Opening Screens. The bottom left hyperlink, entitled "Privacy Policy," takes users to the privacy policy if clicked. *See* ECF No. 49, Exhibit 8. The bottom right hyperlink, entitled "Terms of Service," takes users to the TOU if clicked. *See id.* Once the user presses the "Play" button, he will gain access to the game and immediately start play. *See id.*

When a user clicks the hyperlink, "Terms of Service," it directs the user to the TOU. The TOU includes an "Arbitration Agreement" that provides in relevant part:

> With the exception of class actions, small claims court filings, or actions for preliminary injunctive relief (as further discussed below), any other dispute of any kind between you and Warner arising under this Agreement or in connection with your use of the Service ("Dispute(s)"), if unresolved through the informal process outlined above, will be resolved by binding arbitration in Los Angeles County, California . . .
>
> Both parties reserve the right to seek a preliminary injunction or temporary restraining order from a federal or state court located in Los Angeles County, California. However, after such request for relief has been adjudicated by such court, the remainder of the Dispute will be resolved by binding arbitration as set forth herein.

ECF No. 41-1, Ex. 1 at 13.

In addition, the TOU includes a "Class Action Waiver" that provides in relevant part:

> YOU AND WARNER AGREE THAT DISPUTES WILL BE RESOLVED ON AN INDIVIDUAL BASIS AND THAT ANY CLAIMS BROUGHT UNDER THESE TERMS OF USE OR IN CONNECTION WITH THE SERVICE MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITIES, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PUTATIVE CLASS, COLLECTIVE, OR REPRESENTATIVE PROCEEDING. The parties further agree that they will
> not participate in any class action (existing or future) brought by any third party arising under this Agreement or in connection with the Service. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration hereunder can proceed on a class-wide basis, then such class action is not subject to arbitration and must be litigated in state or federal court in Los Angeles County, California.

*Id.*

## II. Applicable Law

### A. Arbitration Agreements

Under Section 2 of the Federal Arbitration Act ("FAA"), arbitration clauses in contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). "If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

"[T]he party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). In determining whether to compel arbitration, the court must consider two gateway factors: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Moreover, arbitration agreements may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 343 (internal quotation marks omitted) (citing *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

It has long been established that a contract containing an arbitration clause gives rise to a presumption of arbitrability. *See, e.g.*, *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009); *Three Valleys Mun. Water Dist. v. E. F. Hutton & Co.*, 925 F.2d 1136, 1139 (9th Cir. 1991) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").

### B. Online Formation of Contract Agreements

The Court begins its discussion with a review of the various manners in which online providers seek to impose contractual terms on consumers. California courts have identified four categories of internet contract formation, "most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 60 (Cal. App. 2022).

> A "browsewrap" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site. A "clickwrap" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. A "scrollwrap" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button.... "Sign-in-wrap" agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.

*Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Cal. App. 2021).

"The 'wrap' methods of online contract-formation provide varying degrees of notice to users, with browsewrap providing the least and scrollwrap providing the most." *Blizzard*, 292 Cal. Rptr. 3d at 60. As such, California courts have generally "reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable." *Id.*

Where the website operator does not argue that the consumer had actual knowledge of the agreement, an enforceable contract may still "be found based on an inquiry notice theory." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). Under an inquiry notice theory, an enforceable contract will be found "only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* This is because "[r]easonably conspicuous notice of the existence of contract terms and

unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.*

The California Court of Appeals has addressed the validity of "sign-in wrap" agreements on two occasions: in *Sellers v. JustAnswer LLC* and again in *B.D. v. Blizzard Ent., Inc.* In *Sellers*, the Court concluded that "[s]ign-in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements." *Sellers*, 289 Cal. Rptr. 3d at 21. As a matter of first impression, the *Sellers* Court addressed whether "sign-in wrap" agreements were "sufficiently conspicuous to bind the Plaintiffs to the Arbitration Provision." *Id.* at 26. The *Sellers* court observed that while "sign-in wrap" agreements have been generally upheld by federal courts, there are some inconsistencies in the case law due to the highly subjective criteria that courts consider. *Id.* at 21–22. In determining whether "sign-in wrap" agreements put consumers on sufficient notice, courts have considered: "1) the size of the text; 2) the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Id.* at 23.

Thus, given the highly subjective nature of these criteria, the *Sellers* court found that "it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online." *Id.* at 25. "[T]he full context of any transaction is critical to determining whether any particular notice is sufficient to put a consumer on inquiry notice of contractual terms contained on a separate, hyperlinked page." *Id.* at 5. Where the "circumstances involve a consumer signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship governed by terms and conditions." *Blizzard*, 292 Cal. Rptr. 3d at 64. "This is the type of transaction in which federal courts have generally found sign-in wrap agreements enforceable." *Id.* at 64–65.

### III. Discussion

Warner Bros. moves to compel arbitration of the entire action under the TOU on the basis that: (1) the parties formed a valid arbitration agreement; (2) the arbitration agreement encompasses

Plaintiffs' claims; and (3) the claims must be arbitrated on an individual basis. *See generally* Mot. Plaintiffs respond that the Motion fails because: (1) the GOTC Opening Screen did not provide inquiry notice of the TOU; (2) the TOU is unconscionable; (3) Plaintiffs seek public injunctive relief; and (4) P.W. has disaffirmed the TOU. Opp'n at 5.

**A. A valid arbitration agreement does not exist between the parties.**

i. <u>California law governing contract formation applies.</u>

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The Ninth Circuit applies "the law of the forum state—here, California—when making choice of law determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). Warner Bros. argues—and Plaintiffs do not dispute—that California law applies. The Court finds that California law governs the issue of contract formation.

ii. <u>The Court finds that the parties are capable of contracting, arbitration is a lawful object, and sufficient cause for consideration.</u>

Under California law, the essential elements for a contract are: (1) "[p]arties capable of contracting;" (2) "[t]heir consent;" (3) "[a] lawful object;" and (4) "[s]ufficient cause or consideration." *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (quoting CAL. CIV. CODE § 1550).

First, the Court finds that Plaintiffs are "persons capable of contracting." CAL. CIV. CODE § 1556 ("All persons are capable of contracting."). In regard to P.W., who is a minor, the Court finds that he is capable of "contract[ing] in the same manner as an adult," CAL. FAM. CODE § 6700, as the exceptions outlined in CAL. FAM. CODE § 6701 are not applicable here. Plaintiffs do not dispute that the individually named Plaintiffs are capable of contracting. For these reasons, the Court finds that the parties are capable of contracting, in satisfaction of the first element.

In addition, the Court finds that the Arbitration Agreement pursues a lawful object. Under CAL. CIV. CODE § 1550, "[i]t is essential to the existence of a contract that there should be . . . [a]

lawful object." The Court finds—and Plaintiffs do not dispute—that resolving disputes in arbitration is lawful, in satisfaction of the third element.

Finally, the Court finds—and Plaintiffs do not dispute—that a mutual promise to arbitrate forms sufficient consideration, in satisfaction of the fourth element. It is well-established under California law that a "promise to submit to arbitration and to forego the option of a judicial forum for a specified class of claims constitutes sufficient consideration." *Cir. City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002) (collecting cases).

The Court finds that three of the four elements of the formation of a valid contract have been met. The main dispute in this case is over the second element—whether there was mutual assent to the Arbitration Agreement—which the Court considers below.

    iii. <u>The Court finds no mutual assent to the Arbitration Agreement.</u>

Warner Bros. argues that there was mutual assent to the Arbitration Agreement because (1) the Opening Screen "provide[d] reasonably conspicuous notice" of the TOU and (2) Plaintiffs took an "action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her assent to those terms." Mot. at 10 (citing *Berman*, 30 F.4th at 856). Plaintiffs counter that (1) Warner Bros. did not provide reasonably conspicuous notice and (2) Plaintiffs did not unambiguously manifest assent to the TOU. Opp'n at 6–15.

    *1. Warner Bros. failed to provide reasonably conspicuous notice.*

Warner Bros. argues that the Opening Screen provides sufficiently conspicuous notice of the TOU because "the notice of the contractual terms was spatially coupled and temporally coupled with the play button." Mot. at 10. Plaintiffs respond that "[t]he screen's design—including font choice, distracting elements, and the inclusion of the large blue "Play" button as the mode of assent— effectively hides the TOU and falls far short of providing inquiry notice." Opp'n at 7.

"[I]n order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." *Sellers*, 289 Cal. Rptr. at 13. While several federal district courts have focused on factors such as font size and graphic layout to determine whether a user would be on inquiry notice that he

was consenting to an agreement, the *Sellers* Court observed that the consideration of such subjective criteria, alone, has led to inconsistent decisions. *Id.* at 22–23. Thus, the Court in *Sellers* and *Blizzard* have considered the sign-in pages within the "the full context of the transaction . . . to determin[e] whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms." *Sellers*, 289 Cal. Rptr. 3d at 26. For example, the *Sellers* Court noted that "the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking relationships," where "[t]he registration process clearly contemplated some sort of continuing relationship between the putative user and [the company], one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship." *Id.* (internal citations and quotations omitted). Thus, in order to determine whether there is mutual assent, the Court must look at the context of the transaction, in addition to the visual elements of the Opening Screen.

The Court observes that both Warner Bros. and the Plaintiffs only address the visual elements of the Opening Screen to argue the issue of notice. However, pursuant to *Sellers* and *Blizzard*—the only California precedent concerning "sign-in wrap" agreements—the Court must also consider whether the Opening Screen provided notice in the context of the transaction between Warner Bros. and GOTC players. On a motion to compel arbitration, the defendant maintains the burden to provide this context. *See Knutson*, 771 F.3d at 565.

Here, the Court finds that the transaction is more akin to the transaction in *Sellers*—where the Court declined to compel arbitration over a one-time trial purchase. At the October 6 hearing, Warner Bros. argued that *Sellers* is inapplicable because it imposed a heightened requirement on Defendants pursuant to a statute governing automatic renewals. While *Sellers* addresses this statutory requirement in a limited portion of the opinion, the Court finds that its holding concerning inquiry notice applies to sign-in wrap agreements, more broadly. *See Sellers*, 289 Cal. Rptr. 3d at 29–31. Furthermore, the Court in *Berman*, a case which Warner Bros. repeatedly asked the Court to apply during the October 6 hearing, references *Sellers* in its discussion of inquiry notice. *Berman*, 30 F.4th at 857.

As in *Sellers*, where the consumer was not asked to sign-up for an account before starting a trial, a GOTC player is not required to create an account before playing the game. As such, the Court finds that the facts here do not present the type of "situation in which [t]he registration process clearly contemplated some sort of continuing relationship . . . that would require some terms and conditions." *See Sellers*, 289 Cal. Rptr. 3d at 29 (finding that because Plaintiffs "were not likely expecting that their 'trial' would be governed by approximately 26 pages of contractual terms . . . [they] would not likely be scrutinizing the page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms"). At the October 6 hearing, Warner Bros. argued that it was sufficient that GOTC players were prompted to create accounts in the App Store, before downloading GOTC. The Court finds the creation of App Store accounts irrelevant to the issue of whether the *Warner Bros.'* Opening Screen put users on sufficient notice of *Warner Bros.'* TOU. While creating this account may have allowed users to "contemplate[] some sort of continuous relationship" with the App Store, this association would not have carried over to Warner Bros. and its specific TOU.

Furthermore, the Court considers that players who viewed the Opening Screens at Exhibits 6 and 7 would have an even lower expectation of being bound by Warner Bros.' terms due to the typographical error in the text. In Exhibits 6 and 7, the statement below the "Play" button states, "By tapping 'Play' I accept the **Terms of *Use*** and acknowledge the Privacy Policy," while the hyperlink below is entitled, "**Terms of *Service***." ECF No. 41-1, Exhibits 6, 7 (emphasis added). Warner Bros. has not met its burden of indicating which of the Opening Screens the Court should consider and whether users who saw Exhibits 6 and 7 would know that "Terms of Use" and "Terms of Service" referred to the same contractual terms.

Finally, the Court distinguishes the instant facts from *Blizzard*, where the Defendant game company established that video game players would reasonably contemplate an ongoing relationship with Defendant, after creating an account to play.

> Blizzard explained that to play any of its online games, make in-game purchases, or interact with other online players, [Plaintiff] needed an account on Blizzard's online platform, "Battle.net." To create an account, a user was required to enter certain information (e.g., name, age, email address) and click a button titled "Create a Free Account." Below this button was a notice stating: "By clicking on 'Create a

Free Account,' I agree to the Battle.net End User License Agreement and Privacy Policy." The text "Battle.net End User License Agreement" and "Privacy Policy" were hyperlinks that took users to another webpage containing the entire referenced documents.

*Blizzard*, 292 Cal. Rptr. 3d at 53–54. Here, GOTC players did not have to create an account *with Warner Bros.* before playing the game. Players could freely play GOTC by simply pressing the "Play" button. In the absence of a formal sign-up process—which would convey to users that they were entering into an ongoing relationship with Warner Bros.—the Court cannot reasonably expect GOTC users to click the link to the TOU and be placed on inquiry notice.

For these reasons the Court finds that Warner Bros. has failed to meet its burden to establish that it provided reasonably conspicuous notice of the TOU on its Opening Screen. Because Warner Bros. has not met the first element of mutual assent, Warner Bros. has not established the existence of a valid arbitration agreement. As such, the Court DENIES Warner Bros. Motion.[3]

## IV. Conclusion

For the reasons stated above, the Court DENIES the Motion to Compel Arbitration without prejudice.

**IT IS SO ORDERED.**

Dated: October 13, 2022

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge

---

[3] Because Warner Bros. has not met its burden of demonstrating the existence of a valid arbitration agreement, the Court DENIES the Motion on this basis. As such, the Court need not address Warner Bros.' additional arguments that: (1) Plaintiffs' claims fall within the scope of the Arbitration Agreement; (2) that the Arbitration Agreement is not unconscionable; (3) and that the Class Action Waiver should apply.