No. 22-55982

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

CHARISSA KEEBAUGH, et al.,

*Plaintiffs-Appellees,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-CV-01272 | Honorable Maame Ewusi-Mensah Frimpong

———————————

## APPELLANT'S EXCERPTS OF RECORD: VOLUME 2 OF 3

———————————

Christopher Chorba
Jeremy S. Smith
Patrick J. Fuster
Adrienne M. Liu
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

———————————

*Attorneys for Defendant-Appellant Warner Bros. Entertainment Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHARISSA KEEBAUGH, et al.,

                  Plaintiffs,

      v.

WARNER BROS. ENTERTAINMENT INC.,
a Delaware corporation,

                  Defendant.

Case No.: 2:22-cv-01272-MEMF(AGRx)

**ORDER GRANTING STIPULATION TO ENTER STAY PENDING APPEAL
[ECF NO. 62]**

On November 10, 2022, Defendant filed a motion to stay proceedings pending its appeal from the Court's order denying its motion to compel arbitration under the Federal Arbitration Act. (Dkt. 61.) On November 23, 2022, the parties filed a joint stipulation to stay proceedings pending appeal. The Court, having considered Defendant's motion to stay and the parties' stipulation, hereby GRANTS the stipulation to stay pending appeal and ORDERS as follows:

      1.     The current proceedings, including all motion practice, depositions, and/or discovery (with the limited exceptions described herein), is stayed until the Ninth Circuit issues its mandate in Defendant's appeal, No. 22-55982;

2-ER-15

2.      The parties shall exchange initial disclosures on December 26, 2022, which is 28 days after filing of the stipulation;

3.      The parties shall make a limited production of agreed-upon categories of documents and information as described in the parties' stipulation;

4.      Providing the information in paragraphs 2 and 3 does not in any way waive Defendant's right to pursue individual arbitration through all available means, including on appeal;

5.      Defendant will prepare a draft protective order and ESI protocol to govern the production of documents and information by December 26, 2022, which is 28 days after filing of the stipulation;

6.      Defendant's deadline to file a responsive pleading to Plaintiffs' first amended complaint will be extended until 28 days after the stay is lifted; and

7.      This stipulation shall not waive any rights, arguments, or defenses of either Party, and Defendant continues to assert that Plaintiffs' claims should be decided in an arbitral forum.


IT IS SO ORDERED.


Dated: November  29, 2022

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

1              UNITED STATES OF AMERICA
            UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
                 WESTERN DIVISION
3
                    - - -
4       HONORABLE MAAME EWUSI-MENSAH FRIMPONG
          UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6

CHARISSA KEEBAUGH, ET AL.,            )
7                                      )
            PLAINTIFF,                 )
8                                      )
    VS.                                )    CASE NO.:
9                                      )    CV 22-01272-MEMF
    WARNER BROTHERS ENTERTAINMENT,     )
10   INC.,                             )
                                       )
11          DEFENDANT.                 )
    _____)
12

13

14
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                 THURSDAY, OCTOBER 6, 2022
16
                 LOS ANGELES, CALIFORNIA
17

18

19

20

21          LAURA MILLER ELIAS, CSR 10019
           FEDERAL OFFICIAL COURT REPORTER
22         350 WEST FIRST STREET, ROOM 4455
           LOS ANGELES, CALIFORNIA 90012
23              PH:  (213)894-0374

24

25

```
1    APPEARANCES OF COUNSEL:

2

3    ON BEHALF OF PLAINTIFF:

4            POLLOCK COHEN LLP

5            BY:  RAPHAEL JANOVE, ESQ.

6            60 BROAD STREET

7            24TH FLOOR

8            NEW YORK, NY 10004

9

10           JAY KUMAR LAW

11           BY:  JAY KUMAR, ESQ.

12           73 WEST MONROE STREET

13           SUITE 100

14           CHICAGO, IL 60603

15

16   ON BEHALF OF DEFENDANT:

17

18           GIBSON DUNN AND CRUTCHER LLP

19           BY:  CHRISTOPHER CHORBA, ESQ.

20               JEREMY SMITH, ESQ.

21               PATRICK FUSTER, ESQ.

22           333 SOUTH GRAND AVENUE

23           LOS ANGELES, CA 90071-3197

24

25
```

```
 1
 2                              INDEX
 3
 4        PROCEEDINGS                            PAGE
 5
 6        MOTION TO
 7        COMPEL ARBITRATION                       4
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

1    LOS ANGELES, CALIFORNIA; THURSDAY, OCT. 6, 2022; 11:55 A.M.

2                              - - -

3            THE CLERK:  Calling Item No. 6.

4            L.A. Civil Case 22-1272-MEMF.

5            Charissa Keebaugh, et al. versus Warner Brothers

6    Entertainment, Incorporated.

7            Counsel, please state your appearances.

8            MR. CHORBA:  Good morning, Your Honor.  Chris

9    Chorba, Gibson Dunn & Crutcher on behalf of defendant.  With

10   me are Jeremy Smith and Patrick Fuster.

11           May I approach the podium, Your Honor?

12           THE COURT:  Yes.  I have something to discuss with

13   both parties before you start your argument.

14           MR. CHORBA:  Sure.

15           MR. JANOVE:  Good morning, Your Honor.  Raphael

16   Janove for the plaintiffs.

17           MR. KUMAR:  Good morning, Your Honor.  Jay Kumar

18   for the plaintiffs.

19           THE COURT:  Thank you.

20           So one preliminary matter that I wanted to discuss

21   was that I understand that, um, defense counsel submitted a

22   phone for the Court to be able to look at the game.  We maybe

23   because of how our Wifi works or limitations, we were not

24   able to use the phone so I want to return the phone.

25           I also just wanted to give the parties the

1    opportunity if you, it may be too late to do this in an

2    efficient way, but if there was something you wanted to

3    display for Court, um, I'm happy to let you plug into our

4    system and display as needed.  Let me start by having --

5    let's go off the record for me to just confer with my

6    courtroom deputy about how to return the phone to you.

7                    (Discussion held off the record.)

8              THE COURT:  The record reflects that the Court has

9    returned the phone to defense counsel.

10             And did you want a moment to display anything?

11             MR. CHORBA:  Actually, I do, Your Honor, but we're

12    gonna go old school since we weren't sure of the technology.

13    We actually have paper copies that we tried with the best

14    image, best resolution.

15             THE COURT:  Okay.  But are those the same as

16    Exhibits 5 through 7?

17             MR. CHORBA:  This is either Exhibit 6 or 7,

18    Your Honor.

19             THE COURT:  Okay.  Cause I was able to look at

20    those.

21             MR. CHORBA:  Okay.  If we can hand these just

22    because they have a slightly better resolution.

23             THE COURT:  Okay, that's fine.  You can hand them

24    to the courtroom deputy.  If you could make sure opposing

25    counsel has at least one.

1          So with that, uh, I trust the parties received the

2     Court's tentative?  Yes?

3          MR. JANOVE:  Yes.

4          MR. CHORBA:  Yes.

5          THE COURT:  With that I think you know where the

6     Court is in terms of its thinking, um, and in light of that,

7     let me let you go ahead, Mr. Chorba.

8          MR. CHORBA:  Thank you, Your Honor.

9          I appreciate the Court was a little bit behind and

10    I'm standing between Your Honor and your staff and lunch so

11    I'll try to keep it as brief as possible.  Um, as an initial

12    matter and, again, this is why we handed this out, I want to

13    flag for you just the distinction between the game that we're

14    dealing with in this case and the software and games that

15    were at issue in the cases cited in your tentative ruling.

16          As Your Honor no doubt knows, this Game of Thrones

17    Conquest is a game that's available for download on an app

18    store so Apple iTunes store, Google Play store.  And the

19    customer that is using the game must have an account set up

20    through the platform.  Either through Apple or through Google

21    or through some other provider in order to download and use

22    the game.  And in fact as we submitted here, even to just

23    display the game, you need a device capable of displaying it.

24          That's one of the reasons we submitted the

25    iPhone 12 in this particular case.  So if I wanted to play

1     this game, I have to first establish an account and have a

2     device from Apple, from Google, from another third party and

3     the gating that occurs is largely handled through --

4              THE COURT:  The what, gating?

5              MR. CHORBA:  Gating, you know, the payment

6     information.  For example, you pay if you were to purchase

7     content and in fact that's one of the underlying claims in

8     this case is the content that was purchased on the game, it's

9     actually paid to Apple, it's paid to Google.  Of course, the

10    money does ultimately flow to our client after those third

11    party platforms and device providers take their cut.  There's

12    been obviously a lot of litigation and I think it's well

13    known, um, about that amount that's taken.

14             But I wanted to establish that framework because

15    it's very different in Sellers, of course, you were dealing

16    with, you know, a website where the person landed on the

17    page, presented a question, and then the screens that were at

18    issue, um, really displayed on the next page after you

19    entered the question.

20             And in the Blizzard case, again, that was a video

21    game that was available directly from the defendant.  You

22    didn't have this piece.  And since the tentative really

23    focuses on this issue well, I think at one point Your Honor

24    noted, there is no prompt for a user to actually enter their

25    information.

1     I just wanted to make clear that already occurs in

2 advance through Apple, through Google, and then once you're

3 in their ecosystem, once you're in their store, you then

4 download apps.  Nevertheless --

5     THE COURT:  I'm just gonna stop you there for the

6 purpose of clarity.  The reason why the Court focused on what

7 happened here and I'm lifting up the piece of paper that you

8 gave is because the Court's understanding is that's what you

9 were focusing on in order to establish that the customers or

10 players did have notice and entered into the arbitration

11 agreement.  So, um, if you want to clarify, you can.

12     I'm not sure what relevance it is that before

13 people get to this page, they have signed up, they've

14 provided their payment information because it's not my

15 understanding that you're relying on any of that as the basis

16 for them having notice that they are entering into an

17 arbitration agreement.

18     MR. CHORBA:  Okay.  And I will get there,

19 Your Honor.

20     THE COURT:  Thank you.

21     MR. CHORBA:  There's actually three points I would

22 like to address in the tentative.

23     THE COURT:  Wonderful.

24     MR. CHORBA:  The point you just addressed is the

25 third one so let me actually go there immediately.

1          THE COURT:  Great.

2          MR. CHORBA:  The reason I was giving you this

3     preface is because on page 11 of the tentative immediately

4     after the block quote, it says here, "GOTC players did not

5     have to create an account before playing the game."  So that

6     was the reason why I just wanted to quickly focus on the

7     context because players do have to create an account.  It

8     just not through this particular app.

9          Of course, there are apps available on these

10    stores, one popular one that my son would want me to mention

11    is Madden NFL.  You can create either through Apple or

12    through Electronic Arts and then log in that way.  But let me

13    focus on briefly the three parts of the tentative where we

14    respectfully submit we think the Court's analysis might have

15    gone astray.

16         The first point and this is relevant to this screen

17    that I put in front of you, again, on page 11, the Court's

18    tentative concluded "that it is not likely that players would

19    expect their play to be governed by contractual terms that

20    can only be accessed by clicking on a hyperlink in small text

21    beneath the play button."

22         And as we read that, you're referring obviously to

23    the play button and then you're referring to the hyperlinks

24    immediately below.  But what we would urge the Court to focus

25    on this isn't a very busy landing screen.  There's not a lot

1   of text and in fact the most text appears between the play

2   button and those hyperlinks.  And it specifically says, by

3   tapping play, I accept the terms of use and acknowledge the

4   privacy policy which are then available below.

5         Now, the reason why we focus on this and why it's

6   significant is just this year in Berman versus Freedom

7   Financial Network, the 9th Circuit specifically held that

8   quote, "A user's click of a button can be construed as an

9   unambiguous manifestation of assent only if the user is

10  explicitly advised that the act of clicking will constitute

11  assent to the terms and conditions of an agreement."

12        Now, in Berman itself that did not occur because

13  the language that I just highlighted for you was missing and

14  in fact the 9th Circuit in Berman specifically said quote,

15  "This notice defect could easily have been remedied by

16  including language such as "by clicking the continue button,

17  you agree to the terms and conditions."  And that's at

18  page 858 of the decision.  So here that is what we're dealing

19  with and that is exactly substantively the language that's

20  before you.

21        Now, again, California law specifically allows apps

22  to disclose terms through hyperlinks.  The tentative suggests

23  that users will not expect a hyperlink to disclose the terms,

24  but again Berman says it is permissible to disclose terms and

25  conditions through a hyperlink provided quote "the fact that

 1   a hyperlink is present must be readily apparent."

 2          And here the same button you have to click to play,

 3   it's the same -- again, it's an app.  It's on a phone, it's

 4   on an iPad.  It's not gonna be underlined in blue like we see

 5   on web pages.  The same type of button is found below if you

 6   click on terms of service or you click on privacy policy.

 7          The second point that I would like to make,

 8   Your Honor, is Your Honor pointed out, uh, at the next part

 9   of the tentative in the next paragraph that there's a

10   discrepancy because at least in Exhibits 6 and 7, it uses

11   terms of use instead of terms of service.  As an initial

12   matter, we also submitted Exhibit 5 which uses the same

13   language.

14          But more importantly in 2020, the 9th Circuit dealt

15   with this issue as well in Dohrmann versus Intuit 823 Federal

16   Appendix 482 at page 484.  There the hyperlink, quote, "Turbo

17   Tax Terms of Use" directed the user to the Intuit terms of

18   service and the 9th Circuit was specifically presented with

19   this issue and concluded that that semantic difference did

20   not make a difference.

21          THE COURT:  And if I could just interrupt you, on

22   Dohrmann, correct me if I'm wrong, the issue in Dohrmann was

23   the link, and I'm gonna get the two confused, but the

24   hyperlink said terms of use and when you went there, it said

25   terms of service.

1         MR. CHORBA:  That's correct, Your Honor.

2         THE COURT:  So if you're looking for terms of use,

3  you're gonna see a link for terms of use, and then when you

4  get there, you see a document that has another title, but it

5  is the document you're looking for; right?

6         MR. CHORBA:  That's my understanding of the facts

7  in Dohrmann.

8         THE COURT:  And so the distinction here is, um,

9  looking at the sentence that says I accept the terms of use,

10  but I don't see anything to tell me where I can click to get

11  to the terms of use.  That was the distinction the Court was

12  making.

13         MR. CHORBA:  Yeah, thank you, Your Honor.  I

14  appreciate that.  And, again, Exhibit 5 doesn't have this

15  issue.  For Exhibit 6 and 7, we would say it does not make a

16  material difference to your analysis because it specifically

17  says you accept the terms of use and acknowledge the privacy

18  policy.  And then, again, on a very not busy screen,

19  immediately below privacy policy, terms of service.

20         So it's regrettable it didn't say terms of use

21  there and we regret that it didn't say terms of use, but when

22  you, again, the cases say a reasonable user reading in

23  context, there can be no confusion when, again, you have two

24  boxes which makes us again unlike the Turbo Tax case, uh, but

25  again I understand the factual distinction you're making, but

 1    it's the closest analogue that we have and that's why we're

 2    citing it to you.

 3         So we don't believe there could be any confusion,

 4    uh, again, given the surrounding context, but let me focus on

 5    the third point.  I sort of started there.  You held again at

 6    page 11 that there's "no formal sign in process."  And again

 7    we believe Berman addressed this specific issue and in

 8    Berman, Your Honor relies on Sellers in which there's a

 9    discussion of the transactional context.

10         Berman, of course, doesn't have that specific type

11    of discussion, but we would respectfully submit that Sellers,

12    this case of the three decisions that I would identify,

13    Berman, Sellers and the Blizzard case, we think this specific

14    situation is the most unlike Sellers and let me explain to

15    you why.

16         As an initial matter, this is the landing page that

17    was given.  When you install the app, this is where you go.

18    In Sellers you are actually brought to a site when you typed

19    in a question.  It's a little bit like when you go to Google,

20    you type in the search term.  It was then that the user was

21    then transported to the next page that had the terms and

22    conditions, disclosed the trial period.

23         And so the court said they found -- the court said

24    at page 478 of Sellers, notably there was no mention of cost

25    on this initial screen.  So that fact really informed the

 1 | court's analysis. So a person landing on that primary page
 2 | and entering a question was not put on any notice that there
 3 | was going to be terms of service, that there was going to be
 4 | indeed any cost whatsoever.
 5 |         Now, the transactional context language in Sellers
 6 | if you read that part of the opinion, I think it's 472 to
 7 | 479, is specifically addressing a different law than we have
 8 | at issue here. That case addressed the automatic renewal law
 9 | and Sellers specifically said both plaintiffs believed their
10 | business dealings with Just Answer were complete, but both
11 | were charged a monthly membership for several months.
12 |         And then the problem is the automatic renewal law
13 | imposed specific disclosure requirements if you were going to
14 | bind someone to such a subscription including that the terms
15 | of enrollment are presented in quote "a clear and conspicuous
16 | manner."
17 |         Now, that's a term of art that's often used with
18 | online contracting, but the difference is the California
19 | automatic renewal law actually defines what clear and
20 | conspicuous means. And it defines it to mean quote "text"
21 | end quote in larger type than the surrounding text or in the
22 | contrasting type font or color to the surrounding text of the
23 | same size or set off from the surrounding text of the same
24 | size and that's at page 479 of Sellers.
25 |         So, again, that discussion, the entire discussion

1    of the formation and the transactional context in Sellers was

2    informed not by simply an analysis of an arbitration clause,

3    but the context of an automatic renewal law and the

4    requirements of an automatic renewal law.  In other words,

5    automatic renewal programs have to be extra conspicuous

6    because Sellers incorporated that heightened statutory

7    requirements into the common law test.

8          THE COURT:  And your position would be that those

9    requirements are higher than what's required for the Court to

10   find that these players had notice of the arbitration

11   agreement.

12         MR. CHORBA:  Exactly, Your Honor.

13         And moreover, here the only law that's overlaying

14   what we're dealing with today is the Federal Arbitration Act

15   and the Supreme Court has held repeatedly that there can't be

16   different laws for arbitration than there are for general

17   contracting.  Now, again, Sellers was able to deal with that

18   issue because you had the automatic renewal law not the FAA.

19         Here we would argue that the FAA would preempt any

20   attempt to use a discussion of the automatic renewal law and

21   apply it in this context when all we're talking about at this

22   stage is the right to compel arbitration.  Again, we're not

23   dealing with the underlying claims that are brought in this

24   case nor was Sellers.  Sellers took pains to say not we are

25   not passing judgment on whether or not the disclosures

1   complied with the automatic renewal law, but we must consider

2   that surrounding transactional context.

3          And I would say in closing at a broader level,

4   Sellers was concerned about sign-up screens that appeared to

5   be one-off transactions and Your Honor's tentative picks this

6   up.  Again, one-off just ask a question and before you know

7   it, you're entering your information and you're subscribed to

8   a very expensive monthly service.  So this supposed trial

9   actually turned into a subscription service.

10          Sellers noted that "the majority of the federal

11  cases finding an enforceable sign-in wrap agreement involved

12  continuing forward-looking relationships."  That's at

13  page 476.  Your Honor, it's alleged in the complaint and I

14  don't think it's reasonably disputed that a continuing

15  forward-looking relationship is exactly what we have here.

16          Indeed, the underlying claim are that these

17  plaintiffs allege they were mislead into spending money

18  because they played the game so much.  So we don't have the

19  same problem here where there's some belief that oh, I'm just

20  checking on this once.  It's a video game.  It's an app.

21  It's intended to be played multiple times.  If you don't like

22  it, you don't play it again.  You don't play it again, you

23  don't incur costs and have a claim to assert in the first

24  instance.

25          So, again, after signing in, the players returned

1   to the game and played it repeatedly.  So, again, we would

2   say there's no requirement to have a formal sign-in process

3   that should not be viewed as a predicate to enforce the terms

4   of service that are at issue in this particular case.  And in

5   fact, Your Honor, we would submit such a ruling would have

6   far-reaching consequences.

7          It is we believe a good thing that our client

8   doesn't require the submission of personally identifiable

9   information and payment information in this specific

10  transactional context because a user is actually providing

11  that information to Apple, to Google, and then they feel

12  comfortable once they're in that ecosystem that they can

13  transact and they have comfort that the apps have been vetted

14  by that particular platform.

15         And so if we were to have your tentative and our

16  client were to attempt to comply, it would then require that

17  type of sign-in screen.  Now, I know that's not what you're

18  saying.  You can redesign this, but I'm also saying that if

19  it looked just like this, we read the tentative to suggest if

20  there were a formal sign-in process and then you got to this,

21  that would be another way for us to comply.

22         And that's all we're saying is that in this

23  particular context, unlike Sellers, unlike Berman and unlike

24  Blizzard, we're dealing with this closed ecosystem and just a

25  very different context than those cases were addressing.

```
 1    Unless you have questions, Your Honor.

 2              THE COURT:  No, that's very helpful.  Thank you.

 3              Who is handling the argument on behalf of

 4    Ms. Keebaugh?

 5              MR. JANOVE:  I will, Your Honor.

 6              THE COURT:  Okay, thank you.

 7              MR. JANOVE:  Thank you, Your Honor.

 8              I don't know if you want me to respond to his

 9    points in the order or if you had specific questions you'd

10    like to start with?

11              THE COURT:  I don't have specific questions.  I

12    would like you to respond to his points and then to the

13    extent that there's anything in the tentative that you don't

14    agree with or you think needs clarification, I would like to

15    hear that as well.

16              MR. JANOVE:  Yes.  So I appreciate Mr. Chorba for

17    bringing up the full context of the transaction.  Signing up

18    for an Apple account or a Google account and if you continue

19    to play a game, if you make in-app purchases, you will have a

20    pop up from Apple or the Google store saying confirm this

21    purchase.

22              So when we talk about an ongoing, continued,

23    forward-looking relationship, if you look at the context of

24    the transaction, obviously a user is gonna understand they

25    have a relationship with Google or Apple, but there's nothing
```

```
 1    here that's gonna tell them I have an ongoing relationship

 2    with Warner Brothers.  In fact if you look at sign-up screen,

 3    Warner Brothers is completely absent.

 4           To the extent we want to discuss, you know, steps

 5    that happens before players reach this play sign-in screen,

 6    all that does is went to the fact that they have a reasonable

 7    expectation of a contractual relationship with Google or

 8    Apple not with Warner Brothers.

 9           Next I wanted to just --

10    THE COURT:  Sorry.  Just to clarify with respect to

11    that point, um, it sounds like the important distinction is

12    not that they know that it's Warner Brothers versus Columbia

13    versus somebody else, but they know they're entering into a

14    relationship with some entity other than Google or Apple.

15    MR. JANOVE:  Correct, Your Honor.  If you look at

16    the full context, everything is pointing to a relationship,

17    an ongoing relationship with Apple and Google.  And that's

18    certainly how any of us using phones, downloading apps we

19    understand who provided us the phone, who provided us the app

20    store.

21           So Berman, I first want to correct the Court.  I

22    believe that counsel's misunderstanding the holding of

23    Berman.  It is true that Berman makes the point that if the

24    sign-in screen had made it clear via textual notice by

25    clicking a button, you would be accepting the terms of
```

```
 1    service, but before Berman even gets to that holding, Berman
 2    independently holds that there is a lack of reasonable
 3    conspicuous notice.
 4          In other words, in Berman the sign-in screen failed
 5    on both prongs.  There was nothing in that opinion that said
 6    if you fix this language, you would be somehow otherwise
 7    making this notice conspicuous, but I thought it would be
 8    interesting to talk about Berman using your analysis,
 9    Your Honor, about the full context of the transaction.  And
10    while I don't think Berman, the majority opinion highlights
11    Sellers heavily, it doesn't specifically cite the language
12    that you have, um, cited from Sellers.
13          Um, the concurrence does talk about Sellers, the
14    full context of the transaction.  It's kind of like a sliding
15    scale test.  It's more of an ongoing relationship.
16          THE COURT:  Counsel, I'm gonna ask you to slow
17    down.
18          MR. JANOVE:  Oh, sorry.  The -- the ongoing
19    relationship is a part of the factor.  If it is one-off
20    transaction, courts will be more strict in analyzing the
21    conspicuousness of notice.  Um, if it's an ongoing
22    relationship, perhaps courts will not be as strict analyzing
23    the various features that have given people notice of other
24    terms.
25          But I think if we do talk about Berman, there's
```

 1    lots in the Berman opinion if you look at the fact that show

 2    the context of the transaction there is much closer to

 3    Blizzard than to what we have here which further counsels in

 4    the plaintiff's favor.

 5          So in Berman one of the plaintiffs, for example,

 6    had entered some of that information.  So when she came back

 7    to the sign-up screen, it even said welcome Stephanie.  In

 8    Berman the other plaintiff, they asked for name, address, zip

 9    code.  There was, in other words, there was far more in

10    Berman to suggest the context of an ongoing relationship than

11    what we have here with Game of Thrones.

12          Next, I'd like to speak to Dohrmann and, again,

13    Dohrmann's an unpublished opinion.  It was two one.  I would

14    submit that it's likely not, um, good law given recent

15    9th Circuit and California precedent, but, again, applying

16    Your Honor's contextual analysis, it's very clear why

17    Dohrmann is distinguishable from Game of Thrones.

18          In Dohrmann there's Intuit.  They're signing up to

19    give social security information.  They have already created

20    an account with Intuit.  So there's no question in Dohrmann

21    that the plaintiffs are contracting with the defendants and

22    have an actual, full account.

23          Again, they speak with regret about the distinction

24    of not using terms of service or terms of use, but California

25    and the 9th Circuit are very clear the onus is on the

1   defendants to design their website, their mobile application

2   in a way that provides conspicuous notice.  Right?  This

3   could all be very easily solved if Warner Brothers had

4   decided to provide, you know, notice, for example, in

5   Blizzard.

6          Your Honor, I want to point out in Blizzard, I

7   think, a very key fact that shows how that notice was so

8   robust as opposed to here.  In Blizzard there was an actual

9   pop up of the terms of use, um, that was sent to users in

10  2018 that had a continue button.  By clicking continue,

11  you're agreeing to terms of service.

12         The Court points out that Blizzard literally

13  provides these terms to the users.  There's no clicking of

14  hyperlinks, there's no jumping around, there's no, you know,

15  hopefully, you know, looking past the play button.

16         THE COURT:  I'm going to interrupt you for a moment

17  and maybe when you speak again, you'll be a little slower.

18         MR. JANOVE:  Sorry.  I apologize, Your Honor.

19         THE COURT:  Let me ask you this question.  So we've

20  got Exhibits 5, 6, 7.  Let's put to one side Exhibits 6 and

21  7.  As you heard, I don't find Mr. Chorba's arguments about

22  those two compelling.  Let's talk for a moment, um, about

23  Exhibit 5 which may help the Court to clarify what your

24  argument is.

25         So with Exhibit 5, the Court's understanding is

1   there is a button that says play.  Underneath the button says

2   play, there is language that says by tapping play, I accept

3   the terms of use and acknowledge the privacy policy.  I'm not

4   sure if it uses terms of use or terms of service, and then

5   under that is the hyperlink to the same document that is

6   referred to above.  It uses the same title.  I'm forgetting

7   which one it is.

8           Is it your contention that even if the hyperlink

9   uses the same language that's in the notice under the play

10  button that that is not sufficient and if so, why?

11          MR. JANOVE:  Well, I believe, Your Honor, the full

12  context or the full elements of a display is not that there's

13  one deficiency like the typo here instead of terms of

14  service --

15          THE COURT:  So the answer is no.

16          MR. JANOVE:  No.

17          THE COURT:  I need you to explain to me why.

18          MR. JANOVE:  So the answer is no because, again,

19  even in Exhibit 5, you'll have to read a sentence saying I

20  agree to terms of service.  Assuming you glance below the

21  large play button, you read sentence I agree terms of

22  service.  Then you click a link to a document that says

23  terms -- the link says terms of service, but then you're

24  taken to a separate document that says terms of use.

25          Now, that fact alone might not be enough for

1   inconspicuous notice, but when you layer the fact that there

2   is an error in terms of what document a user is supposed to

3   be understanding they're agreeing to, you have an entire

4   graphic design --

5           THE COURT:  But I'm sorry.  I'm talking about, and

6   maybe I'm misunderstanding the facts.  I thought there's at

7   least one scenario with Exhibit 5 where there's no

8   distinction between the hyperlink and the name of the --

9   maybe it will help if I actually get to the exhibit.  Let me

10  do that.  Um, give me just a moment.

11          MR. CHORBA:  Your Honor, may I clarify?

12          THE COURT:  Just a moment.  Let me get to the

13  document and I think that will be helpful for everybody.

14          Perhaps the parties can remind me what document,

15  what filing were 5, 6 and 7 attached to?

16          MR. CHORBA:  I believe it's 45-1, Your Honor, or

17  41-1 and it's at page 65 of 69, Exhibit 5.

18          THE COURT:  Just a moment.  Thank you.

19          So we're all looking at Document 41-1 page 65 in

20  the ECF Document.  This is, um, Exhibit 5 to the Woldman

21  declaration.  And so as I read it, you've got the graphics at

22  the top.  You've got Game of Thrones: Conquest TM.  You've

23  got the big blue play button.  Beneath the blue play button

24  it reads by tapping play, I agree to the terms of service and

25  beneath that line, there is a hyperlink for privacy policy

1    and a hyperlink for terms of service.

2            And I guess my assumption was when somebody clicks

3    the hyperlink for terms of service, that's what takes them to

4    the document that contains the arbitration agreement.  But

5    are you indicating, Mr. Janove that when you click the terms

6    of service, that takes you to some other document?

7            MR. JANOVE:  It takes you to a document labeled

8    terms of use.

9            THE COURT:  Okay.  So that's one problem you see

10   with this set up.  Besides that what are the other problems

11   you see with this set up?

12           MR. JANOVE:  So, again, I think the problems

13   otherwise are the same as Exhibits 6 and 7.  If you look at

14   the design of the screen, it is designed to make the user

15   focus on this big play button.  You have this out-sized Game

16   of Thrones graphic.  You look down and the immediate thing

17   you have is this large, huge play button that has elements

18   that make it look like a 3D graphic button that's blue with

19   this kind of brown outline.

20           So obviously the design of this sign-in screen is

21   taking users away from the most important part here which is

22   if you click play, you're gonna be giving up a whole host of

23   rights.  So, again, I would submit that the way that

24   Exhibit 5, 6, 7 are designed, it draws attention to a large

25   play button and away from really important terms and it

1    affects plaintiff's and class members' legal rights.

2              THE COURT:  Thank you.

3              I don't know that Mr. Chorba would disagree with

4    that.  I think that's pretty obvious, but is that enough to

5    make it insufficient?  The fact that they are trying to

6    focus, you know, most of the screen obviously is the Game of

7    Thrones graphic.  You have GOT, et cetera.  The fact that

8    you're drawing attention to other things given that there are

9    so few things on this page, how is that enough to make it

10   insufficient?

11             I think Mr. Chorba's argument is there's not that

12   much here.  So even if people are being directed to focus on

13   play, they can still see the other stuff because it's right

14   there.

15             MR. JANOVE:  Yes, Your Honor, and I would submit

16   that under Berman and Sellers and Blizzard that it's still

17   insufficient, um, insofar as when a. . . Sorry.  My

18   apologies.  Let me start that back a second.

19             When they put this in the brief, when there's a

20   sign-up screen that's cluttered, it's hard to find what

21   you're supposed to be looking at and where you're supposed to

22   click.  Right?  This is not cluttered, but I would submit

23   that this has the same effect as any sort of clutter design.

24   The effect being drawing users' attention away from the key,

25   important, you know, issue which is the terms of use.

 1    THE COURT:  And I would ask you what case law or

 2  authority would you cite to for the idea that they are

 3  required to put this language, to make this language as

 4  prominent as for instance the play button?  I'm not sure that

 5  the case law supports that idea.

 6    MR. JANOVE:  Yes, and I -- I think Sellers is kind

 7  of spot on where the case law is a little bit -- certainly in

 8  federal court, it's a bit hard to find these amorphous

 9  standards, but I would refer at least to Berman and Sellers

10  where the notice, the design was far more conspicuous than we

11  have here.  In Berman the hyperlinks were bolded and

12  underlined.  They were above the continue sign.  In

13  Sellers -- for mobile users, Sellers -- the users literally

14  had to click a box saying I agree to the terms and conditions

15  or terms of use which was above the continue button.

16    THE COURT:  Let me interrupt you.  The fact what

17  was in Berman and Sellers was appropriate doesn't mean

18  anything less than that is inappropriate.

19    MR. JANOVE:  Well, I think at the end of the day,

20  Your Honor, it goes to the full context of the transaction.

21  So stepping back in a different world where we're not

22  creating an account with Apple or Google, where you first are

23  signing up with Warner Brothers, you're enter your

24  information, here's your user ID.  Then you go to the next

25  screen, okay, there's a big play button, there's also notice

1    about terms of use.  In that context, I would say, well, I'd

2    probably still argue the opposite, Your Honor, but --

3              THE COURT:  Of course you would.

4              MR. JANOVE:  Of course, but I would think that the

5    Court would say well, look at the full context of the

6    transaction.  Sellers teaches that depending on the nature of

7    the relationship, we're going to be more or less strict to

8    website providers.  If it's a situation where a user has a

9    suspicion, a thought, a real understanding that they might

10   have a contractual relationship, in that case perhaps notice

11   like this would be sufficient because you've already gone

12   through some additional steps.

13             THE COURT:  I understand.  Thank you.

14             Anything else you need to share with the Court?

15             MR. JANOVE:  Thank you very much, Your Honor.

16             THE COURT:  Mr. Chorba, anything final from you?

17             MR. CHORBA:  I will be extremely brief, Your Honor.

18             First of all on the interplay between Exhibit 5, I

19   just want to fill in some record cites for you to make sure

20   you have it.  Counsel was correct that although both the

21   language and the button say terms of service, and this is

22   Exhibit 5 that we referenced page 65.  If you go in the same

23   filing to page 5, Exhibit 1 does pull up a document titled

24   Terms of Use.  So I just for the Court, I want to acknowledge

25   that, but I think that puts use directly into the Intuit

1  situation which Your Honor asked me about earlier.

2          The first point I'd like to make in rebuttal is

3  just, um, counsel just referenced that there's nothing about

4  this landing screen or the similar ones in Exhibit 6 or 7

5  that would tell you that you're dealing with Warner Brothers.

6  First of all, I think that's, um, not a very plausible

7  suggestion in light of the IP that's being displayed here,

8  but moreover, you do not even get here until you download the

9  game.

10         And when you go to the App Store, at least on

11 Apple, when you download the game, immediately beneath the

12 title it says Warner Brothers so you can't get here without

13 getting here.  Now, I did this on my phone because if you

14 look at page 18 of plaintiff's opposition brief, it's cut

15 off, but you can see in the margin the start of Warner and

16 Warner Brothers.  And so, again, anyone that gets to this

17 page knows they're dealing with Warner Brothers and not with

18 Apple.

19         THE COURT:  Whatever screen you're talking about is

20 that anywhere in the record?

21         MR. CHORBA:  It is.  It's page 18 of the opposition

22 brief.  It's cut off in the opposition.

23         THE COURT:  The part you want me to look at is that

24 in the record?

25         MR. CHORBA:  I'm sorry, Your Honor.  Page 18 of the

1    complaint.  I misspoke and I can get the reference to you.

2    The part I want you to look at is in the record.  It's

3    page 18 of the complaint.  And what it has there, Your Honor,

4    if you go to the App Store and you actually try to download

5    this game, you see Warner Brothers before you even download

6    the game and therefore, before you even get to this screen.

7    So I'm just making this point --

8           THE COURT:  So what is it you're saying?  You're

9    saying I'm looking now at page 18 of the first amended

10   complaint.  There is a graphic just before Paragraph 59 and,

11   um, there is an image at the top, and then underneath it

12   reads Game of Thrones: Conquest.  And then at the very bottom

13   on the left, you see 72K ratings.  Then you see age, then you

14   see category.  And then to the right, this is what you're

15   saying is cut off.  That I'm assuming reads developer and

16   that reads Warner Brothers.

17          MR. CHORBA:  Precisely, Your Honor.

18          And the only reason it looks like this, and as

19   you'll see it has updates, is it means whoever took this

20   screen shot had already downloaded the game.  And so what I

21   was representing to you is the first time you download this

22   game, it's a lot more conspicuous and where you see the

23   Game of Thrones: Conquest immediately below that it will say

24   Warner Brothers so it's --

25          THE COURT:  That's what I'm asking.  What you're

```
 1    telling me is that in the record somewhere?

 2             MR. CHORBA:  It is not, Your Honor.

 3             THE COURT:  I'm gonna ask you to submit that by the

 4    end of the day today 5:00 p.m.

 5             MR. CHORBA:  Gladly.

 6             THE COURT:  Whatever screen you're talking about

 7    that one would see when you first download the game.  And I

 8    would ask you to meet and confer with Mr. Janove before you

 9    submit it so that there's no question that it truly is what

10    you say it is.

11             MR. CHORBA:  Absolutely, Your Honor, absolutely.  I

12    will do that and we will get it on file this afternoon.

13             Um, the final point, well, the final two points I

14    would make is when you asked opposing counsel for the case

15    law that supports his view that this is too busy and it's not

16    enforceable, I heard him cite Sellers.  We had a long

17    discussion earlier.  Sellers is informed by the automatic

18    renewal law and, again, pages 472 to 479 of Sellers discuss

19    at length what those requirements are, why the legislature

20    had those requirements, specific font sizes.

21             And I would cite to you a Supreme Court case

22    Doctors Associates versus Casarotto 517 U.S. 681 at page --

23             THE COURT:  I'm gonna ask you to repeat the

24    citation.

25             MR. CHORBA:  Sorry.  Doctors Associates, Inc.
```

 1    versus Casarotto 517 U.S. 681 at page 683.  It's a 1996 case.

 2    And therein the Supreme Court held that the Federal

 3    Arbitration Act preempted a state law that required an

 4    arbitration clause to include quote "underlying capital

 5    letters on the first page of the contract."  So the Supreme

 6    Court has said the FAA would preempt any state law that

 7    requires specific formatting requirements.

 8          But in the context of Sellers when interpreting

 9    state law, the Court of Appeal held that it must consider

10    that transactional context.  So my point in rebuttal to you

11    is simply that when asked for authority why this doesn't work

12    even Exhibit 5, counsel cited Sellers but Sellers is informed

13    by the automatic renewal law.  We would argue Doctors

14    Associates would preempt under the FAA any attempt to make

15    very specific formatting requirements and, again, as I said

16    it's not a very busy screen to begin with.

17          Finally, I would just like to end with this.

18    Safeguarding my client's IP, you might imagine that licensing

19    these characters and these names require significant

20    investment by Warner Brothers.  I mentioned earlier there's

21    often an end user license agreement in which the user that's

22    downloading and playing this free game has a limited license.

23          You know, Mr. Kumar or myself or Mr. Smith can't go

24    and start selling imagery from this game simply because

25    they've downloaded this game and made purchases in connection

Case 2:22-cv-01272-MEMF-AGR / 2:22-cv-01275-MEMF-AGR Document 25-5 / Document 25 Filed 10/26/22 Filed 10/26/22 Page 36 of 42 Page 36 of 42 Page ID #:418

33

  1    with this game.  And so in order to protect those, it is

  2    vitally important that my client be able to form a

  3    contractual relationship with its customers to protect those

  4    investments that its made.

  5            And so the ruling here with respect to arbitration,

  6    we would just respectfully submit users understand and expect

  7    that when they're downloading a Star Wars game or a Game of

  8    Thrones game or a Lego Bat Man game that they are using IP

  9    that companies invest significant resources in and must be

 10    able to protect by contract.

 11            Thank you for your patience, Your Honor.

 12            THE COURT:  Thank you.

 13            Okay.  The parties submit?

 14            MR. CHORBA:  Yes, Your Honor.

 15            THE COURT:  With that the matter is taken under

 16    submission.  Again, thank the parties again for your

 17    patience.

 18            What I need from you by 5:00 p.m. is the screen

 19    that you have made reference to you after you meet and confer

 20    with Mr. Janove and Mr. Kumar.  To the extent that you can't

 21    agree as to what the screen looks like, Mr. Janove and

 22    Mr. Kumar are welcome to also by 7:00 p.m. this evening

 23    submit their own version of what they think the screen looks

 24    like.  Thank you.

 25            (Proceedings were concluded at 12:38 p.m.)



```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4

 5   COUNTY OF LOS ANGELES      )

 6                              )  SS.

 7   STATE OF CALIFORNIA        )

 8

 9   I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

10   STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

11   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

12   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

13   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

14   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

15   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

16   OF MY STENOGRAPHIC NOTES.

17

18

19   DATE:   OCTOBER 28, 2022

20

21       /s/  LAURA MILLER ELIAS

22   LAURA MILLER ELIAS, CSR 10019

23   FEDERAL OFFICIAL COURT REPORTER

24

25
```

**/**

/s [1] - 35:21

**1**

1 [1] - 28:23
100 [1] - 2:13
10004 [1] - 2:8
10019 [1] - 1:21, 35:22
11 [3] - 9:3, 9:17, 13:6
11:55 [1] - 4:1
12 [1] - 6:25
12:38 [1] - 33:25
18 [5] - 29:14, 29:21, 29:25, 30:3, 30:9
1996 [1] - 32:1

**2**

2018 [1] - 22:10
2020 [1] - 11:14
2022 [3] - 1:15, 4:1, 35:19
213)894-0374 [1] - 1:23
22-01272-MEMF [1] - 1:9
22-1272-MEMF [1] - 4:4
24TH [1] - 2:7
28 [1] - 35:19

**3**

333 [1] - 2:22
350 [1] - 1:22
3D [1] - 25:18

**4**

4 [1] - 3:7
41-1 [2] - 24:17, 24:19
4455 [1] - 1:22
45-1 [1] - 24:16
472 [2] - 14:6, 31:18
476 [1] - 16:13
478 [1] - 13:24
479 [3] - 14:7, 14:24, 31:18
482 [1] - 11:16
484 [1] - 11:16

**5**

5 [16] - 5:16, 11:12, 12:14, 22:20, 22:23, 22:25, 23:19, 24:7, 24:15, 24:17, 24:20, 25:24, 28:18, 28:22,

28:23, 32:12
517 [2] - 31:22, 32:1
59 [1] - 30:10
5:00 [2] - 31:4, 33:18

**6**

6 [12] - 1:15, 4:1, 4:3, 5:17, 11:10, 12:15, 22:20, 24:15, 25:13, 25:24, 29:4
60 [1] - 2:6
60603 [1] - 2:14
65 [3] - 24:17, 24:19, 28:22
681 [2] - 31:22, 32:1
683 [1] - 32:1
69 [1] - 24:17

**7**

7 [10] - 5:16, 5:17, 11:10, 12:15, 22:20, 22:21, 24:15, 25:13, 25:24, 29:4
72K [1] - 30:13
73 [1] - 2:12
7:00 [1] - 33:22

**8**

823 [1] - 11:15
858 [1] - 10:18

**9**

90012 [1] - 1:22
90071-3197 [1] - 2:23
9th [6] - 10:7, 10:14, 11:14, 11:18, 21:15, 21:25

**A**

A.M [1] - 4:1
able [6] - 4:22, 4:24, 5:19, 15:17, 33:2, 33:10
absent [1] - 19:3
absolutely [2] - 31:11
accept [4] - 10:3, 12:9, 12:17, 23:2
accepting [1] - 19:25
accessed [1] - 9:20
account [2] - 6:19, 7:1, 9:5, 9:7, 18:18, 21:20, 21:22, 27:22
acknowledge [4] - 10:3, 12:17, 23:3, 28:24

Act [2] - 15:14, 32:3
act [1] - 10:10
actual [2] - 21:22, 22:8
additional [1] - 28:12
address [2] - 8:22, 21:8
addressed [3] - 8:24, 13:7, 14:8
addressing [2] - 14:7, 17:25
advance [1] - 8:2
advised [1] - 10:10
affects [1] - 26:1
afternoon [1] - 31:12
age [1] - 30:13
agree [7] - 10:17, 18:14, 23:20, 23:21, 24:24, 27:14, 33:21
agreeing [2] - 22:11, 24:3
agreement [7] - 8:11, 8:17, 10:11, 15:11, 16:11, 25:4, 32:21
ahead [1] - 6:7
AIDED [1] - 35:14
AL [1] - 1:6
al [1] - 4:5
allege [1] - 16:17
alleged [1] - 16:13
allows [1] - 10:21
alone [1] - 23:25
amended [1] - 30:9
AMERICA [1] - 1:1
amorphous [1] - 27:8
amount [1] - 7:13
analogue [1] - 13:1
analysis [6] - 9:14, 12:16, 14:1, 15:2, 20:8, 21:16
analyzing [2] - 20:20, 20:22
AND [5] - 2:18, 35:9, 35:12, 35:14, 35:15
ANGELES [5] - 1:16, 1:22, 2:23, 4:1, 35:5
Answer [1] - 14:10
answer [2] - 23:15, 23:18
apologies [1] - 26:18
apologize [1] - 22:18
app [7] - 6:17, 9:8, 11:3, 13:17, 16:20, 18:19, 19:19
App [2] - 29:10, 30:4
apparent [1] - 11:1
Appeal [1] - 32:9
appearances [1] - 4:7
APPEARANCES [1] - 2:1

appeared [1] - 16:4
Appendix [1] - 11:16
Apple [16] - 6:18, 6:20, 7:2, 7:9, 8:2, 9:11, 17:11, 18:18, 18:20, 18:25, 19:8, 19:14, 19:17, 27:22, 29:11, 29:18
application [1] - 22:1
apply [1] - 15:21
applying [1] - 21:15
appreciate [2] - 6:9, 12:14, 18:16
approach [1] - 4:11
appropriate [1] - 27:17
apps [5] - 8:4, 9:9, 10:21, 17:13, 19:18
Arbitration [2] - 15:14, 32:3
ARBITRATION [1] - 3:7
arbitration [9] - 8:10, 8:17, 15:2, 15:10, 15:16, 15:22, 25:4, 32:4, 33:5
argue [2] - 15:19, 28:2, 32:13
argument [4] - 4:13, 18:3, 22:24, 26:11
arguments [1] - 22:21
art [1] - 14:17
Arts [1] - 9:12
assent [2] - 10:9, 10:11
assert [1] - 16:23
Associates [3] - 31:22, 31:25, 32:14
assuming [2] - 23:20, 30:15
assumption [1] - 25:2
astray [1] - 9:15
AT [1] - 35:12
attached [1] - 24:15
attempt [3] - 15:20, 17:16, 32:14
attention [3] - 25:24, 26:8, 26:24
authority [2] - 27:2, 32:11
automatic [11] - 14:8, 14:12, 14:19, 15:3, 15:4, 15:5, 15:18, 15:20, 16:1, 31:17, 32:13
available [4] - 6:17, 7:21, 9:9, 10:4
AVENUE [1] - 2:22

**B**

basis [1] - 8:15
Bat [1] - 33:8
begin [1] - 32:16
BEHALF [2] - 2:3, 2:16
behalf [2] - 4:9, 18:3
behind [1] - 6:9
belief [1] - 16:19
below [6] - 9:24, 10:4, 11:5, 12:19, 23:20, 30:23
beneath [4] - 9:21, 24:23, 24:25, 29:11
Berman [26] - 10:6, 10:12, 10:14, 10:24, 13:7, 13:8, 13:10, 13:13, 17:23, 19:21, 19:23, 20:1, 20:4, 20:8, 20:10, 20:25, 21:1, 21:5, 21:8, 21:10, 26:16, 27:9, 27:11, 27:17
best [2] - 5:13, 5:14
better [1] - 5:22
between [5] - 6:10, 6:13, 10:1, 24:8, 28:18
big [3] - 24:23, 25:15, 27:25
bind [1] - 14:14
bit [4] - 6:9, 13:19, 27:7, 27:8
Blizzard [9] - 7:20, 13:13, 17:24, 21:3, 22:5, 22:6, 22:8, 22:12, 26:16
block [1] - 9:4
blue [4] - 11:4, 24:23, 25:18
bolded [1] - 27:11
bottom [1] - 30:12
box [1] - 27:14
boxes [1] - 12:24
brief [5] - 6:11, 26:19, 28:17, 29:14, 29:22
briefly [1] - 9:13
bringing [1] - 18:17
BROAD [1] - 2:6
broader [1] - 16:3
BROTHERS [1] - 1:9
Brothers [15] - 4:5, 19:2, 19:3, 19:8, 19:12, 22:3, 27:23, 29:5, 29:12, 29:16, 29:17, 30:5, 30:16, 30:24, 32:20
brought [2] - 13:18, 15:23
brown [1] - 25:19

business [1] - 14:10
busy [4] - 9:25, 12:18, 31:15, 32:16
button [24] - 9:21, 9:23, 10:2, 10:8, 10:16, 11:2, 11:5, 19:25, 22:10, 22:15, 23:1, 23:10, 23:21, 24:23, 25:15, 25:17, 25:18, 25:25, 27:4, 27:15, 27:25, 28:21
BY [4] - 2:5, 2:11, 2:19, 35:14

## C

CA [1] - 2:23
California [4] - 10:21, 14:18, 21:15, 21:24
CALIFORNIA [6] - 1:2, 1:16, 1:22, 4:1, 35:7, 35:10
capable [1] - 6:23
capital [1] - 32:4
Casarotto [2] - 31:22, 32:1
Case [1] - 4:4
case [17] - 6:14, 6:25, 7:8, 7:20, 12:24, 13:12, 13:13, 14:8, 15:24, 17:4, 27:1, 27:5, 27:7, 28:10, 31:14, 31:21, 32:11
CASE [1] - 1:8
cases [4] - 6:15, 12:22, 16:11, 17:25
category [1] - 30:14
CENTRAL [2] - 1:2, 35:10
certainly [2] - 19:18, 27:7
CERTIFICATE [1] - 35:3
CERTIFY [2] - 35:11, 35:15
cetera [1] - 26:7
characters [1] - 32:19
charged [1] - 14:11
CHARISSA [1] - 1:6
Charissa [1] - 4:5
checking [1] - 16:20
CHICAGO [1] - 2:14
Chorba [5] - 4:9, 6:7, 18:16, 26:3, 28:16
CHORBA [28] - 2:19, 4:8, 4:14, 5:11, 5:17, 5:21, 6:4, 6:8, 7:5, 8:18, 8:21, 8:24, 9:2, 12:1, 12:6, 12:13, 15:12, 24:11, 24:16,

28:17, 29:21, 29:25, 30:17, 31:2, 31:5, 31:11, 31:25, 33:14
Chorba's [2] - 22:21, 26:11
Chris [1] - 4:8
CHRISTOPHER [1] - 2:19
Circuit [6] - 10:7, 10:14, 11:14, 11:18, 21:15, 21:25
citation [1] - 31:24
cite [4] - 20:11, 27:2, 31:16, 31:21
cited [3] - 6:15, 20:12, 32:12
cites [1] - 28:19
citing [1] - 13:2
Civil [1] - 4:4
claim [2] - 16:16, 16:23
claims [2] - 7:7, 15:23
clarification [1] - 18:14
clarify [4] - 8:11, 19:10, 22:23, 24:11
clarity [1] - 8:6
class [1] - 26:1
clause [1] - 15:2, 32:4
clear [6] - 8:1, 14:15, 14:19, 19:24, 21:16, 21:25
CLERK [1] - 4:3
click [10] - 10:8, 11:2, 11:6, 12:10, 23:22, 25:5, 25:22, 26:22, 27:14
clicking [6] - 9:20, 10:10, 10:16, 19:25, 22:10, 22:13
clicks [1] - 25:2
client [4] - 7:10, 17:7, 17:16, 33:2
client's [1] - 32:18
closed [1] - 17:24
closer [1] - 21:2
closest [1] - 13:1
closing [1] - 16:3
clutter [1] - 26:23
cluttered [2] - 26:20, 26:22
code [1] - 21:9
COHEN [1] - 2:4
color [1] - 14:22
Columbia [1] - 19:12
comfort [1] - 17:13
comfortable [1] - 17:12
common [1] - 15:7
companies [1] - 33:9

COMPEL [1] - 3:7
compel [1] - 15:22
compelling [1] - 22:22
complaint [4] - 16:13, 30:1, 30:3, 30:10
complete [1] - 14:10
completely [1] - 19:3
complied [1] - 16:1
comply [2] - 17:16, 17:21
COMPUTER [1] - 35:14
COMPUTER-AIDED [1] - 35:14
concerned [1] - 16:4
concluded [3] - 9:18, 11:19, 33:25
concurrence [1] - 20:13
conditions [5] - 10:11, 10:17, 10:25, 13:22, 27:14
confer [3] - 5:5, 31:8, 33:19
confirm [1] - 18:20
confused [1] - 11:23
confusion [2] - 12:23, 13:3
connection [1] - 32:25
conquest [2] - 30:12, 30:23
Conquest [2] - 6:17, 24:22
consequences [1] - 17:6
consider [2] - 16:1, 32:9
conspicuous [8] - 14:15, 14:20, 15:5, 20:3, 20:7, 22:2, 27:10, 30:22
conspicuousness [1] - 20:21
constitute [1] - 10:10
construed [1] - 10:8
contains [1] - 25:4
content [2] - 7:7, 7:8
contention [1] - 23:8
context [25] - 9:7, 12:23, 13:4, 13:9, 14:5, 15:1, 15:3, 15:21, 16:2, 17:10, 17:23, 17:25, 18:17, 18:23, 19:16, 20:9, 20:14, 21:2, 21:10, 23:12, 27:20, 28:1, 28:5, 32:8, 32:10
contextual [1] - 21:16
continue [6] - 10:16, 18:18, 22:10, 27:12,

27:15
continued [1] - 18:22
continuing [2] - 16:12, 16:14
contract [2] - 32:5, 33:10
contracting [3] - 14:18, 15:17, 21:21
contractual [4] - 9:19, 19:7, 28:10, 33:3
contrasting [1] - 14:22
copies [1] - 5:13
correct [5] - 11:22, 12:1, 19:15, 19:21, 28:20
CORRECT [1] - 35:15
cost [2] - 13:24, 14:4
costs [1] - 16:23
counsel [9] - 4:7, 4:21, 5:9, 5:25, 20:16, 28:20, 29:3, 31:14, 32:12
COUNSEL [1] - 2:1
counsel's [1] - 19:22
counsels [1] - 21:3
COUNTY [1] - 35:5
course [6] - 7:9, 7:15, 9:9, 13:10, 28:3, 28:4
court [3] - 13:23, 27:8
COURT [48] - 1:1, 1:21, 4:12, 4:19, 5:8, 5:15, 5:19, 5:23, 6:5, 7:4, 8:5, 8:20, 8:23, 9:1, 11:21, 12:2, 12:8, 15:8, 18:2, 18:6, 18:11, 19:10, 20:16, 22:16, 22:19, 23:15, 23:17, 24:5, 24:12, 24:18, 25:9, 26:2, 27:1, 27:16, 28:3, 28:13, 28:16, 29:19, 29:23, 30:8, 30:25, 31:3, 31:6, 31:23, 33:12, 33:15, 35:10, 35:23
Court [9] - 4:22, 5:3, 5:8, 6:6, 6:9, 8:6, 9:24, 12:11, 15:9, 15:15, 19:21, 22:12, 22:23, 28:5, 28:14, 28:24, 31:21, 32:2, 32:6, 32:9
Court's [5] - 6:2, 8:8, 9:14, 9:17, 22:25
court's [1] - 14:1
courtroom [2] - 5:6, 5:24
courts [2] - 20:20,

20:22
create [3] - 9:5, 9:7, 9:11
created [1] - 21:19
creating [1] - 27:22
Crutcher [1] - 4:9
CRUTCHER [2] - 2:18
CSR [2] - 1:21, 35:22
customer [1] - 6:19
customers [2] - 8:9, 33:3
cut [4] - 7:11, 29:14, 29:22, 30:15
CV [1] - 1:9

## D

DATE [1] - 35:19
deal [1] - 15:17
dealing [8] - 6:14, 7:15, 10:18, 15:14, 15:23, 17:24, 29:5, 29:17
dealings [1] - 14:10
dealt [1] - 11:14
decided [1] - 22:4
decision [2] - 10:18
decisions [1] - 13:12
declaration [1] - 24:21
defect [1] - 10:15
defendant [2] - 4:9, 7:21
DEFENDANT [2] - 1:11, 2:16
defendants [2] - 21:21, 22:1
defense [2] - 4:21, 5:9
deficiency [1] - 23:13
defines [2] - 14:19, 14:20
deputy [2] - 5:6, 5:24
design [6] - 22:1, 24:4, 25:14, 25:20, 26:23, 27:10
designed [2] - 25:14, 25:24
developer [1] - 30:15
device [2] - 6:23, 7:2, 7:11
difference [4] - 11:19, 11:20, 12:16, 14:18
different [5] - 7:15, 14:7, 15:16, 17:25, 27:21
directed [2] - 11:17, 26:12
directly [2] - 7:21, 28:25
disagree [1] - 26:3
disclose [3] - 10:22,

10:23, 10:24
**disclosed** [1] - 13:22
**disclosure** [1] - 14:13
**disclosures** [1] - 15:25
**discrepancy** [1] - 11:10
**discuss** [4] - 4:12, 4:20, 19:4, 31:18
**discussion** [7] - 5:7, 13:9, 13:11, 14:25, 15:20, 31:17
**display** [5] - 5:3, 5:4, 5:10, 6:23, 23:12
**displayed** [2] - 7:18, 29:7
**displaying** [1] - 6:23
**disputed** [1] - 16:14
**distinction** [7] - 6:13, 12:8, 12:11, 12:25, 19:11, 21:23, 24:8
**distinguishable** [1] - 21:17
**DISTRICT** [5] - 1:1, 1:2, 1:4, 35:10
**DIVISION** [1] - 1:2
**DO** [2] - 35:11, 35:14
**Doctors** [2] - 31:22, 32:13
**doctors** [1] - 31:25
**document** [12] - 12:4, 12:5, 23:5, 23:22, 23:24, 24:2, 24:13, 24:14, 25:4, 25:6, 25:7, 28:23
**Document** [2] - 24:19, 24:20
**Dohrmann** [8] - 11:15, 11:22, 12:7, 21:12, 21:17, 21:18, 21:20
**Dohrmann's** [1] - 21:13
**doubt** [1] - 6:16
**down** [2] - 20:17, 25:16
**download** [9] - 6:17, 6:21, 8:4, 29:8, 29:11, 30:4, 30:5, 30:21, 31:7
**downloaded** [2] - 30:20, 32:25
**downloading** [3] - 19:18, 32:22, 33:7
**drawing** [2] - 26:8, 26:24
**draws** [1] - 25:24
**Dunn** [1] - 4:9
**DUNN** [1] - 2:18

## E

**easily** [2] - 10:15, 22:3
**ECF** [1] - 24:20
**ecosystem** [3] - 8:3, 17:12, 17:24
**effect** [2] - 26:23, 26:24
**efficient** [1] - 5:2
**either** [3] - 5:17, 6:20, 9:11
**Electronic** [1] - 9:12
**elements** [2] - 23:12, 25:17
**ELIAS** [4] - 1:21, 35:9, 35:21, 35:22
**end** [5] - 14:21, 27:19, 31:4, 32:17, 32:21
**enforce** [1] - 17:3
**enforceable** [2] - 16:11, 31:16
**enrollment** [1] - 14:15
**enter** [2] - 7:24, 27:23
**entered** [3] - 7:19, 8:10, 21:6
**entering** [4] - 8:16, 14:2, 16:7, 19:13
**Entertainment** [1] - 4:6
**ENTERTAINMENT** [1] - 1:9
**entire** [2] - 14:25, 24:3
**entity** [1] - 19:14
**error** [1] - 24:2
**ESQ** [5] - 2:5, 2:11, 2:19, 2:20, 2:21
**establish** [3] - 7:1, 7:14, 8:9
**ET** [1] - 1:6
**et** [2] - 4:5, 26:7
**evening** [1] - 33:22
**EWUSI** [1] - 1:4
**EWUSI-MENSAH** [1] - 1:4
**exactly** [3] - 10:19, 15:12, 16:15
**example** [3] - 7:6, 21:5, 22:4
**exhibit** [1] - 24:9
**Exhibit** [16] - 5:17, 11:12, 12:14, 12:15, 22:23, 22:25, 23:19, 24:7, 24:17, 24:20, 25:24, 28:18, 28:22, 28:23, 29:4, 32:12
**Exhibits** [5] - 5:16, 11:10, 22:20, 25:13
**expect** [3] - 9:19, 10:23, 33:6
**expectation** [1] - 19:7

**expensive** [1] - 16:8
**explain** [2] - 13:14, 23:17
**explicitly** [1] - 10:10
**extent** [3] - 18:13, 19:4, 33:20
**extra** [1] - 15:5
**extremely** [1] - 28:17

## F

**FAA** [4] - 15:18, 15:19, 32:6, 32:14
**fact** [16] - 6:22, 7:7, 10:1, 10:14, 10:25, 13:25, 17:5, 19:2, 19:6, 21:1, 22:7, 23:25, 24:1, 26:5, 26:7, 27:16
**factor** [1] - 20:19
**facts** [2] - 12:6, 24:6
**factual** [1] - 12:25
**failed** [1] - 20:4
**far** [3] - 17:6, 21:9, 27:10
**far-reaching** [1] - 17:6
**favor** [1] - 21:4
**features** [1] - 20:23
**FEDERAL** [2] - 1:21, 35:23
**Federal** [3] - 11:15, 15:14, 32:2
**federal** [2] - 16:10, 27:8
**few** [1] - 26:9
**file** [1] - 31:12
**filing** [2] - 24:15, 28:23
**fill** [1] - 28:19
**final** [3] - 28:16, 31:13
**finally** [1] - 32:17
**Financial** [1] - 10:7
**fine** [1] - 5:23
**FIRST** [1] - 1:22
**first** [12] - 7:1, 9:16, 16:23, 19:21, 27:22, 28:18, 29:2, 29:6, 30:9, 30:21, 31:7, 32:5
**fix** [1] - 20:6
**flag** [1] - 6:13
**FLOOR** [1] - 2:7
**flow** [1] - 7:10
**focus** [8] - 9:6, 9:13, 9:24, 10:5, 13:4, 25:15, 26:6, 26:12
**focused** [1] - 8:6
**focuses** [1] - 7:23
**focusing** [1] - 8:9
**font** [1] - 14:22, 31:20

**FOR** [2] - 35:9, 35:10
**FOREGOING** [1] - 35:12
**forgetting** [1] - 23:6
**form** [1] - 33:2
**FORM** [1] - 35:14
**formal** [1] - 13:6, 17:2, 17:20
**formation** [1] - 15:1
**formatting** [2] - 32:7, 32:15
**FORTH** [1] - 35:13
**forward** [3] - 16:12, 16:15, 18:23
**forward-looking** [3] - 16:12, 16:15, 18:23
**framework** [1] - 7:14
**free** [1] - 32:22
**Freedom** [1] - 10:6
**FRIMPONG** [1] - 1:4
**front** [1] - 9:17
**full** [9] - 18:17, 19:16, 20:9, 20:14, 21:22, 23:11, 23:12, 27:20, 28:5
**FURTHER** [1] - 35:15
**FUSTER** [1] - 2:21
**Fuster** [1] - 4:10

## G

**Game** [9] - 6:16, 21:11, 21:17, 24:22, 25:15, 26:6, 30:12, 30:23, 33:7
**game** [28] - 4:22, 6:13, 6:17, 6:19, 6:22, 6:23, 7:1, 7:8, 7:21, 9:5, 16:18, 16:20, 17:1, 18:19, 29:9, 29:11, 30:5, 30:6, 30:20, 30:22, 31:7, 32:22, 32:24, 32:25, 33:1, 33:7, 33:8
**games** [1] - 6:14
**gating** [3] - 7:3, 7:4, 7:5
**general** [1] - 15:16
**Gibson** [1] - 4:9
**GIBSON** [1] - 2:18
**given** [5] - 13:4, 13:17, 20:23, 21:14, 26:8
**gladly** [1] - 35:1
**glance** [1] - 23:20
**gonna** [11] - 5:12, 8:5, 11:4, 11:23, 12:3, 18:24, 19:1, 20:16, 25:22, 31:3, 31:23
**Google** [14] - 6:18, 6:20, 7:2, 7:9, 8:2,

13:19, 17:11, 18:18, 18:20, 18:25, 19:7, 19:14, 19:17, 27:22
**GOT** [1] - 26:7
**GOTC** [1] - 9:4
**governed** [1] - 9:19
**GRAND** [1] - 2:22
**graphic** [5] - 24:4, 25:16, 25:18, 26:7, 30:10
**graphics** [1] - 24:21
**great** [1] - 9:1
**guess** [1] - 25:2

## H

**hand** [2] - 5:21, 5:23
**handed** [1] - 6:12
**handled** [1] - 7:3
**handling** [1] - 18:3
**happy** [1] - 5:3
**hard** [2] - 26:20, 27:8
**hear** [1] - 18:15
**heard** [2] - 22:21, 31:16
**heavily** [1] - 20:11
**heightened** [1] - 15:6
**held** [6] - 10:7, 10:7, 13:5, 15:15, 32:2, 32:9
**help** [2] - 22:23, 24:9
**helpful** [2] - 18:2, 24:13
**HEREBY** [1] - 35:11
**HEREINBEFORE** [1] - 35:12
**higher** [1] - 15:9
**highlighted** [1] - 10:13
**highlights** [1] - 20:10
**holding** [2] - 19:22, 20:1
**holds** [1] - 20:2
**Honor** [42] - 4:8, 4:11, 4:15, 4:17, 5:11, 5:18, 6:8, 6:10, 6:16, 7:23, 8:19, 11:8, 12:1, 12:13, 13:8, 15:12, 16:13, 17:5, 18:1, 18:5, 18:7, 19:15, 20:9, 22:6, 22:18, 23:11, 24:11, 24:16, 26:15, 27:20, 28:2, 28:15, 28:17, 29:1, 29:25, 30:3, 30:17, 31:2, 31:11, 33:11, 33:14
**Honor's** [2] - 16:5, 21:16
**HONORABLE** [1] - 1:4
**hopefully** [1] - 22:15

**host** [1] - 25:22
**huge** [1] - 25:17
**hyperlink** [12] - 9:20, 10:23, 10:25, 11:1, 11:16, 11:24, 23:5, 23:8, 24:8, 24:25, 25:1, 25:3
**hyperlinks** [5] - 9:23, 10:2, 10:22, 22:14, 27:11

## I

**ID** [1] - 27:24
**idea** [2] - 27:2, 27:5
**identifiable** [1] - 17:8
**identify** [1] - 13:12
**IL** [1] - 2:14
**image** [2] - 5:14, 30:11
**imagery** [1] - 32:24
**imagine** [1] - 32:18
**immediate** [1] - 25:16
**immediately** [6] - 8:25, 9:3, 9:24, 12:19, 29:11, 30:23
**important** [5] - 19:11, 25:21, 25:25, 26:25, 33:2
**importantly** [1] - 11:14
**imposed** [1] - 14:13
**IN** [1] - 35:9
**in-app** [1] - 18:19
**inappropriate** [1] - 27:18
**Inc** [1] - 31:25
**INC** [1] - 1:10
**include** [1] - 32:4
**including** [2] - 10:16, 14:14
**inconspicuous** [1] - 24:1
**Incorporated** [1] - 4:6
**incorporated** [1] - 15:6
**incur** [1] - 16:23
**indeed** [2] - 14:4, 16:16
**independently** [1] - 20:2
**INDEX** [1] - 3:2
**indicating** [1] - 25:5
**information** [10] - 7:6, 7:25, 8:14, 16:7, 17:9, 17:11, 21:6, 21:19, 27:24
**informed** [4] - 13:25, 15:2, 31:17, 32:12
**initial** [4] - 6:11, 11:11, 13:16, 13:25
**insofar** [1] - 26:17

**install** [1] - 13:17
**instance** [2] - 16:24, 27:4
**instead** [2] - 11:11, 13:13
**insufficient** [3] - 26:5, 26:10, 26:17
**intended** [1] - 16:21
**interesting** [1] - 20:8
**interplay** [1] - 28:18
**interpreting** [1] - 32:8
**interrupt** [3] - 11:21, 22:16, 27:16
**Intuit** [5] - 11:15, 11:17, 21:18, 21:20, 28:25
**invest** [1] - 33:9
**investment** [1] - 32:20
**investments** [1] - 33:4
**involved** [1] - 16:11
**IP** [3] - 29:7, 32:18, 33:8
**iPad** [1] - 11:4
**iPhone** [1] - 6:25
**IS** [1] - 35:15
**issue** [12] - 6:15, 7:18, 7:23, 11:15, 11:19, 11:22, 12:15, 13:7, 14:8, 15:18, 17:4, 26:25
**Item** [1] - 4:3
**itself** [1] - 10:12
**iTunes** [1] - 6:18

## J

**Janove** [5] - 4:16, 25:5, 31:8, 33:20, 33:21
**JANOVE** [19] - 2:5, 4:15, 6:3, 18:5, 18:7, 18:16, 19:15, 20:18, 22:18, 23:11, 23:16, 23:18, 25:7, 25:12, 26:15, 27:6, 27:19, 28:4, 28:15
**Jay** [1] - 4:17
**JAY** [2] - 2:10, 2:11
**Jeremy** [1] - 4:10
**JEREMY** [1] - 2:20
**JUDGE** [1] - 1:4
**judgment** [1] - 15:25
**jumping** [1] - 22:14

## K

**KEEBAUGH** [1] - 1:6
**Keebaugh** [2] - 4:5, 18:4
**keep** [1] - 6:11

**key** [2] - 22:7, 26:24
**kind** [3] - 20:14, 25:19, 27:6
**known** [1] - 7:13
**knows** [2] - 6:16, 29:17
**Kumar** [4] - 4:17, 32:23, 33:20, 33:22
**KUMAR** [3] - 2:10, 2:11, 4:17

## L

**L.A** [1] - 4:4
**labeled** [1] - 25:7
**lack** [1] - 20:2
**landed** [1] - 7:16
**landing** [4] - 9:25, 13:16, 14:1, 29:4
**language** [12] - 10:13, 10:16, 10:19, 11:13, 14:5, 20:6, 20:11, 23:2, 23:9, 27:3, 28:21
**large** [3] - 23:21, 25:17, 25:24
**largely** [1] - 7:3
**larger** [1] - 14:21
**late** [1] - 5:1
**LAURA** [4] - 1:21, 35:9, 35:21, 35:22
**law** [22] - 10:21, 14:7, 14:8, 14:12, 14:19, 15:3, 15:4, 15:7, 15:13, 15:18, 15:20, 16:1, 21:14, 27:1, 27:5, 27:7, 31:15, 31:18, 32:3, 32:6, 32:9, 32:13
**LAW** [1] - 2:10
**laws** [1] - 15:16
**layer** [1] - 24:1
**least** [5] - 5:25, 11:10, 24:7, 27:9, 29:10
**left** [1] - 30:13
**legal** [1] - 26:1
**legislature** [1] - 31:19
**Lego** [1] - 33:8
**length** [1] - 31:19
**less** [2] - 27:18, 28:7
**letters** [1] - 32:5
**level** [1] - 16:3
**license** [2] - 32:21, 32:22
**licensing** [1] - 32:18
**lifting** [1] - 8:7
**light** [2] - 6:6, 29:7
**likely** [2] - 9:18, 21:14
**limitations** [1] - 4:23
**limited** [1] - 32:22

**line** [1] - 24:25
**link** [4] - 11:23, 12:3, 23:22, 23:23
**literally** [2] - 22:12, 27:13
**litigation** [1] - 7:12
**LLP** [2] - 2:4, 2:18
**log** [1] - 9:12
**look** [13] - 4:22, 5:19, 18:23, 19:2, 19:15, 21:1, 25:13, 25:16, 25:18, 28:5, 29:14, 29:23, 30:2
**looked** [1] - 17:19
**looking** [10] - 12:2, 12:5, 12:9, 16:12, 16:15, 18:23, 22:15, 24:19, 26:21, 30:9
**looks** [3] - 30:18, 33:21, 33:23
**LOS** [5] - 1:16, 1:22, 2:23, 4:1, 35:5
**lunch** [1] - 6:10

## M

**MAAME** [1] - 1:4
**Madden** [1] - 9:11
**majority** [2] - 16:10, 20:10
**Man** [1] - 33:8
**manifestation** [1] - 10:9
**manner** [1] - 14:16
**margin** [1] - 29:15
**material** [1] - 12:16
**matter** [5] - 4:20, 6:12, 11:12, 13:16, 33:15
**mean** [2] - 14:20, 27:17
**means** [2] - 14:20, 30:19
**MEANS** [1] - 35:14
**meet** [2] - 31:8, 33:19
**members'** [1] - 26:1
**membership** [1] - 14:11
**MENSAH** [1] - 1:4
**mention** [2] - 9:10, 13:24
**mentioned** [1] - 32:20
**might** [4] - 9:14, 23:25, 28:9, 32:18
**MILLER** [3] - 1:21, 35:21, 35:22
**mislead** [1] - 16:17
**missing** [1] - 10:13
**misspoke** [1] - 30:1
**misunderstanding** [2] - 19:22, 24:6

**mobile** [2] - 22:1, 27:13
**moment** [6] - 5:10, 22:16, 22:22, 24:10, 24:12, 24:18
**money** [2] - 7:10, 16:17
**MONROE** [1] - 2:12
**monthly** [2] - 14:11, 16:8
**months** [1] - 14:11
**moreover** [2] - 15:13, 29:8
**morning** [3] - 4:8, 4:15, 4:17
**most** [4] - 10:1, 13:14, 25:21, 26:6
**MOTION** [1] - 3:6
**MR** [45] - 4:8, 4:14, 4:15, 4:17, 5:11, 5:17, 5:21, 6:3, 6:4, 6:8, 7:5, 8:18, 8:21, 8:24, 9:2, 12:1, 12:6, 12:13, 15:12, 18:5, 18:7, 18:16, 19:15, 20:18, 22:18, 23:16, 23:18, 24:11, 24:16, 25:7, 25:12, 26:15, 27:6, 27:19, 28:4, 28:15, 28:17, 29:21, 29:25, 30:17, 31:2, 31:5, 31:11, 31:25, 33:14
**multiple** [1] - 16:21
**must** [5] - 6:19, 11:1, 16:1, 32:9, 33:9
**MY** [1] - 35:16

## N

**name** [2] - 21:8, 24:8
**names** [1] - 32:19
**nature** [1] - 28:6
**need** [4] - 6:23, 23:17, 28:14, 33:18
**needed** [1] - 5:4
**needs** [1] - 18:14
**Network** [1] - 10:7
**nevertheless** [1] - 8:4
**NEW** [1] - 2:8
**next** [7] - 7:18, 11:8, 11:9, 13:21, 19:9, 21:12, 27:24
**NFL** [1] - 9:11
**NO** [1] - 1:8
**notably** [1] - 13:24
**noted** [2] - 7:24, 16:10
**NOTES** [1] - 35:16
**nothing** [3] - 18:25, 20:5, 29:3

**notice** [18] - 8:10, 8:16, 10:15, 14:2, 15:10, 19:24, 20:3, 20:7, 20:21, 20:23, 22:2, 22:4, 22:7, 23:9, 24:1, 27:10, 27:25, 28:10
**NY** [1] - 2:8

**O**

**obvious** [1] - 26:4
**obviously** [5] - 7:12, 9:22, 18:24, 25:20, 26:6
**occur** [1] - 10:12
**occurs** [2] - 7:3, 8:1
**OCT** [1] - 4:1
**OCTOBER** [2] - 1:15, 35:19
**OF** [12] - 1:1, 1:2, 1:14, 2:1, 2:3, 2:16, 35:3, 35:5, 35:7, 35:10, 35:14, 35:16
**OFFICIAL** [3] - 1:21, 35:9, 35:23
**often** [2] - 14:17, 32:21
**old** [1] - 5:12
**ON** [2] - 2:3, 2:16
**once** [4] - 8:2, 8:3, 16:20, 17:12
**one** [19] - 4:20, 5:25, 6:24, 7:7, 7:23, 8:25, 9:10, 16:5, 16:6, 20:19, 21:5, 21:13, 22:20, 23:7, 23:13, 24:7, 25:9, 31:7
**one-off** [3] - 16:5, 16:6, 20:19
**ones** [1] - 29:4
**ongoing** [7] - 18:22, 19:1, 19:17, 20:15, 20:18, 20:21, 21:10
**online** [1] - 14:18
**onus** [1] - 21:25
**opinion** [5] - 14:6, 20:5, 20:10, 21:1, 21:13
**opportunity** [1] - 5:1
**opposed** [1] - 22:8
**opposing** [2] - 5:24, 31:14
**opposite** [1] - 28:2
**opposition** [3] - 29:14, 29:21, 29:22
**order** [4] - 6:21, 8:9, 18:9, 33:1
**otherwise** [2] - 20:6, 25:13

**out-sized** [1] - 25:15
**outline** [1] - 25:19
**overlaying** [1] - 15:13
**own** [1] - 33:23

**P**

**p.m** [4] - 31:4, 33:18, 33:22, 33:25
**page** [28] - 7:17, 7:18, 8:13, 9:3, 9:17, 10:18, 11:16, 13:6, 13:16, 13:21, 13:24, 14:1, 14:24, 16:13, 24:17, 24:19, 26:9, 28:22, 28:23, 29:14, 29:17, 29:21, 29:25, 30:3, 30:9, 31:22, 32:1, 32:5
**PAGE** [1] - 3:4
**pages** [2] - 11:5, 31:18
**paid** [1] - 7:9
**pains** [1] - 15:24
**paper** [2] - 5:13, 8:7
**paragraph** [1] - 11:9
**Paragraph** [1] - 30:10
**part** [6] - 11:8, 14:6, 20:19, 25:21, 29:23, 30:2
**particular** [5] - 6:25, 9:8, 17:4, 17:14, 17:23
**parties** [6] - 4:13, 4:25, 6:1, 24:14, 33:13, 33:16
**parts** [1] - 9:13
**party** [2] - 7:2, 7:11
**passing** [1] - 15:25
**past** [1] - 22:15
**patience** [2] - 33:11, 33:17
**PATRICK** [1] - 2:21
**Patrick** [1] - 4:10
**pay** [1] - 7:6
**payment** [3] - 7:5, 8:14, 17:9
**people** [3] - 8:13, 20:23, 26:12
**perhaps** [3] - 20:22, 24:14, 28:10
**period** [1] - 13:22
**permissible** [1] - 10:24
**person** [2] - 7:16, 14:1
**personally** [1] - 17:8
**PH** [1] - 1:23
**phone** [8] - 4:22, 4:24, 5:6, 5:9, 11:3, 19:19, 29:13
**phones** [1] - 19:18

**picks** [1] - 16:5
**piece** [2] - 7:22, 8:7
**PLACE** [1] - 35:12
**plaintiff** [1] - 21:8
**PLAINTIFF** [2] - 1:7, 2:3
**plaintiff's** [3] - 21:4, 26:1, 29:14
**plaintiffs** [6] - 4:16, 4:18, 14:9, 16:17, 21:5, 21:21
**platform** [2] - 6:20, 17:14
**platforms** [1] - 7:11
**plausible** [1] - 29:6
**Play** [1] - 6:18
**play** [27] - 6:25, 9:19, 9:21, 9:23, 10:1, 10:3, 11:2, 16:22, 18:19, 19:5, 22:15, 23:1, 23:2, 23:9, 23:21, 24:23, 24:24, 25:15, 25:17, 25:22, 25:25, 26:13, 27:4, 27:25
**played** [3] - 16:18, 16:21, 17:1
**players** [7] - 8:10, 9:4, 9:7, 9:18, 15:10, 16:25, 19:5
**playing** [2] - 9:5, 32:22
**plug** [1] - 5:3
**podium** [1] - 4:11
**point** [12] - 7:23, 8:24, 9:16, 11:7, 13:5, 19:11, 19:23, 22:6, 29:2, 30:7, 31:13, 32:10
**pointed** [1] - 11:8
**pointing** [1] - 19:16
**points** [5] - 8:21, 18:9, 18:12, 22:12, 31:13
**policy** [6] - 10:4, 11:6, 12:18, 12:19, 23:3, 24:25
**POLLOCK** [1] - 2:4
**pop** [2] - 18:20, 22:9
**popular** [1] - 9:10
**position** [1] - 15:8
**possible** [1] - 6:11
**precedent** [1] - 21:15
**precisely** [1] - 30:17
**predicate** [1] - 17:3
**preempt** [1] - 15:19, 32:6, 32:14
**preempted** [1] - 32:3
**preface** [1] - 9:3
**preliminary** [1] - 4:20
**present** [1] - 11:1

**presented** [3] - 7:17, 11:18, 14:15
**PRESIDING** [1] - 1:4
**pretty** [1] - 26:4
**primary** [1] - 14:1
**privacy** [6] - 10:4, 11:6, 12:17, 12:19, 23:3, 24:25
**problem** [3] - 14:12, 16:19, 25:9
**problems** [2] - 25:10, 25:12
**proceedings** [1] - 33:25
**PROCEEDINGS** [3] - 1:14, 3:4, 35:12
**process** [3] - 13:6, 17:2, 17:20
**programs** [1] - 15:5
**prominent** [1] - 27:4
**prompt** [1] - 7:24
**prongs** [1] - 20:5
**protect** [3] - 33:1, 33:3, 33:10
**provide** [1] - 22:4
**provided** [4] - 8:14, 10:25, 19:19
**provider** [1] - 6:21
**providers** [2] - 7:11, 28:8
**provides** [2] - 22:2, 22:13
**providing** [1] - 17:10
**pull** [1] - 28:23
**purchase** [2] - 7:6, 18:21
**purchased** [1] - 7:8
**purchases** [2] - 18:19, 32:25
**purpose** [1] - 8:6
**put** [5] - 9:17, 14:2, 22:20, 26:19, 27:3
**puts** [1] - 28:25

**Q**

**questions** [3] - 18:1, 18:9, 18:11
**quickly** [1] - 9:6
**quote** [9] - 9:4, 10:8, 10:14, 10:25, 11:16, 14:15, 14:20, 14:21, 32:4

**R**

**RAPHAEL** [1] - 2:5
**Raphael** [1] - 4:15
**ratings** [1] - 30:13
**reach** [1] - 19:5

**reaching** [1] - 17:6
**read** [6] - 9:22, 14:6, 17:19, 23:19, 23:21, 24:21
**readily** [1] - 11:1
**reading** [1] - 12:22
**reads** [4] - 24:24, 30:12, 30:15, 30:16
**real** [1] - 28:9
**really** [4] - 7:18, 7:22, 13:25, 25:25
**reason** [5] - 8:6, 9:2, 9:6, 10:5, 30:18
**reasonable** [3] - 12:22, 19:6, 20:2
**reasonably** [1] - 16:14
**reasons** [1] - 6:24
**rebuttal** [2] - 29:2, 32:10
**received** [1] - 6:1
**recent** [1] - 21:14
**record** [8] - 5:5, 5:7, 5:8, 28:19, 29:20, 29:24, 30:2, 31:1
**redesign** [1] - 17:18
**REDUCED** [1] - 35:13
**refer** [1] - 27:9
**reference** [2] - 30:1, 33:19
**referenced** [2] - 28:22, 29:3
**referred** [1] - 23:6
**referring** [2] - 9:22, 9:23
**reflects** [1] - 5:8
**regret** [2] - 12:21, 21:23
**regrettable** [1] - 12:20
**relationship** [15] - 16:15, 18:23, 18:25, 19:1, 19:7, 19:14, 19:16, 19:17, 20:15, 20:19, 20:22, 21:10, 28:7, 28:10, 33:3
**relationships** [1] - 16:12
**relevance** [1] - 8:12
**relevant** [1] - 9:16
**relies** [1] - 13:8
**relying** [1] - 8:15
**remedied** [1] - 10:15
**remind** [1] - 24:14
**renewal** [11] - 14:8, 14:12, 14:19, 15:3, 15:4, 15:5, 15:18, 15:20, 16:1, 31:18, 32:13
**repeat** [1] - 31:23
**repeatedly** [2] - 15:15, 17:1

**REPORTED** [1] - 35:11
**REPORTER** [4] - 1:21, 35:3, 35:9, 35:23
**REPORTER'S** [1] - 1:14
**representing** [1] - 30:21
**require** [3] - 17:8, 17:16, 32:19
**required** [3] - 15:9, 27:3, 32:3
**requirement** [1] - 17:2
**requirements** [8] - 14:13, 15:4, 15:7, 15:9, 31:19, 31:20, 32:7, 32:15
**requires** [1] - 4:27
**resolution** [2] - 5:14, 5:22
**resources** [1] - 33:9
**respect** [2] - 19:10, 33:5
**respectfully** [3] - 9:14, 13:11, 33:6
**respond** [2] - 18:8, 18:12
**return** [2] - 4:24, 5:6
**returned** [2] - 5:9, 16:25
**rights** [2] - 25:23, 26:1
**robust** [1] - 22:8
**ROOM** [1] - 1:22
**ruling** [6] - 6:15, 17:5, 33:5

**S**

**safeguarding** [1] - 32:18
**SAME** [1] - 35:13
**scale** [1] - 20:15
**scenario** [1] - 24:7
**school** [1] - 5:12
**screen** [24] - 9:16, 9:25, 12:18, 13:25, 17:17, 19:2, 19:5, 19:24, 20:4, 21:7, 25:14, 25:20, 26:6, 26:20, 27:25, 29:4, 29:19, 30:6, 30:20, 31:6, 32:16, 33:18, 33:21, 33:23
**screens** [2] - 7:17, 16:4
**search** [1] - 13:20
**second** [2] - 11:7, 26:18
**security** [1] - 21:19
**see** [15] - 11:4, 12:3,

12:4, 12:10, 25:9, 25:11, 26:13, 29:15, 30:5, 30:13, 30:14, 30:19, 30:22, 31:7
**sellers** [4] - 15:24, 16:10, 28:6, 31:17
**Sellers** [30] - 7:15, 13:8, 13:11, 13:13, 13:14, 13:18, 13:24, 14:5, 14:9, 14:24, 15:1, 15:6, 15:17, 15:24, 16:4, 17:23, 20:11, 20:12, 20:13, 26:16, 27:6, 27:9, 27:13, 27:17, 31:16, 31:18, 32:8, 32:12
**selling** [1] - 32:24
**semantic** [1] - 11:19
**sent** [1] - 22:9
**sentence** [3] - 12:9, 23:19, 23:21
**separate** [1] - 23:24
**service** [2] - 11:6, 11:11, 11:18, 11:25, 12:19, 14:3, 16:8, 16:9, 17:4, 20:1, 21:24, 22:11, 23:4, 23:14, 23:20, 23:22, 23:23, 24:24, 25:1, 25:3, 25:6, 28:21
**SET** [1] - 35:12
**set** [4] - 6:19, 14:23, 25:10, 25:11
**several** [1] - 14:11
**share** [1] - 28:14
**shot** [1] - 30:20
**show** [1] - 21:1
**shows** [1] - 22:7
**side** [1] - 22:20
**sign** [14] - 13:6, 16:4, 16:11, 17:2, 17:17, 17:20, 19:2, 19:5, 19:24, 20:4, 21:7, 25:20, 26:20, 27:12
**sign-in** [8] - 16:11, 17:2, 17:17, 17:20, 19:5, 19:24, 20:4, 25:20
**sign-up** [4] - 16:4, 19:2, 21:7, 26:20
**signed** [1] - 8:13
**significant** [1] - 10:6, 32:19, 33:9
**signing** [4] - 16:25, 18:17, 21:18, 27:23
**similar** [1] - 29:4
**simply** [3] - 15:2, 32:11, 32:24
**site** [1] - 13:18
**situation** [3] - 13:14,

28:8, 29:1
**size** [2] - 14:23, 14:24
**sized** [1] - 25:15
**sizes** [1] - 31:20
**sliding** [1] - 20:14
**slightly** [1] - 5:22
**slow** [1] - 20:16
**slower** [1] - 22:17
**small** [1] - 9:20
Smith [2] - 4:10, 32:23
**SMITH** [1] - 2:20
**social** [1] - 21:19
**software** [1] - 6:14
**solved** [1] - 22:3
**someone** [1] - 14:14
**somewhere** [1] - 31:1
**son** [1] - 9:10
**Sorry** [1] - 22:18
**sorry** [6] - 19:10, 20:18, 24:5, 26:17, 29:25, 31:25
**sort** [2] - 13:5, 26:23
**sounds** [1] - 19:11
**SOUTH** [1] - 2:22
**specific** [10] - 13:7, 13:10, 13:13, 14:13, 17:9, 18:9, 18:11, 31:20, 32:7, 32:15
**specifically** [9] - 10:2, 10:7, 10:14, 10:21, 11:18, 12:16, 14:7, 14:9, 20:11
**spending** [1] - 16:17
**spot** [1] - 27:7
**SS** [1] - 35:6
**staff** [1] - 6:10
**stage** [1] - 15:22
**standards** [1] - 27:9
**standing** [1] - 6:10
**Star** [1] - 33:7
**start** [6] - 4:13, 5:4, 18:10, 26:18, 29:15, 32:24
**started** [1] - 13:5
**STATE** [1] - 35:7
**state** [4] - 4:7, 32:3, 32:6, 32:9
**STATES** [4] - 1:1, 1:1, 1:4, 35:10
**statutory** [1] - 15:6
**STENOGRAPHIC** [1] - 35:16
**STENOGRAPHICAL LY** [1] - 35:11
**Stephanie** [1] - 21:7
**stepping** [1] - 27:21
**steps** [2] - 19:4, 28:12
**still** [3] - 26:13, 26:16, 28:2

**stop** [1] - 8:5
**store** [6] - 6:18, 8:3, 18:20, 19:20
**Store** [2] - 29:10, 30:4
**stores** [1] - 9:10
**STREET** [3] - 1:22, 2:6, 2:12
**strict** [2] - 20:20, 20:22, 28:7
**stuff** [1] - 26:13
**submission** [2] - 17:8, 33:16
**submit** [12] - 9:14, 13:11, 17:5, 21:14, 25:23, 26:15, 26:22, 31:3, 31:9, 33:6, 33:13, 33:23
**submitted** [4] - 4:21, 6:22, 6:24, 11:12
**subscribed** [1] - 16:7
**subscription** [2] - 14:14, 16:9
**substantively** [1] - 10:19
**sufficient** [2] - 23:10, 28:11
**suggest** [2] - 17:19, 21:10
**suggestion** [1] - 29:7
**suggests** [1] - 10:22
**SUITE** [1] - 2:13
**supports** [2] - 27:5, 31:15
**supposed** [4] - 16:8, 24:2, 26:21
**Supreme** [4] - 15:15, 31:21, 32:2, 32:5
**surrounding** [5] - 13:4, 14:21, 14:22, 14:23, 16:2
**suspicion** [1] - 28:9
**system** [1] - 5:4

**T**

**tapping** [3] - 10:3, 23:2, 24:24
**Tax** [2] - 11:17, 12:24
**teaches** [1] - 28:6
**technology** [1] - 5:12
**tentative** [13] - 6:2, 6:15, 7:22, 8:22, 9:3, 9:13, 9:18, 10:22, 11:9, 16:5, 17:15, 17:19, 18:13
**term** [2] - 13:20, 14:17
**Terms** [2] - 11:17, 28:24
**terms** [54] - 6:6, 9:19, 10:3, 10:11, 10:17,

10:22, 10:23, 10:24, 11:6, 11:11, 11:17, 11:24, 11:25, 12:2, 12:3, 12:9, 12:11, 12:17, 12:19, 12:20, 12:21, 13:21, 14:3, 14:14, 17:3, 19:25, 20:24, 21:24, 22:9, 22:11, 22:13, 23:3, 23:4, 23:13, 23:20, 23:21, 23:23, 23:24, 24:2, 24:24, 25:1, 25:3, 25:5, 25:8, 25:25, 26:25, 27:14, 27:15, 28:1, 28:21
**test** [2] - 15:7, 20:15
**text** [7] - 9:20, 10:1, 14:20, 14:21, 14:22, 14:23
**textual** [1] - 19:24
**THAT** [3] - 35:11, 35:13, 35:15
**THE** [50] - 4:3, 4:12, 4:19, 5:8, 5:15, 5:19, 5:23, 6:5, 7:4, 8:5, 8:20, 8:23, 9:1, 11:21, 12:2, 12:8, 15:8, 18:2, 18:6, 18:11, 19:10, 20:16, 22:16, 22:19, 23:15, 23:17, 24:5, 24:12, 24:18, 25:9, 26:2, 27:1, 27:16, 28:3, 28:13, 28:16, 29:19, 29:23, 30:8, 30:25, 31:3, 31:6, 31:23, 33:12, 33:15, 35:9, 35:10, 35:11, 35:12, 35:13
**THEREAFTER** [1] - 35:13
**therefore** [1] - 30:6
**therein** [1] - 32:2
**they've** [2] - 8:13, 32:25
**thinking** [1] - 6:6
**third** [4] - 7:2, 7:10, 8:25, 13:5
**THIS** [1] - 35:15
**three** [3] - 8:21, 9:13, 13:12
**Thrones** [9] - 6:16, 21:11, 21:17, 24:22, 25:16, 26:7, 30:12, 30:23, 33:8
**THURSDAY** [2] - 1:15, 4:1
**TIME** [1] - 35:12
**title** [3] - 12:4, 23:6, 29:12

titled [1] - 28:23
TM [1] - 24:22
TO [2] - 3:6, 35:13
today [2] - 15:14, 31:4
took [2] - 15:24, 30:19
top [2] - 24:22, 30:11
transact [1] - 17:13
transaction [8] -
18:17, 18:24, 20:9,
20:14, 20:20, 21:2,
27:20, 28:6
transactional [6] -
13:9, 14:5, 15:1,
16:2, 17:10, 32:10
transactions [1] - 16:5
TRANSCRIPT [1] -
1:14
TRANSCRIPTION [2] -
35:14, 35:15
transported [1] -
13:21
trial [2] - 13:22, 16:8
tried [1] - 5:13
true [1] - 19:23
TRUE [1] - 35:15
truly [1] - 31:9
trust [1] - 6:1
try [2] - 6:11, 30:4
trying [1] - 26:5
Turbo [2] - 11:16,
12:24
turned [1] - 16:9
two [5] - 11:23, 12:23,
21:13, 22:22, 31:13
type [6] - 11:5, 13:10,
13:20, 14:21, 14:22,
17:17
typed [1] - 13:18
TYPEWRITTEN [1] -
35:13
typo [1] - 23:13

## U

U.S [2] - 31:22, 32:1
ultimately [1] - 7:10
unambiguous [1] -
10:9
under [5] - 23:5, 23:9,
26:16, 32:14, 33:15
underlined [2] - 11:4,
27:12
underlying [4] - 7:7,
15:23, 16:16, 32:4
underneath [2] - 23:1,
30:11
UNITED [4] - 1:1, 1:1,
1:4, 35:9
unless [1] - 18:1
unlike [5] - 12:24,

13:14, 17:23
unpublished [1] -
21:13
up [18] - 6:19, 8:7,
8:13, 16:4, 16:6,
18:17, 18:20, 19:2,
21:7, 21:18, 22:9,
25:10, 25:11, 25:22,
26:20, 27:23, 28:23
updates [1] - 30:19
urge [1] - 9:24
user [13] - 7:24, 10:9,
11:17, 12:22, 13:20,
17:10, 18:24, 24:2,
25:14, 27:24, 28:8,
32:21
user's [1] - 10:8
users [7] - 10:23,
22:9, 22:13, 25:21,
27:13, 33:6
users' [1] - 26:24
uses [5] - 11:10,
11:12, 23:4, 23:6,
23:9

## V

various [1] - 20:23
version [1] - 33:23
versus [7] - 4:5, 10:6,
11:15, 19:12, 19:13,
31:22, 32:1
vetted [1] - 17:13
via [1] - 19:24
video [2] - 7:20, 16:20
view [1] - 31:15
viewed [1] - 17:3
vitally [1] - 33:2
VS [1] - 1:8

## W

Warner [16] - 4:5,
19:2, 19:3, 19:8,
19:12, 22:3, 27:23,
29:5, 29:12, 29:15,
29:16, 29:17, 30:5,
30:16, 30:24, 32:20
WARNER [1] - 1:9
Wars [1] - 33:7
WAS [1] - 35:13
web [1] - 11:5
website [3] - 7:16,
22:1, 28:8
welcome [2] - 21:7,
33:22
WEST [2] - 1:22, 2:12
WESTERN [1] - 1:2
whatsoever [1] - 14:4
whole [1] - 25:22

Wifi [1] - 4:23
Woldman [1] - 24:20
wonderful [1] - 8:23
words [3] - 15:4, 20:4,
21:9
works [1] - 4:23
world [1] - 27:21
wrap [1] - 16:11

## Y

year [1] - 10:6
YORK [1] - 2:8

## Z

zip [1] - 21:8

1   CHRISTOPHER CHORBA, SBN 216692
        cchorba@gibsondunn.com
2   JEREMY S. SMITH, SBN 283812
        jssmith@gibsondunn.com
3   PATRICK J. FUSTER, SBN 326789
        pfuster@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
5   Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
6   Facsimile:  213.229.7520

7   *Attorneys for Defendant*
    *Warner Bros. Entertainment Inc.*

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10                       WESTERN DIVISION

11

12  CHARISSA KEEBAUGH, STEPHANIE         CASE NO. 2:22-CV-01272-MEMF (AGRx)
    NEVEU, HEATHER MERCIERI, SOPHIA
13  NICHOLSON, and P.W., by and through JOIE   **DECLARATION OF PATRICK J. FUSTER**
    WEIHER,                              **IN RESPONSE TO REQUEST OF COURT**
14                                       **TO SUBMIT IMAGE**
                    Plaintiffs,
15                                       **Hearing:**
         v.                              Date:      October 6, 2022
16                                       Time:      10:00 a.m.
    WARNER BROS. ENTERTAINMENT INC.,     Place:     Courtroom 8B
17  a Delaware corporation,              Judge:     Hon. Maame Ewusi-Mensah
                                                    Frimpong
18                  Defendant.

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PATRICK J. FUSTER
IN RESPONSE TO REQUEST OF COURT TO SUBMIT IMAGE       **2-ER-59**
CASE NO. 2:22-CV-01272-MEMF (AGRx)

# **DECLARATION OF PATRICK J. FUSTER**

I, Patrick J. Fuster, declare and state as follows.

1.      I am an attorney licensed to practice law in the State of California.  I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendant Warner Bros. Entertainment Inc.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      At today's hearing, the Court requested that the parties submit an image of how an app store displays *Game of Thrones: Conquest* before a user downloads the game.

3.      I conferred with Plaintiffs' counsel, Raphael Janove, who sent me three images of the *Game of Thrones: Conquest* page, the first displayed on Jay Kumar's iPhone 13 Pro, and the second and third displayed on Karl Kronenberger's iPhone 12.

4.      Enclosed as **Exhibit 9** is a true and correct copy of the image from Mr. Kumar's phone.

5.      Enclosed as **Exhibit 10** is a true and correct copy of an image from Mr. Kronenberger's phone, which demonstrates how the screen appears when the user initially arrives at the page.  Mr. Janove informs me this image is consistent with the picture on page 18 of the Amended Complaint at Docket Entry 39.

6.      Enclosed as **Exhibit 11** is a true and correct copy of the image from Mr. Kronenberger's phone, which demonstrates how the screen appears when the user scrolls the information bar to the left.

7.      Enclosed as **Exhibit 12** is a true and correct image of the current sign-in screen for *Game of Thrones: Conquest*, which counsel for Warner Bros. displayed at today's hearing.  I took a screenshot of this image on my phone, an iPhone 13 Pro.  This image has a higher resolution, closer to that displayed on an actual phone screen, but is otherwise identical to Exhibit 7 submitted with Docket Entry 41-1.

8.      Mr. Janove informed me that Plaintiffs do not object to our filing of the enclosed images with the Court.

1       I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.  Executed on October 6, 2022, in Los Angeles, California.

3

4                                                     /s/ Patrick J. Fuster
                                                    Patrick J. Fuster

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

3
RESPONSIVE DECLARATION OF PATRICK J. FUSTER
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-61

# Exhibit 9





# Exhibit 10



# Exhibit 11



### Game of Thrones: Conquest ™

Win Wars with Battle Strategy



| RATINGS | AGE | CHART | DEVELOPER |
|---------|-----|-------|-----------|
| 4.3 ★★★☆ | 12+ Years Old | #72 Role Playing |  Warner Bros. |

## What's New

Version History

Version 5.10.710051    1w ago

The dragon takeover continues in GOT:Conquest, with plenty of spoils for the daring and bold!
  –New Dragon Rider avatars available now!   more

## Preview



| Today | Games | Apps | Arcade | Search |
|-------|-------|------|--------|--------|

# Exhibit 12



1   CHRISTOPHER CHORBA, SBN 216692
      cchorba@gibsondunn.com
2   JEREMY S. SMITH, SBN 283812
      jssmith@gibsondunn.com
3   PATRICK J. FUSTER, SBN 326789
      pfuster@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
5   Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
6   Facsimile:  213.229.7520

7   *Attorneys for Defendant*
    *Warner Bros. Entertainment Inc.*

8                          UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10                              WESTERN DIVISION

11

12  CHARISSA KEEBAUGH, STEPHANIE       CASE NO. 2:22-CV-01272-MEMF (AGRx)
    NEVEU, HEATHER MERCIERI, SOPHIA
13  NICHOLSON, and P.W., by and through JOIE   **DEFENDANT WARNER BROS.**
    WEIHER,                            **ENTERTAINMENT INC.'S REPLY IN**
14                                     **SUPPORT OF MOTION TO COMPEL**
                     Plaintiffs,       **ARBITRATION AND STAY PROCEEDINGS**
15
         v.                            **Hearing:**
16                                     Date:     October 6, 2022
    WARNER BROS. ENTERTAINMENT INC.,   Time:     10:00 a.m.
17  a Delaware corporation,            Place:    Courtroom 8B
                                       Judge:    Hon. Maame Ewusi-Mensah
18                   Defendant.                  Frimpong

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................. 1

II.   ARGUMENT ................................................................................................... 1

      A.    Plaintiffs Unambiguously Assented to the TOU by Clicking the Play Button
            Above a Conspicuous Disclaimer Regarding the Existence of Terms and
            Conditions ............................................................................................. 1

            1.    Which Exact Screen Each Plaintiff Saw Is Irrelevant ...................... 2

            2.    The Sign-In Screens Provide Reasonably Conspicuous Notice of the
                  TOU. ....................................................................................... 2

            3.    Plaintiffs Unambiguously Manifested Assent to the TOU. .............. 5

      B.    The Arbitration Agreement Is Not Unconscionable .................................... 6

      C.    Plaintiffs Have Not Sought and Do Not Seek "Public Injunctive Relief" .......... 9

      D.    P.W. Cannot Disaffirm the Terms of Use ................................................... 9

III.  CONCLUSION ................................................................................................ 10

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.V. v. iParadigms, Ltd. Liab. Co.,*
544 F. Supp. 2d 473 (E.D. Va. 2008) ..................................................................10

*Andre v. U.S. Bank, N.A.,*
No. 20-4854-CBM, 2021 WL 3598737 (C.D. Cal. May 20, 2021) .......................9

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ..............................................................................................6

*B.D. v. Blizzard Entm't, Inc.,*
76 Cal. App. 5th 931 (2022) ............................................................................4, 6

*Be In, Inc. v. Google Inc.,*
2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) .........................................................5

*Berman v. Freedom Fin. Network LLC,*
30 F.4th 849 (9th Cir. 2022) ................................................................1, 3, 4, 5

*Blair v. Rent-A-Center, Inc.,*
928 F.3d 819 (9th Cir. 2019) .................................................................................9

*Boy Blue, Inc. v. Brown,*
74 Va. Cir. 4 (2007) ............................................................................................10

*Brooks v. IT Works Mktg., Inc.,*
2022 WL 2079747 (E.D. Cal. June 9, 2022) ....................................................3, 5

*Buckeye Check Cashing, Inc. v. Cardegna,*
546 U.S. 440 (2006) ...........................................................................................6, 7

*Chamber of Commerce v. Bonta,*
13 F.4th 766 (9th Cir. 2021) ...............................................................................10

*Colgate v. JUUL Labs, Inc.,*
402 F. Supp. 3d 728 (N.D. Cal. 2019) ..................................................................3

*Cordas v. Uber Techs., Inc.,*
228 F. Supp. 3d 985 (N.D. Cal. 2017) ..................................................................3

*Cottrell v. AT&T Inc.,*
2021 WL 4963246 (9th Cir. Oct. 26, 2021) ..........................................................9

*Cullinane v. Uber Techs., Inc.,*
893 F.3d 53 (1st Cir. 2018) ...................................................................................3

*Doe v. Roblox Corp.,*
2022 WL 1459568 (N.D. Cal. May 9, 2022) .........................................................5

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3   *Dohrmann v. Intuit, Inc.*,
      823 F. App'x 482 (9th Cir. 2020) ................................................................5

4

5   *Duarte v. JPMorgan Chase Bank, N.A.*,
      No. 21-1907-ODW, 2021 WL 5299908 (C.D. Cal. Nov. 15, 2021).................9

6   *Epic Systems Corp. v. Lewis*,
      138 S. Ct. 1612 (2018) .............................................................................7

7

8   *I.B. ex rel. Fife v. Facebook, Inc.*,
      905 F. Supp. 2d 989, 1000 (N.D. Cal. 2012) ............................................10

9   *Greer v. Sterling Jewelers, Inc.*,
      2018 WL 3388086 (E.D. Cal. July 10, 2018) ..........................................8, 9

10

11  *Hodges v. Comcast Cable Commc'ns, LLC*,
      21 F.4th 535 (9th Cir. 2021) .....................................................................9

12  *I.B. by and through Bohannon v. Facebook, Inc.*,
      82 F. Supp. 3d 1115 (N.D. Cal. 2015) .....................................................10

13

14  *Kindred Nursing Ctrs. v. Clark*,
      137 S. Ct. 1421 (2017) .........................................................................7, 10

15  *MacClelland v. Cell Co. P'ship*,
      2022 WL 2390997 (N.D. Cal. July 1, 2022) .............................................7, 8

16

17  *McGill v. Citibank, N.A.*,
      2 Cal. 5th 945 (2017) ...............................................................................7

18  *McKee v. Audible, Inc.*,
      No. 17-1941-GW, 2017 WL 4685039 (C.D. Cal. July 17, 2017)...................5

19

20  *Meyer v. Uber Techs., Inc.*,
      868 F.3d 66 (2d Cir. 2017) ....................................................................2, 3

21  *Mohamed v. Uber Techs., Inc.*,
      848 F.3d 1201 (9th Cir. 2016) ...................................................................6

22

23  *Moreno v. Sanchez*,
      106 Cal. App. 4th 1415 (2003) ..................................................................7

24  *Nguyen v. Barnes & Noble Inc.*,
      763 F.3d 1171 (9th Cir. 2014) ...................................................................3

25

26  *Nguyen v. Tesla, Inc.*,
      No. 19-1422-JLS, 2020 WL 2114937 (C.D. Cal. Apr. 6, 2020) ...................9

27  *Oberstein v. Live Nation Entm't, Inc.*,
      No. 20-3888-GW, 2021 WL 4772885 (C.D. Cal. Sept. 20, 2021) .................6

28

Gibson, Dunn &
Crutcher LLP

iii

DEFENDANT'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-73

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3

*PacifiCare Health Systems, Inc. v. Book,*
538 U.S. 401 (2003).................................................................................................8

4

*Peter v. DoorDash, Inc.,*
445 F. Supp. 3d 580 (N.D. Cal. 2020) .................................................................2

5

6

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US) LLC,*
55 Cal. 4th 223 (2012)...........................................................................................6

7

*Ponkey v. LLR, Inc.,*
No. 21-518-AB, 2021 WL 4595801 (C.D. Cal. Aug. 5, 2021)...........................8

8

9

*Poublon v. C.H. Robinson Co.,*
846 F.3d 1251 (9th Cir. 2017).........................................................................6, 7, 9

10

*Price v. Apple, Inc.,*
2022 WL 1032472 (N.D. Cal. Apr. 6, 2022) ......................................................6

11

12

*R.A. v. Epic Games, Inc.,*
No. 19-1488-GW, 2019 WL 6792801 (C.D. Cal. July 30, 2019).....................10

13

*Rent-A-Center, West, Inc. v. Jackson,*
561 U.S. 63 (2010).................................................................................................6

14

15

*Seaton v. Henson,*
83 Eng. Rep. 527 (K.B. 1679)...............................................................................1

16

*Selden v. Airbnb, Inc.,*
4 F.4th 148 (D.C. Cir. 2021)..............................................................................2, 3

17

18

*Sellers v. JustAnswer LLC,*
73 Cal. App. 5th 444 (2021) .....................................................................2, 3, 4, 5

19

*Shroyer v. New Cingular Wireless Servs., Inc.,*
498 F.3d 976 (9th Cir. 2007).................................................................................6

20

21

*Smith v. Baldwin,*
510 F.3d 1127 (9th Cir. 2007) (en banc)..............................................................8

22

*Snow v. Eventbrite, Inc.,*
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020)......................................................2

23

24

*Soltani v. Western & Southern Life Ins. Co.,*
258 F.3d 1038 (9th Cir. 2001)...............................................................................8

25

*Starke v. SquareTrade, Inc.,*
913 F.3d 279 (2d Cir. 2019)..................................................................................3

26

27

*Stover v. Experian Holdings, Inc.,*
978 F.3d 1082 (9th Cir. 2020)...............................................................................9

28

iv

2-ER-74

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3  *In re Stubhub Refund Litig.*,
      2021 WL 5447006 (N.D. Cal. Nov. 22, 2021) ..................................................... 2

4

5  *Tompkins v. 23andMe, Inc.*,
      840 F.3d 1016 (9th Cir. 2016) .............................................................................. 8

6  *West v. Uber Techs.*,
      No. 18-3001-PSG, 2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ........................ 3

7

**STATUTES**

8

9 U.S.C. § 2 ............................................................................................................. 6, 8

9

Cal. Fam. Code § 6700 ................................................................................................ 5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

2-ER-75

# I.    INTRODUCTION

Plaintiffs do not dispute that the FAA governs this Motion or that the arbitration agreement encompasses the claims raised in the Amended Complaint.  Nor do they contend that their class allegations could survive the agreement's enforceable class action waiver.  To avoid their obligation to arbitrate, Plaintiffs instead argue that they did not agree to the Terms of Use (TOU) because players would have missed the 24 words on the screen—almost all of which discussed the TOU—before tapping "Play."  They also present a grab bag of unconscionability arguments, try to conjure a public injunction request where none exists, purport to disaffirm the TOU for the minor plaintiff after gaining access to *Game of Thrones: Conquest*, and attempt to distract the Court with arguments about the merits of their claims that have no bearing on this Motion.  Plaintiffs will have a full opportunity to present their claims, but they agreed to present them to an arbitrator under the TOU.

# II.    ARGUMENT

## A.    Plaintiffs Unambiguously Assented to the TOU by Clicking the Play Button Above a Conspicuous Disclaimer Regarding the Existence of Terms and Conditions

The sign-in screens for *Game of Thrones: Conquest* provided sufficiently conspicuous notice that terms and conditions governed Plaintiffs' access to the game.  In clear language right below the play button, users were informed that by pressing play they were accepting the TOU.  (*See* Woldman Decl., Exs. 5–7, Dkt. 41-1.)  The screens also include a button titled "Terms of Service" that (with a simple touch of the mobile screen) would allow the user to view the entire TOU, including an upfront disclosure in all caps that "THESE TERMS ALSO REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES."  (*Id.*, Exs. 1–3.)  This layout ensures "that a reasonably prudent Internet user would have seen" both the affirmation and the hyperlink, and then "unambiguously manifest[ed]" assent by "clicking a button."  *Berman v. Freedom Fin. Network LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Perhaps because this affirmation was so simple and straightforward, Plaintiffs have attempted to muddy the waters by citing cases about hidden hyperlinks, confusing sign-in screens, and a host of other issues not present here.  In fact, Plaintiffs seem to wish for a return to formalities of 17th-century English law, where contracts had to be sealed with wax, *see Seaton v. Henson*, 83 Eng. Rep. 527

(K.B. 1679), rather than on the actual inquiry here: whether there was *reasonable* notice. There was.

### 1.    *Which Exact Screen Each Plaintiff Saw Is Irrelevant.*

Plaintiffs' first argument is not only hyper-technical, but academic. Plaintiffs argue that the record does not link each Plaintiff to a particular sign-in screen. (Opp. 5, Dkt. 46.) But Plaintiffs never argue that they did *not* use one of the sign-in screens in the record. (Exs. 5–7; *see* Janove Decl., Ex. A at 3, Dkt. 46-1.) Nor do they contend that one version was permissible, whereas another was not— probably because the screens are substantively identical. Both layouts have minimal, easily identifiable text and say that by pressing play the user agrees to the TOU. (Exs. 5–7.) Which version each Plaintiff used is therefore immaterial to the analysis.[1]

### 2.    *The Sign-In Screens Provide Reasonably Conspicuous Notice of the TOU.*

Plaintiffs principally object that the sign-in screen did not provide adequate notice because the affirmation language was "vastly over-shadowed by other elements"—namely, the "large blue 'Play' button" and graphic art. (Opp. 7–8.) But this turns the conspicuousness inquiry on its head. Plaintiffs essentially argue the sign-in screen was too clean—too *un*cluttered. That's the exact opposite of the cases on which Plaintiffs rely like *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 473 (2021), where the question was whether "other elements on the screen clutter or otherwise obscure the textual notice."

Warner Bros. hardly could have designed a screen with less clutter. The sign-in screen depicted in Exhibit 7 contains only 24 words—the game's title (four), the "PLAY" button (one), the notice of the TOU (14), the Privacy Policy button (two), and the Terms of Service button (three). (*See also* Ex. 5 [19 total words due to *shorter* affirmation].) This "simple design" made the affirmation and hyperlink conspicuous. *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (applying California law). "The entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (same); *see, e.g.*, *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 587 (N.D. Cal. 2020). While Plaintiffs

---

[1] Because Warner Bros. has identified the universe of sign-in screens (Woldman Decl. ¶¶ 7–9), this case is unlike the cases cited by Plaintiffs where the defendant could not identify "what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period." *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at 5 (N.D. Cal. Oct. 19, 2020); *In re Stubhub Refund Litig.*, 2021 WL 5447006, at *7 (N.D. Cal. Nov. 22, 2021). Warner Bros. even offered to identify which particular sign-in screen each Plaintiff encountered, but Plaintiffs refused to share their display names with Warner Bros., as needed to look up that information. Plaintiffs conceded they didn't "need additional information about specific graphic images," and cannot reverse course now. (Janove Decl., Ex. A at 3.)

string together quotes about defects in *other* cases—such as "diverse text" or distracting "promotional advertisements," *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019)—they don't (and can't) identify any decision rejecting a similar sign-in screen.  (Opp. 7–8.)

No other feature of the sign-in screens defeats the conspicuous notice of the TOU.  Plaintiffs point to the purportedly "outsized Play button" with its "bright blue" color.  (*Id.* at 8, 10.)  But unlike screens where the button was "[f]ar above" the affirmation, *Starke*, 913 F.3d at 294, the play button here is "spatially coupled" with the TOU notice, *Meyer*, 868 F.3d at 78.  The play button's size and color thus "draw the user's attention" toward rather than "away from the most important part of the page."  *Berman*, 30 F.4th at 857.  Plaintiffs also mention that the screen plays the theme music from *Game of Thrones* and depicts "a striking graphic image of dragons."  (Opp. 8.)  But they cite no authority—nor offer any reason to believe—that music or background art makes a user *less* likely to read the page before clicking play.  Warner Bros. set out the white-text affirmation against a black background to ensure the graphic did not "obscure the textual notice."  *Sellers*, 73 Cal. App. 5th at 473.

Plaintiffs next contend that the reasonably prudent user would not know that the "Terms of Service" button was a hyperlink.  But their style nits—underlining, capital letters, blue font—come from precedent on *website* hyperlinks.  (Opp. 8.)  *See, e.g.*, *Brooks v. IT Works Mktg., Inc.*, 2022 WL 2079747, at *6 (E.D. Cal. June 9, 2022) (discussing "tiny grey hyperlink displayed against a slightly lighter grey background and located in the very bottom left corner of each webpage").  In a mobile application like *Game of Thrones: Conquest*, a clickable "stand-alone rectangular box" indicates a hyperlink.  *West v. Uber Techs.*, No. 18-3001-PSG, 2018 WL 5848903, at *3–4 (C.D. Cal. Sept. 5, 2018); *see, e.g.*, *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988 (N.D. Cal. 2017); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019).  "Reasonable notice does not turn on where the hyperlinked text falls on the color wheel," *Selden*, 4 F.4th at 157, and any suggestion that the text within a clickable box must be blue or underlined presumes "that the user has never before encountered an app or entered into a contract using a smartphone," *Meyer*, 868 F.3d at 77.  In short, the screen's simple three-button design did not force anyone "to ferret out hyperlinks," *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014), which renders this case unlike *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (cited at Opp. 9).

Plaintiffs also argue that the sign-in screens, as displayed on a phone, provided less conspicuous notice of the TOU than the exhibits filed by Warner Bros. (Opp. 6.) In fact, the opposite is true. Plaintiffs purport to accurately represent how the sign-in screen would appear on an iPhone 12. (Kumar Decl. ¶¶ 4–5, Dkt. 46-2; Opp. 7.) But they have submitted images that, while sized to a phone screen, have a much lower resolution than an iPhone 12. (Fuster Decl. ¶¶ 6–7.) Their images distort the conspicuousness of the disclaimer and buttons as compared to their appearance on an actual phone. Although Plaintiffs' counsel personally knows how the sign-in screen appears on a phone (*see* Kumar Decl. ¶ 2), the Opposition takes liberties in complaining that the "language relating to Defendant's TOU is *hidden in small, transparent font*" and that "[o]n very close examination there is a shape of a box drawn in a thin line around 'Terms of Service' [that is] '*barely legible to the naked eye*'" (Opp. 7, 9 [emphasis added]). Plaintiffs' accusations fairly describe only their own low-resolution images, not the sign-in screen as displayed by Warner Bros. on its mobile application.

To correct the misimpression created by Plaintiffs and to allow the Court to view (and, if inclined, to hear) the actual sign-in screen, Warner Bros. has submitted an iPhone 12 Pro—which has the same screen size and resolution as an iPhone 12—installed with *Game of Thrones: Conquest*. (Fuster Decl. ¶¶ 2–6; *id.*, Ex. 8.) The phone screen leaves no doubt that the white affirmation stands out against the black background and that the Terms of Service button underscores "the obviousness of any associated hyperlink." *Sellers*, 73 Cal. App. 5th at 473. Warner Bros. welcomes the comparison of its screen to the "barely legible" text in *Berman*, which will only confirm that Warner Bros. honored its obligation "to put users on notice of the terms." 30 F.4th at 856–57, 859–60. (*See* Opp. 10.)

Plaintiffs lastly contend that the sign-in screen was inadequate as to P.W. (*Id.* at 11.) In support, they misleadingly quote *Sellers* for the notion that children may not "understand that their use of a website may be governed by contractual terms." 73 Cal. App. 5th at 475. *Sellers* did not hold that conspicuousness depends on the user's age. To the contrary, the Court of Appeal held that, because "not all internet users are alike," "it is more appropriate" for inquiry notice "to *focus on the providers*, which have complete control over the design of their websites." *Id.* at 475–76 (emphasis added); *see B.D. v. Blizzard Entm't, Inc.*, 76 Cal. App. 5th 931, 950–51 (2022) (applying standard conspicuousness analysis to minor). The Ninth Circuit too has adopted an objective analysis of "conspicuousness

Gibson, Dunn & Crutcher LLP

tailored to the reasonably prudent Internet user." *Berman*, 30 F.4th at 857. Contract formation does not double-count P.W.'s minor status, because disaffirmance already addresses such considerations. (*See infra* pp. 9–10.) In holding otherwise, *Doe v. Roblox Corp.*, 2022 WL 1459568, at *6 (N.D. Cal. May 9, 2022), misinterpreted California law, which provides that "a minor may make a contract in the same manner as an adult, subject to the power of disaffirmance." Cal. Fam. Code § 6700.

### 3. *Plaintiffs Unambiguously Manifested Assent to the TOU.*

Plaintiffs also unambiguously manifested their assent to the TOU by clicking the play button. This conclusion follows directly from *Berman*. There, the Ninth Circuit acknowledged that the "notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>.'" 30 F.4th at 858. The screens here contained nearly identical language. (Ex. 5 ["By tapping 'Play' I agree to the Terms of Service"]; Exs. 6–7 ["By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy."].)

Plaintiffs counter that two of the sign-in screens refer to "Terms of Use" while the hyperlink's title is "Terms of Service." (Opp. 11–12.) But these are generic synonyms. *See, e.g.*, *Be In, Inc. v. Google Inc.*, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013). That is why the Ninth Circuit didn't skip a beat when approving a screen with "the hyperlink 'TurboTax Terms of Use'" that directed the user to "the 'Intuit Terms of Service.'" *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020). Plaintiffs' cases show this hypertechnical difference could matter only if a reasonable user would think that the "Terms of Service" hyperlink was separate from "Terms of Use" (which is also the title of the underlying agreement). (*See* Exs. 1–4.) But "Terms of Use" could point the user only to the "Terms of Service" button immediately below the affirmation. (Exs. 6–7.)[2]

Plaintiffs also argue that the notice ("By tapping 'Play' I accept the Terms of Use") does not make clear that "the user *agrees* to the terms of use." (Opp. 11.) Nonsense. *See Sellers*, 73 Cal. App. 5th at 463 (using "'I agree' or 'I accept' button" interchangeably); *Berman*, 30 F.4th at 856

---

[2] Plaintiffs' cases are not to the contrary. In *Brooks*, the phrase "I AGREE TO ALL TERMS & CONDITIONS" seemed to refer to "the Loyal Customer Agreement located immediately above it (also titled 'TERMS AND CONDITIONS'), and not to the 'Terms of Use' hyperlink found far *below* the electronic acknowledgement." 2022 WL 2079747, at *7. And in *McKee v. Audible, Inc.*, No. 17-1941-GW, 2017 WL 4685039 (C.D. Cal. July 17, 2017), the user would have to "scroll down" for the disclosure of the "Conditions of Use" and would not see "Terms of Use" until the "following page." *Id.* at *8 (distinguishing "decisions where buttons appeared next to or above disclosure that explicitly tied pressing the button to terms of service").

(asking if "user engages in conduct that manifests her *acceptance* of those terms") (emphasis added).

**B.     The Arbitration Agreement Is Not Unconscionable**

To avoid arbitration, Plaintiffs must show that the TOU is both procedurally and substantively unconscionable.  *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016).  It is neither.

That the TOU is an "adhesion" contract (Opp. 13) does not make it "per se unconscionable" procedurally.  *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017).  Plaintiffs cannot show unfair surprise because (i) the sign-in screen conspicuously disclosed the TOU (*see supra* pp. 2–5), (ii) the TOU's first lines disclose the arbitration provisions (Ex. 3 at 32 [2020 TOU]), and (iii) players signing up for an online game can expect "'a continuing, forward-looking relationship' governed by terms and conditions," *B.D.*, 76 Cal. App. 5th at 951.  Plus, while market alternatives "'*alone* can[not] defeat a claim of procedural unconscionability,'" *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 985 (9th Cir. 2007), they do strongly cut against such a finding here, because "'the consumer always has the option of simply forgoing'" a "'nonessential recreational activity,'" *Price v. Apple, Inc.*, 2022 WL 1032472, at *3 (N.D. Cal. Apr. 6, 2022); *see Oberstein v. Live Nation Entm't, Inc.*, No. 20-3888-GW, 2021 WL 4772885, at *9 (C.D. Cal. Sept. 20, 2021).

The arbitration agreement also is not substantively unconscionable.  It operates bilaterally and shifts fees to Warner Bros., which ensures that arbitration will not be "overly harsh or one-sided." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US) LLC*, 55 Cal. 4th 223, 246 (2012).  (*See* Mot. 12–13.)  Disputing none of this, Plaintiffs instead run through a conclusory litany of objections, some concerning *non-arbitration provisions*.  (Opp. 13–14.)  The FAA, however, limits the analysis under 9 U.S.C. § 2 to arguments "specifically" about "the agreement to arbitrate," rather than arguments "that the illegality of one of the contract's provisions renders the whole contract invalid."  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006); *see Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010).  At any rate, each objection is misguided.

**1.  *"Public Injunctive Relief."***  The TOU waives representative procedures and cabins remedies to the scope "necessary to provide relief warranted by that party's individual claim."  (Ex. 3 [2020 TOU § 16(F)].)  In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011), the Court upheld an identical class waiver, and "terms providing for individualized proceedings" generally must

be enforced, *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).  Plaintiffs contend that these restrictions are unconscionable as applied to a single remedy: a public injunction.  (Opp. 13.)  *See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 961 (2017).  Yet Plaintiffs' complaint does not have a valid "public" injunction request.  (See *infra* p. 9.)  Regardless, the limited rule of *McGill* invalidates the waiver only as applied to the particular remedy.  It could not render the entire agreement unconscionable.  The Ninth Circuit has already held the same with respect to invalid PAGA waivers: The Supreme Court's decision in "*Concepcion* weighs sharply against holding that the waiver of other representative, collective or class action claims . . . is unconscionable."  *Poublon*, 846 F.3d at 1264.

**2.  *No-Refund Policy.***  The TOU provides that "no refunds are available."  (Ex. 3 [2020 TOU § 6] [bolding omitted].)  Plaintiffs contend that this term is unconscionable because minors might have a right to disaffirm purchases.  But at most, this issue goes to the merits of whether P.W., *and only P.W.*, can disaffirm his purchases—something for the arbitrator to decide.  *See Buckeye*, 546 U.S. at 446.  The no-refund policy has nothing to do with the consciability, much less the enforceability, of the arbitration provision.  On this point, Plaintiffs cite no cases at all.

**3.  *Jury Trial.***  The TOU informs users that they are "waiving the right to a trial by jury" by agreeing to arbitration.  (Ex. 3 [2020 TOU § 16(A)].)  Plaintiffs argue that this provision "unconscionably waives the right to a jury trial" (Opp. 13), which implies every arbitration agreement is invalid.  Of course that is not true: The FAA would preempt any "legal rule hinging on the primary characteristic of an arbitration agreement—namely, a waiver of the right to go to court and receive a jury trial."  *Kindred Nursing Ctrs. v. Clark*, 137 S. Ct. 1421, 1427 (2017).  Plaintiffs' only case involved a waiver for claims brought *in court*, not the "jury trial waiver [that] is inherent in arbitration agreements."  *MacClelland v. Cell Co. P'ship*, 2022 WL 2390997, at *7 (N.D. Cal. July 1, 2022).

**4.  *Limitations Period.***  The TOU provides that, "to the extent permit[t]ed by applicable law," any dispute "must be commenced within one year of the relevant events."  (Ex. 3 [2020 TOU § 14] [capitalization omitted].)  Plaintiffs assert that a one-year period is unconscionable because their claims have different statutes of limitation.  (Opp. 13.)  But parties have "considerable freedom to modify the length of a statute of limitations," so long as the period is reasonable.  *Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1430 (2003).  The Ninth Circuit has upheld periods of one year and even less.  *See, e.g.*,

*Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016); *Soltani v. Western & Southern Life Ins. Co.*, 258 F.3d 1038, 1043–44 (9th Cir. 2001). In any event, the qualification that the limitations period kicks in only as permitted by applicable law would "save[] the agreement from being rendered unconscionable." *Greer v. Sterling Jewelers, Inc.*, 2018 WL 3388086, at *6 (E.D. Cal. July 10, 2018).

**5.** *Limitation of Liability.* The TOU limits damages, insofar as "permitted by applicable law," to the "amount (if any) paid by [Plaintiffs] to Warner in the six months immediately preceding the event giving rise to the claim." (Ex. 3 [2020 TOU § 14].) Plaintiffs contend that this restriction on punitive damages is unconscionable. Again, the FAA assigns this issue to the arbitrator. *See Ponkey v. LLR, Inc.*, No. 21-518-AB, 2021 WL 4595801, at *7 (C.D. Cal. Aug. 5, 2021) (citing *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401, 407 (2003)). *MacClelland* was wrong that any contractual provision "enforced via arbitration" can be considered under 9 U.S.C. § 2, which would unravel the *Buckeye* distinction between terms that affect the validity of the arbitration agreement (a proper inquiry) and terms whose validity would be an issue in either forum (an improper inquiry). 2022 WL 2390997, at *8. Anyway, the "applicable law" proviso would prevent substantive unconscionability even assuming contracts cannot limit punitive damages. *Greer*, 2018 WL 3388086, at *6.

**6.** *Severability Provision.* The TOU requires the severance of the provisions relating to individualized proceedings if any such provision is held unenforceable "after exhaustion of all appeals." (Ex. 3 [2020 TOU § 16(F)].) Plaintiffs puzzlingly argue that this language requires "a consumer to specifically litigate *and exhaust all appeals*" before a claim can proceed in court. (Opp. 14.) Plaintiffs need not exhaust anything; severability matters when *Warner Bros.* loses an argument about the individualized relief. If neither party appeals, the issue becomes exhausted when the time to appeal runs. *Cf. Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (en banc) (discussing "technical" exhaustion in habeas context). Plaintiffs cite no case prohibiting provisions that delay severance until a party has an opportunity to appeal. They instead misquote *MacClelland*, which held that a *mass arbitration provision* could prevent consumers from even "*fil[ing] a claim in arbitration for years and possibly ever.*" 2022 WL 2390997, at *16 (emphasis added).

In short, no provision is unconscionable. Much less could one say that "'the central purpose of the contract' is so tainted with illegality that there is no lawful object of the contract to enforce."

*Poublon*, 846 F.3d at 1273.  If any provision is invalid, it does not affect "the essential bilaterality" of the agreement and should be severed as "collateral."  *Greer*, 2018 WL 3388086, at *8–9; *Duarte v. JPMorgan Chase Bank, N.A.*, No. 21-1907-ODW, 2021 WL 5299908, at *7 (C.D. Cal. Nov. 15, 2021).

### C.    Plaintiffs Have Not Sought and Do Not Seek "Public Injunctive Relief"

Plaintiffs also cannot avoid arbitration under *McGill*.  (Opp. 15–16.)  To begin, the complaint "does not mention a 'public injunction.'"  *Andre v. U.S. Bank, N.A.*, No. 20-4854-CBM, 2021 WL 3598737, at *4 (C.D. Cal. May 20, 2021).  Plaintiffs request only an injunction against Warner Bros. "continuing to engage in the [allegedly] wrongful acts and practices" related to in-app ads.  (Am. Compl. at 42, Dkt. 39.)  They cite, but ignore the implications of, the Ninth Circuit's binding decision in *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535 (9th Cir. 2021):  Because the "*primary* beneficiaries" would be putative class members (*i.e.*, *GOTC* players), there is at best "an incidental public benefit from what is otherwise class-wide private injunctive relief," which "is not sufficient to establish the requested injunction is actually public relief."  *Id.* at 546; *Cottrell v. AT&T Inc.*, 2021 WL 4963246, at *2 (9th Cir. Oct. 26, 2021) (no *McGill* barrier if "beneficiaries of the injunction would be current and future AT&T customers").  Nor does the complaint allege the required "threat of future harm" to *Plaintiffs*.  *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1087 (9th Cir. 2020).  And in asking for leave to amend their patently deficient complaint (Opp. 16 n.8), Plaintiffs still do not assert a "*desire* to purchase" packs in the future, which Article III again requires, *Stover*, 978 F.3d at 1087.[3]

### D.    P.W. Cannot Disaffirm the Terms of Use

Before the Opposition, P.W. had not purported to disaffirm the TOU, but only the in-app purchases.  (Am. Compl. ¶¶ 69, 163; Mot. 13.)  But P.W.'s guardian has now submitted a sworn declaration repudiating the contract.  (Dkt. 47.)  This change in position makes no difference.

To start, this Court should apply the law of Virginia, which has the greatest interest in its minor

---

[3]  Even if this Court concluded that Plaintiffs alleged a valid request for a public injunction, this request would have to be stayed pending the arbitration of their claims and remaining remedies.  *See Nguyen v. Tesla, Inc.*, No. 19-1422-JLS, 2020 WL 2114937, at *5–6 (C.D. Cal. Apr. 6, 2020).  The parties agreed that, if the TOU is "unenforceable with respect to a particular claim *or with respect to a particular request for relief* (such as a request for injunctive relief sought with respect to a particular claim), then that claim *or request for relief* shall be severed, *and all other claims and requests for relief shall be arbitrated*."  (Ex. 3 [2020 TOU § 16(F)] [emphasis added].)  The Ninth Circuit in *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819 (9th Cir. 2019), held that "[p]arties are welcome to agree to split decisionmaking between a court and an arbitrator in this manner," but the provision there (unlike here) referred only to severance of "a particular *claim* for relief," not a particular request for injunctive relief.  *Id.* at 831–32 (emphasis added).

Gibson, Dunn & Crutcher LLP

residents. California "statutes are presumed not to have extraterritorial effect." *I.B. by and through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1121 (N.D. Cal. 2015). *Bohannon* applied California Family Code § 6710 to out-of-state minors only because "a valid choice of law provision" in a *separate* (un-disaffirmed) contract called for California law. *Id.* at 1122. But P.W. has purported to disaffirm the TOU, which would render the "entire contract"—including its choice-of-law provision—a "nullity." *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1000 (N.D. Cal. 2012). As judges in this District have noted, "it would be incongruous to rely on a choice of law provision in the contract that Plaintiff supposedly disaffirmed." *R.A. v. Epic Games, Inc.*, No. 19-1488-GW, 2019 WL 6792801, at *5 (C.D. Cal. July 30, 2019).

Under Virginia law, P.W. cannot disaffirm the TOU because he "received benefits" of access to *Game of Thrones: Conquest* and also "gained the benefit of standing to bring the present suit" concerning in-app purchases. *A.V. v. iParadigms, Ltd. Liab. Co.*, 544 F. Supp. 2d 473, 481 (E.D. Va. 2008). Plaintiffs mix apples and oranges in arguing that P.W. did not get his money's worth from the in-game purchases. (Opp. 20.) Whether or not P.W.'s enjoyment of the packs will be relevant to disaffirming *in-app purchases*, the question here is whether P.W. can reject the *TOU* after gaining access to the free game by representing he "obtained parent or guardian consent to do so" and agreeing to the mutual arbitration provision. (Ex. 3 [2020 TOU § 2].) *iParadigms* shows that he may not. In contrast, *Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4 (2007), on which Plaintiffs rely, held only that a minor could not be sued for breach of contract after validly disaffirming a contract. *Id.* at *5.

In any event, the FAA would preempt this defense. Plaintiffs muster no response to the equal-treatment problem—that Virginia and California law exempt "necessaries" contracts from disaffirmance. (Mot. 13 n.2; *see* Opp. 21.) "If a state-law contract defense treats arbitration agreements less favorably than *any other* contract"—here, contracts for "necessaries"—"that contract defense does not fall within the [FAA's] saving clause." *Chamber of Commerce v. Bonta*, 13 F.4th 766, 774–75 (9th Cir. 2021) (emphasis added); *see Kindred Nursing*, 137 S. Ct. at 1426.

### III.   CONCLUSION

Warner Bros. respectfully requests that this Court compel the parties to individual, non-class arbitration and then stay this case pending the completion of arbitration.

Gibson, Dunn & Crutcher LLP

1   Dated:   August 11, 2022          GIBSON, DUNN & CRUTCHER LLP

2

3                                 By:         */s/ Christopher Chorba*
                                        Christopher Chorba

4

5                           *Attorneys for Defendant Warner Bros. Entertainment Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   CHRISTOPHER CHORBA, SBN 216692
        cchorba@gibsondunn.com
2   JEREMY S. SMITH, SBN 283812
        jssmith@gibsondunn.com
3   PATRICK J. FUSTER, SBN 326789
        pfuster@gibsondunn.com
4   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
5   Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
6   Facsimile:  213.229.7520

7   *Attorneys for Defendant*
    *Warner Bros. Entertainment Inc.*

8                  UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                      WESTERN DIVISION

11

12  CHARISSA KEEBAUGH, STEPHANIE          CASE NO. 2:22-CV-01272-MEMF (AGRx)
    NEVEU, HEATHER MERCIERI, SOPHIA
13  NICHOLSON, and P.W., by and through JOIE   **RESPONSIVE DECLARATION OF**
    WEIHER,                               **PATRICK J. FUSTER IN SUPPORT OF**
14                                        **DEFENDANT WARNER BROS.**
                   Plaintiffs,            **ENTERTAINMENT, INC.'S MOTION TO**
15                                        **COMPEL ARBITRATION AND STAY**
            v.                            **PROCEEDINGS**
16
    WARNER BROS. ENTERTAINMENT INC.,      **Hearing:**
17  a Delaware corporation,               Date:      October 6, 2022
                                          Time:      10:00 a.m.
18                 Defendant.             Place:     Courtroom 8B
                                          Judge:     Hon. Maame Ewusi-Mensah
19                                                   Frimpong

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

RESPONSIVE DECLARATION OF PATRICK J. FUSTER
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-87

## **RESPONSIVE DECLARATION OF PATRICK J. FUSTER**

I, Patrick J. Fuster, declare and state as follows.

1.      I am an attorney licensed to practice law in the State of California.  I am an associate at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendant Warner Bros. Entertainment Inc.  I make this declaration in support of Warner Bros.' Motion to Compel Arbitration and Stay Proceedings and in response to Plaintiffs' Opposition (Dkt. 46) and to the Declaration of Jay Kumar (Dkt. 46-2).  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      At my direction, a true and correct copy of *Game of Thrones: Conquest* was downloaded from the Apple App Store onto an iPhone 12 Pro.

3.      With the filing of this declaration and Warner Bros. Entertainment Inc.'s Reply, the iPhone 12 Pro will be lodged as **Exhibit 8** with the Court.

4.      At my direction, an iPhone 12 Pro containing *Game of Thrones: Conquest* will be served on Plaintiffs.

5.      Exhibit 8 will permit the Court to view the sign-in screen at issue "as it would appear on Apple's iPhone 12, Apple's top-selling iPhone in 2021."  Kumar Decl. ¶ 5, Dkt. 46-2.

6.      An iPhone 12 Pro has a display resolution of 460 pixels per inch (ppi).  *See iPhone 12 Pro—Technical Specifications*, Apple, https://support.apple.com/kb/SP831?locale=en_US.  An iPhone 12 Pro has the same screen size and resolution as an iPhone 12.  *See iPhone 12—Technical Specifications*, Apple, https://support.apple.com/kb/SP830?locale=en_US.

7.      Using the "preflight" function in Adobe Acrobat DC, I determined that the three images in a PDF copy of the declaration (Dkt. 46-2) submitted by Plaintiffs' counsel, Jay Kumar, in support of the Opposition to the Motion to Compel Arbitration are 150.168 ppi, 150 ppi, and 150.168 ppi resolution, respectively.  The iPhone's resolution is more than three times better than that.

8.      Using the "preflight" function in Adobe Acrobat DC, I determined that Exhibits 5, 6, and 7 in a PDF copy of the Declaration of David Woldman (Dkt. 41-1) submitted in support of Defendant's Motion to Compel Arbitration are each 301 ppi resolution.  The resolution is closer to the resolution of an iPhone 12, but still significantly less (460 ppi versus 301 ppi).

Gibson, Dunn &
Crutcher LLP

RESPONSIVE DECLARATION OF PATRICK J. FUSTER
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)
2

2-ER-88

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct. Executed on August 10, 2022, in Los Angeles, California.

3

4                               Patrick J. Fuster

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

RESPONSIVE DECLARATION OF PATRICK J. FUSTER
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-89

CHRISTOPHER CHORBA, SBN 216692
JEREMY S. SMITH, SBN 283812
PATRICK J. FUSTER, SBN 326789
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Charissa Keebaugh, Stephanie Neveu, Heather Mercieri, Sophia Nicholson, and P.W. <br><br> PLAINTIFF(S) <br><br> v. <br><br> Warner Bros. Entertainment Inc. <br><br> DEFENDANT(S). | CASE NUMBER: <br><br> 2:22-CV-01272-MEMF (AGRx) <br><br><br> **NOTICE OF MANUAL FILING OR LODGING** |

PLEASE TAKE NOTICE:

Pursuant to Local Rule 5-4.2, the following document(s) or item(s) are exempt from electronic filing, and will therefore be manually ☐ Filed ☑ Lodged: (**List Documents**)

Exhibit 8: iPhone 12 Pro containing Game of Thrones: Conquest

Warner Bros. respectfully requests that Exhibit 8 be returned to counsel following the disposition of the motion to compel arbitration.

**Reason:**

☐ Under Seal

☐ In Camera

☑ Items not conducive to e-filing (i.e., videotapes, CDROM, large graphic charts)

☐ Per Court order dated: _____

☐ Other:

| | |
|---|---|
| August 11, 2022 | /s/ Patrick J. Fuster |
| Date | Attorney Name |
| | Warner Bros. Entertainment Inc. |
| | Party Represented |

2-ER-90

*Note:   File one Notice of Manual Filing or Lodging in each case, each time you manually submit a document(s).*

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112) (he/him/his)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*) (she/her/hers)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (admitted *PHV*) (he/him/his)
rafi@pollockcohen.com
Adam Pollock (admitted *PHV*) (he/him/his)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (admitted *pro hac vice*) (he/him/his)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON**, and **P.W.**, by and through **JOIE WEIHER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**WARNER BROS. ENTERTAINMENT INC.,** a Delaware corporation,<br><br>Defendant. | Case No. 2:22-cv-01272-MEMF (AGRx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date:     October 6, 2022<br>Time:     10:00 a.m.<br>Before:   Hon. Maame Ewusi-Mensah Frimpong<br>Ctrm.:    8B |

1

**TABLE OF CONTENTS**

2     INTRODUCTION ................................................................................................. 1

3     BACKGROUND ................................................................................................... 2

4        A.     Game of Thrones Conquest................................................................... 2

5        B.     Defendant's Motion to Compel Arbitration........................................... 3

6     LEGAL STANDARD ............................................................................................ 4

7     ARGUMENT ....................................................................................................... 5

8        A.     Defendant Does Not Show That Plaintiffs Had Inquiry Notice of TOU ........................... 5

9            1.     Warner Bros. Did Not Provide Conspicuous Notice ............................. 6

10            2.     Plaintiffs Did Not Unambiguously Manifest Assent to the Terms of Use............ 11

11        B.     Defendant's Terms of Use Are Unconscionable................................... 12

12        C.     Plaintiffs Can Seek Public Injunctive Relief in This Court ............................. 15

13        D.     Defendant's Terms Do Not Bind Minor P.W. ..................................... 16

14            1.     California Law on Disaffirmance Applies ........................................ 17

15            2.     P.W. Unequivocally Disaffirms and Disavows the TOU and His Purchases ....... 18

16     CONCLUSION.................................................................................................... 21

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Cases**

*A.V. v. iParadigms Liab. Co.*,
544 F. Supp. 2d 473 (E.D. Va. 2008) ........................................................ 20

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
24 Cal. 4th 83, 6 P.3d 669 (2000) .......................................................... 15

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ...................................................................... 16, 17

*B.D. v. Blizzard Ent., Inc.*,
76 Cal. App. 5th 931 (2022) ........................................................... 10, 15

*Berman v. Freedom Fin. Network, LLC*,
2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) ..................................................... 7

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........................................................... passim

*Blair v. Rent-A-Ctr., Inc.*,
928 F.3d 819 (9th Cir. 2019) ........................................................... 18, 19

*Bohannon v. Facebook, Inc.*,
82 F. Supp. 3d 1115 (N.D. Cal. 2015) ................................................... 21, 24

*Boy Blue, Inc. v. Brown*,
74 Va. Cir. 4 (2007) .............................................................. 21, 22, 24

*Brooks v. IT Works Mktg., Inc.*,
2022 WL 2079747 (E.D. Cal. June 9, 2022) ................................................. 10

*Brown v. Madison Reed, Inc.*,
2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) ............................................... 18

*Burnand v. Irigoyen*,
86 P.2d 417 (Cal. 1947) .................................................................. 24

*Capili v. Finish Line, Inc.*,
116 F. Supp. 3d 1000 (N.D. Cal. 2015) .................................................... 16

*Celli v. Sports Car Club, Inc.*,
29 Cal. App. 3d 511 (Ct. App. 1972) ..................................................... 23

*Chavarria v. Ralphs Grocery Co.*,
733 F.3d 916 (9th Cir. 2013) ............................................................ 15

*Colgate v. JUUL Labs, Inc.*,
402 F. Supp. 3d 728 (N.D. Cal. 2019) ................................................ 10, 11

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) .......................................................... 10, 11

*Doe v. Epic Games, Inc.*,
  435 F. Supp. 3d 1024 (N.D. Cal. 2020) .................................................. 20, 22, 23, 24

*Doe v. Roblox Corp.*,
  --- F.Supp.3d---, 2022 WL 1459568 (N.D. Cal. May 9, 2022)................................. 12, 19, 20, 22

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ........................................................ 10

*Fife v. Facebook, Inc.*,
  905 F.Supp.2d 989 (N.D. Cal. 2012) ..................................................... 22

*Fish v. Tesla, Inc.*,
  2022 WL 1552137 (C.D. Cal. May 12, 2022) ............................................. 10

*Flittner v. Equitable Life Assur. Soc.*,
  30 Cal. App. 209 (1916)................................................................ 24

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021)........................................................... 18

*In re Ring LLC Priv. Litig.*,
  2021 WL 2621197 (C.D. Cal. June 24, 2021) ............................................ 10

*In re Stubhub Refund Litig.*,
  2021 WL 5447006 (N.D. Cal. Nov. 22, 2021)........................................... 5, 11

*Karla Maree v. Deutsche Lufthansa AG Anthony Castanares et al.*,
  2021 WL 4352912 (C.D. Cal. June 21, 2021) ........................................... 11

*Kilgore v. KeyBank, Nat'l Ass'n*,
  718 F.3d 1052 (9th Cir. 2013)......................................................... 14

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
  137 S. Ct. 1421 (2017)................................................................ 25

*Knutson v. Sirius XM Radio Inc.*,
  771 F.3d 559 (9th Cir. 2014).......................................................... 5

*MacClelland v. Cellco P'ship*,
  2022 WL 2390997 (N.D. Cal. July 1, 2022)......................................... passim

*MacGreal v. Taylor*,
  167 U.S. 688 (1897)................................................................... 20

*McArdle v. AT&T Mobility LLC*,
  772 F. App'x 575 (9th Cir. 2019) ...................................................... 19

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 45 (2017) .................................................................. 17

*McKee v. Audible, Inc.*,
  2017 WL 4685039 (C.D. Cal. July 17, 2017) ....................................... 13, 14

*Meyer v. Uber Technologies, Inc.*,
  868 F.3d 66 (2d Cir. 2017)............................................................ 10

*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*,
    186 Cal. App. 4th 696 (2010) ........................................................................ 24

*Morgan v. Sundance, Inc.*,
    142 S. Ct. 1708 (2022) ........................................................................... 1, 25

*Mustard v. Wohlford's Heirs*,
    56 Va. 329 (1859) ........................................................................................ 24

*Newton v. Am. Debt Servs., Inc.*,
    854 F. Supp. 2d 712 (N.D. Cal. 2012) ......................................................... 16

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ................................................................... 5, 7

*OTO, L.L.C. v. Kho*,
    8 Cal. 5th 111 (2019) .................................................................................. 14

*Peter v. DoorDash, Inc.*,
    445 F. Supp. 3d 580 (N.D. Cal. 2020) ......................................................... 10

*R.A. v. Epic Games, Inc.*,
    2019 WL 6792801 (C.D. Cal. July 30, 2019) ............................................... 23

*Regan v. Pinger, Inc.*,
    2021 WL 706465 (N.D. Cal. Feb. 23, 2021) ................................................ 10

*Rui Chen v. Premier Fin. All., Inc.*,
    2019 WL 280944 (N.D. Cal. Jan. 22, 2019) ................................................... 5

*Schmitt v. SN Servicing Corp.*,
    2021 WL 3493754 (N.D. Cal. Aug. 9, 2021) ................................................ 21

*Sellers v. JustAnswer LLC*,
    289 Cal. Rptr. 3d 1 (Cal. App. 4th. 2021) ........................................ 6, 12, 19

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    498 F.3d 976 (9th Cir. 2007) ....................................................................... 15

*Snow v. Eventbrite, Inc.*,
    2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ....................................... 5, 9, 13

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002) ............................................................................. 6

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019) ..................................................................... 9, 11

*T. K. v. Adobe Sys. Inc.*,
    2018 WL 1812200 (N.D. Cal. Apr. 17, 2018) ....................................... 21, 24

*Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*,
    925 F.2d 1136 (9th Cir. 1991) ........................................................................ 5

*Tillage v. Comcast Corp.*,
    772 F. App'x 569 (9th Cir. 2019) ................................................................. 19

*Ting v. AT&T,*
    319 F.3d 1126 (9th Cir. 2003) ........................................................................... 15

*Vasquez v. Cebridge Telecom CA, LLC,*
    569 F.Supp.3d 1016 (N.D. Cal. 2021) .............................................................. 18

*Viking River Cruises, Inc. v. Moriana,*
    142 S. Ct. 1906 (2022) ...................................................................................... 19

*Wayne v. Staples, Inc.,*
    135 Cal.App.4th 466 (2006) .............................................................................. 15

*Wilson v. Huuuge, Inc.,*
    944 F.3d 1212 (9th Cir. 2019) ........................................................................... 14

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.,*
    485 F. Supp. 3d 1168 (N.D. Cal. 2020) ...................................................... 15, 16

**Statutes and Rules**

16 C.F.R. §233.1(a) ................................................................................................... 3

Cal. Family Code 6700 ............................................................................................ 21

Cal. Family Code 6710 ............................................................................................ 21

**INTRODUCTION**

Game of Thrones Conquest ("GOTC") has generated Defendant Warner Bros. Entertainment Inc. ("Defendant" or "Warner Bros.") over $750 million in revenue. Defendant makes enormous sums by leveraging some of the well-documented psychological weapons of "free to play" games, enticing players to spend far more than the cost of a typical for-purchase game. Warner Bros. falsely advertises "discounts," to convince users to spend hundreds of millions on a "free" game.

Instead of defending the merits of its supposedly "free" game—the same game that induced minor Plaintiff P.W. to spend *$6,200* within *three weeks*—Warner Bros. has moved to compel arbitration, attempting to enforce an unconscionable contract of which Plaintiffs never had notice and to which they did not agree. *See* D.E. 41, Defendant's Motion and Memorandum of Points and Authorities ("Mem.") at 1. Defendant's arguments rely on the incorrect premise of a "liberal federal policy favoring arbitration." *See* Mem. at 7, 9. However, "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc*., 142 S. Ct. 1708, 1713 (2022).

The "onus" is on Warner Bros. "to put users on notice of the terms to which they wish to bind consumers." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). But Warner Bros. "did not take that obligation to heart." *Id.* The only "notice" it provided to users, regarding their agreement to arbitrate and relinquish many of the statutory protections afforded to consumers, was on GOTC's sign-up screen. This screen buried an inconspicuous disclaimer about terms beneath a large, striking graphic image and encouraged users to click an outsized bright blue "Play" button. Therefore Warner Bros.'s Terms of Use ("TOU") and the arbitration agreement within it are unenforceable, and Defendant's Motion should be denied in its entirety.

Even if Defendant had demonstrated that Plaintiffs had sufficient notice of the TOU to unambiguously manifest assent to them, this Court should deny the Motion because the TOU are unconscionable, and Plaintiffs seek public injunctive relief. In addition, minor Plaintiff P.W. has disavowed Defendant's terms and cannot be forced to arbitrate.

//

//

# BACKGROUND

## A.     Game of Thrones Conquest

GOTC is based upon the popular HBO television series "Game of Thrones," which is an adaption of the "A Song of Ice and Fire" book series, which was written by George R.R. Martin. D.E. 39, First Amended Complaint ("FAC") ¶25. GOTC has been enormously successful, having been downloaded over 20 million times and made $750 million in revenue. *Id.* ¶¶26-27. GOTC makes money by offering players "microtransactions"—discrete in-app purchases of "packs" that contain virtual resources to allow players to advance in the game. *Id.* ¶¶27-30.

These in-app purchases cost gameplayers real and substantial currency. The packs necessary for these in-game upgrades each have a version that is offered at $99.99, $49.99, $19.99, $9.99, $4.99, and $0.99. *Id.* ¶31. GOTC aggressively markets the packs: each and every time a player logs into the game, a pop-up advertisement for a $99.99 pack fills the entire screen. Each displayed pack, whether located on the login pop-up ad, or on the right corner, has an hourglass timer counting down the time that the pack is still available to create a sense of urgency and scarcity to induce a player to immediately purchase a pack. *Id.* ¶¶33-34.

On top of these high-pressured sales tactics, Warner Bros. also deceptively, and falsely, promotes these packs as being on sale or discounted by misrepresenting that such packs include limited-time bonuses that purport to substantially increase the value of the packs. *Id.* ¶36. There are two primary categories of deceptive packs: (1) packs that offer the illusion of discounts on additional in-game "gold" through strikethrough graphics, and (2) packs that falsely advertise that a pack contains extra value by virtue of being on sale because of a holiday or as part of some other event. *Id.* ¶40. Warner Bros. uses false discounts and false reference pricing schemes to increase sales because they know these reference prices influence purchasing decisions, as consumers are enticed by bargains. *Id.* ¶38; *see also id.* ¶¶7-8; 16 C.F.R. §233.1(a).

Warner Bros.'s false discounting is particularly effective in influencing purchasing decisions because GOTC, like other free online games, is already highly addictive. FAC ¶39. Worse, even though minors are especially susceptible to these elements of the game's design—or perhaps precisely *because* minors are so susceptible—Warner Bros. specifically targets minors with its advertisements,

advertising that the game is for young players aged "12+." *Id.* ¶¶57-59; *id.* ¶60 (Society for the Study of Addiction: "Younger players may be particularly less equipped to critically appraise the value proposition of these [in-game] purchase schemes.").

Defendant's false and deceptive advertising caused Plaintiffs to make in-app purchases relying on the false and deceptive advertising. *Id.* ¶¶19-23. Minor Plaintiff P.W. fell victim to Defendant's scheme despite his parents' best efforts to monitor his phone usage. They allowed him access only because they believed, based on Warner Bros.'s representations, that it was safe for kids 12 and over. *Id.* ¶68. P.W. spent more than $6,200 in just three weeks in mid-March to early April 2022, purchasing dozens and dozens of packs. *Id.* ¶¶67-68; Declaration of Joie Weiher ("Weiher Decl.") ¶2. P.W. and his parents asked for refunds but were refused. FAC ¶87.

Plaintiffs allege that California law applies to all those who made a purchase in GOTC. *Id.* ¶¶97-102. They bring suit on behalf of themselves and all users of GOTC under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA"), and also assert claims for fraud, negligent misrepresentation, declaratory judgment (on behalf of P.W. and the Minor Subclass), as well as various state laws, to the extent California law does not apply.

Plaintiffs filed the original complaint on February 24, 2022, and the amended complaint on May 23, 2022.

## B. Defendant's Motion to Compel Arbitration

On June 14, 2022, Warner Bros. moved to compel arbitration. D.E. 41. Defendant contends that Plaintiffs had inquiry notice of the TOU and that the TOU has a valid and binding arbitration clause.

Defendant has submitted three different versions of the sign-up screen for GOTC, which they contend provided Plaintiffs adequate notice. *See* D.E. 41-1, Woldman Decl., Exs. 6-7. Although GOTC is played on mobile phones with small screens, Defendant has artificially enlarged them to the size of a full page in their submission.

Defendant's Motion lacks factual support as to which of these sign-up screens Plaintiffs actually viewed. Although the Motion states the approximate dates that some of the sign-up screens were used, the declaration of an executive at Warner Bros. does not contain that information. *See* Mem. at 3-4

(citing Woldman Decl. ¶¶6, 8-9). In addition, Exhibit 7 of that declaration displays "Development Build," suggesting that it might not have ever been used.

Plaintiffs' counsel emailed Defendant's attorneys for clarification and asked if Defendant would amend its Motion with updated information. Defendant replied that "according to a preliminary review," the sign-up screen as reflected in Exhibit 5 of the Woldman Decl. existed up until December 19, 2019. *See* Declaration of Raphael Janove ("Janove Decl."), Ex. A. Assuming this is true, then up until December 2019, the sign-up screen featured large, striking graphics and a prominent blue "Play" button, beneath all of which it stated, in small non-descript font: "By tapping 'Play' I agree to the Terms of Service," with a link labeled "Terms of Service," but which linked to Warner Bros.'s "Terms of *Use*," *not* service.

Further, according to Defendant's counsel's "preliminary review," after December 2019, the phrase on the sign-up screen changed to: "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy," but then contained a hyperlink labeled "Terms of Service," which confusingly took users to a document labeled "Terms of Use." *See* Mem. at 2-3.

In connection with this Motion, Plaintiffs submit the Declaration of Jay Kumar ("Kumar Decl."), which shows the sign-in as it currently appears and as it appeared as of, at least, May 2021. Importantly, the declaration contains pictures scaled to the sizes of popular mobile phones, rather than to the size of a computer screen. *See* Kumar Decl. ¶¶4-6.

## LEGAL STANDARD

"[T]he party seeking to compel arbitration[ ] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). In determining whether to enforce a purported arbitration agreement, mutual manifestation of assent is required. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). And "[i]n deciding whether there is a genuine issue of fact concerning formation of an agreement, the party opposing arbitration shall receive 'the benefit of all reasonable doubts and inferences.'" *Rui Chen v. Premier Fin. All., Inc.*, 2019 WL 280944, at *2 (N.D. Cal. Jan. 22, 2019) (quoting *Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). //

## ARGUMENT

As a threshold matter, Defendant has not submitted any evidence sufficient to show which sign-up screens any Plaintiff would have viewed. *See* Background Part B, above. For this reason alone, Defendant's Motion fails. *See, e.g.*, *In re Stubhub Refund Litig.*, 2021 WL 5447006, at *8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice."); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020) ("Eventbrite's first problem is broad and extends to all of its evidence. . . . [T]he evidence Eventbrite offers does not demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period.").

In addition, Defendant's Motion fails because (1) the GOTC sign-up screens did not provide inquiry notice of the TOU; (2) the TOU are unconscionable; (3) Plaintiffs seek public injunctive relief, and (4) minor Plaintiff P.W. has disaffirmed the TOU.

### A. Defendant Does Not Show That Plaintiffs Had Inquiry Notice of the TOU

Defendant does not contend (nor could it) that Plaintiffs or the putative class had actual notice of the agreement to arbitrate. *See* Mem. at 9-11. Thus, to carry its burden, which is considerable, Defendant must establish that Plaintiffs and the putative class were on inquiry notice of the TOU. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)) ("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").

The standard of inquiry notice is high because "users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857.[1] And because companies like Warner Bros. have "complete control over the design" of their applications or websites, the "onus" is on them "to put users on notice of terms to which they wish to bind consumers." *Id.*; *see Sellers v.*

---

[1] Plaintiffs insist that California law applies. FAC ¶¶97-102. Defendant also argues in its motion that California law applies. *See* Mem. at 8.

**PLNTFS' OPP. TO DEF'S MOTION TO COMPEL
ARBITRATION AND STAY PROCEEDINGS**

*JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 30 (Cal. App. 4th. 2021) ("Because website providers have full control over the design of their websites, the onus is on them to provide adequate notice of contractual terms.") (citing *Nyugen*, 763 F.3d at 1178-79).

Therefore, courts will only enforce online agreements on an inquiry notice theory if: (1) there is "reasonably conspicuous notice of the terms to which the consumer will be bound," ***and*** (2) "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. Defendant's Motion does not meet either requirement.

### 1. Warner Bros. Did Not Provide Reasonably Conspicuous Notice

Whether the disclosure of the terms is sufficiently conspicuous "depends on the design and content of the website and the agreement's webpage." *Nyugen*, 763 F.3d at 1177. Furthermore, "[g]iven the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." *Id.* at 1179. But this "ferret[ing]" is exactly what Warner Bros. expects consumers to do.

The design of the GOTC's sign-up screen failed to provide sufficient notice to bind Plaintiffs to the arbitration clause. Several factors demonstrate the lack of reasonable conspicuousness, including: (1) font size, particularly in comparison to other font sizes on the screen, (2) the overall format and design of the web page or sign-up screen, and (3) whether it is apparent that text contains a hyperlink. *See Berman*, 30 F. 4th at 856.

The following is an image of the GOTC sign-up screen as it would appear on Apple's iPhone 12, the top-selling iPhone in 2021, *not* as artificially inflated by Defendant in its filings. *See Berman v. Freedom Fin. Network, LLC*, 2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) (observing that the hyperlinks were "formatted in black font against a white background which is exceedingly small compared to the larger, more colorful and high-contrast fonts on the rest of the page, making it difficult to read on a large, high-resolution monitor, *much less a mobile device*") (emphasis added); Kumar Decl. ¶5.

//

//

**PLNTFS' OPP. TO DEF'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**



The screen's design—including font choice, distracting elements, and the inclusion of the large blue "Play" button as the mode of assent—effectively hides the TOU and falls far short of providing inquiry notice, for the following reasons.

*First*, the language relating to Defendant's TOU is hidden in small, transparent font, which is vastly over-shadowed by the other elements. And small font is particularly inconspicuous where it is "considerably smaller than the font used in the surrounding website elements," and where "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." *Berman*, 30 F. 4th at 856-57.

In addition, "the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text."

*Berman*, 30 F.4th at 857. Accordingly, "[f]ar from meeting the requirement that a webpage must take steps to capture the user's attention and secure her assent, the design and content of these webpages draw the user's attention away from the most important part of the page"—that by clicking the outsized Play button directly below the striking graphic image of dragons, a user is agreeing to Defendant's terms. *Id.* at 857; *see Snow*, 2020 WL 6135990, at *9 ("All of those buttons also use large, clear fonts; the text of the disclaimer, in contrast, is small. The overall impression, consequently, would lead many consumers to click one of the vibrant buttons while never knowing—and reasonably so—that the low-contrast disclaimer subjects them to the [terms]."); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019) ("[T]he interface here is cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink.").

The disclaimer language is also "further deemphasized" by another feature of the screen's "overall design." *See Berman*, 30 F.4th at 857. The screen plays the Game of Thrones theme song, *see* Kumar Decl. ¶3, further distracting users.

*Second*, the sign-up screen does not make it apparent that there is a hyperlink for a consumer to click on to reach the TOU. Below the graphics and large Play button, plain white text states: "Terms of Service." This confuses users, who would have to intuit that "Terms of Service" actually meant "Terms of Use."

This text also lacks any of the "[c]ustomary design elements denoting the existence of a hyperlink." *Berman*, 30 F.4th at 857. The phrase "Terms of Service" is neither underlined, in all capital letters, nor in contrasting color such as blue, and therefore fails to "alert[s] a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.*; *see Brooks v. IT Works Mktg., Inc.*, 2022 WL 2079747, at *6 (E.D. Cal. June 9, 2022) ("No [c]ustomary design elements denoting the existence of a hyperlink,' such as 'contrasting font color' or 'the use of all capital letters,' were used to make the Terms of Use hyperlink more noticeable.") (quoting *Berman*, 30 F.4th at 857); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764 (N.D. Cal. 2019) (inconspicuous notice where "the hyperlink to the Terms and Conditions was not a different color, underlined, italicized, or in any way visually distinct from the surrounding text").

On very close examination there is a shape of a box drawn in a thin line around "Terms of Service." Nonetheless, that does not make the hyperlinks conspicuous because the box is "barely legible to the naked eye." *See Berman*, 30 F.4th at 856-57; *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (insufficient notice where "the 'Terms of Service & Privacy Policy' hyperlink was presented in a gray rectangular box in white bold text"). And a user cannot be expected to "aimlessly click on words" on the sign-up screen to "ferret out hyperlinks." *Berman*, 30 F.4th at 857 (holding that even underlined hyperlinks "fail[ed] our conspicuousness test"). But Warner Bros.'s design requires them to do so. *Id.*;[2] *see Brooks*, 2022 WL 2079747, at *6 ("The text of that hyperlink is so small that it is barely visible to the naked eye, and coupled with its muted grey color and background, it is considerably deemphasized in relation to the other text on the webpage."); *Colgate*, 402 F. Supp. 3d at 766 ("A reasonable user scanning the page would first see the 'Forgot Password?' hyperlink and would observe that it is a different color, underlined, and of a particular font size. That user would not then see the 'Terms and Conditions' and 'Privacy Policy' hyperlinks and conclude that they were clickable. They are not underlined, they are the same size as the sentence they are in, and the color is different from the initial hyperlink they would see."); *Cullinane*, 893 F.3d at 63-64 ("[T]he presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention."); *Karla Maree v. Deutsche Lufthansa AG Anthony Castanares et al.*, 2021 WL 4352912, at *3 (C.D. Cal. June 21, 2021) ("[T]he design of Expedia.com's website was extremely cluttered, rendering the Terms of Use link visually indistinct from the many other links on the page.").

//

---

[2] For these reasons, Defendant's citation to *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017) and other authorities are misplaced. *See* Mem. at 10; *Berman*, 30 F.4th at 857 (distinguishing *Meyer* because that decision found "the hyperlinks reasonably conspicuous because they were both in blue and underlined"); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) ("The relevant warning language and hyperlink to the Terms of Use were conspicuous – they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was relatively uncluttered."); *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *4 (C.D. Cal. May 12, 2022) (hyperlinks shown in "bolded and/or underlined text"); *In re Ring LLC Priv. Litig.*, 2021 WL 2621197, at *6 (C.D. Cal. June 24, 2021) (notice sufficient where sign-in pages were "less cluttered" than in *Dohrmann* and hyperlinks were in blue text); *Regan v. Pinger, Inc.*, 2021 WL 706465, at *5 (N.D. Cal. Feb. 23, 2021) at *2 (hyperlinks were in blue on a simple sign-up screen that lacked the distracting features of Warner Bros.); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (sign up screens were "uncluttered" and hyperlinks were in blue); *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 951 (2022) (terms were displayed in pop-up notice that "consisted primarily of a scrollable text box that contained the entire 2018 License Agreement").

**Third**, the large blue "Play" button further demonstrates the lack of inquiry notice. The word "Play" gives no indication that by clicking, the consumer agrees to Warner Bros.'s terms. Nor does it put them on inquiry notice that they should search for those terms. *See Stubhub Refund Litig.*, 2021 WL 5447006, at *5 (buttons labeled "This is correct, Continue!" and "Continue" provided insufficient notice as they "plainly refer to the entry of other information on the page, not assent to the Terms & Conditions"). In fact, the blue "Play" button only serves to obscure any assent to notice. The stark contrast between the large bright blue button, which commands a user's attention to press "Play," with the plain, small font following it "makes it hard to escape the inference that [Warner Bros.] hoped the reader's eye would be drawn elsewhere." *Starke*, 913 F.3d at 294.

All told, the GOTC sign-up screen is far less conspicuous than even what the Ninth Circuit in *Berman* rejected as insufficient. There, the hyperlinks were underlined, and the disclaimer language appeared above the large green "Continue" buttons. *See Berman*, 30 F.4th 849 at Appendices A&B:




Finally, the GOTC sign-up screen is woefully deficient as to minor Plaintiff P.W., particularly given that Warner Bros. knows that minors use GOTC and represents that the game is safe for kids 12 and over. *See* FAC ¶¶68, 161; *Doe v. Roblox Corp.*, --- F.Supp.3d---, 2022 WL 1459568, at *6 (N.D. Cal. May 9, 2022) ("Taken together, these considerations lead me to conclude that Doe did not give a sufficient outward manifestation of intent to be bound by the Terms of Use. She was 10 years old. Roblox knew her age. It did not require her to get an adult's permission or supervision. And the only indication that she was agreement [*sic*] to complicated terms of use was a not-so-conspicuous disclaimer above a bright sign-up button."); *Sellers*, 73 Cal. App. 5th at 475 ("Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children knew how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked 'terms of use.'").

### 2.    Plaintiffs Did Not Unambiguously Manifest Assent to the Terms of Use

Because Defendant fails to show that the TOUs were reasonably conspicuous, its Motion can be denied outright. Defendant also fails to satisfy the second requirement of inquiry notice: that "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman* 30 F.4th at 856. Even when viewed by a consumer with a close and discerning eye, Warner Bros. has made it unclear what terms the consumer is even agreeing to.

Below the big blue "Play" button, in small, plain-white text, the sign-up screen advises users: "By tapping 'Play' I ***accept*** the Terms of Use." It does not state that a user *agrees* to the terms of use. Further, nothing on the sign-up screen references the "Terms of Use." Instead, there is plain white text stating: "Terms of Service."

Therefore, not only would a user (a) have to look at the plain text below, despite attention elsewhere being focused on having the user click Play, and (b) then intuit that plain white text actually also contained a hyperlink, the user (c) "would also need to surmise that [Warner Bros.] really meant that" Terms of Service meant Terms of Use. *McKee v. Audible, Inc.*, 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017). Warner Bros. simply "ask[s] too much . . . and this level of notice is inferior to

most of the cases where sign-in-wrap, or clickwrap agreements have been enforced." *See id.* (insufficient notice where the disclosure to consumers referenced "Conditions of Use," whereas the document that it sought to bind consumers was titled "Audible's Terms of Use"); *see also Snow*, 2020 WL 6135990 at *8 (insufficient notice where users had the option to select "Get started," "Continue with Apple," or "Continue with Facebook," but where the disclaimer only stated users accepted the terms by selecting "Get Started" or "Continue with Facebook.").

Even the sign-up screen that purportedly existed in July 2018 and June 2019 does not show the unambiguous manifestation of assent. *See* Mem. at 2. That screen states that "By tapping 'Play' I agree to the Terms of Service" and the link reads "Terms of Service." However, if the user finds and clicks the link, they are taken instead to a document labeled "Terms of Use." *See* Mem. at 3. This neither provides sufficient notice nor an unambiguous manifestation of assent, as, a user would have to "surmise" that Terms of Service meant Terms of Use. *See McKee*, 2017 WL 4685039, at *8.

It bears repeating that "the onus" is on Defendant "to put users on notice of the terms to which they wish to bind consumers." *Berman*, 30 F.4th at 857. And "nothing prevents" Warner Bros. from ensuring that GOTC "provides disclosures that are properly labelled, conspicuously located, and linguistically precise." *McKee,* 2017 WL 4685039, at *8. If Warner Bros. "wishes to condition use of [GOTC] on a customer's willingness to forgo access to the courts, it must do so carefully, as indeed many other companies have." *Id.* Warner Bros. has not, so its Motion fails. *See id.; Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) ("Instead of requiring a user to affirmatively assent, Huuuge chose to gamble on whether its users would have notice of its Terms. The odds are not in its favor.").

## B.  Defendant's Terms of Use Are Unconscionable

"Under California law, 'a contractual provision is unenforceable if it is both procedurally and substantively unconscionable.'" *MacClelland v. Cellco P'ship*, 2022 WL 2390997, at *4 (N.D. Cal. July 1, 2022) (quoting *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013)). Where there is a high degree of procedural unconscionability, "even a low degree of substantive unconscionability may suffice to render the agreement unenforceable." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 130 (2019). Defendant's Terms of Use are both procedurally and substantively unconscionable. //

The TOU is procedurally unconscionable because it is a non-negotiable "take it or leave it" contract of adhesion. *See MacClelland*, 2022 WL 2390997, at *5 (citing *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 6 P.3d 669, 113 (2000) (a contract of adhesion "relegates to the subscribing party only the opportunity to adhere to the contract or reject it").[3] The defects described above ensure that Defendant's terms come as a surprise to consumers; Defendant does not even attempt to argue that any specific Plaintiff ever clicked on the non-descript words "Terms of Service" that furtively linked to the Terms of Use. *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) ("Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party."); *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1188 (N.D. Cal. 2020).[4]

The TOU is also substantively unconscionable. As further explained in Part C, below, the arbitration agreement's purported ban on public injunctive relief violates clear California law. *See MacClelland*, 2022 WL 2390997, at *8. In addition, the game is openly marketed to minors but asks *only* that the minor (and not a parent or guardian) agree to the terms. TOU §3. Despite a minor's right to disaffirm a contract, *see* Part D, below, the terms state that "All purchases are final and **no refunds are available**." TOU §6 (emphasis in original). The TOU also unconscionably waives the right to a jury trial. *See MacClelland*, 2022 WL 2390997, at *7. In addition, the TOU unconscionably requires claims to be brought within one-year, even though Plaintiffs' claims have three-to-four-year statutes of limitations. TOU §15; *see MacClelland*, 2022 WL 2390997, at *7 (the "short notice provision here erects a potential trap to the unwary").

//

---

[3] Defendant incorrectly argues that there is nothing procedurally unconscionable because Plaintiffs could have played another video game. However, Defendant relies on a California case that has been explicitly rejected by the Ninth Circuit. *See Mem* at 13 (citing *Wayne v. Staples, Inc.*, 135 Cal.App.4th 466, 482 (2006)); *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 985 (9th Cir. 2007) ("[W]e have consistently followed the courts that reject the notion that the existence of 'marketplace alternatives' bars a finding of procedural unconscionability.") (collecting cases).

[4] Defendant argues lack of surprise because GOTC players "can reasonably expect "'a continuing, forward-looking relationship governed by terms and conditions.'" Mem. at 11 (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 946 (2022)). However, in *B.D.*, the player encountered a pop-up during the sign-up process that advised that "'By Clicking Continue,' the user acknowledges he or she has read and understood the License Agreement." *Id.* As the court specifically noted, "[U]nlike in *Sellers*, users did not need to ferret out hyperlinks to terms and conditions. Blizzard directly provided those terms and conditions." *Id.* at 951 (internal quotations and citations omitted).

Further, the TOU contains a substantively unconscionable limitation of liability, precluding punitive and other damages that would be available to Plaintiffs. TOU §14; *MacClelland*, 2022 WL 2390997, at *8 ("California courts have found substantive unconscionability where an arbitration clause limits the types of remedies that would be available under the statute.") (citing *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 724 (N.D. Cal. 2012)).

As a result, the TOU is so "permeated" with unconscionability that the entire agreement is unenforceable, notwithstanding the TOU's severance clause. *MacClelland*, 2022 WL 2390997, at **15-16 ("Here, there is strong evidence that Verizon was trying to impose an 'inferior forum' on its customers.). To hold that some claims can be severed instead of the entire TOU would "create[] a 'perverse incentive.'" *Id.* (quoting *Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015), *aff'd*, 699 F. App'x 620 (9th Cir. 2017)). As *MacClelland* explained:

> If the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court.

*Id.*.[5]

Moreover, the severance clause is also an egregiously unconscionable term. Before such a claim can be severed under this provision—such as one for public injunctive relief or for punitive damages, which cannot even be sought in arbitration—the TOU require a consumer to specifically litigate *and exhaust all appeals* on the issue of whether this illegal bar on individualized relief applies. TOU §16 ¶F. So not only does the TOU seek to force consumers into an arbitration proceeding that can never provide the relief they are entitled to under California law, but consumers must also wait until completely exhausting the arbitration process including appeals—a process transparently

---

[5] Defendant contends that the arbitration clause is "identical" to the one upheld in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011). *See* Mem. at 12. However, the TOU here is unconscionable based on many different provisions in the TOU, not just one clause in the agreement itself. Plaintiffs' argument therefore does not conflict with *Concepcion*. *See Yeomans*, 485 F. Supp. 3d at 1176 ("[A]rbitration agreements may 'be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'") (quoting *Concepcion*, 563 U.S. at 339).

designed to prevent their vindication of consumer rights "for years and possibly ever." *MacClelland*, 2022 WL 2390997, at *16.

"In sum, the arbitration clause and the applicable limitations as a whole demonstrate a systematic effort to impose arbitration on a customer as an inferior forum." *Id.* And because the "object of the [TOU] is to force [Defendant's] consumers into an inferior (and, in many circumstances, wholly ineffective) forum," *id.*, this Court should hold that the arbitration clause is unconscionable and unenforceable.

## C.     Plaintiffs Can Seek Public Injunctive Relief in this Court

Even if the terms were not unconscionable, at a minimum, Plaintiffs' claims that seek public injunctive relief cannot be arbitrated.

Defendant asks the Court to compel arbitration *individually* and proscribe anything but relief on an individual basis. *See* Mem. at 17 ("At all relevant times, the TOU provided (in identical language) for individualized arbitration without class procedures."). But "[u]nder California law, a contractual provision purporting to waive the right to seek public injunctive relief in any forum is unenforceable." *MacClelland*, 2022 WL 2390997, at *8 (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 45 (2017)). The so-called *McGill* rule, which "prohibits the waiver of the right to pursue public injunctive relief in any forum," does not violate the FAA because it "is a generally applicable contract defense derived from long-established California public policy." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 828 (9th Cir. 2019).

Plaintiffs seek an injunction barring Defendant from engaging in the deceptive advertising practices and violating the UCL, FAL, and CLRA. This is "[t]he paradigmatic example [of public injunctive relief]." *MacClelland*, 2022 WL 2390997, at *9 (alterations in original) (quoting *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021)). Indeed, "the statutory schemes set out in 'the UCL, the CLRA, and the false advertising law' are explicitly designed to provide for 'public injunctive relief' that is 'by definition' 'primarily for the benefit of the general public.'" *MacClelland*, 2022 WL 2390997, at *9 (quoting *Vasquez v. Cebridge Telecom CA, LLC*, 569 F.Supp.3d 1016, 1026 (N.D. Cal. 2021) (alterations omitted)).

The TOU's arbitration provision improperly prohibits *any* method of obtaining aggregate relief in *any* forum—including for public injunctions. *See, e.g.*, TOU §16 ¶F ("The arbitrator may award

declaratory or injunctive relief *only in favor of the individual party* seeking relief and *only* to the extent necessary to provide relief warranted by that party's individual claim.") (emphasis added).[6] And "[t]his language is virtually identical to the language" that other courts have declined to enforce because it improperly prevents a plaintiff from "seek[ing] public injunctive relief in arbitration." *Brown v. Madison Reed, Inc.*, 2021 WL 3861457, at **7-8 (N.D. Cal. Aug. 30, 2021) ("[T]he [unenforceable] provision here is more restrictive and authorizes an arbitrator to award 'injunctive relief *only in favor of the claimant* and *only to the extent necessary to provide relief warranted by the claimant's individual claim.*'") (emphasis in original) (citing *Tillage v. Comcast Corp.*, 772 F. App'x 569 (9th Cir. 2019) and *McArdle v. AT&T Mobility LLC*, 772 F. App'x 575 (9th Cir. 2019)).

Because Warner Bros.'s TOU "preclude[es] injunctive relief benefitting anyone other than the individual claimant, the contract prevents Plaintiffs from seeking public injunctive relief in any forum, a right which cannot be denied whether in arbitration or otherwise." *MacClelland*, 2022 WL 2390997, at *8. Thus, at the very least, Defendant's Motion must be denied as to the public injunctive relief Plaintiffs seek. *See id.*; *see also Blair*, 928 F.3d at 832 (holding that a similar severance clause as Defendant's TOU required "that the entire claim be severed for judicial determination").[78]

## D.    Defendant's Terms Do Not Bind Minor Plaintiff P.W.

Even if this Court were to conclude that Defendant provided sufficient notice to the other Plaintiffs to establish mutual assent, Warner Bros.'s sign-up screen—for a game marketed to 12-year-olds—still failed to provide inquiry notice to minor Plaintiff P.W. *See Roblox*, 2022 WL 1459568, at **5-6 ("Even if the notice would be sufficiently conspicuous and understandable for an adult, it is not for a child—at least as a matter of law at this pre-evidentiary stage. . . . [And] the only indication that she was agreement [sic] to complicated terms of use was a not-so-conspicuous disclaimer above a

---

[6] Throughout this Memorandum, Plaintiffs refer to the TOU as it appears in Exhibit 3 of the Woldman Decl. for simplicity.
[7] In addition, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), does not "overrule[] or undermine[]" *McGill's* core holding that an arbitration agreement cannot prohibit a party from seeking public injunctive relief in any forum." *MacClelland*, 2022 WL 2390997, at *9 ("Importantly, *Viking River* found that the FAA does not preempt a rule of California law prohibiting wholesale waivers of the right to assert representative claims under PAGA.").

[8] In the alternative, should the Court determine that Plaintiffs failed to adequately plead facts which demonstrate that they seek public injunctive relief, Plaintiffs respectfully request leave to amend their Complaint to clarify this point. Defendant's ongoing deceptive advertising practices pose a danger to the public at large, not just those players unfortunate enough to have already been deceived by them.

bright sign-up button."); *Sellers*, 73 Cal. App. 5th at 475 ("Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children know how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked 'terms of use.'").

Regardless, P.W. has disaffirmed Warner Bros.'s TOU and therefore he and the Minor Subclass cannot be forced to arbitrate their claims, as discussed below.

### 1. California Law on Disaffirmance Applies

As Defendant concedes, the Court should use California's choice-of-law analysis, which requires courts to "apply California law" unless the parties "identify a meaningful conflict between California law and the law of another state." Mem. at 8. Defendant has not identified any conflict. It also cites primarily to California authorities on disaffirmance. The Court should therefore apply California law on this issue. *Roblox Corp.*, 2022 WL 1459568, at *4 ("[B]oth parties rely on cases applying California law and I follow suit.").[9]

In addition, it is appropriate to apply California law to claims by P.W. and the minor subclass because Warner Bros. is located in this State, the TOU requires that any dispute be interpreted under

---

[9] In a long string that includes primarily California authorities, Defendant includes just one case from Virginia. But Defendant does not argue that the cited case reflects any conflict between Virginia and California law on disaffirmance. *See* Mem. at 13-14 n.2; *see also Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1035 n.2 (N.D. Cal. 2020) ("the disaffirmance analysis would not necessarily vary based on which law was applied"). To the extent Defendant implicitly suggests a conflict, Defendant's sole Virginia authority, *A.V. v. iParadigms Liab. Co.*, 544 F. Supp. 2d 473 (E.D. Va. 2008), which it cites to accuse P.W. of using disaffirmance as a "sword" to "injure" Warner Bros., is readily distinguishable.

Defendant's quoted language from *A.V.* does not come from an authority on a unique provision of Virginia law. Instead, *A.V.* relied on an older U.S. Supreme Court case that broadly affirmed the right of a minor to disavow a contract, even if the hardship is one sided. *See A.V.*, 544 F. Supp. 2d at 481; *MacGreal v. Taylor*, 167 U.S. 688, 700 (1897) ("If the minor, when avoiding his contract, have in his hands any of its fruits specifically, the act of avoiding the contract by which he acquired such property will divest him of all right to retain the same, and the other party may reclaim it. . . . And the adult who deals with him . . . with the same chances of loss in the one case as in the other. . . . It is not necessary, in order to give effect to the disaffirmance of the deed or contract of a minor, that the other party should be placed in statu [sic] quo.") (citations omitted). Thus, *MacGreal* stands for the unremarkable proposition that if a minor disaffirms a contract, it must return the property or consideration it received as part of that contract if it is still "under his control." *Id.* at 701.

Furthermore, P.W. played Defendant's game for three weeks and spent $6,200 on purchases. And P.W. did not retain anything from the thousands he spent on the game, whereas in *A.V.* plaintiffs retained the benefit of the agreement—"[t]hey received a grade from their teachers." 544 F.Supp.2d at 481. To the extent *A.V.* meant something else, it misstates Virginia law. *See Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4, at *5 (2007) ("He who deals with an infant deals at his peril and subject to this right of the infant to disaffirm and avoid the contract.").

---

California law, and Defendant's unlawful conduct and false statements emanated from California. *See* FAC ¶¶97-102. As the court in *I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1121 (N.D. Cal. 2015), explained:

> It was Facebook that selected California law to apply to interactions between itself and its users, and thus it should come as no surprise that Facebook's own conduct would also be considered through the lens of California law. . . . Application of Facebook's SRR in such a manner is consistent with the purpose, dating to the 1870s, of California's laws regarding the power of minors to contract—laws that were designed as much to prevent California adults from contracting with minors as they were to protect minors who entered into contracts.

The fact that P.W. disaffirms the agreement does not alter this analysis. *T. K. v. Adobe Sys. Inc.*, 2018 WL 1812200, at *6 (N.D. Cal. Apr. 17, 2018) ("Moreover, T.K.'s reference to the choice of law provision in the terms of service is not inconsistent with her disaffirmance of the entire contract. T.K. explicitly states that she and the Class 'are not subject to the ACCP General Terms of Use,' but T.K. argues that '[b]y choosing California law for the resolution of disputes in the agreement, Adobe concedes that it is appropriate for this Court to apply California law to the instant dispute."); *see also*, *e.g.*, *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *4 (N.D. Cal. Aug. 9, 2021) (applying California law to out-of-state plaintiffs and class members).

### 2. P.W. Unequivocally Disaffirms and Disavows the TOU and His Purchases

Under California law, a minor has capacity to contract, but must be allowed to disaffirm the same. *See* Cal. Family Code 6700 ("[A] minor may make a contract in the same manner as an adult, subject to the power of disaffirmance."); Cal. Family Code 6710 ("Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards."); *see also Roblox*, 2022 WL 1459568, at *6 ("California law (like the common law) permits minors to disaffirm most contracts, rendering them void."); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F.Supp.2d 989, 1000 (N.D. Cal. 2012) ("Disaffirmation by a minor rescinds the entire contract, rendering it a nullity.").[10]

---

[10] Virginia law is the same. *See Boy Blue*, 74 Va. Cir. 4, at *5 ("A disaffirmance avoids the infant's contract ab initio, and the parties revert to the same situation as if the contract had never been made. The right of an infant to void his contract is an absolute and paramount right, superior to all equities of other persons. He who deals with an infant deals at his peril and subject to this right of the infant to disaffirm and avoid the contract.").

### i. P.W. has clearly disaffirmed the TOU.

P.W. has made it clear that he has disaffirmed the contract by the act of filing this lawsuit and, in addition, explicitly alleging so. *See, e.g., Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1035 (N.D. Cal. 2020) ("Disaffirmance may be made by any act or declaration indicating an intent to disaffirm. . . . In other words, express notice to the other party is unnecessary . . . and no specific language is required to communicate an intent to disaffirm.") (citations, quotations, and alterations omitted). As the allegations make clear, (a) his parents no longer let him play GOTC, FAC ¶68; (b) P.W. and his parents attempted to receive refunds for each of his in-app purchases, but were refused, *id.* ¶¶69, 77; (c) "Minor Plaintiff and his guardians have, by no later than the date of the First Amended Complaint, disaffirmed all in-game purchases made through GOTC to date and requested a refund," *id.* ¶164 (emphasis added); and (d) he is seeking, *inter alia*, declaratory judgment that this case may proceed as a class action and that the sales contracts with Defendant are voidable, *id.* ¶167.

These statements and P.W.'s actions more than sufficiently disclose his "unequivocal intent to repudiate" his agreements with Defendant, including to arbitrate, as "the minor's power to disaffirm a contract is broad and can be invoked through 'any act or declaration' that conveys his intent to repudiate a contract." *Epic Games*, 435 F. Supp. 3d at 1036 (quoting *Celli v. Sports Car Club, Inc.*, 29 Cal. App. 3d 511, 517 (Ct. App. 1972)).

To the extent there is any doubt, P.W. submits a declaration from his parent confirming that P.W. disavows and disaffirms the TOU and that he no longer plays GOTC. Weiher Decl. ¶¶7-8; see *R.A. v. Epic Games, Inc.*, 2019 WL 6792801, at *6 (C.D. Cal. July 30, 2019) ("The present case involves a motion to compel arbitration where extrinsic evidence, including declarations, is considered and both sides filed multiple declarations in support of their positions."). This declaration "unequivocally expresses" P.W.'s "intent to disaffirm" the TOU. *See R.A.*, 2019 WL 6792801, at *7. Moreover, "there is no evidence . . . that Plaintiff continued playing [GOTC] after he submitted his declaration that would contradict his intent to disaffirm the entirety of the [TOU]." *Id.*

### ii. P.W.'s parents did not agree to the TOU on his behalf.

Defendant argues that "a minor cannot disaffirm an arbitration agreement entered into by a legal guardian." *See* Mem. at 13 n.2. This is both inaccurate and irrelevant. Here, P.W., not his parents,

downloaded and installed GOTC. Weiher Decl. ¶3. P.W.'s parents did not enter into any contract with Defendant on P.W.'s behalf. Weiher Decl. ¶¶4-6.

### iii. P.W. may disavow the contract despite playing the game.

The Court should also reject Defendant's astonishing contention that P.W.'s disaffirmance is somehow unfair to Warner Bros. and thus "P.W. … could not disaffirm the TOU after enjoying access to the game." Mem. at 13 n.2. Defendant's highly addictive game that specifically target minors is rife with predatory monetization schemes, and unlawfully claims that purchases are non-refundable. P.W. did not benefit from playing GOTC in any way that remotely approaches how Defendant benefitted—raking in $6,200 from P.W. for just a few weeks of game play. And P.W., who is no longer playing the game, is certainly not retaining any unfair benefit following his disaffirmance. *See* FAC ¶¶38-39, 57-71.[11]

Further, because P.W. no longer plays GOTC, "this is not a case in which a minor seeks to adopt that part of an entire transaction which is beneficial, and reject its burdens." *Epic Games*, 435 F. Supp. 3d at 1037; *T. K.*, 2018 WL 1812200, at \*\*5-6 (denying motion to compel arbitration, despite "the principles that a minor cannot continue to receive the benefits of a contract after disaffirming and that a minor cannot disaffirm only parts of a contract," because the minor "has disaffirmed the entire" contract and ceased to use defendant's services).

Permitting minors to disavow contracts "reflect[s] both a strong public policy in favor of protecting minors, and, even more so, of discouraging adults from contracting with minors." *Facebook*, 82 F. Supp. 3d at 1122 ("The policy of the law is to discourage adults from contracting with an infant and they cannot complain if as a consequence of violating the rule they are injured by the exercise of the right of disaffirmance vested in the infant." *Id*. (emphasis in original) (quoting *Burnand v. Irigoyen*, 86 P.2d 417 (Cal. 1947); *Flittner v. Equitable Life Assur. Soc.*, 30 Cal. App. 209, 216 (1916) ("This position may seem, under all the circumstances of the case, to be a hardship on the defendant, but 'the

---

[11] Defendant also argues that P.W. cannot disaffirm because this action "'derives from, relies on, or is intimately intertwined with the subject contract containing the arbitration agreement.'" Mem. at 13-14 n.2 (quoting *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*, 186 Cal. App. 4th 696, 717 (2010)). But *Molecular* had nothing to do with a minor's right to disavow a contract, and instead dealt with equitable estoppel and whether a non-signatory "has a right to enforce the arbitration agreement." *Id.* at 717.

PLNTFS' OPP. TO DEF'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

2-ER-116

right of an infant to avoid his contracts is one conferred by law for his protection against his own improvidence and the designs of others.'").[12]

### iv.     Disaffirmance is fully consistent with the FAA.

Finally, Defendant confusingly argues that P.W.'s disavowal of the entire contract would violate the "FAA's 'equal-treatment' principle." Mem. at 14 n.2 (quoting *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017)). But this principle simply means that while "[a] court may invalidate an arbitration agreement based on generally applicable contract defenses," it cannot do so based on "on legal rules that apply only to arbitration." *Kindred*, 137 S. Ct. at 1426. Here, however, P.W. disavows the entire contract based on California statutes and legal rules that apply to contracts generally, not rules that somehow treat arbitration clauses differently. Indeed, as discussed above, P.W. disaffirms any and all agreements between him and Defendant, not only the arbitration clause. This is fully consistent with the "equal-treatment" principal. The Court should reject Defendant's attempt to elevate the status of the arbitration clause over other provisions of the agreement and make it somehow immune from generally applicable principles of capacity and disaffirmance. *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").

### CONCLUSION

Defendant seeks enforcement of an arbitration provision in an unconscionable agreement to which they never obtained mutual assent. Its Motion flaunts binding Ninth Circuit precedent on inquiry notice, California law prohibiting bars on aggregated relief in cases seeking public injunctions, and a minor's right to disaffirm a contract. For all these reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Compel Arbitration and Stay Case in its entirety. In the alternative, Plaintiffs request that the Court at least deny the Motion with respect to Plaintiffs' CLRA, FAL, and UCL claims, and that it further deny the Motion in its entirety with respect to claims brought by Plaintiff P.W. and the putative Minor Subclass.

//

---

[12] This is true even if Virginia law applied. *See Boy Blue*, 74 Va. Cir. at *5 (citing *Mustard v. Wohlford's Heirs*, 56 Va. 329, 329 (1859)).

Respectfully Submitted,

DATED: July 21, 2022            **KRONENBERGER ROSENFELD, LLP**


By:  /s/ Karl Kronenberger
              Karl S. Kronenberger
       Katherine E. Hollist (admitted *pro hac vice*)


**POLLOCK COHEN LLP**
Raphael Janove (he/him/his)
rafi@pollockcohen.com
Adam Pollock (he/him/his)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (admitted *pro hac vice*) (he/him/his)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiffs Charissa Keebaugh, Stephanie Neveu, Heather Mercieri, Sophia Nicholson, and P.W.*

2-ER-118

1
2   **KRONENBERGER ROSENFELD, LLP**
    Karl S. Kronenberger (Bar No. 226112)
3   karl@kr.law
    Katherine E. Hollist (admitted *pro hac vice*)
4   kate@kr.law
    150 Post Street, Suite 520
5   San Francisco, CA 94108
    Telephone: (415) 955-1155
6   Facsimile: (415) 955-1158

7   **POLLOCK COHEN LLP**                          **JAY KUMAR LAW**
    Raphael Janove (admitted *pro hac vice*)        Jay Kumar
8   rafi@pollockcohen.com                           jay@jaykumarlaw.com (admitted *pro hac vice*)
    Adam Pollock (admitted *pro hac vice*)          73 W. Monroe Street, Suite 100
9   adam@pollockcohen.com                           Chicago, IL 60603
    111 Broadway, Suite 1804                        Telephone: (312) 767-7903
10  New York, NY 10006
    Telephone: (212) 337-5361
11

12                      **UNITED STATES DISTRICT COURT**
13                      **CENTRAL DISTRICT OF CALIFORNIA**
                                **WESTERN DIVISION**
14

15  **CHARISSA KEEBAUGH, STEPHANIE**          Case No. 2:22-cv-01272-MEMF (AGRx)
    **NEVEU, HEATHER MERCIERI, SOPHIA**
16  **NICHOLSON,** and **P.W.,** by and through   **DECLARATION OF RAPHAEL JANOVE IN**
    **JOIE WEIHER,** on behalf of themselves and  **SUPPORT OF PLAINTIFFS' OPPOSITION**
17  all others similarly situated,                **TO DEFENDANT'S MOTION TO COMPEL**
                                                   **ARBITRATION AND STAY PROCEEDINGS**
18                          Plaintiffs,

19          v.                                     Date:      October 6, 2022
                                                   Time:      10:00 a.m.
20  **WARNER BROS. ENTERTAINMENT**               Before:    Hon. Maame Ewusi-Mensah
    **INC.,** a Delaware corporation,                        Frimpong
21                                                 Ctrm.:     8B
                            Defendant.
22

23

24

25

26

27

28

1  RAPHAEL JANOVE declares under penalty of perjury of the laws of the United States as

2  follows.

3       1.    I am an attorney and counsel of record for Plaintiffs in the above-captioned action. I

4  make this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration

5  and Stay Proceedings.

6       2.    I have personal knowledge of the matters set forth herein and am competent to testify

7  upon them if called upon to do so.

8       3.    Attached as Exhibit A is a true and correct copy of email correspondence between

9  counsel for the Parties, dated July 11-19, 2022.

10      4.    Attached as Exhibit B is a true and correct copy of email correspondence, with

11  highlighting added, between counsel for the Parties regarding the provision of player IDs, as referenced

12  in Exhibit A, dated June 3-10, 2022.

13

14      I declare under penalty of perjury under the laws of the United States that the foregoing is true

15  and correct.

16

17  Executed on July 21, 2022 in Portland, Oregon.

18

19                                              By: _____

20                                                       RAPHAEL JANOVE

21

22

23

24

25

26

27

28

Case No. 2:22-CV-01272-MEMF (AGRx)        1        JANOVE DECL ISO PLNTF'S OPP. TO DEF'S
                                                   MOTION TO COMPEL ARBITRATION

EXHIBIT A

**Jasper Eagleton**

---

| | |
|---|---|
| **From:** | Fuster, Patrick J. <PFuster@gibsondunn.com> |
| **Sent:** | Tuesday, July 19, 2022 6:50 PM |
| **To:** | Raphael Janove |
| **Cc:** | Smith, Jeremy S.; Chorba, Christopher; Karl Kronenberger; Kate Hollist; Jay Kumar; Jordan Marcus; Adam Pollock |
| **Subject:** | RE: Keebaugh v. Warner Bros - 22-cv-1272 |

Hi Rafi,

We disagree with your characterization of our motion and our prior correspondence about the display names, which speaks for itself. While I appreciate the offer to chat, I agree that we have nothing left to discuss at the moment.

Thanks,
Patrick

**Patrick J. Fuster**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

**From:** Raphael Janove <rafi@pollockcohen.com>
**Sent:** Tuesday, July 19, 2022 3:01 PM
**To:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; Jay Kumar <jay@jaykumarlaw.com>; Jordan Marcus <jordan@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>
**Subject:** Re: Keebaugh v. Warner Bros - 22-cv-1272

<span style="color:red">**[WARNING: External Email]**</span>
Hi Patrick,

We weren't asking for different graphics, but instead wanted to know what date range(s) Exhibits 5,6,7 were displayed to players. The Woldman Declaration is silent as to dates, though your Motion is not.

The Judge can decide whether Defendant carried its evidentiary burden, but Plaintiffs do not need additional information about specific graphic images. Whether it was Tyrion Lannister or the dragons used as the background art, Defendants' Motion to Compel fails as to each and every plaintiff.

That said, for the purposes of our opposition, we are assuming that Exhibit 5 was displayed until December 2019 and that at that point, what you term the "sign-in flow" changed, too.

Lastly, I'm a bit surprised about your inaccurate--and I believe unfair--characterization of the issue of player IDs. We are not "withholding" nor are "continu[ing] to withhold" this information. We offered it to you before you filed the Motion. But you declined

and filed the Motion with the factual support you deemed sufficient to carry Defendant's burden. And the information we requested after you filed the Motion does not require the user IDs, either.

I think there's nothing left to discuss on this issue and Plaintiffs will file the opposition on Thursday. However, I'm happy to chat if you'd like. I'm free for the next couple of hours.

Best,

Rafi

On Tue, Jul 19, 2022 at 2:43 PM Fuster, Patrick J. <PFuster@gibsondunn.com> wrote:

> Hi Rafi,
>
> Just following up on our email from last Wednesday.  To be clear, we do not believe that the background art is relevant to the motion to compel arbitration.  Your clients necessarily completed at least one of two sign-in flows to access *GOTC*.  We accurately represented both sign-in flows, including their layout and text, which was the issue in the two cases you cited below.  *See In re Stubhub Refund Litig.*, 2021 WL 5447006, at *8 (N.D. Cal. Nov. 22, 2021); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020).  And our filings also explained that "the graphic art varied over time."  Woldman Decl. ¶ 7, Dkt. 41-1.
>
> Still, we remain willing to provide you the background art.  But we reiterate that we cannot determine the specific background art that the plaintiffs would have seen if you continue to withhold your clients' current or last-used display names.  By withholding this basic information, you are, in effect, forcing the defendant to litigate this case without knowing who the plaintiff is.  Again, we don't believe this affects the motion to compel arbitration, because our motion identified all of the applicable sign-in flows during the relevant time period and established that all players had to agree to the arbitration clause before playing the game.  But if you want this information, then we need the display names to give you exactly what you've requested.
>
> Please let me know if you'd like to discuss more in advance of filing your opposition on Thursday.
>
> Best,
>
> Patrick
>
>
> **Patrick J. Fuster**
>
> GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Wednesday, July 13, 2022 6:50 PM
**To:** Raphael Janove <rafi@pollockcohen.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; Jay Kumar <jay@jaykumarlaw.com>; Jordan Marcus <jordan@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>
**Subject:** RE: Keebaugh v. Warner Bros - 22-cv-1272

We can share with you that, according to a preliminary review of our records, the affirmation language changed from the "I agree" language (the left image in the motion) to the "I accept" language (the right image in the motion) on or about December 19, 2019. (You'll see that your quotes below line up with the approximate date on which the screen changed.) But the background art varied from time to time. To research the background art for the correct date, we need the player IDs to confirm the date on which they first logged into the game.

Let me know if you have more questions.

**Patrick J. Fuster**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

**From:** Raphael Janove <rafi@pollockcohen.com>
**Sent:** Wednesday, July 13, 2022 5:28 PM
**To:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; Jay Kumar <jay@jaykumarlaw.com>; Jordan Marcus <jordan@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>
**Subject:** Re: Keebaugh v. Warner Bros - 22-cv-1272

[WARNING: External Email]

Hi Patrick,

Sorry, but I'm a little confused and hopefully you can clarify.

It was our understanding from the Parties' correspondence on June 7 & 8, 2022, that, although Warner Bros. had initially expressed interest in the player IDs, it ultimately decided those were not needed for the Motion.  Also, it appears that Warner Bros. already knows when these sign-up screens were displayed.

For instance, the Motion states that the sign-up screen in Woldman Decl. Exhibit 5 was in place between July 2018 and June 2019, even though there is no factual support for this in the Woldman declaration. *See* Mot. at 3 ("Ms. Mercieri and Ms. Neveu allege that they began playing Game of Thrones: Conquest in July 2018 and June 2019, respectively. . . .  At those times, players could not access the game without first completing the sign-in process by clicking 'Play' on the **screen shown on the left above**."). Similarly, the Motion states that Exhibit 7--the one that puzzlingly is labeled "Development Build"-- was available at least between May 2020 and June 2020, once again without factual support. *See id.* at 4 ("Ms. Keebaugh and Ms. Nicholson allege that they began playing Game of Thrones: Conquest in May 2020 and June 2020, respectively. . . .  At that time, players could not access the game without first completing the sign-in process by clicking the "Play" button on the **screen shown on the right above**.").

So it seems like Warner Bros. can easily provide the information requested.  Please let me know if I'm missing something.

Thanks,

Rafi

On Wed, Jul 13, 2022 at 5:19 PM Fuster, Patrick J. <PFuster@gibsondunn.com> wrote:

> Rafi,
>
> I appreciate you reaching out in advance of the opposition.  As you know, we asked for your clients' current (or last-used) display names so that we could trace them to the underlying user IDs associated with the account.  We're willing to exchange more specific information about the sign-in screens if you provide what we need to try to locate that information—it's not as simple as just giving general date ranges.
>
> Please let us know if you're willing to give us the information we need to accommodate your request.

Thanks,

Patrick

**Patrick J. Fuster**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

**From:** Raphael Janove <rafi@pollockcohen.com>
**Sent:** Monday, July 11, 2022 10:16 AM
**To:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Cc:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; Jay Kumar <jay@jaykumarlaw.com>; Jordan Marcus <jordan@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>
**Subject:** Keebaugh v. Warner Bros - 22-cv-1272

[WARNING: External Email]

Hi Patrick,

Can you please let us know when the sign-up screens in the Woldman Declaration were used in the GOTC application, and which date ranges? We'd like to know which sign-up screens were actually made available to Plaintiffs, particularly given the differences between Exhibit 5, on one hand, and Exhibits 6&7 on the other, and that Exhibit 7 states "Development Build."

We'd prefer to resolve this factual issue now, before raising it in our opposition. *See, e.g., In re Stubhub Refund Litig.*, 2021 WL 5447006, at *8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice of the User Agreement when they signed up with StubHub."); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020) ("Eventbrite's first problem is broad and extends to all of its evidence. This motion turns on whether or not the plaintiffs were on inquiry notice based on online agreements. Yet the evidence Eventbrite offers does not demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period.").

Please let us know if and when you will provide the requested information, and if Warner Bros. will amend its filings.

Best,


Rafi



--

**Raphael Janove**
**Associate**
o: (215) 667-8607
rafi@pollockcohen.com
*Pronouns: he/him/his*

**Pollock | Cohen LLP**
111 Broadway, Ste. 1804; New York, NY 10006
1617 John F. Kennedy Blvd., 20th Fl.; Philadelphia, PA 19103

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

2-ER-127

EXHIBIT B

## Jasper Eagleton

| | |
|---|---|
| **From:** | Kate Hollist |
| **Sent:** | Friday, June 10, 2022 1:31 PM |
| **To:** | Fuster, Patrick J.; Smith, Jeremy S.; Karl Kronenberger; jay@jaykumarlaw.com; Raphael Janove; Adam Pollock |
| **Cc:** | Chorba, Christopher |
| **Subject:** | RE: Keebaugh v. Warner Bros. - Meet and Confer |

Hi Patrick,

To clarify, we will not oppose your request to set a further responsive pleading deadline following disposition of the MTC. You may affix Karl's signature.

Thank you,

Kate

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Friday, June 10, 2022 11:20 AM
**To:** Kate Hollist <kate@krinternetlaw.com>; Smith, Jeremy S. <JSSmith@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; jay@jaykumarlaw.com; Raphael Janove <rafi@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Hi Kate,

I'm writing to follow up on the questions below—specifically, (1) asking we have authorization to add Karl's signature to the briefing schedule stip and (2) confirming that you oppose our request to set a further responsive pleading deadline following the disposition of the motion to compel.  I've reattached the stip here.

Thank you!


**Patrick J. Fuster**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Wednesday, June 8, 2022 5:32 PM
**To:** Kate Hollist <kate@krinternetlaw.com>; Smith, Jeremy S. <JSSmith@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; jay@jaykumarlaw.com; Raphael Janove <rafi@pollockcohen.com>; Adam Pollock <Adam@pollockcohen.com>

2-ER-129

**Cc:** Chorba, Christopher <<CChorba@gibsondunn.com>>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Hi Kate,

1. August 25 works for us too. Given that hearing date, I've proposed a revised briefing schedule that gives both of us additional time on the briefs and pushes the opposition after your busy week. Those changes are reflected in the attached. Please let us know if the draft is acceptable and if we have authorization to add your signature.

2. With regard to our responsive deadline, by "that works for us" do you mean that we should go forward with the opposed motion to set a further responsive pleading deadline?

3. Thank you for clarifying about the minor-specific arguments. We're ready to move forward with the motion to compel, but are willing to revisit the exchange of information before you file your opposition.


**Patrick J. Fuster**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Kate Hollist <<kate@krinternetlaw.com>>
**Sent:** Wednesday, June 8, 2022 12:38 PM
**To:** Fuster, Patrick J. <<PFuster@gibsondunn.com>>; Smith, Jeremy S. <<JSSmith@gibsondunn.com>>; Karl Kronenberger <<karl@krinternetlaw.com>>; jay@jaykumarlaw.com; Raphael Janove <<rafi@pollockcohen.com>>; Adam Pollock <<Adam@pollockcohen.com>>
**Cc:** Chorba, Christopher <<CChorba@gibsondunn.com>>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

**[WARNING: External Email]**
Hi Patrick,

Thanks for your response. A hearing date of August 25 works better on our end (Karl and I will be attending mediation on the east coast July 12-13, and anticipate flying back on July 14, so it won't be doable for us to file our opposition that day).

We understand your position re: briefing for the MTD; that works for us.

As for the IDs, thank you for clarifying that WB's position is not a fact-intensive one. However, I do want to be clear that we intend to raise minor-specific arguments in our briefing. If this means that you will require the minor's ID number for your own briefing, we're happy to provide that, provided that in exchange you produce to us: (1) any records associated with that ID number that you contend bind the minor to an agreement to arbitrate; and (2) the audiotracks for the sign-in screens, as described below.

Let us know if that works for you.

Best,

Kate

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Wednesday, June 8, 2022 11:17 AM
**To:** Kate Hollist <kate@krinternetlaw.com>; Smith, Jeremy S. <JSSmith@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; jay@jaykumarlaw.com; Raphael Janove <rafi@pollockcohen.com>
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Kate,

Thanks for getting back to us. I realize now that there may have been some confusion at the meet and confer. We asked for player IDs in the event that the opposition would raise minor-specific issues, but that doesn't seem to be your intention. We too don't want or need the motion to be heavily fact-based, and we're comfortable filing on the current deadline, Monday, without the player IDs.

We would still like to work with you on a schedule that accommodates hearing availability and gives both sides enough time to brief the opposition and reply. You proposed a Tuesday for the hearing date, but Judge Frimpong hears her civil law and motion calendar on Thursday mornings. We've proposed August 18, but let us know if August 25 or some other date works better.

As to the responsive deadline, our position remains that we can file a motion to compel in lieu of a 12(b) motion or answer. *See, e.g.*, *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1383 n.2 (10th Cir. 2009) ("If a party files a motion under FAA §§ 3 and 4, that motion is denied by the court, and the denial is affirmed on interlocutory appeal, nothing prevents that party from then filing a Rule 12 motion to dismiss."). We will not agree to parallel briefing because we would lose the benefit of our arbitration agreement if we're forced to brief the merits while the motion to compel is pending. The question is whether we file a responsive pleading within the default 14-day period following a final ruling on the motion to compel or if you accommodate our request for 28 days. If you still oppose this request, we're prepared to file a motion requesting the Court to set the deadline at 28 days.

Best,
Patrick

---

**Patrick J. Fuster**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Kate Hollist <kate@krinternetlaw.com>
**Sent:** Tuesday, June 7, 2022 4:18 PM
**To:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Karl Kronenberger <karl@krinternetlaw.com>; jay@jaykumarlaw.com; Raphael Janove <rafi@pollockcohen.com>
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

[WARNING: External Email]

Jeremy and Patrick,

Thank you for your patience. Please find attached our redlined changes. For scheduling reasons, we've proposed August 23 as the date for the MTC hearing, and have based our filings deadlines off that, but let us know if that won't work for you.

The biggest change you'll see is that we included a deadline of Oct 24th (60 days after the proposed hearing on the MTC) for Defendant to file its response to the FAC, in the event the judge hasn't issued a ruling on the MTC by then. While we're happy to postpone that deadline significantly in the hopes of obtaining clarity from the Court on the MTC in the meantime, we do not want to be in a position of waiting twelve months for a ruling on the MTC, only to then begin a *second* twelve-month timer for a ruling on the newly-briefed MTD. Let us know whether this is agreeable to you.

As for the player IDs of the named Plaintiffs, we are willing to provide those, subject to a few conditions:

1. By seven days prior to filing Defendant's MTC, you supply us with copies of any factual information/documents on which you plan to rely in advancing your MTC arguments, specifically including (but not limited to) any records WB contends support its claim that our clients consented to arbitrate this dispute;

2. By the date of filing Defendant's MTC, you provide us with copies of the audiotrack(s) played in the Game of Thrones: Conquest mobile app on any user sign-in screen on which WB claims the user provides agreement to arbitrate; and

3. In the event that WB's MTC relies heavily on fact-based arguments, where Plaintiffs lack access to the relevant facts necessary to rebut these arguments, that WB cooperate with Plaintiffs' efforts to obtain the information needed to rebut such arguments (including, as necessary, working with us on deadlines and/or potentially some limited-scope discovery). This is another reason why we need the factual background documents/information prior to Defendant's MTC deadline—so we can quickly determine whether Plaintiffs need any additional clarification or information.

Please advise whether you and WB are amenable to these conditions so that all parties will be in a position to litigate the MTC.

Best,

Kate

---

**From:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Sent:** Tuesday, June 7, 2022 8:49 AM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; jay@jaykumarlaw.com
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Thank you, Karl.


**Jeremy S. Smith**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7973 • Fax +1 213.229.6973
JSSmith@gibsondunn.com • www.gibsondunn.com

2-ER-132

---

**From:** Karl Kronenberger <karl@krinternetlaw.com>
**Sent:** Tuesday, June 7, 2022 8:48 AM
**To:** Smith, Jeremy S. <JSSmith@gibsondunn.com>; Kate Hollist <kate@krinternetlaw.com>; jay@jaykumarlaw.com
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

**[WARNING: External Email]**

Hi Jeremy,

We will get back to you later today.

Very best,

Karl

---

**From:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Sent:** Tuesday, June 7, 2022 8:33 AM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; jay@jaykumarlaw.com
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Good morning Karl, Kate, and Jay,

I just wanted to check in on our request for the user IDs and proposed schedule.

Thank you,

Jeremy

**Jeremy S. Smith**

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7973 • Fax +1 213.229.6973
JSSmith@gibsondunn.com • www.gibsondunn.com

---

**From:** Smith, Jeremy S. <>
**Sent:** Friday, June 3, 2022 6:00 PM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>; 'jay@jaykumarlaw.com' <jay@jaykumarlaw.com>
**Cc:** Chorba, Christopher <CChorba@gibsondunn.com>; Fuster, Patrick J. <PFuster@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Hi Karl, Kate, and Jay,

Nice meeting you all earlier. We spoke with our client, and if you can provide your clients' current (or last-used) display names, we should be able to trace them to the underlying user IDs associated with the account. If any of your clients don't know their current display names, we can try another method, such as an email address.

2-ER-133

To give us time as you consider this request, we propose adopting a briefing schedule that adds a week for us to file the motion and a week to both the opposition and reply.  That's a total of 3.5 weeks for the opposition and 2 weeks for the reply.  For our schedules, we propose an August 11 hearing but could also make August 18 work.  Although it would be difficult for our schedules, we might be able to do August 4 if necessary.

Attached is a stipulation that reflects that schedule.  The stip also sets a date for a further responsive pleading, as discussed on the meet and confer.  Please let us know if it is acceptable or if you have proposed edits.

Thank you,

Jeremy


**Jeremy S. Smith**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7973 • Fax +1 213.229.6973
JSSmith@gibsondunn.com • www.gibsondunn.com

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Thursday, June 2, 2022 9:51 AM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Thanks, Karl, that would be great.  See you then.


**Patrick J. Fuster**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Karl Kronenberger <karl@krinternetlaw.com>
**Sent:** Thursday, June 2, 2022 9:45 AM
**To:** Fuster, Patrick J. <PFuster@gibsondunn.com>; Kate Hollist <kate@krinternetlaw.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

**[WARNING: External Email]**

Hi Patrick,

So sorry for the delayed response.

2-ER-134

Tomorrow at 11:00 will be fine. Shall I provide a Zoom link?

Very best,

Karl

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Thursday, June 2, 2022 9:37 AM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Subject:** RE: Keebaugh v. Warner Bros. - Meet and Confer

Hi Karl and Kate,

Just following up on this. Would the two of you be available tomorrow at 11:00 AM or 4:00 PM for the meet and confer? We also may be able to do Monday afternoon if neither time works for you.

Many thanks,
Patrick

**Patrick J. Fuster**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

**From:** Fuster, Patrick J. <PFuster@gibsondunn.com>
**Sent:** Tuesday, May 31, 2022 12:47 PM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Kate Hollist <kate@krinternetlaw.com>
**Cc:** Smith, Jeremy S. <JSSmith@gibsondunn.com>
**Subject:** Keebaugh v. Warner Bros. - Meet and Confer

Hi Karl and Kate,

Could you please let us know your availability this week and next Monday for a meet and confer pursuant to Local Rule 7-3? And to facilitate our discussions about our forthcoming motion to compel arbitration, would you be able to inform us of the plaintiffs' usernames (and if applicable, the email addresses) that they registered with Game of Thrones: Conquest? Happy to discuss more if you have any questions.

Thank you,

Patrick

**Patrick J. Fuster**

# GIBSON DUNN

2-ER-135

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7117 • Fax +1 213.229.6117
PFuster@gibsondunn.com • www.gibsondunn.com

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (admitted *pro hac vice*)
rafi@pollockcohen.com
Adam Pollock (admitted *pro hac vice*)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com (admitted *pro hac vice*)
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON,** and **P.W.**, by and through **JOIE WEIHER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**WARNER BROS. ENTERTAINMENT INC.**, a Delaware corporation,<br><br>Defendant. | Case No. 2:22-cv-01272-MEMF (AGRx)<br><br>**DECLARATION OF JAY KUMAR IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date:     October 6, 2022<br>Time:    10:00 a.m.<br>Before:  Hon. Maame Ewusi-Mensah Frimpong<br>Ctrm:    8B |

JAY KUMAR declares under penalty of perjury of the laws of the United States as follows.

1.      I am an attorney and counsel of record for Plaintiffs in the above-captioned action. I make this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration and Stay Proceedings.

2.      I have personal knowledge of the matters set forth herein and am competent to testify upon them if called upon to do so.

3.      The Game of Thrones: Conquest sign-up screen plays the theme song from the popular HBO Game of Thrones series.

4.     The following is an image of the Game of Thrones: Conquest sign-up screen, as it appears currently and at least as early as May 2021, and as it would appear on Apple's iPhone XR, Apple's top-selling iPhone in 2019, with dimensions 5.94" x 2.98" x 0.33."[1]



---

[1]  *See* https://9to5mac.com/2020/02/25/iphone-xr-2019-best-seller/ (*data from Omdia's Smartphone Model Market Tracker report noting top selling iPhone.*); https://support.apple.com/kb/SP781?locale=en_US (Apple's iPhone XR Technical Specifications).

5.    The following is an image of the Game of Thrones: Conquest sign-up screen as it would appear on Apple's iPhone 12, Apple's top-selling iPhone in 2021, with dimensions 5.78" x 2.82" x 0.29."[2]



---

[2]    *See*   https://www.counterpointresearch.com/global-top-10-smartphones-2021/   (data   from Counterpoint   Research's   Global   Monthly   Handset   Model   Sales   Tracker); https://www.apple.com/iphone-12/specs/ (Apple's iPhone 12 technical specifications).

KUMAR DECL ISO PLNTF'S OPP. TO DEF'S MOTION TO COMPEL ARBITRATION

2-ER-140

6.    The following is an image of the Game of Thrones: Conquest sign-up screen as it would appear on Samsung's Galaxy A12, Samsung's top-selling smartphone in 2021, with dimensions 6.5" x 2.98"x 0.35."[3]



---

[3] *See* https://www.sammobile.com/news/samsung-galaxy-a12-was-the-best-selling-android-phone-in-2021/ (SamMobile's website noting top-selling Samsung phones in 2021); https://www.samsung.com/sg/smartphones/galaxy-a/galaxy-a10-black-32gb-sm-a105gzkgxsp/ (Samsung's Galaxy A10 technical specifications).

1

2       I declare under penalty of perjury under the laws of the United States that the foregoing is true

3  and correct.

4

5  Executed on July 21 in 2022.

6

7                      By: _____

                                     JAY KUMAR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (admitted *pro hac vice*)
rafi@pollockcohen.com
Adam Pollock (admitted *pro hac vice*)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com (admitted *pro hac vice*)
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON,** and **P.W.**, by and through **JOIE WEIHER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**WARNER BROS. ENTERTAINMENT INC.**, a Delaware corporation,<br><br>Defendant. | Case No. 2:22-cv-01272-MEMF (AGRx)<br><br>**DECLARATION OF JOIE WEIHER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date: October 6, 2022<br>Time: 10:00 a.m.<br>Before: Hon. Maame Ewusi-Mensah Frimpong<br>Ctrm.: 8B |

2-ER-143

JOIE WEIHER declares under penalty of perjury of the laws of the United States as follows.

1.    I am the mother of Minor Plaintiff P.W. I have personal knowledge of the facts stated herein, and I am otherwise competent to testify. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration or Stay.

2.    P.W. made over $6,200.00 worth of in-game purchases on the Game of Thrones Conquest mobile app during an approximately three-week period in mid-March to early April 2022.

3.    Neither I nor P.W.'s father downloaded or installed the Game of Thrones Conquest application. Nor did we ever see, read, or agree to Warner Bros.'s Terms of Use. P.W. downloaded and installed the game on his own.

4.    Neither I nor P.W.'s father gave P.W. permission to accept Warner Bros.'s Terms of Use.

5.    Neither I nor P.W.'s father agreed to any contract with Warner Bros. on behalf of P.W. or otherwise.

6.    Neither I nor P.W.'s father permitted P.W. to make any purchase through the Game of Thrones Conquest application.

7.    P.W. does not have permission to play Game of Thrones Conquest, and ceased playing the game before the filing of the Amended Complaint.

8.    P.W. disaffirms and disavows Warner Bros.'s Terms of Use and each of P.W.'s in-app purchases made while using Game of Thrones Conquest.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 21, 2022 in Warrenton, Virginia.

By: _____
             JOIE WEIHER

Case No. 2:22-CV-01272-MEMF (AGRx)1    **WEIHER DECL ISO PLNTF'S OPP. TO DEF'S**
**MOTION TO COMPEL ARBITRATION**

CHRISTOPHER CHORBA, SBN 216692
    cchorba@gibsondunn.com
JEREMY S. SMITH, SBN 283812
    jssmith@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
    pfuster@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

*Attorneys for Defendant*
*Warner Bros. Entertainment Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON, and P.W., by and through JOIE WEIHER,<br><br>Plaintiffs,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT INC., a Delaware corporation,<br><br>Defendant. | CASE NO. 2:22-CV-01272-MEMF (AGRx)<br><br>**DEFENDANT WARNER BROS. ENTERTAINMENT INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>**Hearing:**<br>Date:      August 25, 2022<br>Time:      10:00 a.m.<br>Place:     Courtroom 8B<br>Judge:    Hon. Maame Ewusi-Mensah Frimpong |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

  **PLEASE TAKE NOTICE THAT** on August 25, 2022, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Maame Ewusi-Mensah Frimpong of the United States District Court for the Central District of California in the First Street Courthouse, Courtroom 8B, 350 West First Street, Los Angeles, California 90012, Defendant Warner Bros. Entertainment Inc. ("Warner Bros.") will and does move this Court for an order: (1) compelling Plaintiffs' claims to arbitration on an individual basis; and (2) staying Plaintiffs' claims pending the completion of arbitration.

  Warner Bros. brings this Motion because Plaintiffs' claims are subject to a valid and enforceable arbitration agreement that requires Plaintiffs to arbitrate those claims on an individual basis. *See* 9 U.S.C. §§ 3–4.

  This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on June 3, 2022.

  Warner Bros.' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of David Woldman, the Proposed Order, any other matters of which the Court may take judicial notice, other documents on file in this action, and any oral argument of counsel.

Dated: June 13, 2022    GIBSON, DUNN & CRUTCHER LLP

         By:   */s/ Christopher Chorba*
             Christopher Chorba

         *Attorneys for Defendant Warner Bros.*
         *Entertainment Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................. 1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY ..................... 2

        A.      The Relevant Terms of Use.................................. 2

        B.      Plaintiffs File Individual and Class Claims Against Warner Bros. ........... 5

III.    LEGAL STANDARD ......................................................... 6

IV.     ARGUMENT.................................................................. 7

        A.      The Federal Arbitration Act Governs the Arbitration Agreement............. 7

        B.      Plaintiffs and Warner Bros. Agreed to Binding Individual
                Arbitration ......................................................... 8

                1.      Plaintiffs and Warner Bros. Formed a Valid Arbitration
                        Agreement................................................... 8

                2.      The Arbitration Agreement Encompasses Plaintiffs' Claims. ...... 14

                3.      The Claims Must Be Arbitrated on an Individual Basis................ 16

        C.      The Court Should Stay the Case Pending Completion of Arbitration..... 17

V.      CONCLUSION ............................................................... 18

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MOTION TO COMPEL ARBITRATION
CASE NO. 2:22-CV-01272-MEMF (AGRx)

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.V. v. iParadigms, Ltd. Liability Co.*,
544 F. Supp. 2d 473 (E.D. Va. 2008) ............................................................ 14

*Allied-Bruce Terminix Cos. v. Dobson*,
513 U.S. 265 (1995) ........................................................................................ 7

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ................................................................................... 7, 17

*Armendariz v. Foundation Health Psychcare Servs., Inc.*,
24 Cal. 4th 83 (2000) .................................................................................... 12

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ......................................... 1, 4, 7, 9, 12, 16, 17

*B.D. v. Blizzard Entm't, Inc.*,
76 Cal. App. 5th 931 (2022) .................................................... 9, 10, 11

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ................................................... 10, 11

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ................................................... 15

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006) ........................................................................ 7

*Cape Flattery Ltd. v. Titan Maritime, LLC*,
647 F.3d 914 (9th Cir. 2011) ............................................ 14

*Circuit City Stores, Inc. v. Najd*,
294 F.3d 1104 (9th Cir. 2002) ............................................ 11

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003) ............................................................. 8

*DIRECTV, Inc. v. Imburgia*,
577 U.S. 47 (2015) ............................................................ 14

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) ....................................... 11

*Doyle v. Giuliucci*,
62 Cal. 2d 606 (1965) ........................................................ 13

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) .................................................... 9, 15

*Epic Systems Corp. v. Lewis*,
138 S. Ct. 1612 (2018) ................................................... 6, 17

iii

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Esquivel v. Charter Comm'cns, Inc.*,
No. 18-cv-7304-GW-MRWx, 2018 WL 10806904 (C.D. Cal. Dec. 6, 2018) .................................................................................................... 11

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995) .......................................................................... 8, 15

*Fish v. Tesla, Inc.*,
No. 21-cv-060-PSG-JDEx, 2022 WL 1552137 (C.D. Cal. May 12, 2022) .............................................................................................. 10, 11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) ............................................................................ 15

*Hohe v. San Diego Unified Sch. Dist.*,
224 Cal. App. 3d 1559 (1990) ............................................................... 13

*Homedics, Inc. v. Valley Forge Ins. Co.*,
315 F.3d 1135 (9th Cir. 2003) ................................................................. 8

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) .................................................................................. 7

*Johnmohammadi v. Bloomingdale's, Inc.*,
755 F.3d 1072 (9th Cir. 2014) ............................................................... 17

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .............................................................................. 8

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
137 S. Ct. 1421 (2017) .......................................................................... 14

*Lamps Plus, Inc. v. Varela*,
139 S. Ct. 1407 (2019) .......................................................................... 17

*Laver v. Credit Suisse Securities (USA), LLC*,
976 F.3d 841 (9th Cir. 2020) ................................................................. 17

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*,
363 F.3d 1010 (9th Cir. 2004) ................................................................. 8

*Long v. Provide Commerce, Inc.*,
245 Cal. App. 4th 855 (2016) .................................................................. 9

*Magana v. DoorDash, Inc.*,
343 F. Supp. 3d 891 (N.D. Cal. 2018) ................................................... 17

*Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*,
89 Cal. App. 4th 1042 (2001) ................................................................ 10

iv

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Martinez v. Anthem Cos., Inc.*,
No. 19-cv-3692-RGK-JPRx, 2019 WL 6825739 (C.D. Cal. July 23, 2019) ................................................................................................. 18

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......................................................... 10, 11

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ........................................................... 12

*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*,
186 Cal. App. 4th 696 (2010) ............................................................ 14

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ............................................................................... 15

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ............................................................. 8

*Norcia v. Samsung Telecomm. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ............................................................. 9

*Peter v. Doordash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) ............................................... 11

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US) LLC*,
55 Cal. 4th 223 (2012) ................................................................. 12, 13

*R.A. v. Epic Games, Inc.*,
No. 19-cv-1488-GW-Ex, 2019 WL 6792801 (C.D. Cal. July 30, 2019) ............ 8, 14

*Regan v. Pinger, Inc.*,
2021 WL 706465 (N.D. Cal. Feb. 23, 2021) ...................................... 11

*In re Ring LLC Privacy Litig.*,
No. 19-cv-10899-MWF-RAOx, 2021 WL 2621197 (C.D. Cal. June 24, 2021) ..... 11

*Scherck v. Alberto-Culver Co.*,
417 U.S. 506 (1974) ........................................................................... 17

*Southland Corp. v. Keating*,
465 U.S. 1 (1984) ............................................................................... 12

*Stewart v. Preston Pipeline Inc.*,
134 Cal. App. 4th 1565 (2005) ............................................................ 9

*Stolt-Nielsen v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ........................................................................... 17

*Strotz v. Dean Witter Reynolds, Inc.*,
223 Cal. App. 3d 208 (1990) ............................................................. 11

v

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Ting v. AT&T,*
  319 F.3d 1126 (9th Cir. 2003) .................................................. 12

*Tompkins v. 23andMe, Inc.,*
  840 F.3d 1016 (9th Cir. 2016) .................................................. 12

*Wagner v. Stratton Oakmont, Inc.,*
  83 F.3d 1046 (9th Cir. 1996) .................................................... 9

*Wayne v. Staples, Inc.,*
  135 Cal. App. 4th 466 (2006) .................................................. 13

*Wilson v. Huuuge, Inc.,*
  944 F.3d 1212 (9th Cir. 2019) .................................................. 10

*Zelnick v. Adams,*
  263 Va. 601 (2002) .............................................................. 14

**STATUTES**

9 U.S.C. § 2 ....................................................................... 7, 9, 12

9 U.S.C. § 3 .................................................................... 2, 7, 17

9 U.S.C. § 4 ...................................................................... 7, 9, 16

Cal. Bus. & Prof. Code § 17200 *et seq.* ....................................... 6

Cal. Bus. & Prof. Code § 17501 ................................................. 6

Cal. Civ. Code § 1550 ............................................................ 9

Cal. Civ. Code § 1556 ............................................................ 9

Cal. Civ. Code § 1557 ............................................................ 9

Cal. Civ. Code § 1750 *et seq.* .................................................. 6

Cal. Fam. Code § 6700 ........................................................... 9

Cal. Fam. Code § 6701 ........................................................... 9

Cal. Fam. Code § 6712 ........................................................... 14

N.H. Rev. Stat. § 358-A:1 *et seq.* .............................................. 6

N.Y. Gen. Bus. Law § 349 ....................................................... 6

N.Y. Gen. Bus. Law § 350 ....................................................... 6

Wash. Rev. Code § 19.86.020 *et seq.* .......................................... 6

# TABLE OF AUTHORITIES
(continued)

Page(s)

**R**ULES

AAA Rule R-14(a) ............................................................................................ 15

Fed. R. Civ. P. 17(c) ........................................................................................... 9

Gibson, Dunn &
Crutcher LLP

## I. INTRODUCTION

This putative class action lawsuit challenges certain aspects of a mobile application video game called *Game of Thrones: Conquest*. Based on the popular television series, players assemble armies and play against one another to amass the strongest house and compete for the "Iron Throne." As with many mobile video games, players have the option to purchase bundles of virtual items to enhance their gameplay, such as virtual gold, weapons, food, and building material.

Plaintiffs Charissa Keebaugh, Stephanie Neveu, Heather Mercieri, Sophia Nicholson, and P.W. contend that that these virtual items were improperly represented as "discounted" from their original price. They do not contend that they were charged a different amount from what was displayed on the screen, but instead that the advertised "discount" was illusory.

But this Court need not wade into the merits of these claims, because they belong in arbitration. Warner Bros. invests significant time, money, and effort in developing exciting high-quality games that are free to play. Players can enjoy many hours of entertainment without having to spend anything at all, if they choose. The one thing Warner Bros. requires in return for playing the free game is that every player—including each of the named Plaintiffs here—agrees to Warner Bros.' Terms of Use, including an agreement "to arbitrate all disputes and claims between" the parties. One of Plaintiffs' counsel is well aware of this, having previously arbitrated and lost a similar case of his own about the game.

The sign-in page for *Game of Thrones: Conquest* presents a conspicuous notice of these Terms of Use, which in turn disclose prominently in the first paragraph that the parties' contract requires arbitration on an individual basis without class procedures. And the arbitration agreement includes a class action waiver that is identical to the provision that the Supreme Court upheld in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011). As the Court has repeatedly confirmed since that decision, the Federal Arbitration Act simply does not allow Plaintiffs to disregard their contractual

Gibson, Dunn &
Crutcher LLP

obligations. There is no basis for refusing to enforce the binding arbitration agreement here, and the Court should compel Plaintiffs to arbitrate all their claims on an individual basis and stay this case pending the completion of arbitration under 9 U.S.C. § 3.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Relevant Terms of Use

This case centers on Warner Bros.' mobile application video game, *Game of Thrones: Conquest*. This app, like many, requires users to complete a "sign-in flow"—*i.e.*, players may gain access only by accepting terms and conditions for using the game. At all times, the sign-in screen presented players with an affirmation, immediately below the "Play" button, that "By tapping 'Play' I agree to the Terms of Service" or "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy."





Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MOTION TO COMPEL ARBITRATION
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-154

(Decl. of David Woldman, Exs. 5, 7; *see also id.*, Ex. 6.)  As depicted above, the sign-in screens displayed hyperlink boxes immediately below the affirmation that directed players to the privacy policy and Terms of Use (TOU) for *Game of Thrones: Conquest*. (The screens did not display "Development Build" to users.)  Players could not gain initial access to the game without accepting the TOU, and they were periodically required to re-accept the TOU following updates.  (Woldman Decl. ¶¶ 6, 10.)

Ms. Mercieri and Ms. Neveu allege that they began playing *Game of Thrones: Conquest* in July 2018 and June 2019, respectively.  (Am. Compl. ¶¶ 20–21, Dkt. 39.)  At those times, players could not access the game without first completing the sign-in process by clicking "Play" on the screen shown on the left above.  (Woldman Decl. ¶¶ 6, 8.)  Through this process, they necessarily agreed to the TOU that took effect on May 8, 2018.  The TOU began with a conspicuous disclosure that the agreement requires individualized arbitration:

> "PLEASE READ THESE TERMS OF USE ('Terms,' 'Terms of Use,' or 'Agreement') CAREFULLY—THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, AND INCLUDE WAIVERS OF RIGHTS, LIMITATIONS OF LIABILITY, AND YOUR INDEMNITY TO US. THESE TERMS ALSO REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, WAIVING YOUR RIGHT TO A JURY TRIAL AND CLASS ACTION RELIEF."

(Ex. 1 at 5 [2018 TOU].)

This 2018 arbitration agreement is broad in scope.  By accepting the TOU, Ms. Mercieri and Ms. Neveu agreed that, "[w]ith the exception of class actions, small claims court filings, or actions for preliminary injunctive relief (as further discussed below), any other dispute of any kind between you and Warner arising under this Agreement or in connection with your use of the Service . . . will be resolved by binding arbitration."  (Ex. 1 [2018 TOU § 16(C)(1)].)  They also agreed "that disputes will be resolved on an individual basis and that any claims brought under these Terms of Use or in connection with the [game] must be brought in the parties' individual capacities, and not as a plaintiff or class member in any putative class, collective, or representative

proceeding." (*Id.* § 16(C)(2) [capitalization omitted].) *See Concepcion*, 563 U.S. at 336 (upholding identical class action waiver). The TOU also provides that "[t]he arbitrator will be empowered to grant whatever relief would be available in a court under law or in equity, other than class relief." (*Id.* § 16(C)(1).).

Ms. Keebaugh and Ms. Nicholson allege that they began playing *Game of Thrones: Conquest* in May 2020 and June 2020, respectively. (Am. Compl. ¶¶ 19, 22.) At that time, players could not access the game without first completing the sign-in process by clicking the "Play" button on the screen shown on the right above. (Woldman Decl. ¶¶ 6, 9.) They thus necessarily agreed to the TOU that took effect on April 7, 2020. That TOU also started with a clear and conspicuous disclosure of the agreement that the parties would submit their disputes to individualized arbitration:

> "FIRST, AN IMPORTANT MESSAGE: PLEASE READ THESE TERMS OF USE ('Terms', 'Terms of Use', or 'Agreement') CAREFULLY BEFORE USING THIS ONLINE ENTERTAINMENT SERVICE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, WAIVERS OF RIGHTS, LIMITATION OF LIABILITY, AND YOUR INDEMNITY TO US. **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS, AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE.**"

(Ex. 3 at 32 [2020 TOU]; *see also* Ex. 2 at 18 [2019 TOU] [identical language].)

The arbitration agreement in the 2020 TOU is materially identical to the one in the 2018 TOU to which Ms. Mercieri and Ms. Neveu initially agreed. Ms. Keebaugh and Ms. Nicholson "agree[d] to arbitrate all disputes and claims" with Warner Bros., including "claims arising out of or relating to any aspect of the relationship between [them]." (Ex. 3 [2020 TOU § 16(A)]; *see* Ex. 2 [2019 TOU § 16(A)] [identical].) This bilateral agreement between Plaintiffs and Warner Bros. provided that "you and we agree that each may bring claims against the other only in your or our individual capacity, and not as a plaintiff or class member in any purported class, representative, or

private attorney general proceeding." (Ex. 3 [2020 TOU § 16(F)] [bolding and capitalization omitted]; *see* Ex. 2 [2019 TOU § 16(F)] [identical].) Finally, Ms. Keebaugh and Ms. Nicholson agreed that "[t]he arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim." (Ex. 3 [2020 TOU § 16(F)]; *see* Ex. 2 [2019 TOU § 16(F)] [identical].)[1]

P.W. does not allege when he began playing *Games of Thrones: Conquest* or whether a guardian completed the sign-in process for his account. (*See generally* Am. Compl.) But if he purchased packs of virtual items, he or his guardian necessarily completed the sign-in process under the 2018 TOU, 2019 TOU, 2020 TOU, and/or 2022 TOU. (Woldman Decl. ¶¶ 6–9; *see id.*, Ex. 4 [2022 TOU] [materially identical to 2020 TOU].) And P.W. could have gained access to *Game of Thrones: Conquest* only by agreeing to the condition that "you represent and warrant that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parent or guardian consent to do so." (Ex. 4 [2022 TOU § 2]; Ex. 3 [2020 TOU § 2]; Ex. 2 [2019 TOU § 2]; Ex. 1 [2018 TOU § 2].)

## B. Plaintiffs File Individual and Class Claims Against Warner Bros.

*Game of Thrones: Conquest* is free to download and play through the Apple App Store and Google Play Store. (Am. Compl. ¶¶ 25, 27.) Players have the option to spend money on in-app purchases of packs containing virtual items, such as "gold, building materials, crafting materials, research materials, dragon food," and a range of other items. (*Id.* ¶ 29.) Buying virtual items is not necessary to play the game, but players may elect to purchase packs of virtual items if they so choose. (*Id.* ¶¶ 27–28.)

Plaintiffs allege that they made in-app purchases of virtual items through *Game*

---

[1] The 2018 TOU differs from the other TOUs in two respects that have no impact on this Motion: (1) the 2018 version delegates gateway issues of arbitrability to the arbitrator, including "any claim that all or any part of these [TOU] is void or voidable, or whether a claim is subject to arbitration" (Ex. 1 [2018 TOU § 16(C)(1)]); and (2) unlike the later iterations, the arbitration agreement contained a right to opt out within 30 days (*id.* § 16(C)(3)). Warner Bros. has not received an opt-out form from any of Plaintiffs. (Woldman Decl. ¶ 11.)

Gibson, Dunn &
Crutcher LLP

*of Thrones: Conquest*. (*Id.* ¶¶ 19–23.) According to Plaintiffs, the game advertised some of these packs as being a time-limited "special" or "sale" pack even though similar packs were offered at other points in time. (*Id.* ¶¶ 51–55.) Plaintiffs also allege that the game advertised other packs with a strikethrough graphic that, according to Plaintiffs, represented that the pack contained more virtual "gold" than packs sold at that same price at other points in time. (*Id.* ¶¶ 41–49.) Plaintiffs assert that the "sale" and "strikethrough" graphics are deceptive and that they would not have purchased the packs without the advertising. (*Id.* ¶¶ 50, 56.)

Instead of submitting these allegations to arbitration, as the TOU requires, Plaintiffs filed this action on behalf of a putative global class, a putative nationwide subclass of minors, a putative Washington class, a putative Arizona class, a putative New Hampshire class, and a putative New York class. (*Id.* ¶¶ 78–83.) They assert statutory claims under the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*); the California False Advertising Law (*id.* § 17501); the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*); the New Hampshire Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. § 358-A:1 *et seq.*); the Washington Consumer Protection Act (Wash. Rev. Code § 19.86.020 *et seq.*); and N.Y. Gen. Bus. Law §§ 349 and 350. (Am. Compl. ¶¶ 103–46, 168–95.) They also assert common-law claims under theories of fraud and negligent misrepresentation (*id.* ¶¶ 147–59), and seek a declaratory judgment on the alleged rights of minors to disaffirm in-game purchases (*id.* ¶¶ 160–67). The Amended Complaint requests classwide relief to remedy these alleged violations. (*Id.* at 42.)

Warner Bros. brings this Motion to vindicate its contractual right to arbitration through the Federal Arbitration Act (FAA). The parties also agreed to defer Warner Bros.' responsive pleading deadline until after this Court rules on this Motion. (Dkt. 40.)

## III. LEGAL STANDARD

Congress enacted the FAA "in response to a perception that courts were unduly hostile to arbitration." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). The

FAA reflects a "liberal federal policy favoring arbitration" that "makes arbitration agreements 'valid, irrevocable, and enforceable' as written." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344, 346 (2011) (citations omitted). Consistent with that policy, courts must "'rigorously enforce' arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).

The FAA requires the enforcement of a valid agreement to arbitrate when a particular dispute falls within the scope of agreement. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83–84 (2002). If a court is satisfied that a plaintiff's claims are "referable to arbitration under an agreement in writing," it "shall on application of one of the parties stay" the action, 9 U.S.C. § 3, and order arbitration to "proceed in the manner provided for" in the agreement, *id.* § 4. *See Concepcion*, 563 U.S. at 344.

## IV.    ARGUMENT

The FAA does not allow Plaintiffs to evade their contractual obligation to submit their disputes to individual arbitration, and Plaintiffs cannot identify any reason to avoid this result. Plaintiffs' agreement with Warner Bros. subjects all their claims to arbitration, and this matter should be stayed pending the result of those proceedings.

### A.    The Federal Arbitration Act Governs the Arbitration Agreement

The FAA governs this agreement because each TOU is a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Here, the parties explicitly stated that their "agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision." (Ex. 3 [2020 TOU § 16(A)]; Ex. 2 [2019 TOU § 16(A)]; Ex. 1 [2018 TOU § 16(A)(1)].) *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 442–44 (2006).

Moreover, the TOU falls comfortably within the broad meaning of "involving commerce." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–74 (1995). The contract is an agreement between Warner Bros. (a citizen of California and Delaware) and Plaintiffs (citizens of different states) regarding the use of an online game that can involve (as here) purchases of virtual items. (Am. Compl. ¶¶ 19–24.) *See, e.g.*, *Allied-*

*Bruce*, 513 U.S. at 282 (holding that FAA governed contract with "multistate nature"); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 57 (2003) (per curiam) (effect on interstate commerce measured "in the aggregate").

**B.      Plaintiffs and Warner Bros. Agreed to Binding Individual Arbitration**

Under the FAA, this Court need decide only two further issues: (1) whether there exists a valid agreement to arbitrate; and (2) whether the agreement covers the dispute. *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). Those two requirements are satisfied here.

**1.      *Plaintiffs and Warner Bros. Formed a Valid Arbitration Agreement*.**

Federal courts determine the validity of an arbitration agreement by "apply[ing] ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). This Court applies "the law of the forum state—here, California—when making choice of law determinations." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). California's choice-of-law analysis requires courts to "apply California law" unless the parties "identif[y] a meaningful conflict between California law and the law of another state." *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1138 (9th Cir. 2003). If such a conflict exists, the states where Plaintiffs reside—Washington, Arizona, New Hampshire, New York, and Virginia (Am. Compl. ¶¶ 19–23)—have the greater "governmental interest" in the application of their law to contracts formed within their borders by their residents. *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107–15 (2006); *see R.A. v. Epic Games, Inc.*, No. 19-cv-1488-GW-Ex, 2019 WL 6792801, at *5 (C.D. Cal. July 30, 2019) ("In California, federal courts apply the law of the state where the contract was formed with respect to issues concerning contract formation.") (internal quotation marks omitted). But Warner Bros. at present is unaware of any meaningful conflict with respect to contract formation and accordingly discusses California law of contract formation. *See Nguyen*, 763 F.3d at 1175 (finding that "California law and New York law dictate the same outcome" for contract formation).

California law establishes four elements of a valid contract: (1) the parties are capable of contracting; (2) the contract has a lawful object; (3) the parties have given mutual consent; and (4) sufficient cause or consideration supports the contract. Cal. Civ. Code § 1550; *see Norcia v. Samsung Telecomm. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017). Because the arbitration agreement in the TOU meets each of the four requirements and is not "revoca[ble]" under California law, this "making of the agreement for arbitration" requires "the parties to proceed to arbitration." 9 U.S.C. §§ 2, 4. The agreement here satisfies each of these elements:

<u>Capacity.</u> Plaintiffs are persons capable of contracting. Cal. Civ. Code §§ 1556–1557; *see also* Fed. R. Civ. P. 17(c). This goes for both adults and minors such as P.W.: "[A] minor may make a contract in the same manner as an adult," Cal. Fam. Code § 6700, subject only to exceptions not applicable here for (a) delegations of power, (b) contracts with respect to real property, and (c) contracts with respect to personal property "not in the immediate possession or control of the minor," *id.* § 6701.

<u>Lawful Object.</u> California law clearly establishes that arbitration is a lawful object. *See Stewart v. Preston Pipeline Inc.*, 134 Cal. App. 4th 1565, 1586 (2005). And the FAA in any event would not allow state law to negate "the federal policy in favor of arbitration." *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996); *see Concepcion*, 563 U.S. at 346. State law must place arbitration agreements "on equal footing" with other contracts. *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002).

<u>Mutual Consent.</u> Plaintiffs and Warner Bros. formed a sign-in wrap agreement, meaning an agreement that provides a sufficiently conspicuous "textual notice indicating the user will be bound by the terms" by clicking a sign-in button (or, as here, a play button). *B.D. v. Blizzard Entm't, Inc.*, 76 Cal. App. 5th 931, 946 (2022). Conspicuousness is a question of law determined by the features of the sign-in page. *See Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016). To determine whether the notice of the contractual terms was sufficiently conspicuous, California courts consider "the size, color, contrast, and location of any text notices; the

obviousness of any hyperlinks; and overall screen 'clutter'" on the sign-in page.  *B.D.*, 76 Cal. App. 5th at 947; *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019) (discussing rules for clickwrap agreements, which likewise "require users to affirmatively assent to the terms of use before they can access the website and its services").  Importantly, "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001).

Plaintiffs formed a valid contract with Warner Bros. because (1) the sign-in page "provide[d] reasonably conspicuous notice" of the TOU and (2) Plaintiffs took an "action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  Plaintiffs could not have accessed *Game of Thrones: Conquest* without completing this process on the sign-in page. (*See* Woldman Decl. ¶¶ 6–9.)  This evidence on the function of the mobile application game is "sufficient to establish their assent." *Fish v. Tesla, Inc.*, No. 21-cv-060-PSG-JDEx, 2022 WL 1552137, at *4 (C.D. Cal. May 12, 2022).

*First*, the sign-in screen provided sufficiently conspicuous notice that terms and conditions govern access to the game.  The screen listed a clear affirmation right below the play button that Plaintiffs accepted the TOU by clicking the play button. (Ex. 5 ["By tapping 'Play' I agree to the Terms of Service"]; Exs. 6–7 ["By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy."].)  Before accepting the agreement, Plaintiffs also had the opportunity to click the obvious hyperlink titled "Terms of Service" that was immediately below the play button. (Exs. 5–7.)  That link took (or would have taken) Plaintiffs to the TOU, which provided a conspicuous notice in its first paragraph that Plaintiffs were agreeing to arbitration on an individual basis. (Ex. 3 at 1 [2020 TOU]; Ex. 2 at 1 [2019 TOU]; Ex. 1 at 1 [2018 TOU].)  This layout satisfies the conspicuousness requirement because the notice of contractual terms was "spatially coupled" and "temporally coupled" with the play button. *Meyer v. Uber*

*Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (applying California law); *see, e.g.*, *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020); *Fish*, 2022 WL 1552137, at *4; *In re Ring LLC Privacy Litig.*, No. 19-cv-10899-MWF-RAOx, 2021 WL 2621197, at *5 (C.D. Cal. June 24, 2021); *Regan v. Pinger, Inc.*, 2021 WL 706465, at *6–7 (N.D. Cal. Feb. 23, 2021); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 585–87 (N.D. Cal. 2020).

*Second*, Plaintiffs unambiguously manifested their assent to the TOU. Each Plaintiff clicked "Play" after being informed, again, that "[b]y tapping 'Play,'" they "agree[d]" or "accept[ed]" the TOU. (Exs. 5–7.) This notice ensured unambiguous assent because it "explicitly advised" users "that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857; *see, e.g.*, *Meyer*, 868 F.3d at 78–80. Nor could the existence of the TOU have come as a surprise to Plaintiffs. Game developers invest considerable resources in designing entertaining games that players can enjoy on an ongoing basis. As a result, California law on contract formation provides that players signing up for an online video game can reasonably expect "a continuing, forward-looking relationship governed by terms and conditions." *B.D.*, 76 Cal. App. 5th at 946 (internal quotation marks omitted) (applying this principle to a contract accepted by a minor).

<u>Consideration.</u> Plaintiffs and Warner Bros. agreed to submit their disputes to arbitration. (Ex. 3 [2020 TOU § 16(A)]; Ex. 2 [2019 TOU § 16(A)]; Ex. 1 [2018 TOU § 16(C)(1)].) These mutual promises to arbitrate were valid consideration to form a contract. *See Strotz v. Dean Witter Reynolds, Inc.*, 223 Cal. App. 3d 208, 216 (1990), *overruled on other grounds by Rosenthal v. Great Western Fin. Sec. Corp.*, 14 Cal. 4th 394, 423 (1996). Even when (unlike here) only one party must submit claims to arbitration, the "promise to be bound by the arbitration process itself serves as adequate consideration" under California law. *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1108 (9th Cir. 2002); *see, e.g.*, *Esquivel v. Charter Comm'cns, Inc.*, No. 18-cv-7304-GW-MRWx, 2018 WL 10806904, at *4 n.7 (C.D. Cal. Dec. 6, 2018) (holding that

11

consideration exists because "the agreement [to arbitrate] is a mutual one, meaning that *both parties* gave up rights to litigate in court").

<u>Enforceability.</u> Plaintiffs formed a valid arbitration agreement and cannot now "ignore the contract and resort to the courts." *Southland Corp. v. Keating*, 465 U.S. 1, 7 (1984). While a court may refuse to enforce an arbitration agreement under 9 U.S.C. § 2 by relying on "generally applicable contract defenses" that do not "stand as an obstacle to the accomplishment of the FAA's objectives," *Concepcion*, 563 U.S. at 343, no such defense applies here. Plaintiffs will be unable to prove that the arbitration agreement is unconscionable because the TOU is neither substantively nor procedurally "unconscionable"—both of which must be present to decline to enforce the agreement. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (citing *Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)). As noted, the Supreme Court upheld this identical clause in *Concepcion*, ruling that the FAA preempted California state-law unconscionability challenges that target features of arbitration. 563 U.S. at 352.

As an initial matter, the TOU is not "substantively unconscionable" because the arbitration provision is bilateral, not "overly harsh or one-sided." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US) LLC*, 55 Cal. 4th 223, 246 (2012). It governs claims brought by Warner Bros., just like it governs these claims brought by Plaintiffs. (Ex. 3 [2020 TOU § 16(A)]; Ex. 2 [2019 TOU § 16(A)]; Ex. 1 [2018 TOU § 16(C)(1)].) And although the 2020 TOU and 2019 TOU exclude intellectual property claims from arbitration, that exclusion is not relevant to the present dispute and in any event is mutual, which prevents a finding of unconscionability. *See, e.g.*, *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1031 (9th Cir. 2016). Finally, Warner Bros. agreed to pay the arbitral fees for non-frivolous claims seeking less than $75,000 (Ex. 3 [2020 TOU § 16(D)]; Ex. 2 [2019 TOU § 16(D)]), which ensures that no good-faith claimant could face "prohibitive arbitration costs" relative to the value of their claims (*Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003)). (*See also* Ex. 1 [2018 TOU § 16(C)(1)] [requiring

12

1   users to pay only $250 filing fee and also allowing users to bring claims worth less than

2   $10,000 in small claims court].)

3       Nor is the agreement "procedurally unconscionable." Plaintiffs cannot show

4   "oppression or surprise" here. *Pinnacle*, 55 Cal. 4th at 247. "There can be no oppression

5   establishing procedural unconscionability" because Plaintiffs "have a wide range of

6   choices" for online video games—after all, nothing compelled them to play *Game of*

7   *Thrones: Conquest* if they were not willing to abide by the arbitration agreement. *Wayne*

8   *v. Staples, Inc.*, 135 Cal. App. 4th 466, 482 (2006). And as to (lack of) surprise, the very

9   first paragraph of the TOU conspicuously states: "**THIS AGREEMENT REQUIRES**

10  **THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE**

11  **DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS,**

12  **AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE.**"

13  (Ex. 3 at 32 [2020 TOU]; Ex. 2 at 18 [2019 TOU] [identical]; Ex. 1 at 5 [2018 TOU]

14  [similar capitalized statement without bolding].) The arbitration agreement was in no

15  way "hidden within a prolix" document, so Plaintiffs cannot avoid their contractual

16  obligations on the ground that they "never actually read the clause." *Pinnacle*, 55

17  Cal. 4th at 236, 247 (internal quotation marks omitted).

18      The arbitration provisions also govern Plaintiff P.W.'s claims. Plaintiffs admit

19  that P.W.'s parents "allowed him access" to *Game of Thrones: Conquest*. (Am. Comp.

20  ¶ 68.) And P.W. could not access the game without representing to Warner Bros. that

21  he "obtained parent or guardian consent to do so." (Ex. 3 [2020 TOU § 2]; *see supra*, at

22  p. 5.) Although he purports to "disaffirm[] all in-game purchases made through [*Game*

23  *of Thrones: Conquest*] to date" (Am. Compl. ¶¶ 69, 163), P.W. has not attempted to—

24  and cannot—disaffirm the TOU itself, which contains the arbitration agreement.[2]

---

25  [2] The Amended Complaint does not allege whether P.W. or a guardian signed up for

26  the game account, but a minor cannot disaffirm an arbitration agreement entered into
    by a legal guardian. *See, e.g.*, *Doyle v. Giuliucci*, 62 Cal. 2d 606, 610 (1965); *Hohe*

27  *v. San Diego Unified Sch. Dist.*, 224 Cal. App. 3d 1559, 1564 (1990) ("A parent may
    contract on behalf of his or her children."). P.W. also could not disaffirm the TOU

28  after enjoying access to the game and bringing an action that "derives from, relies on,

*(Cont'd on next page)*

Gibson, Dunn &
Crutcher LLP

## 2. *The Arbitration Agreement Encompasses Plaintiffs' Claims.*

Plaintiffs agreed to arbitrate the claims that they raise in this case.  When Ms. Mercieri and Ms. Neveu first signed into *Game of Thrones: Conquest*, they agreed that, apart from explicit exceptions not applicable here, "*any other dispute of any kind between you and Warner* arising under this Agreement or in connection with your use of the Service . . . will be resolved by binding arbitration."  (Ex. 1 [2018 TOU § 16(C)(1)]; *see* Am. Compl. ¶¶ 19–20.)  The other Plaintiffs initially accepted either the 2019 or 2020 TOU.  (*See supra*, at pp. 4–5; *see also* Am. Compl. ¶¶ 19–23.)  The 2019 TOU and 2020 TOU have a materially identical scope to the 2018 TOU: "Warner and you agree to arbitrate *all disputes and claims between us*, except for claims arising from bodily injury and that pertain to enforcing, protecting, or the validity of your or our intellectual property rights." (Ex. 3 [2020 TOU § 16(A)] [emphasis added]; Ex. 2 [2019 TOU § 16(A)] [identical].)  This provision includes "claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory," as well as "claims that arose before this or any prior Agreement (including, but not limited to, claims relating to *advertising*)."  (Ex. 3 [2020 TOU § 16(A)] [emphasis added]; Ex. 2 [2019 TOU § 16(A)] [identical].)  *See Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011) (recognizing breadth of "arising out of or relating to").

---

or is intimately intertwined with the subject contract containing the arbitration agreement." *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*, 186 Cal. App. 4th 696, 717 (2010); *see also R.A.*, 2019 WL 6792801, at *5 (applying disaffirmation law of state "where Plaintiff was playing the game," which is Virginia here); *A.V. v. iParadigms, Ltd. Liability Co.*, 544 F. Supp. 2d 473, 481 (E.D. Va. 2008), *aff'd in part and rev'd in part on other grounds*, 562 F.3d 630 (4th Cir. 2009) ("[T]he infancy defense cannot function as 'a sword to be used to the injury of others'").  Regardless, the FAA's "equal-treatment principle" would preempt P.W.'s disaffirmation defense. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017).  To the extent Plaintiffs attempt to read California or Virginia law to treat arbitration contracts worse than contracts for so-called necessaries, such as the "provision of legal services," *Zelnick v. Adams*, 263 Va. 601, 608–09 (2002); Cal. Fam. Code § 6712, that would result in treating arbitration contracts differently and not "'on equal footing with *all* other contracts,'" *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015) (emphasis added), which the FAA precludes.

14

All of the claims—whether they sound in false advertising, unfair business practices, fraud, negligent misrepresentation, or minor disaffirmation of in-app purchases—relate to the way that Warner Bros. advertised or transacted in-app purchases of virtual items to Plaintiffs. (Am. Compl. ¶¶ 113, 115–16, 133, 140, 148–53, 156–58, 164, 175, 189; *see supra*, at pp. 5–6.) The claims constitute a "dispute of any kind" with Warner Bros. that is "in connection with Plaintiffs' use of *Game of Thrones: Conquest*. (Ex. 1 [2018 TOU § 16(C)(1)].) Or put another way, the claims are "arising out of or relating to any aspect of the relationship" between Plaintiffs and Warner Bros. (Ex. 2 [2019 TOU § 16(A)]; Ex. 3 [2020 TOU § 16(A)].) This conclusion is the same for all Plaintiffs whether the Court applies the 2018, 2019, or 2020 TOU.[3]

The text of the parties' arbitration agreement speaks plainly and unambiguously and therefore "defines the scope of disputes subject to arbitration." *Waffle House*, 534 U.S. at 289. But even if a doubt were to remain, the federal presumption of arbitration under the FAA would compel the arbitration of Plaintiffs' claims. This presumption dictates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). In other words, "issues will be deemed arbitrable unless it is clear that the arbitration clause has *not* included them." *First Options*, 514 U.S. at 945 (emphasis

---

[3] In this case, the Court decides the gateway question of whether the parties' agreement to arbitrate encompasses the claims raised by Plaintiffs. The agreement incorporates the AAA Consumer Arbitration Rules, which provides "clear and unmistakable evidence" that the parties agreed to arbitrate arbitrability. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130–31 (9th Cir. 2015); *see* AAA Rule R-14(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."). But the TOU itself carves out arbitrability from the delegation to the arbitrator: "All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide." (Ex. 3 [2020 TOU § 16(C)]; Ex. 2 [2019 TOU § 16(C)].) As explained above (*supra*, at p. 5 n.1), however, the 2018 TOU delegates questions of arbitrability to the arbitrator. (Ex. 1 [2018 TOU § 16(C)(1)].) If the 2018 TOU governs any of Plaintiffs' claims, then the parties agreed to arbitrate arbitrability, and this Court should compel those claims to arbitration without deciding whether there is a valid agreement to arbitrate or whether the arbitration provision covers the claims. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

added) (internal quotation marks omitted).  None of the TOUs evinces a discernable intent to exclude Plaintiffs' claims from the scope of the arbitration agreement.

### 3. *The Claims Must Be Arbitrated on an Individual Basis.*

Plaintiffs cannot proceed on a classwide basis—either in court or in arbitration. Under the FAA, an order compelling arbitration must direct the parties to "proceed in the manner provided for" in the agreement.  9 U.S.C. § 4.  The TOUs here require Plaintiffs (1) to arbitrate their claims on an individual basis with individualized relief and (2) to waive any right to bring a class action.

At all relevant times, the TOU provided (in identical language) for individualized arbitration without class procedures.  Plaintiffs each agreed with Warner Bros. "that disputes will be resolved on an individual basis and that any claims brought under these Terms of Use or in connection with the [game] must be brought in the parties' individual capacities, and not as a plaintiff or class member in any putative class, collective, or representative proceeding." (Ex. 1 [2018 TOU § 16(C)(2)] [capitalization omitted]; *see* Ex. 3 [2020 TOU § 16(F)] [same]; Ex. 2 [2019 TOU § 16(F)] [same].)  They also agreed that "[t]he arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim."  (Ex. 3 [2020 TOU § 16(F)]; Ex. 2 [2019 TOU § 16(F)]; *see also* Ex. 1 [2018 TOU § 16(C)(1)] [arbitrator can "grant whatever relief would be available in a court under law or in equity, *other than class relief*"] [emphasis added].)

*Concepcion* concerned the identical arbitration agreement at issue here, and the Supreme Court explained that this language "provided for arbitration of all disputes between the parties, but required that claims be brought in the parties' 'individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding.'"  563 U.S. at 336.  As the Court observed, parties have good reason to agree to class action waivers because "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process

slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 348. The Court therefore held that the FAA preempts state laws that prevent parties from agreeing to individualized arbitration. *Id.* at 352.

Since *Concepcion*, the Supreme Court has reaffirmed in several decisions that federal courts "must enforce arbitration agreements according to their terms—including terms providing for individualized proceedings." *Epic Systems*, 138 S. Ct. at 1619; *see Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1418–19 (2019); *Italian Colors*, 570 U.S. at 233; *see also, e.g.*, *Laver v. Credit Suisse Securities (USA), LLC*, 976 F.3d 841, 846 (9th Cir. 2020). In fact, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010).

In short, the FAA ensures that class action waivers and individualized relief provisions are valid and enforceable. The parties here plainly agreed to "the traditional individualized arbitration contemplated by the FAA" without class procedures or requests for relief that extend beyond the arbitral claimant. *Lamps Plus*, 139 S. Ct. at 1415 (internal quotation marks omitted); *see Concepcion*, 563 U.S. at 344. The order compelling arbitration of Plaintiffs' claims should specify that arbitration must proceed on an individual basis under these terms.

## C. The Court Should Stay the Case Pending Completion of Arbitration

Warner Bros. respectfully requests a stay of this case pending completion of arbitration. The FAA provides that a court, upon granting a motion to compel, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *see Scherck v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974). Under Ninth Circuit precedent, this provision is not strictly mandatory. *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014). But courts routinely stay the action upon a party's request unless there is "reason to depart from the FAA's plain language" by dismissing the case. *Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 902 (N.D. Cal. 2018); *see,*

1  *e.g.*, *Martinez v. Anthem Cos., Inc.*, No. 19-cv-3692-RGK-JPRx, 2019 WL 6825739,
2  at *2 (C.D. Cal. July 23, 2019).  There is no such reason to depart from Section 3's
3  command here.

## V.    CONCLUSION

5       Plaintiffs agreed to arbitrate their disputes with Warner Bros. on an individual
6  basis.  Despite that agreement, they have filed in court on behalf of themselves and a
7  putative class.  Warner Bros. respectfully requests that this Court compel the parties to
8  individual, non-class arbitration and then stay this case pending the completion of
9  arbitration.

11  Dated: June 13, 2022              GIBSON, DUNN & CRUTCHER LLP

13                                    By:  _____/s/ Christopher Chorba_____
                                              Christopher Chorba

14                                    *Attorneys for Defendant Warner Bros.*
                                      *Entertainment Inc.*

CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
JEREMY S. SMITH, SBN 283812
  jssmith@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

*Attorneys for Defendant*
*Warner Bros. Entertainment Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON, and P.W., by and through JOIE WEIHER, <br><br> Plaintiffs, <br><br> v. <br><br> WARNER BROS. ENTERTAINMENT INC., a Delaware corporation, <br><br> Defendant. | CASE NO. 2:22-CV-01272-MEMF (AGRx) <br><br> **DECLARATION OF DAVID WOLDMAN IN SUPPORT OF DEFENDANT WARNER BROS. ENTERTAINMENT, INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS** <br><br> **Hearing:** <br> Date:   August 25, 2022 <br> Time:   10:00 a.m. <br> Place:   Courtroom 8B <br> Judge:   Hon. Maame Ewusi-Mensah Frimpong |

DECLARATION OF DAVID WOLDMAN
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-171

# DECLARATION OF DAVID WOLDMAN

I, David Woldman, declare and state as follows.

1.   I am the Executive Producer at WB Games Boston Inc. I lead the team that operates *Game of Thrones: Conquest*, and my responsibilities include product strategy and all day-to-day operations for the game. I make this declaration in support of Warner Bros.'s Motion to Compel Arbitration and Stay Proceedings. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.   Attached as **Exhibit 1** is a true and correct copy of the Terms of Use ("TOU") for *Game of Thrones: Conquest* that took effect on May 8, 2018.

3.   Attached as **Exhibit 2** is a true and correct copy of the TOU for *Game of Thrones: Conquest* that took effect on December 30, 2019.

4.   Attached as **Exhibit 3** is a true and correct copy of the TOU for *Game of Thrones: Conquest* that took effect on April 7, 2020.

5.   Attached as **Exhibit 4** is a true and correct copy of the TOU for *Game of Thrones: Conquest* that took effect on April 11, 2022.

6.   New players, as well as players who re-download the game, cannot access *Game of Thrones: Conquest* without clicking the "Play" button on the sign-in screen.

7.   Although the graphic art varied over time, the sign-in screen has always included one of two affirmations informing players that clicking the "Play" button constitutes agreement to the TOU.

8.   The first affirmation is that "By tapping 'Play,' I agree to the Terms of Service." Attached as **Exhibit 5** is a true and correct image of the sign-in screen for *Game of Thrones: Conquest* displaying this affirmation.

9.   The second affirmation is that "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy." Attached as **Exhibit 6** and **Exhibit 7** are

2

DECLARATION OF DAVID WOLDMAN
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

2-ER-172

Gibson, Dunn & Crutcher LLP

1  true and correct images of the sign-in screen for *Game of Thrones: Conquest*

2  displaying this affirmation.

3     10.   *Game of Thrones: Conquest* has periodically required players to re-accept

4  the TOU following updates to the TOU's terms.

5     11.   The TOU that took effect on May 8, 2018, allowed players to opt out of

6  the arbitration agreement within 30 days of accepting the agreement. (Ex. 1 [TOU

7  § 16(C)(3)].) Warner Bros. has no record of any of the Plaintiffs completing the opt-

8  out form.

9     12.   The TOUs that took effect on December 30, 2019, April 7, 2020, and

10  April 11, 2022 allowed players to reject modifications to the arbitration agreement by

11  sending written notice within 30 days of the change. (Ex. 2 [TOU § 16(G)]; Ex. 3

12  [TOU § 16(G)]; Ex. 4 [TOU § 16(G)].) Warner Bros. has no record of any of the

13  Plaintiffs completing the modification-rejection form.

14     I declare under penalty of perjury under the laws of the United States of America

15  that the foregoing is true and correct. Executed on June *10*, 2022, in *Sherford*,

16  *MA* .

17

18  _____
   David Woldman

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID WOLDMAN
ISO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
CASE NO. 2:22-CV-01272-MEMF (AGRx)

# EXHIBIT 1

# TERMS OF USE

Updated: May 8, 2018

PLEASE READ THESE TERMS OF USE ("Terms," "Terms of Use," or "Agreement") CAREFULLY—THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, AND INCLUDE WAIVERS OF RIGHTS, LIMITATIONS OF LIABILITY, AND YOUR INDEMNITY TO US. THESE TERMS ALSO REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, WAIVING YOUR RIGHT TO A JURY TRIAL AND CLASS ACTION RELIEF.

Welcome and thank you for using a service provided by Warner Bros. Entertainment Inc. or its subsidiaries or affiliates ("Warner," "we," "us," or "our"). These Terms of Use are a legally binding agreement between you and Warner and govern your use of our online, digital, or mobile services, including our websites, software, applications, games, and any of our other products and services in connection with which these Terms of Use are posted or from which they are linked (collectively, the "Service").

Certain aspects of the Service may be subject to additional terms and conditions, which may include, among other things, particularized age requirements, codes of conduct, sweepstakes and contest rules, and payment or subscription terms (collectively, "Additional Terms"). When Additional Terms are made available in connection with any aspect of the Service, those Additional Terms also apply to your use of that aspect of the Service and control in the event of a conflict with these Terms.

By accessing or using the Service, you agree to be bound by these Terms and any applicable Additional Terms (which are incorporated herein by reference) and consent to our collection and use of your information as described in our Privacy Policy (https://www.warnerbros.com/privacy). If you do not wish to be bound by these Terms or Additional Terms, do not access or use the Service.

## 1. Changes to these Terms

We reserve the right, in our sole discretion, to modify these Terms (including applicable Additional Terms) from time to time. You agree that we may notify you of modified terms or policies by posting them on the Service, and agree that your continued use of the Service after such notice constitutes your agreement to the modified terms, which will govern your ongoing use of the Service. Thus, you should review the posted Terms of Use and applicable Additional Terms each time you use the Service. Any modifications to these Terms will supersede the prior version for all activity occurring after the revised version has been made available.

## 2. Your Representations

By accessing, previewing, or otherwise using the Service in any manner, you represent and warrant that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parental or guardian consent to do so. You represent and warrant that you have read, understand, and agree to abide by these Terms and any applicable Additional Terms, and that you have read, understand, and agree to the data collection and use practices set forth in our Privacy Policy (https://www.warnerbros.com/privacy).

## 3. The Warner Service

Warner grants you a limited, non-exclusive, non-sublicensable, non-transferable, and fully revocable license to access, view, and use the Service for your personal, non-commercial use solely as provided by these Terms and as expressly permitted by the features and functionality of the Service, subject to your complete compliance with these Terms of Use and all applicable Additional Terms. The Service may allow you to Rev175

preview, select, stream, and access certain content, including video, audio, graphics, photos, and text (collectively, "Content"). Such use may be limited (for example, to supported devices or by number of simultaneous streams per account; by geographic region; by time window; by subscription level; or otherwise, and access will require your use of an approved device with sufficient connectivity).

The Service and Content are protected by copyrights, trademarks, service marks, or other intellectual property rights that are owned by Warner or its licensors. Warner respects the intellectual property rights of others and asks that you do the same. Any unauthorized use of Content or any other aspect of the Service, or any portion thereof, will constitute a violation of copyright or other intellectual property rights, and Warner reserves the right to fully prosecute such violations and enforce its rights to the fullest extent of the law, including seeking both civil and criminal penalties. Violation of this Agreement in any manner automatically terminates the license granted to you herein and obligates you to cease all use of the Service and Content. Any authorization to copy material granted by Warner in any part of the Service for any reason is restricted to viewing a single copy for non-commercial, personal, entertainment use only, unless otherwise specified, and is subject to your keeping intact all copyright, trademark, and other proprietary notices.

Except as expressly provided herein, Warner does not grant you any other express or implied right or license in or to the Service or Content and all right, title, and interest that Warner has in the Service and Content are retained by Warner, including the right to modify, discontinue, or temporarily suspend any or all of the Service at any time, with or without notice.

No aspect of the Service constitutes legal, financial, medical, or other category of professional advice.

## 4. User Accounts

### A. Account Creation

You may be required or permitted to create user accounts (each an "Account") in order to access or use certain aspects of the Service. If you open an Account or otherwise access the Service on behalf of a company, organization, or other entity (a "Business User"), then you represent and warrant that you have the authority to also bind the Business User to these Terms, and hereby do so, and both you and the Business User will be responsible for any breach of this Agreement. You acknowledge and agree that you have no ownership or other proprietary interest in any Account. You agree that all of the details you provide in connection with your Account are about yourself or an applicable Business User and not about another individual or entity (whether real or fictitious), and that such details will be maintained by you as correct, current, and complete.

### B. Investigations, Suspensions, and Termination

You agree that Warner has the right, in our sole discretion, to investigate any actual or suspected violation of these Terms and to suspend or terminate your Account and refuse you access to your Account, the Service, or the Content (or any portion thereof) for any reason, including if Warner believes the information you provide is not correct, current, or complete, or that you have otherwise violated this Agreement or any applicable law. You agree that Warner may report your conduct, activity, or identity to law enforcement or other appropriate authorities, take appropriate legal action against you, respond to subpoenas or other requests for information regarding your Account or use of the Service, or otherwise take action to protect our rights and the rights of any third party. BY ACCEPTING THESE TERMS, YOU WAIVE ANY CLAIMS RESULTING, DIRECTLY OR INDIRECTLY, FROM ANY ACTION TAKEN BY WARNER DURING OR AS A RESULT OF THESE INVESTIGATIONS.

### C. Account Security

You may not use anyone else's Account at any time and you may not allow anyone else to use your Account at any time. You are responsible for all activity occurring under your Account, including all activities or transactions conducted through the use of your Account. You are responsible for

maintaining the confidentiality of your Account username and password, and agree not to disclose your username and password to anyone. You agree not to transfer, resell, or otherwise convey your Account or the right to use your Account to anyone. You agree that Warner will not be liable for any loss you may incur as a result of someone else using your Account, either with or without your knowledge. You also agree that any information you provide is offered at your own risk, and that Warner cannot guarantee its protection from unauthorized access. If you have reason to believe that your Account is no longer secure, you must: (i) promptly change your password; and (ii) immediately notify us of the problem through our Customer Service (https://www.warnerbros.com/customer-service) contact page. Warner may require you to change your Account username and password.

## 5. Mobile Devices

### A. *Wireless Charges*

You are solely responsible for all charges from your wireless provider including any data and messaging fees that you may incur if you use mobile devices to interact with the Service or to receive communications from Warner.

### B. *Mobile Software*

Warner may make certain mobile software applications ("Apps") available for download in connection with the Service. You may only use Apps on approved devices, for personal use. You are not permitted to modify, transfer, or distribute any Apps. Warner does not guarantee that the Apps will be compatible with your device. Warner may choose to make available updates, bug fixes, or other changes or enhancements to the Apps from time to time; such updates may be automatic, at your election, or mandatory if you wish to continue using the Apps, at Warner's discretion. You may not use or otherwise export or re-export the Apps, or any other software provided as part of the Service, except as authorized by United States law and the laws of the jurisdiction in which the software was obtained. In particular, but without limitation, neither the Apps, nor any other software, may be exported or re-exported into any U.S. embargoed countries or to any persons listed as prohibited under applicable law or regulation. If you download or use any software, you represent and warrant that you (i) are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) are not listed on any U.S. Government list of prohibited or restricted parties.

### C. *iTunes App Store*

The additional terms in this Section 5.C apply only to your use of Apps downloaded through Apple Inc.'s ("Apple") iTunes App Store ("iTunes Apps"). You agree that this Agreement is solely between you and Warner, not Apple, and that Apple is not responsible for iTunes Apps or their content. Apple has no obligation whatsoever to furnish any maintenance or support services in connection with iTunes Apps. You will not involve Apple in any claims relating to your use of iTunes Apps, or in any third-party claims alleging infringement of intellectual property rights by the iTunes Apps. You agree to comply with all third-party agreements in connection with your use of iTunes Apps (for example, your wireless provider agreement). Finally, you agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the Agreement solely for the purpose of enforcing the applicable Terms against you in connection with your use of iTunes Apps.

## 6. Paid Services

Certain aspects of the Service may require payments. If you use those aspects of the Service, you agree to the applicable pricing and payment terms. Such terms will be displayed in connection with that aspect of the Service requiring payment. Warner may update pricing and payment terms at any time and in its sole

2-ER-177

discretion, with any changes to subscription fees taking effect upon the conclusion of your current subscription term unless otherwise specified. The transaction is with the specific Warner entity identified by the aspect of the Service used to make the purchase.

All payment transactions are administered by a third-party payment processor or third-party store (for example, Google Play). Warner expressly disclaims any liability for the processing of any transactions by a third party, including any errors in invoicing or payment processing or any breach in security with respect to your payment information associated with the third-party's handling of the transaction. Warner is not responsible or liable to you for any credit card, bank-related, or other financial service charges and fees related to your transactions. You represent and warrant that all payment information you provide is correct, current, and complete. You agree to pay all applicable charges (including any applicable taxes) billed to your chosen payment method. We reserve the right to refuse or cancel transactions, including due to pricing or other typographical errors.

All purchases are final and **no refunds are available** unless otherwise specified in applicable Additional Terms, including where your account is terminated or suspended preventing your access to paid aspects of the Service, such as any remaining subscription terms. Subscriptions have no monetary value and are purchases of only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to access the applicable portion of the Service. Unless otherwise specified (at initial sign-up or subsequently), **subscriptions may renew automatically** for up to the initial subscription term at a rate not exceeding the rate for the prior subscription period. If you sign up for a free trial subscription (if available), you will be automatically billed at the then-current rate at the conclusion of the free trial. You may cancel any automatically renewing subscription by using that aspect of the Service you used to set up your subscription, unless another cancellation method is specified in applicable Additional Terms.


The name and contact information of the service provider is set forth herein in conformance with Cal. Civ. Code § 1789.3. If you are a California resident, you may report any complaints to the Consumer Information Division of the California Department of Consumer Affairs at 1625 North Market Blvd., Suite N 112, Sacramento, CA 95834, or by telephone at (800) 952-5210.


## 7. Virtual Items

The Service may feature fictional credits, items, rewards, points, currency, or the like (collectively, "Virtual Items"). The Virtual Items may be used exclusively within the Service. You receive only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to use the Virtual Items in connection with the Service and as governed by these Terms. You have no right, title, interest, or ownership in or to any Virtual Items. Virtual Items have no monetary value and are not redeemable for any sum of money. You will receive no compensation for any Virtual Items that are deleted, modified, or to which you lose access if your Account is terminated, suspended, or otherwise limited. Warner has the absolute right to manage, regulate, control, modify, or eliminate Virtual Items as we see fit in our sole discretion, and Warner will have no liability to you or anyone else for the exercise of such rights. For example, Virtual Items may be immediately lost, deleted from your Account, or otherwise forfeited if your Account is terminated or closed for any reason or when Warner discontinues, modifies, or updates an applicable aspect of the Service (for example, discontinuing a game featuring Virtual Items).

All purchases of licenses to Virtual Items are final and governed by the terms of Section 6 (Paid Services); by indicating your desire to purchase a license to any Virtual Items through the Service, including by clicking or tapping the relevant purchase button, you confirm that you want said items credited to your Account and in so doing you lose any cancellation rights you may have under applicable laws.

2-ER-178

Any unauthorized transferring, trading, selling or exchanging of any Virtual Items to anyone, including other users of the Service, is strictly prohibited. Warner may take action it deems appropriate in response, including deletion of the Virtual Items or termination or suspension of any Account involved. You acknowledge and agree that Warner will have no liability for the use or loss of Virtual Items for any reason, including due to any unauthorized third-party activity, such as hacking, phishing, password mining, social engineering, or any other unauthorized activity. Warner may replace such lost Virtual Items under certain circumstances, in our sole discretion and on a case-by-case basis, without incurring any obligation or liability. If Warner revokes your license to Virtual Items, Warner will not have any liability to you for any time or money spent by you on Virtual Items, any Virtual Items associated with your Account, or for any other reason whatsoever.

## 8. Third-Party Services

The Service may link to, integrate with, or incorporate third party content, sites, services, or platforms, including advertisers, online merchants, and social networks (collectively, "Third Party Services"). Warner does not endorse and is not responsible for Third Party Services, whether in terms of their correctness, accuracy, validity, propriety, reliability, legality, security, or otherwise, and Warner disclaims all liability in connection therewith. References to Third Party Services do not imply endorsement of any Third Party Services by Warner or any association with its operators. Your dealings with Third Party Services are solely between you and the applicable Third Party Services. To learn more about Third Party Services, consult the Third Party Services' respective terms of use and privacy policies.

## 9. User Content

From time to time, certain aspects of the Service may invite or otherwise allow you to submit or post a variety of content to the Service, such as text (including comments and reviews), images, videos, music, and other information, either directly to the Service or through a Third Party Service (collectively, "User Content"). Your User Content remains your own, unless as otherwise may be provided in Additional Terms. Please be aware, however, that User Content is not confidential and may be accessible by other users and the public. Moreover, by submitting or posting User Content to the Service (either directly or through a Third Party Service) you grant Warner a royalty-free, perpetual, irrevocable, non-exclusive, sublicensable, assignable, unrestricted, worldwide license to use the User Content, together with all consents or waivers including a publicity rights waiver and a waiver of moral rights (if any) in favor of Warner necessary to reproduce, distribute, publicly perform, publicly display, transmit, communicate to the public, modify and make derivative works of the User Content, by any means and in all media formats and channels now known or hereafter devised in perpetuity, and to advertise and promote such use, without further notice to, or permission from, you or any other person, and without compensation or reference to you or any other person.

Please retain copies of all User Content as Warner is under no obligation to store or return any User Content to you. Your submission of User Content will not be subject to any obligation of confidentiality, attribution, or otherwise. You are solely responsible for your User Content. Warner only acts as a passive conduit for User Content, and will not be liable for any use, disclosure, or exposure of any User Content, including possibly objectionable or offensive User Content, to you, any other user, or any third party. Warner is under no obligation to monitor User Content or use of the Service. However, Warner has the right to monitor or moderate User Content, in our sole discretion, and to enforce our or a third party's intellectual property rights in any User Content. Warner reserves the right to discard or remove User Content from the Service in its sole discretion and without any liability whatsoever.

You represent and warrant the following as to your User Content:

A. You have obtained the written consent of every identifiable individual featured in your User Content (or, in the case of minors, consent of the minor's parent or guardian) to use that person's name, voice, and/or likeness (as applicable) in connection with the Service and pursuant to these Terms.

B. Your User Content does not infringe, violate, or misappropriate any third-party intellectual property rights, including copyrights, trade secrets, or trademarks.

C. Your User Content, as used in connection with the Service, will not violate any applicable laws or regulations or infringe or violate any rights of a third party, including third-party publicity or privacy rights.

D. Warner may exercise the rights to your User Content granted herein without any liability, including for payment of royalties, residuals, guild fees, or the like, to you or any third party.

## 10. Code of Conduct

You agree that you will not use the Service to upload, post, or otherwise distribute any User Content that:

- constitutes or promotes illegal activity;
- is infringing, libelous, defamatory, abusing, harassing, or threatening;
- contains any obscene, pornographic, racist, or otherwise offensive material;
- exploits or harms children, directly or indirectly, including by exposing them to inappropriate material or asking them for any personal information;
- promotes any commercial activity, including promoting goods or services or soliciting donations, except as may be specifically authorized by applicable Additional Terms;
- is subject to confidentiality or non-disclosure obligations;
- includes any visible logos or trademarks that belong to third parties;
- disguises its source or origin, or misrepresent its author, by modifying metadata or other identifiers; or
- links to any third-party sites or services that would violate the standards contained in this list.

In using the Service you also agree not to:

- attempt to interfere with the operation of the Service in any way;
- copy, reproduce, distribute, transfer, sell, license, publish, enter into a database, display, perform publicly, modify, create derivative works of, upload, edit, post, link to, frame, transmit, rent, lease, lend or sublicense, scrape, crawl, or in any way exploit any part of the Service (except: (a) as authorized herein; or (b) in the case of public search engines, which are granted a revocable right to crawl publicly accessible portions of the Service in compliance with instructions posted on applicable "robots.txt" files and without circumventing any technical barriers, for the sole purpose of creating public searchable indexes, but not caches or archives);
- use any viruses, worms, bug exploits, or similar data-gathering and extraction tools on the Service, or frame any portion of the Service, or attempt to tamper, hack, corrupt, or impair the administration or security of the Service;
- assign, sublicense, pledge or transfer any of your rights or obligations under this Agreement to any person or entity without Warner's prior written consent which may be withheld in Warner's sole discretion (and any such purported assignment, pledge, or transfer without such prior written consent will be null and void);
- use any tools designed to compromise security or digital rights management technology (including password guessing programs, cracking tools, or network probing tools) in connection with the Service;
- use the Service for any commercial purposes, including sending "spam" or any malicious or disruptive communications;
- decompile, reverse engineer, disassemble, or otherwise reduce the code used in any Apps, other software, or digital rights management feature on the Service into a readable form in order to examine the construction of such software or to copy or create other products based (in whole or in part) on such software or any feature of the Service or piece of Content available on the Service; or
- intercept, record, or modify network communications transmitted between any Apps, software, or digital rights management features and Warner's networks or systems.

## 11. Unsolicited Submissions and Feedback

Please be aware that Warner does not accept unsolicited submissions of concepts, creative ideas, suggestions, stories, scripts, or other potential creative content ("Unsolicited Submissions"). This is to avoid the possibility of future misunderstanding when projects developed by Warner staff or representatives might seem to others to be similar to their submitted concepts, creative ideas, suggestions, stories, scripts, or other potential creative content. Therefore, please do not send Warner any Unsolicited Submissions. In the event you do send us an Unsolicited Submission, you understand and agree that your Unsolicited Submission does not create any fiduciary relationship between you and Warner and that we are under no obligation to refrain from using the Unsolicited Submission (in whole or in part), to keep it confidential, or to compensate you for our use of it.

## 12. International Use

Warner makes no representation that every aspect of the Service is appropriate or available for use in any particular jurisdiction. When you choose to access and use the Service, you agree that:

A. you do so on your own initiative and at your own risk;
B. you will not use the Service if you are prohibited from receiving products, services, or software originating from the United States;
C. you are responsible for complying with local laws and regulations, if and to the extent local laws and regulations are applicable; and
D. you specifically agree to comply with all applicable laws and regulations concerning the transmission of technical data exported from the country in which you reside.

If there is a conflict between any of the terms herein and your rights in your place of residence, your rights under applicable law will control as to those specific terms.

## 13. Disclaimer of Warranties

YOUR USE OF THE SERVICE IS AT YOUR OWN RISK. THE SERVICE IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, WARNER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WARNER DOES NOT WARRANT THAT THE SERVICE WILL BE AVAILABLE, UNINTERRUPTED, SECURE, OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SERVICE OR THE SERVERS THAT MAKE THE SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WARNER DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, PLATFORM, OR SERVICE LINKED TO THE SERVICE, WHETHER IN TERMS OF THEIR CORRECTNESS, ACCURACY, VALIDITY, PROPRIETY, RELIABILITY, LEGALITY, SECURITY, OR OTHERWISE. WARNER MAKES NO WARRANTIES THAT YOUR USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, OR SERVICE LINKED TO FROM THE SERVICE WILL NOT INFRINGE THE RIGHTS OF OTHERS; AND WARNER ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH SERVICES, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY OTHER WEBSITE, APP, PLATFORM OR SERVICE LINKED TO THE SERVICE. IF APPLICABLE LAW DOES NOT ALLOW THE EXCLUSION OF SOME OR ALL OF THE ABOVE IMPLIED WARRANTIES TO APPLY TO YOU, THE ABOVE EXCLUSIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## 14. Limitation of Liability

WARNER DOES NOT ACCEPT ANY LIABILITY FOR ANY LOSS OR DAMAGE (DIRECT, INDIRECT, PUNITIVE, ACTUAL, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, OR OTHERWISE) ARISING FROM YOUR USE OR INABILITY TO USE THE SERVICE. IN NO EVENT WILL WARNER'S AGGREGATE LIABILITY TO YOU IN CONNECTION WITH THE SERVICE OR THESE TERMS EXCEED THE GREATER OF THE AMOUNT (IF ANY) PAID BY YOU TO WARNER IN THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100. THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION APPLY TO ALL ACTIONS, WHETHER FOR BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, OR UNDER ANY OTHER CAUSE OF ACTION, REGARDLESS OF THE BASIS UPON WHICH LIABILITY IS CLAIMED AND EVEN IF WARNER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. IF APPLICABLE LAW DOES NOT ALLOW ALL OR ANY PART OF THE ABOVE LIMITATION OF LIABILITY TO APPLY TO YOU, THE LIMITATIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## 15. Indemnity

You agree to indemnify and hold harmless Warner and its directors, officers, shareholders, parents, subsidiaries, affiliates, partners, agents, and licensors (collectively, the "Indemnified Parties") from and against all losses, expenses, damages and costs, including reasonable attorney fees and costs, resulting from: (i) your breach of any of the representations, warranties, and agreements made hereunder; (ii) your use of the Service; (iii) your placement or transmission of any User Content onto the Service; (iv) any use of your Account in violation of this Agreement or your failure to fulfill any obligations incurred through the use of your Account by you or a third party; or (v) your willful misconduct.

## 16. Dispute Resolution

### A. Informal Resolution

If a dispute arises between you and us, you agree to first provide us with notice of your complaint via email to legal@wb.com (mailto:legal@wb.com?subject=Informal%20Resolution) so that the parties may attempt to resolve the dispute informally within sixty (60) days from the date your complaint is received.

### B. Applicable Law and Venue

Except as otherwise provided herein, these Terms of Use will be governed by, construed, and enforced in accordance with the laws of the State of California, as they are applied to agreements entered into and to be performed entirely within California, excluding only the California body of laws concerning conflicts of law. Except as provided below, you consent to the exclusive jurisdiction of the state and federal courts located in Los Angeles County, California, including for any action seeking to compel arbitration or vacate an arbitral award, and consent to the personal jurisdiction of such courts. You also acknowledge and agree that any applicable state law implementation of the Uniform Computer Information Transactions Act (including any available remedies) will not apply to these Terms and is hereby disclaimed.

### C. Arbitration Agreement

#### 1. Arbitration

With the exception of class actions, small claims court filings, or actions for preliminary injunctive relief (as further discussed below), any other dispute of any kind between you and Warner arising under this Agreement or in connection with your use of the Service ("Dispute(s)"), if unresolved through the informal process outlined above, will be resolved by binding arbitration in Los Angeles County, California. If you are an individual consumer using the Service primarily for personal reasons such as to view entertainment content (an "Individual Consumer"), as opposed to a Business User or individual accessing the Service for business purposes, and you are located

within the United States, you may alternatively select your state of residence as the place of arbitration, but all other actions remain subject to the venue and choice of law provisions in Section 16.B.

The arbitrator presiding over a Dispute will be a retired judge or justice of any state or federal court with substantial experience in the subject matter relevant to the matter in dispute and will follow California law, exclusive of conflict or choice of law rules, in adjudicating the dispute.

The parties acknowledge that this Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision in the preceding paragraph with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Agreement will be governed by the Federal Arbitration Act.

The parties agree that the arbitrator presiding over a Dispute will be instructed, whenever practicable, to resolve threshold legal issues by way of motions filed by the parties. The parties also agree that they will follow JAMS' streamlined arbitration rules and procedures then in effect in arbitrating any Dispute, except to the extent that the JAMS rules are inconsistent with this Section 16.C including the class action waiver described below. The JAMS rules are available at www.jamsadr.com (http://www.jamsadr.com).

The arbitrator, and not any federal, state, or local court or agency, will have exclusive authority to resolve all Disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of these Terms of Use, including, but not limited to, any claim that all or any part of these Terms of Use is void or voidable, or whether a claim is subject to arbitration. The arbitrator will be empowered to grant whatever relief would be available in a court under law or in equity, other than class relief. The arbitrator's award will be written, and binding, on the parties and may be entered as a judgment in any court of competent jurisdiction. If you are an Individual Consumer, Warner will pay all arbitration administrative fees and fees for the arbitrator's services, other than the $250 filing fee required for you to initiate a claim.

If you are an Individual Consumer and the claim you wish to assert against us is for less than $10,000 then, at your election, (i) the arbitration may proceed in-person, by telephone, or by written briefs or (ii) you may in lieu of arbitration bring your claim in small claims court. If either party files a claim in state or federal court that is required by these Terms of Use to have been brought to arbitration, then the other party will be entitled to such party's reasonable attorneys' fees incurred in successfully compelling arbitration.

Both parties reserve the right to seek a preliminary injunction or temporary restraining order from a federal or state court located in Los Angeles County, California. However, after such request for relief has been adjudicated by such court, the remainder of the Dispute will be resolved by binding arbitration as set forth herein.

2. Class Action Waiver

YOU AND WARNER AGREE THAT DISPUTES WILL BE RESOLVED ON AN INDIVIDUAL BASIS AND THAT ANY CLAIMS BROUGHT UNDER THESE TERMS OF USE OR IN CONNECTION WITH THE SERVICE MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITIES, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PUTATIVE CLASS, COLLECTIVE, OR REPRESENTATIVE PROCEEDING. The parties further agree that they will not participate in any class action (existing or future) brought by any third party arising under this Agreement or in connection with the Service. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration hereunder can proceed on a class-wide basis, then such class action is not subject to arbitration and must be litigated in state or federal court in Los Angeles County, California.

3. Opt-Out

If you are an Individual Consumer, you may opt-out of this Section 16.C (Arbitration Agreement) within thirty (30) days of first accepting these Terms by fully and accurately completing the Opt Out form (http://pages.warnerbros.com/arbitration-opt-out-wb), including providing: (i) your full legal name, (ii) your complete mailing address, (iii) your phone number, (iv) if applicable, the username associated with your Account; and (iv) the date of your initial use of the Service.

## 17. General Terms

### A. *Force Majeure*

Warner will not have any liability to you by reason of any delay or failure to perform any obligation hereunder if the delay or failure to perform is occasioned by force majeure, which refers to any act of God, storm, fire, casualty, unanticipated work stoppage, power outage, satellite failure, strike, lockout, labor dispute, civil disturbance, riot, war, national emergency, Governmental action, or other cause beyond its control.

### B. *No Waiver*

No failure or delay by Warner in exercising its rights under this Agreement will constitute a waiver of those rights, nor will any partial assertion of any such rights preclude further assertion of the same.

### C. *Severability*

If any provision of this Agreement is held unlawful, void, or for any reason unenforceable, then that provision will be deemed severable from this Agreement and will not affect the validity and enforceability of any remaining provisions.

### D. *Construction*

The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) references to the plural include the singular, the singular the plural, and the part the whole; (b) "or" has the inclusive meaning frequently identified with the phrase "and/or;" (c) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation;" and (e) references to "hereunder," "herein," or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation, or agreement, including this Agreement, will be deemed to include such statute, rule, regulation, or agreement as it may be modified, varied, amended, or supplemented from time to time.

### E. *Survival*

Any provision herein which by its nature contemplates your continued observance following termination of this Agreement will survive termination of this Agreement.

### F. *Entire Agreement*

This Agreement, including the Privacy Policy (https://www.warnerbros.com/privacy) and any applicable Additional Terms, is the entire agreement between the parties relating to the matters contained herein.

## 18. Copyright Agent

If you believe that any User Content or other material on the Service infringes your copyright rights, please forward the following information in writing to our Copyright Agent at the address listed below, in conformance with the Digital Millennium Copyright Act of 1998 ("DMCA"):

A. Your name, address, telephone number, and (if available) email address;
B. A description of the copyrighted work that you claim has been infringed;

2-ER-184

C. The exact URL or a description of each place where alleged infringing material is located;

D. A statement by you that you have a good faith belief that the disputed use has not been authorized by you, your agent, or the law;

E. Your electronic or physical signature or the electronic or physical signature of the person authorized to act on your behalf; and

F. A statement by you that the information in your notice is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The above information must be submitted to Warner's Copyright Agent at the following address:

Warner Bros. Entertainment Inc.
Attention: Copyright Agent
4000 Warner Boulevard
Burbank, CA 91522
Tel: (818) 977-0018
Fax: (818) 977-7929
Email: copyright@wb.com (mailto:copyright@wb.com)

If we are notified that any User Content infringes another's intellectual property rights, we may remove such User Content pursuant to the DMCA. In accordance with the DMCA, we have a repeat infringer policy and reserve the right to terminate your Account for submitting infringing User Content in violation of these Terms once or on a repeated basis.

## 19. Accessibility

We strive to make the content on this website usable by all visitors, including those with disabilities. If you are having difficulty using this website, with or without assistive technology, please contact us at accessibility@wb.com (mailto:accessibility@wb.com). To enable us to respond in a manner most helpful to you, please indicate the nature of your difficulty using the website, the specific web address (URL link) at issue, and your full contact information, including email address and phone number. Thank you for helping us make your online experience more enjoyable.

## 20. Contact Us

You may contact us at the addresses specified herein for specific requests, or contact Customer Service (https://www.warnerbros.com/customer-service) with general inquiries. Please do not send us any Unsolicited Submissions.

IF YOU DO NOT AGREE TO BE LEGALLY BOUND BY ALL OF THE FOREGOING TERMS, PLEASE DO NOT ACCESS OR USE THE SERVICE.

TM & © 2015 Warner Bros. Entertainment Inc. All rights reserved.

Privacy Policy (https://www.warnerbros.com/privacy)   Terms of Use (https://policies.warnerbros.com/terms/en-us)
Ad Choices (https://www.warnerbros.com/privacy#adchoices)   Accessibility

# **EXHIBIT 2**

# TERMS OF USE

Updated: December 30, 2019

FIRST, AN IMPORTANT MESSAGE: PLEASE READ THESE TERMS OF USE ("Terms", "Terms of Use", or "Agreement") CAREFULLY BEFORE USING THIS ONLINE ENTERTAINMENT SERVICE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, WAIVERS OF RIGHTS, LIMITATION OF LIABILITY, AND YOUR INDEMNITY TO US. **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS, AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE**.

Welcome and thank you for using a service provided by Warner Bros. Entertainment Inc. or its subsidiaries or affiliates ("Warner," "we," "us," or "our"). These Terms of Use are a legally binding agreement between you and Warner and govern your use of our online, digital, or mobile services, including our websites, software, applications, games, and any of our other products and services in connection with which these Terms of Use are posted or from which they are linked (collectively, the "Service").

Certain aspects of the Service may be subject to additional terms and conditions, which may include, among other things, particularized age requirements, codes of conduct, sweepstakes and contest rules, and payment or subscription terms (collectively, "Additional Terms"). When Additional Terms are made available in connection with any aspect of the Service, those Additional Terms also apply to your use of that aspect of the Service and control in the event of a conflict with these Terms.

By accessing or using the Service, you agree to be bound by these Terms and any applicable Additional Terms (which are incorporated herein by reference) and consent to our collection and use of your information as described in our Privacy Policy (http://wb.com/privacy). If you do not wish to be bound by these Terms or Additional Terms, do not access or use the Service.

## 1. Changes to these Terms

We reserve the right, in our sole discretion, to modify these Terms (including applicable Additional Terms) from time to time. You agree that we may notify you of modified terms or policies by posting them on the Service, and agree that your continued use of the Service after such notice constitutes your agreement to the modified terms, which will govern your ongoing use of the Service. Thus, you should review the posted Terms of Use and applicable Additional Terms each time you use the Service. Any modifications to these Terms will supersede the prior version for all activity occurring after the revised version has been made available.

## 2. Your Representations

By accessing, previewing, or otherwise using the Service in any manner, you represent and warrant that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parental or guardian consent to do so. You represent and warrant that you have read, understand, and agree to abide by these Terms and any applicable Additional Terms, and that you have read, understand, and agree to the data collection and use practices set forth in our Privacy Policy (https://www.warnerbros.com/privacy).

## 3. The Warner Service

Warner grants you a limited, non-exclusive, non-sublicensable, non-transferable, and fully revocable license to access, view, and use the Service for your personal, non-commercial use solely as provided by these Terms and as expressly permitted by the features and functionality of the Service, subject to your complete

2-ER-188

compliance with these Terms of Use and all applicable Additional Terms. The Service may allow you to view, preview, select, stream, and access certain content, including video, audio, graphics, photos, and text (collectively, "Content"). Such use may be limited (for example, to supported devices or by number of simultaneous streams per account; by geographic region; by time window; by subscription level; or otherwise, and access will require your use of an approved device with sufficient connectivity).

The Service and Content are protected by copyrights, trademarks, service marks, or other intellectual property rights that are owned by Warner or its licensors. Warner respects the intellectual property rights of others and asks that you do the same. Any unauthorized use of Content or any other aspect of the Service, or any portion thereof, will constitute a violation of copyright or other intellectual property rights, and Warner reserves the right to fully prosecute such violations and enforce its rights to the fullest extent of the law, including seeking both civil and criminal penalties. Violation of this Agreement in any manner automatically terminates the license granted to you herein and obligates you to cease all use of the Service and Content. Any authorization to copy material granted by Warner in any part of the Service for any reason is restricted to viewing a single copy for non-commercial, personal, entertainment use only, unless otherwise specified, and is subject to your keeping intact all copyright, trademark, and other proprietary notices.

Except as expressly provided herein, Warner does not grant you any other express or implied right or license in or to the Service or Content and all right, title, and interest that Warner has in the Service and Content are retained by Warner, including the right to modify, discontinue, or temporarily suspend any or all of the Service at any time, with or without notice.

No aspect of the Service constitutes legal, financial, medical, or other category of professional advice.

## 4. User Accounts

### A. Account Creation

You may be required or permitted to create user accounts (each an "Account") in order to access or use certain aspects of the Service. If you open an Account or otherwise access the Service on behalf of a company, organization, or other entity (a "Business User"), then you represent and warrant that you have the authority to also bind the Business User to these Terms, and hereby do so, and both you and the Business User will be responsible for any breach of this Agreement. You acknowledge and agree that you have no ownership or other proprietary interest in any Account. You agree that all of the details you provide in connection with your Account are about yourself or an applicable Business User and not about another individual or entity (whether real or fictitious), and that such details will be maintained by you as correct, current, and complete.

### B. Investigations, Suspensions, and Termination

You agree that Warner has the right, in our sole discretion, to investigate any actual or suspected violation of these Terms and to suspend or terminate your Account and refuse you access to your Account, the Service, or the Content (or any portion thereof) for any reason, including if Warner believes the information you provide is not correct, current, or complete, or that you have otherwise violated this Agreement or any applicable law. You agree that Warner may report your conduct, activity, or identity to law enforcement or other appropriate authorities, take appropriate legal action against you, respond to subpoenas or other requests for information regarding your Account or use of the Service, or otherwise take action to protect our rights and the rights of any third party. BY ACCEPTING THESE TERMS, YOU WAIVE ANY CLAIMS RESULTING, DIRECTLY OR INDIRECTLY, FROM ANY ACTION TAKEN BY WARNER DURING OR AS A RESULT OF THESE INVESTIGATIONS.

### C. Account Security

You may not use anyone else's Account at any time and you may not allow anyone else to use your Account at any time. You are responsible for all activity occurring under your Account, including all activities or transactions conducted through the use of your Account. You are responsible for maintaining the confidentiality of your Account username and password, and agree not to disclose your username and password to anyone. You agree not to transfer, resell, or otherwise convey your Account or the right to use your Account to anyone. You agree that Warner will not be liable for any loss you may incur as a result of someone else using your Account, either with or without your knowledge. You also agree that any information you provide is offered at your own risk, and that Warner cannot guarantee its protection from unauthorized access. If you have reason to believe that your Account is no longer secure, you must: (i) promptly change your password; and (ii) immediately notify us of the problem through our Customer Service (https://www.warnerbros.com/customer-service) contact page. Warner may require you to change your Account username and password.

## 5. Mobile Devices

### A. *Wireless Charges*

You are solely responsible for all charges from your wireless provider including any data and messaging fees that you may incur if you use mobile devices to interact with the Service or to receive communications from Warner.

### B. *Mobile Software*

Warner may make certain mobile software applications ("Apps") available for download in connection with the Service. You may only use Apps on approved devices, for personal use. You are not permitted to modify, transfer, or distribute any Apps. Warner does not guarantee that the Apps will be compatible with your device. Warner may choose to make available updates, bug fixes, or other changes or enhancements to the Apps from time to time; such updates may be automatic, at your election, or mandatory if you wish to continue using the Apps, at Warner's discretion. You may not use or otherwise export or re-export the Apps, or any other software provided as part of the Service, except as authorized by United States law and the laws of the jurisdiction in which the software was obtained. In particular, but without limitation, neither the Apps, nor any other software, may be exported or re-exported into any U.S. embargoed countries or to any persons listed as prohibited under applicable law or regulation. If you download or use any software, you represent and warrant that you (i) are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) are not listed on any U.S. Government list of prohibited or restricted parties.

### C. *iTunes App Store*

The additional terms in this Section 5.C apply only to your use of Apps downloaded through Apple Inc.'s ("Apple") iTunes App Store ("iTunes Apps"). You agree that this Agreement is solely between you and Warner, not Apple, and that Apple is not responsible for iTunes Apps or their content. Apple has no obligation whatsoever to furnish any maintenance or support services in connection with iTunes Apps. You will not involve Apple in any claims relating to your use of iTunes Apps, or in any third-party claims alleging infringement of intellectual property rights by the iTunes Apps. You agree to comply with all third-party agreements in connection with your use of iTunes Apps (for example, your wireless provider agreement). Finally, you agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the Agreement solely for the purpose of enforcing the applicable Terms against you in connection with your use of iTunes Apps.

## 6. Paid Services

Certain aspects of the Service may require payments. If you use those aspects of the Service, you agree to the applicable pricing and payment terms. Such terms will be displayed in connection with that aspect of the Service requiring payment. Warner may update pricing and payment terms at any time and in its sole discretion, with any changes to subscription fees taking effect upon the conclusion of your current subscription term unless otherwise specified. The transaction is with the specific Warner entity identified by the aspect of the Service used to make the purchase.

All payment transactions are administered by a third-party payment processor or third-party store (for example, Google Play). Warner expressly disclaims any liability for the processing of any transactions by a third party, including any errors in invoicing or payment processing or any breach in security with respect to your payment information associated with the third-party's handling of the transaction. Warner is not responsible or liable to you for any credit card, bank-related, or other financial service charges and fees related to your transactions. You represent and warrant that all payment information you provide is correct, current, and complete. You agree to pay all applicable charges (including any applicable taxes) billed to your chosen payment method. We reserve the right to refuse or cancel transactions, including due to pricing or other typographical errors.

All purchases are final and **no refunds are available** unless otherwise specified in applicable Additional Terms, including where your account is terminated or suspended preventing your access to paid aspects of the Service, such as any remaining subscription terms. Subscriptions have no monetary value and are purchases of only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to access the applicable portion of the Service. Unless otherwise specified (at initial sign-up or subsequently), **subscriptions may renew automatically** for up to the initial subscription term at a rate not exceeding the rate for the prior subscription period. If you sign up for a free trial subscription (if available), you will be automatically billed at the then-current rate at the conclusion of the free trial. You may cancel any automatically renewing subscription by using that aspect of the Service you used to set up your subscription, unless another cancellation method is specified in applicable Additional Terms.

The name and contact information of the service provider is set forth herein in conformance with Cal. Civ. Code § 1789.3. If you are a California resident, you may report any complaints to the Consumer Information Division of the California Department of Consumer Affairs at 1625 North Market Blvd., Suite N 112, Sacramento, CA 95834, or by telephone at (800) 952-5210.

## 7. Virtual Items

The Service may feature fictional credits, items, rewards, points, currency, or the like (collectively, "Virtual Items"). The Virtual Items may be used exclusively within the Service. You receive only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to use the Virtual Items in connection with the Service and as governed by these Terms. You have no right, title, interest, or ownership in or to any Virtual Items. Virtual Items have no monetary value and are not redeemable for any sum of money. You will receive no compensation for any Virtual Items that are deleted, modified, or to which you lose access if your Account is terminated, suspended, or otherwise limited. Warner has the absolute right to manage, regulate, control, modify, or eliminate Virtual Items as we see fit in our sole discretion, and Warner will have no liability to you or anyone else for the exercise of such rights. For example, Virtual Items may be immediately lost, deleted from your Account, or otherwise forfeited if your Account is terminated or closed for any reason or when Warner discontinues, modifies, or updates an applicable aspect of the Service (for example, discontinuing a game featuring Virtual Items).

All purchases of licenses to Virtual Items are final and governed by the terms of Section 6 (Paid Services); by indicating your desire to purchase a license to any Virtual Items through the Service, including by clicking or tapping the relevant purchase button, you confirm that you want said items credited to your Account and in so doing you lose any cancellation rights you may have under applicable laws.

Any unauthorized transferring, trading, selling or exchanging of any Virtual Items to anyone, including other users of the Service, is strictly prohibited. Warner may take action it deems appropriate in response, including deletion of the Virtual Items or termination or suspension of any Account involved. You acknowledge and agree that Warner will have no liability for the use or loss of Virtual Items for any reason, including due to any unauthorized third-party activity, such as hacking, phishing, password mining, social engineering, or any other unauthorized activity. Warner may replace such lost Virtual Items under certain circumstances, in our sole discretion and on a case-by-case basis, without incurring any obligation or liability. If Warner revokes your license to Virtual Items, Warner will not have any liability to you for any time or money spent by you on Virtual Items, any Virtual Items associated with your Account, or for any other reason whatsoever.

## 8. Third-Party Services

The Service may link to, integrate with, or incorporate third party content, sites, services, or platforms, including advertisers, online merchants, and social networks (collectively, "Third Party Services"). Warner does not endorse and is not responsible for Third Party Services, whether in terms of their correctness, accuracy, validity, propriety, reliability, legality, security, or otherwise, and Warner disclaims all liability in connection therewith. References to Third Party Services do not imply endorsement of any Third Party Services by Warner or any association with its operators. Your dealings with Third Party Services are solely between you and the applicable Third Party Services. To learn more about Third Party Services, consult the Third Party Services' respective terms of use and privacy policies.

## 9. User Content

From time to time, certain aspects of the Service may invite or otherwise allow you to submit or post a variety of content to the Service, such as text (including comments and reviews), images, videos, music, and other information, either directly to the Service or through a Third Party Service (collectively, "User Content"). Your User Content remains your own, unless as otherwise may be provided in Additional Terms. Please be aware, however, that User Content is not confidential and may be accessible by other users and the public. Moreover, by submitting or posting User Content to the Service (either directly or through a Third Party Service) you grant Warner a royalty-free, perpetual, irrevocable, non-exclusive, sublicensable, assignable, unrestricted, worldwide license to use the User Content, together with all consents or waivers including a publicity rights waiver and a waiver of moral rights (if any) in favor of Warner necessary to reproduce, distribute, publicly perform, publicly display, transmit, communicate to the public, modify and make derivative works of the User Content, by any means and in all media formats and channels now known or hereafter devised in perpetuity, and to advertise and promote such use, without further notice to, or permission from, you or any other person, and without compensation or reference to you or any other person.

Please retain copies of all User Content as Warner is under no obligation to store or return any User Content to you. Your submission of User Content will not be subject to any obligation of confidentiality, attribution, or otherwise. You are solely responsible for your User Content. Warner only acts as a passive conduit for User Content, and will not be liable for any use, disclosure, or exposure of any User Content, including possibly objectionable or offensive User Content, to you, any other user, or any third party. Warner is under no obligation to monitor User Content or use of the Service. However, Warner has the right to monitor or moderate User Content, in our sole discretion, and to enforce our or a third party's intellectual property rights in any User Content. Warner reserves the right to discard or remove User Content from the Service in its sole discretion and without any liability whatsoever.

You represent and warrant the following as to your User Content:

A. You have obtained the written consent of every identifiable individual featured in your User Content (or, in the case of minors, consent of the minor's parent or guardian) to use that person's name, voice, and/or likeness (as applicable) in connection with the Service and pursuant to these Terms.

B. Your User Content does not infringe, violate, or misappropriate any third-party intellectual property rights, including copyrights, trade secrets, or trademarks.

C. Your User Content, as used in connection with the Service, will not violate any applicable laws or regulations or infringe or violate any rights of a third party, including third-party publicity or privacy rights.

D. Warner may exercise the rights to your User Content granted herein without any liability, including for payment of royalties, residuals, guild fees, or the like, to you or any third party.

## 10. Code of Conduct

You agree that you will not use the Service to upload, post, or otherwise distribute any User Content that:

- constitutes or promotes illegal activity;
- is infringing, libelous, defamatory, abusing, harassing, or threatening;
- contains any obscene, pornographic, racist, or otherwise offensive material;
- exploits or harms children, directly or indirectly, including by exposing them to inappropriate material or asking them for any personal information;
- promotes any commercial activity, including promoting goods or services or soliciting donations, except as may be specifically authorized by applicable Additional Terms;
- is subject to confidentiality or non-disclosure obligations;
- includes any visible logos or trademarks that belong to third parties;
- disguises its source or origin, or misrepresent its author, by modifying metadata or other identifiers; or
- links to any third-party sites or services that would violate the standards contained in this list.

In using the Service you also agree not to:

- attempt to interfere with the operation of the Service in any way;
- copy, reproduce, distribute, transfer, sell, license, publish, enter into a database, display, perform publicly, modify, create derivative works of, upload, edit, post, link to, frame, transmit, rent, lease, lend or sublicense, scrape, crawl, or in any way exploit any part of the Service (except: (a) as authorized herein; or (b) in the case of public search engines, which are granted a revocable right to crawl publicly accessible portions of the Service in compliance with instructions posted on applicable "robots.txt" files and without circumventing any technical barriers, for the sole purpose of creating public searchable indexes, but not caches or archives);
- use any viruses, worms, bug exploits, or similar data-gathering and extraction tools on the Service, or frame any portion of the Service, or attempt to tamper, hack, corrupt, or impair the administration or security of the Service;
- assign, sublicense, pledge or transfer any of your rights or obligations under this Agreement to any person or entity without Warner's prior written consent which may be withheld in Warner's sole discretion (and any such purported assignment, pledge, or transfer without such prior written consent will be null and void);
- use any tools designed to compromise security or digital rights management technology (including password guessing programs, cracking tools, or network probing tools) in connection with the Service;
- use the Service for any commercial purposes, including sending "spam" or any malicious or disruptive communications;
- decompile, reverse engineer, disassemble, or otherwise reduce the code used in any Apps, other software, or digital rights management feature on the Service into a readable form in order to examine the construction of such software or to copy or create other products based (in whole or in part) on such software or any feature of the Service or piece of Content available on the Service; or

- intercept, record, or modify network communications transmitted between any Apps, software, or digital rights management features and Warner's networks or systems.

## 11. Unsolicited Submissions and Feedback

Please be aware that Warner does not accept unsolicited submissions of concepts, creative ideas, suggestions, stories, scripts, or other potential creative content ("Unsolicited Submissions"). This is to avoid the possibility of future misunderstanding when projects developed by Warner staff or representatives might seem to others to be similar to their submitted concepts, creative ideas, suggestions, stories, scripts, or other potential creative content. Therefore, please do not send Warner any Unsolicited Submissions. In the event you do send us an Unsolicited Submission, you understand and agree that your Unsolicited Submission does not create any fiduciary relationship between you and Warner and that we are under no obligation to refrain from using the Unsolicited Submission (in whole or in part), to keep it confidential, or to compensate you for our use of it.

## 12. International Use

Warner makes no representation that every aspect of the Service is appropriate or available for use in any particular jurisdiction. When you choose to access and use the Service, you agree that:

A. you do so on your own initiative and at your own risk;
B. you will not use the Service if you are prohibited from receiving products, services, or software originating from the United States;
C. you are responsible for complying with local laws and regulations, if and to the extent local laws and regulations are applicable; and
D. you specifically agree to comply with all applicable laws and regulations concerning the transmission of technical data exported from the country in which you reside.

If there is a conflict between any of the terms herein and your rights in your place of residence, your rights under applicable law will control as to those specific terms.

## 13. Disclaimer of Warranties

YOUR USE OF THE SERVICE IS AT YOUR OWN RISK. THE SERVICE IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, WARNER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WARNER DOES NOT WARRANT THAT THE SERVICE WILL BE AVAILABLE, UNINTERRUPTED, SECURE, OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SERVICE OR THE SERVERS THAT MAKE THE SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WARNER DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, PLATFORM, OR SERVICE LINKED TO THE SERVICE, WHETHER IN TERMS OF THEIR CORRECTNESS, ACCURACY, VALIDITY, PROPRIETY, RELIABILITY, LEGALITY, SECURITY, OR OTHERWISE. WARNER MAKES NO WARRANTIES THAT YOUR USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, OR SERVICE LINKED TO FROM THE SERVICE WILL NOT INFRINGE THE RIGHTS OF OTHERS; AND WARNER ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH SERVICES, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY OTHER WEBSITE,

APP, PLATFORM OR SERVICE LINKED TO THE SERVICE. IF APPLICABLE LAW DOES NOT ALLOW THE EXCLUSION OF SOME OR ALL OF THE ABOVE IMPLIED WARRANTIES TO APPLY TO YOU, THE ABOVE EXCLUSIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## 14. Limitation of Liability and Time Limitation for Claims

WARNER DOES NOT ACCEPT ANY LIABILITY FOR ANY LOSS OR DAMAGE (DIRECT, INDIRECT, PUNITIVE, ACTUAL, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, OR OTHERWISE) ARISING FROM YOUR USE OR INABILITY TO USE THE SERVICE. IN NO EVENT WILL WARNER'S AGGREGATE LIABILITY TO YOU IN CONNECTION WITH THE SERVICE OR THESE TERMS EXCEED THE GREATER OF THE AMOUNT (IF ANY) PAID BY YOU TO WARNER IN THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100. THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION APPLY TO ALL ACTIONS, WHETHER FOR BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, OR UNDER ANY OTHER CAUSE OF ACTION, REGARDLESS OF THE BASIS UPON WHICH LIABILITY IS CLAIMED AND EVEN IF WARNER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. IF APPLICABLE LAW DOES NOT ALLOW ALL OR ANY PART OF THE ABOVE LIMITATION OF LIABILITY TO APPLY TO YOU, THE LIMITATIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

TO THE EXTENT PERMITED BY APPLICABLE LAW, ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING IN ANY WAY TO THE SERVICE OR YOUR USE OF THE SERVICE, THESE TERMS OF USE, OR THE RELATIONSHIP BETWEEN US, MUST BE COMMENCED WITHIN ONE YEAR OF THE RELEVANT EVENTS. A DISPUTE IS COMMENCED IF IT IS FILED IN AN ARBITRATION OR, IF THE DISPUTE IS NON-ARBITRABLE, A COURT WITH JURISDICTION, DURING THE ONE-YEAR PERIOD. IF YOU OR WE PROVIDE NOTICE OF A DISPUTE UNDER SECTION 16 (DISPUTE RESOLUTION), THE ONE-YEAR PERIOD IS TOLLED FOR 60 DAYS FOLLOWING RECEIPT OF THE NOTICE OF DISPUTE. YOU AND WE EACH WAIVE—THAT IS, GIVE UP—THE RIGHT TO PURSUE ANY DISPUTE, CLAIM OR CONTROVERSY THAT IS NOT FILED WITHIN ONE YEAR AND ANY RIGHT YOU OR WE MAY HAVE HAD TO PURSUE THAT DISPUTE, CLAIM OR CONTROVERSY IN ANY FORUM IS PERMANENTLY BARRED.

## 15. Indemnity

You agree to indemnify and hold harmless Warner and its directors, officers, shareholders, parents, subsidiaries, affiliates, partners, agents, and licensors (collectively, the "Indemnified Parties") from and against all losses, expenses, damages and costs, including reasonable attorney fees and costs, resulting from: (i) your breach of any of the representations, warranties, and agreements made hereunder; (ii) your use of the Service; (iii) your placement or transmission of any User Content onto the Service; (iv) any use of your Account in violation of this Agreement or your failure to fulfill any obligations incurred through the use of your Account by you or a third party; or (v) your willful misconduct.

## 16. Dispute Resolution

**Summary:**

Our customer-service department can resolve most customer concerns quickly and to the customer's satisfaction. Please contact us via email to legal@wb.com (mailto:legal@wb.com?subject=Informal%20Resolution) so that we may attempt to resolve the dispute informally. **In the unlikely event that you're not satisfied with customer service's solution (or if Warner has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.**

2-ER-195

Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Unless expressly limited by this Dispute Resolution provision, arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted**. For any non-frivolous claim that does not exceed $75,000, we will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from us to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), we will pay you more than the amount of the arbitrator's award if the arbitrator awards you an amount that is greater than what we have offered you to settle the dispute.

## ARBITRATION AGREEMENT

A. ***Claims Subject to Arbitration***: Warner and you agree to arbitrate **all disputes and claims** between us, except for claims arising from bodily injury or that pertain to enforcing, protecting, or the validity of your or our intellectual property rights (or the intellectual property rights of any of our licensors, affiliates and partners). This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims for mental or emotional distress or injury not arising out of physical bodily injury;
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "Warner," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, licensees, licensors, and providers of content as of the time your or our claim arises; our respective predecessors in interest, successors, and assigns (including AT&T and its affiliates); and all authorized or unauthorized users or beneficiaries of Service under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed or appealed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action**. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

B. ***Pre-Arbitration Notice of Disputes***: A party who intends to seek arbitration must first send to the other a written Notice of Dispute ("Notice"). The Notice to Warner should be sent by certified mail to: General Counsel, Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand").

If we and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator

determines the amount, if any, to which you or us is entitled. You may download a form to initiate arbitration at: adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf (https://adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf)

C. ***Arbitration Procedure***: The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by requesting them in writing at the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless we and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided in subsection (F) below, the arbitrator can award the same damages and individualized relief that a court can award under applicable law.

D. ***Arbitration Fees***: After we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000 in value. (The filing fee currently is $200 but is subject to change by the arbitration provider. If you are unable to pay this fee, we will pay it directly upon receiving a written request at the Notice Address.) We will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies we previously paid that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $75,000 (either to you or to us), the payment of these fees will be governed by the AAA rules.

E. ***Alternative Payment***: If you initiated arbitration in accordance with the notice requirements above in subsection (B) and the arbitrator issues an award in your favor that is greater than the value of our last written settlement offer made before an arbitrator was selected, then we will pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater.

If we did not make a written offer to settle the dispute before an arbitrator was selected, you will be entitled to receive the alternative payment if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits. In assessing whether an award that includes attorneys' fees or expenses is greater than the value of our last written settlement offer, the calculation shall include only the portion of the award representing attorneys' fees or expenses that you reasonably incurred pursuing the arbitration through the date of our settlement offer.

Although under some laws we may have a right to an award of attorneys' fees and expenses if we prevail in an arbitration, we agree that we will not seek such an award.

F. **Requirement of Individual Arbitration**: The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING**. Further, unless both you and we agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief sought with respect to a particular claim), then that claim or request for relief shall be severed , and all other claims and requests for relief shall be arbitrated.

G. **Future Changes to Arbitration Provision**: Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address) following your use of this Service, you may reject any such change by sending us written notice within 30 days of the change to the arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

# 17. General Terms

### A. *Governing Law and Venue*

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California, as they are applied to agreements entered into and to be performed entirely within California and without regard to conflict of law principles, except to the extent that law is inconsistent with or preempted by federal law. To the extent that a dispute is not subject to arbitration under Section 16 (Dispute Resolution) of this Agreement, that action shall be brought in the appropriate state or federal court located in Los Angeles County, California; and we both irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts in Los Angeles County, California for the adjudication of all non-arbitral claims.

### B. *Force Majeure*

Warner will not have any liability to you by reason of any delay or failure to perform any obligation hereunder if the delay or failure to perform is occasioned by force majeure, which refers to any act of God, storm, fire, casualty, unanticipated work stoppage, power outage, satellite failure, strike, lockout, labor dispute, civil disturbance, riot, war, national emergency, Governmental action, or other cause beyond its control.

### C. *No Waiver*

No failure or delay by Warner in exercising its rights under this Agreement will constitute a waiver of those rights, nor will any partial assertion of any such rights preclude further assertion of the same.

### D. *Severability*

Except as specified in Section 16 (Dispute Resolution), if any provision of this Agreement shall be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this Agreement and shall not affect the validity and enforceability of any remaining provisions.

2-ER-198

### E. *Construction*

The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise: (a) references to the plural include the singular, the singular the plural, and the part the whole; (b) "or" has the inclusive meaning frequently identified with the phrase "and/or;" (c) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation;" and (e) references to "hereunder," "herein," or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation, or agreement, including this Agreement, will be deemed to include such statute, rule, regulation, or agreement as it may be modified, varied, amended, or supplemented from time to time.

### F. *Survival*

Any provision herein which by its nature contemplates your continued observance following termination of this Agreement will survive termination of this Agreement.

### G. *Entire Agreement*

This Agreement, including the Privacy Policy (https://www.warnerbros.com/privacy) and any applicable Additional Terms, is the entire agreement between the parties relating to the matters contained herein.

## 18. Copyright Agent

If you believe that any User Content or other material on the Service infringes your copyright rights, please forward the following information in writing to our Copyright Agent at the address listed below, in conformance with the Digital Millennium Copyright Act of 1998 ("DMCA"):

A. Your name, address, telephone number, and (if available) email address;
B. A description of the copyrighted work that you claim has been infringed;
C. The exact URL or a description of each place where alleged infringing material is located;
D. A statement by you that you have a good faith belief that the disputed use has not been authorized by you, your agent, or the law;
E. Your electronic or physical signature or the electronic or physical signature of the person authorized to act on your behalf; and
F. A statement by you that the information in your notice is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The above information must be submitted to Warner's Copyright Agent at the following address:

Warner Bros. Entertainment Inc.
Attention: Copyright Agent
4000 Warner Boulevard
Burbank, CA 91522
Tel: (818) 977-0018
Fax: (818) 977-7929
Email: copyright@wb.com (mailto:copyright@wb.com)

If we are notified that any User Content infringes another's intellectual property rights, we may remove such User Content pursuant to the DMCA. In accordance with the DMCA, we have a repeat infringer policy and reserve the right to terminate your Account for submitting infringing User Content in violation of these Terms once or on a repeated basis.

## 19. Accessibility

We strive to make the content on this website usable by all visitors, including those with disabilities. If you are having difficulty using this website, with or without assistive technology, please contact us at accessibility@wb.com (mailto:accessibility@wb.com). To enable us to respond in a manner most helpful to you, please indicate the nature of your difficulty using the website, the specific web address (URL link) at issue, and your full contact information, including email address and phone number. Thank you for helping us make your online experience more enjoyable.

20. ## Contact Us

You may contact us at the addresses specified herein for specific requests, or contact Customer Service (https://www.warnerbros.com/customer-service) with general inquiries. Please do not send us any Unsolicited Submissions.

IF YOU DO NOT AGREE TO BE LEGALLY BOUND BY ALL OF THE FOREGOING TERMS, PLEASE DO NOT ACCESS OR USE THE SERVICE.

---

TM & © 2019 Warner Bros. Entertainment Inc. All rights reserved.

Privacy Policy (https://www.warnerbros.com/privacy)   Terms of Use (https://policies.warnerbros.com/terms/en-us)
Ad Choices (https://www.warnerbros.com/privacy#adchoices)   Accessibility

# EXHIBIT 3

# TERMS OF USE

Updated: April 7, 2020

FIRST, AN IMPORTANT MESSAGE: PLEASE READ THESE TERMS OF USE ("Terms", "Terms of Use", or "Agreement") CAREFULLY BEFORE USING THIS ONLINE ENTERTAINMENT SERVICE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, WAIVERS OF RIGHTS, LIMITATION OF LIABILITY, AND YOUR INDEMNITY TO US. **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS, AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE**.

Welcome and thank you for using a service provided by Warner Bros. Entertainment Inc. or its subsidiaries or affiliates ("Warner," "we," "us," or "our"). These Terms of Use are a legally binding agreement between you and Warner and govern your use of our online, digital, or mobile services, including our websites, software, applications, games, and any of our other products and services in connection with which these Terms of Use are posted or from which they are linked (collectively, the "Service").

Certain aspects of the Service may be subject to additional terms and conditions, which may include, among other things, particularized age requirements, codes of conduct, sweepstakes and contest rules, and payment or subscription terms (collectively, "Additional Terms"). When Additional Terms are made available in connection with any aspect of the Service, those Additional Terms also apply to your use of that aspect of the Service and control in the event of a conflict with these Terms.

By accessing or using the Service, you agree to be bound by these Terms and any applicable Additional Terms (which are incorporated herein by reference) and acknowledge our collection and use of your information as described in the Privacy Policy(ies) applicable to the Service ("Privacy Policy"). If you do not wish to be bound by these Terms or Additional Terms, do not access or use the Service.

## 1. Changes to these Terms

We reserve the right, in our sole discretion, to modify these Terms (including applicable Additional Terms) from time to time. You agree that we may notify you of modified terms or policies by posting them on the Service, and agree that your continued use of the Service after such notice constitutes your agreement to the modified terms, which will govern your ongoing use of the Service. Thus, you should review the posted Terms of Use and applicable Additional Terms each time you use the Service. Any modifications to these Terms will supersede the prior version for all activity occurring after the revised version has been made available.

## 2. Your Representations

By accessing, previewing, or otherwise using the Service in any manner, you represent and warrant that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parental or guardian consent to do so. You represent and

2-ER-202

warrant that you have read, understand, and agree to abide by these Terms and any applicable Additional Terms, and that you have read, understand the data collection and use practices set forth in the Privacy Policy.

## 3. The Warner Service

Warner grants you a limited, non-exclusive, non-sublicensable, non-transferable, and fully revocable license to access, view, and use the Service for your personal, non-commercial use solely as provided by these Terms and as expressly permitted by the features and functionality of the Service, subject to your complete compliance with these Terms of Use and all applicable Additional Terms. The Service may allow you to view, preview, select, stream, and access certain content, including video, audio, graphics, photos, and text (collectively, "Content"). Such use may be limited (for example, to supported devices or by number of simultaneous streams per account; by geographic region; by time window; by subscription level; or otherwise, and access will require your use of an approved device with sufficient connectivity).

The Service and Content are protected by copyrights, trademarks, service marks, or other intellectual property rights that are owned by Warner or its licensors. Warner respects the intellectual property rights of others and asks that you do the same. Any unauthorized use of Content or any other aspect of the Service, or any portion thereof, will constitute a violation of copyright or other intellectual property rights, and Warner reserves the right to fully prosecute such violations and enforce its rights to the fullest extent of the law, including seeking both civil and criminal penalties. Violation of this Agreement in any manner automatically terminates the license granted to you herein and obligates you to cease all use of the Service and Content. Any authorization to copy material granted by Warner in any part of the Service for any reason is restricted to viewing a single copy for non-commercial, personal, entertainment use only, unless otherwise specified, and is subject to your keeping intact all copyright, trademark, and other proprietary notices.

Except as expressly provided herein, Warner does not grant you any other express or implied right or license in or to the Service or Content and all right, title, and interest that Warner has in the Service and Content are retained by Warner, including the right to modify, discontinue, or temporarily suspend any or all of the Service at any time, with or without notice.

No aspect of the Service constitutes legal, financial, medical, or other category of professional advice.

## 4. User Accounts

### A. *Account Creation*

You may be required or permitted to create user accounts (each an "Account") in order to access or use certain aspects of the Service. If you open an Account or otherwise access the Service on behalf of a company, organization, or other entity (a "Business User"), then you represent and warrant that you have the authority to also bind the Business User to these Terms, and hereby do so, and both you and the Business User will be responsible for any breach of this Agreement. You acknowledge and agree that you have no ownership or other proprietary interest in any Account. You agree that all of the details you provide in connection with your Account are about yourself or an applicable Business User and not about another individual or entity (whether real or fictitious), and that such details will be maintained by you as correct, current, and complete.

### B. *Investigations, Suspensions, and Termination*

You agree that Warner has the right, in our sole discretion, to investigate any actual or suspected violation of these Terms and to suspend or terminate your Account and refuse you access to your Account, the Service, or the Content (or any portion thereof) for any reason, including if Warner believes the information you provide is not correct, current, or complete, or that you have otherwise violated this Agreement or any applicable law. You agree that Warner may report your conduct, activity, or identity to law enforcement or other appropriate authorities, take appropriate legal action against you, respond to subpoenas or other requests for information regarding your Account or use of the Service, or otherwise take action to protect our rights and the rights of any third party. BY ACCEPTING THESE TERMS, YOU WAIVE ANY CLAIMS RESULTING, DIRECTLY OR INDIRECTLY, FROM ANY ACTION TAKEN BY WARNER DURING OR AS A RESULT OF THESE INVESTIGATIONS.

C. *Account Security*

You may not use anyone else's Account at any time and you may not allow anyone else to use your Account at any time. You are responsible for all activity occurring under your Account, including all activities or transactions conducted through the use of your Account. You are responsible for maintaining the confidentiality of your Account username and password, and agree not to disclose your username and password to anyone. You agree not to transfer, resell, or otherwise convey your Account or the right to use your Account to anyone. You agree that Warner will not be liable for any loss you may incur as a result of someone else using your Account, either with or without your knowledge. You also agree that any information you provide is offered at your own risk, and that Warner cannot guarantee its protection from unauthorized access. If you have reason to believe that your Account is no longer secure, you must: (i) promptly change your password; and (ii) immediately notify us of the problem through our Customer Service (https://www.warnerbros.com/customer-service) contact page. Warner may require you to change your Account username and password.

# 5. Mobile Devices

A. *Wireless Charges*

You are solely responsible for all charges from your wireless provider including any data and messaging fees that you may incur if you use mobile devices to interact with the Service or to receive communications from Warner.

B. *Mobile Software*

Warner may make certain mobile software applications ("Apps") available for download in connection with the Service. You may only use Apps on approved devices, for personal use. You are not permitted to modify, transfer, or distribute any Apps. Warner does not guarantee that the Apps will be compatible with your device. Warner may choose to make available updates, bug fixes, or other changes or enhancements to the Apps from time to time; such updates may be automatic, at your election, or mandatory if you wish to continue using the Apps, at Warner's discretion. You may not use or otherwise export or re-export the Apps, or any other software provided as part of the Service, except as authorized by United States law and the laws of the jurisdiction in which the software was obtained. In particular, but without limitation, neither the Apps, nor any other software, may be exported or re-exported into any U.S. embargoed countries or to any persons listed as prohibited under applicable law or regulation. If you download

any software, you represent and warrant that you (i) are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) are not listed on any U.S. Government list of prohibited or restricted parties.

### C. *iTunes App Store*

The additional terms in this Section 5.C apply only to your use of Apps downloaded through Apple Inc.'s ("Apple") iTunes App Store ("iTunes Apps"). You agree that this Agreement is solely between you and Warner, not Apple, and that Apple is not responsible for iTunes Apps or their content. Apple has no obligation whatsoever to furnish any maintenance or support services in connection with iTunes Apps. You will not involve Apple in any claims relating to your use of iTunes Apps, or in any third-party claims alleging infringement of intellectual property rights by the iTunes Apps. You agree to comply with all third-party agreements in connection with your use of iTunes Apps (for example, your wireless provider agreement). Finally, you agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the Agreement solely for the purpose of enforcing the applicable Terms against you in connection with your use of iTunes Apps.

## 6. Paid Services

Certain aspects of the Service may require payments. If you use those aspects of the Service, you agree to the applicable pricing and payment terms. Such terms will be displayed in connection with that aspect of the Service requiring payment. Warner may update pricing and payment terms at any time and in its sole discretion, with any changes to subscription fees taking effect upon the conclusion of your current subscription term unless otherwise specified. The transaction is with the specific Warner entity identified by the aspect of the Service used to make the purchase.

All payment transactions are administered by a third-party payment processor or third-party store (for example, Google Play). Warner expressly disclaims any liability for the processing of any transactions by a third party, including any errors in invoicing or payment processing or any breach in security with respect to your payment information associated with the third-party's handling of the transaction. Warner is not responsible or liable to you for any credit card, bank-related, or other financial service charges and fees related to your transactions. You represent and warrant that all payment information you provide is correct, current, and complete. You agree to pay all applicable charges (including any applicable taxes) billed to your chosen payment method. We reserve the right to refuse or cancel transactions, including due to pricing or other typographical errors.

All purchases are final and **no refunds are available** unless otherwise specified in applicable Additional Terms, including where your account is terminated or suspended preventing your access to paid aspects of the Service, such as any remaining subscription terms. Subscriptions have no monetary value and are purchases of only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to access the applicable portion of the Service. Unless otherwise specified (at initial sign-up or subsequently), **subscriptions may renew automatically** for up to the initial subscription term at a rate not exceeding the rate for the prior subscription period. If you sign up for a free trial subscription (if available), you will be automatically billed at the then-current rate at the conclusion of the free trial. You may cancel any automatically renewing subscription by using that aspect of the Service you used to set up your subscription, unless another cancellation method is specified in applicable Additional Terms.

The name and contact information of the service provider is set forth herein in conformance with Cal. Civ. Code § 1789.3. If you are a California resident, you may report any complaints to the Consumer Information Division of the California Department of Consumer Affairs at 1625 North Market Blvd., Suite N 112, Sacramento, CA 95834, or by telephone at (800) 952-5210.

## 7. Virtual Items

The Service may feature fictional credits, items, rewards, points, currency, or the like (collectively, "Virtual Items"). The Virtual Items may be used exclusively within the Service. You receive only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to use the Virtual Items in connection with the Service and as governed by these Terms. You have no right, title, interest, or ownership in or to any Virtual Items. Virtual Items have no monetary value and are not redeemable for any sum of money. You will receive no compensation for any Virtual Items that are deleted, modified, or to which you lose access if your Account is terminated, suspended, or otherwise limited. Warner has the absolute right to manage, regulate, control, modify, or eliminate Virtual Items as we see fit in our sole discretion, and Warner will have no liability to you or anyone else for the exercise of such rights. For example, Virtual Items may be immediately lost, deleted from your Account, or otherwise forfeited if your Account is terminated or closed for any reason or when Warner discontinues, modifies, or updates an applicable aspect of the Service (for example, discontinuing a game featuring Virtual Items).

All purchases of licenses to Virtual Items are final and governed by the terms of Section 6 (Paid Services); by indicating your desire to purchase a license to any Virtual Items through the Service, including by clicking or tapping the relevant purchase button, you confirm that you want said items credited to your Account and in so doing you lose any cancellation rights you may have under applicable laws.

Any unauthorized transferring, trading, selling or exchanging of any Virtual Items to anyone, including other users of the Service, is strictly prohibited. Warner may take action it deems appropriate in response, including deletion of the Virtual Items or termination or suspension of any Account involved. You acknowledge and agree that Warner will have no liability for the use or loss of Virtual Items for any reason, including due to any unauthorized third-party activity, such as hacking, phishing, password mining, social engineering, or any other unauthorized activity. Warner may replace such lost Virtual Items under certain circumstances, in our sole discretion and on a case-by-case basis, without incurring any obligation or liability. If Warner revokes your license to Virtual Items, Warner will not have any liability to you for any time or money spent by you on Virtual Items, any Virtual Items associated with your Account, or for any other reason whatsoever.

## 8. Third-Party Services

The Service may link to, integrate with, or incorporate third party content, sites, services, or platforms, including advertisers, online merchants, and social networks (collectively, "Third Party Services"). Warner does not endorse and is not responsible for Third Party Services, whether in terms of their correctness, accuracy, validity, propriety, reliability, legality, security, or otherwise, and Warner disclaims all liability in connection therewith. References to Third Party Services do not imply endorsement of any Third Party Services by Warner or any association with its operators. Your dealings with Third Party Services are solely between you and the applicable Third Party Services. To learn more about Third Party Services, consult the Third Party Services' respective terms of use and privacy policies.

## 9. User Content

From time to time, certain aspects of the Service may invite or otherwise allow you to submit or post a variety of content to the Service, such as text (including comments and reviews), images, videos, music, and other information, either directly to the Service or through a Third Party Service (collectively, "User Content"). Your User Content remains your own, unless as otherwise may be provided in Additional Terms. Please be aware, however, that User Content is not confidential and may be accessible by other users and the public. Moreover, by submitting or posting User Content to the Service (either directly or through a Third Party Service) you grant Warner a royalty-free, perpetual, irrevocable, non-exclusive, sublicensable, assignable, unrestricted, worldwide license to use the User Content, together with all consents or waivers including a publicity rights waiver and a waiver of moral rights (if any) in favor of Warner necessary to reproduce, distribute, publicly perform, publicly display, transmit, communicate to the public, modify and make derivative works of the User Content, by any means and in all media formats and channels now known or hereafter devised in perpetuity, and to advertise and promote such use, without further notice to, or permission from, you or any other person, and without compensation or reference to you or any other person.

Please retain copies of all User Content as Warner is under no obligation to store or return any User Content to you. Your submission of User Content will not be subject to any obligation of confidentiality, attribution, or otherwise. You are solely responsible for your User Content. Warner only acts as a passive conduit for User Content, and will not be liable for any use, disclosure, or exposure of any User Content, including possibly objectionable or offensive User Content, to you, any other user, or any third party. Warner is under no obligation to monitor User Content or use of the Service. However, Warner has the right to monitor or moderate User Content, in our sole discretion, and to enforce our or a third party's intellectual property rights in any User Content. Warner reserves the right to discard or remove User Content from the Service in its sole discretion and without any liability whatsoever.

You represent and warrant the following as to your User Content:

A. You have obtained the written consent of every identifiable individual featured in your User Content (or, in the case of minors, consent of the minor's parent or guardian) to use that person's name, voice, and/or likeness (as applicable) in connection with the Service and pursuant to these Terms.

B. Your User Content does not infringe, violate, or misappropriate any third-party intellectual property rights, including copyrights, trade secrets, or trademarks.

C. Your User Content, as used in connection with the Service, will not violate any applicable laws or regulations or infringe or violate any rights of a third party, including third-party publicity or privacy rights.

D. Warner may exercise the rights to your User Content granted herein without any liability, including for payment of royalties, residuals, guild fees, or the like, to you or any third party.

## 10. Code of Conduct

You agree that you will not use the Service to upload, post, or otherwise distribute any User Content that:

- constitutes or promotes illegal activity;
- is infringing, libelous, defamatory, abusing, harassing, or threatening;
- contains any obscene, pornographic, racist, or otherwise offensive material;
- exploits or harms children, directly or indirectly, including by exposing them to inappropriate material or asking them for any personal information;

2-ER-207

- promotes any commercial activity, including promoting goods or services or soliciting donations, except as may be specifically authorized by applicable Additional Terms;
- is subject to confidentiality or non-disclosure obligations;
- includes any visible logos or trademarks that belong to third parties;
- disguises its source or origin, or misrepresent its author, by modifying metadata or other identifiers; or
- links to any third-party sites or services that would violate the standards contained in this list.

In using the Service you also agree not to:

- attempt to interfere with the operation of the Service in any way;
- copy, reproduce, distribute, transfer, sell, license, publish, enter into a database, display, perform publicly, modify, create derivative works of, upload, edit, post, link to, frame, transmit, rent, lease, lend or sublicense, scrape, crawl, or in any way exploit any part of the Service (except: (a) as authorized herein; or (b) in the case of public search engines, which are granted a revocable right to crawl publicly accessible portions of the Service in compliance with instructions posted on applicable "robots.txt" files and without circumventing any technical barriers, for the sole purpose of creating public searchable indexes, but not caches or archives);
- use any viruses, worms, bug exploits, or similar data-gathering and extraction tools on the Service, or frame any portion of the Service, or attempt to tamper, hack, corrupt, or impair the administration or security of the Service;
- assign, sublicense, pledge or transfer any of your rights or obligations under this Agreement to any person or entity without Warner's prior written consent which may be withheld in Warner's sole discretion (and any such purported assignment, pledge, or transfer without such prior written consent will be null and void);
- use any tools designed to compromise security or digital rights management technology (including password guessing programs, cracking tools, or network probing tools) in connection with the Service;
- use the Service for any commercial purposes, including sending "spam" or any malicious or disruptive communications;
- decompile, reverse engineer, disassemble, or otherwise reduce the code used in any Apps, other software, or digital rights management feature on the Service into a readable form in order to examine the construction of such software or to copy or create other products based (in whole or in part) on such software or any feature of the Service or piece of Content available on the Service; or
- intercept, record, or modify network communications transmitted between any Apps, software, or digital rights management features and Warner's networks or systems.

## 11. Unsolicited Submissions and Feedback

Please be aware that Warner does not accept unsolicited submissions of concepts, creative ideas, suggestions, stories, scripts, or other potential creative content ("Unsolicited Submissions"). This is to avoid the possibility of future misunderstanding when projects developed by Warner staff or representatives might seem to others to be similar to their submitted concepts, creative ideas, suggestions, stories, scripts, or other potential creative content. Therefore, please do not send Warner any Unsolicited Submissions. In the event you do send us an Unsolicited Submission, you understand

and agree that your Unsolicited Submission does not create any fiduciary relationship between you and Warner and that we are under no obligation to refrain from using the Unsolicited Submission (in whole or in part), to keep it confidential, or to compensate you for our use of it.

## 12. International Use

Warner makes no representation that every aspect of the Service is appropriate or available for use in any particular jurisdiction. When you choose to access and use the Service, you agree that:

    A. you do so on your own initiative and at your own risk;

    B. you will not use the Service if you are prohibited from receiving products, services, or software originating from the United States;

    C. you are responsible for complying with local laws and regulations, if and to the extent local laws and regulations are applicable; and

    D. you specifically agree to comply with all applicable laws and regulations concerning the transmission of technical data exported from the country in which you reside.

If there is a conflict between any of the terms herein and your rights in your place of residence, your rights under applicable law will control as to those specific terms.

## 13. Disclaimer of Warranties

YOUR USE OF THE SERVICE IS AT YOUR OWN RISK. THE SERVICE IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, WARNER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WARNER DOES NOT WARRANT THAT THE SERVICE WILL BE AVAILABLE, UNINTERRUPTED, SECURE, OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SERVICE OR THE SERVERS THAT MAKE THE SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WARNER DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, PLATFORM, OR SERVICE LINKED TO THE SERVICE, WHETHER IN TERMS OF THEIR CORRECTNESS, ACCURACY, VALIDITY, PROPRIETY, RELIABILITY, LEGALITY, SECURITY, OR OTHERWISE. WARNER MAKES NO WARRANTIES THAT YOUR USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, OR SERVICE LINKED TO FROM THE SERVICE WILL NOT INFRINGE THE RIGHTS OF OTHERS; AND WARNER ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH SERVICES, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY OTHER WEBSITE, APP, PLATFORM OR SERVICE LINKED TO THE SERVICE. IF APPLICABLE LAW DOES NOT ALLOW THE EXCLUSION OF SOME OR ALL OF THE ABOVE IMPLIED WARRANTIES TO APPLY TO YOU, THE ABOVE EXCLUSIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## 14. Limitation of Liability and Time Limitation for Claims

WARNER DOES NOT ACCEPT ANY LIABILITY FOR ANY LOSS OR DAMAGE (DIRECT, INDIRECT, PUNITIVE, ACTUAL, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, OR OTHERWISE) ARISING FROM YOUR USE OR INABILITY TO USE THE SERVICE. IN NO EVENT WILL WARNER'S AGGREGATE LIABILITY TO YOU IN CONNECTION WITH THE SERVICE OR THESE TERMS EXCEED THE GREATER OF THE AMOUNT (IF ANY) PAID BY YOU TO WARNER IN THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100. THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION APPLY TO ALL ACTIONS, WHETHER FOR BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, OR UNDER ANY OTHER CAUSE OF ACTION, REGARDLESS OF THE BASIS UPON WHICH LIABILITY IS CLAIMED AND EVEN IF WARNER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. IF APPLICABLE LAW DOES NOT ALLOW ALL OR ANY PART OF THE ABOVE LIMITATION OF LIABILITY TO APPLY TO YOU, THE LIMITATIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

TO THE EXTENT PERMITED BY APPLICABLE LAW, ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING IN ANY WAY TO THE SERVICE OR YOUR USE OF THE SERVICE, THESE TERMS OF USE, OR THE RELATIONSHIP BETWEEN US, MUST BE COMMENCED WITHIN ONE YEAR OF THE RELEVANT EVENTS. A DISPUTE IS COMMENCED IF IT IS FILED IN AN ARBITRATION OR, IF THE DISPUTE IS NON-ARBITRABLE, A COURT WITH JURISDICTION, DURING THE ONE-YEAR PERIOD. IF YOU OR WE PROVIDE NOTICE OF A DISPUTE UNDER SECTION 16 (DISPUTE RESOLUTION), THE ONE-YEAR PERIOD IS TOLLED FOR 60 DAYS FOLLOWING RECEIPT OF THE NOTICE OF DISPUTE. YOU AND WE EACH WAIVE—THAT IS, GIVE UP—THE RIGHT TO PURSUE ANY DISPUTE, CLAIM OR CONTROVERSY THAT IS NOT FILED WITHIN ONE YEAR AND ANY RIGHT YOU OR WE MAY HAVE HAD TO PURSUE THAT DISPUTE, CLAIM OR CONTROVERSY IN ANY FORUM IS PERMANENTLY BARRED.

## 15. Indemnity

You agree to indemnify and hold harmless Warner and its directors, officers, shareholders, parents, subsidiaries, affiliates, partners, agents, and licensors (collectively, the "Indemnified Parties") from and against all losses, expenses, damages and costs, including reasonable attorney fees and costs, resulting from: (i) your breach of any of the representations, warranties, and agreements made hereunder; (ii) your use of the Service; (iii) your placement or transmission of any User Content onto the Service; (iv) any use of your Account in violation of this Agreement or your failure to fulfill any obligations incurred through the use of your Account by you or a third party; or (v) your willful misconduct.

## 16. Dispute Resolution

### Summary:

Our customer-service department can resolve most customer concerns quickly and to the customer's satisfaction. Please contact us via email to legal@wb.com (mailto:legal@wb.com? subject=Informal%20Resolution) so that we may attempt to resolve the dispute informally. **In the unlikely event that you're not satisfied with customer service's solution (or if Warner has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction**.

2-ER-210

Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Unless expressly limited by this Dispute Resolution provision, arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted**. For any non-frivolous claim that does not exceed $75,000, we will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from us to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), we will pay you more than the amount of the arbitrator's award if the arbitrator awards you an amount that is greater than what we have offered you to settle the dispute.

## ARBITRATION AGREEMENT

### A. Claims Subject to Arbitration:

Warner and you agree to arbitrate all disputes and claims between us, except for claims arising from bodily injury or that pertain to enforcing, protecting, or the validity of your or our intellectual property rights (or the intellectual property rights of any of our licensors, affiliates and partners). This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims for mental or emotional distress or injury not arising out of physical bodily injury;
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "Warner," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, licensees, licensors, and providers of content as of the time your or our claim arises; our respective predecessors in interest, successors, and assigns (including AT&T and its affiliates); and all authorized or unauthorized users or beneficiaries of Service under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed or appealed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action**. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

### B. Pre-Arbitration Notice of Disputes:

2-ER-211

A party who intends to seek arbitration must first send to the other a written Notice of Dispute ("Notice"). The Notice to Warner should be sent by certified mail to: General Counsel, Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand").

If we and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or us is entitled. You may download a form to initiate arbitration at: adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf (https://adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf)

## C. Arbitration Procedure:

The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by requesting them in writing at the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless we and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided in subsection (F) below, the arbitrator can award the same damages and individualized relief that a court can award under applicable law.

## D. Arbitration Fees:

After we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000 in value. (The filing fee currently is $200 but is subject to change by the arbitration provider. If you are unable to pay this fee, we will pay it directly upon receiving a written request at the Notice Address.) We will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies we previously paid that are otherwise your

2-ER-212

obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $75,000 (either to you or to us), the payment of these fees will be governed by the AAA rules.

E. Alternative Payment:

If you initiated arbitration in accordance with the notice requirements above in subsection (B) and the arbitrator issues an award in your favor that is greater than the value of our last written settlement offer made before an arbitrator was selected, then we will pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater.

If we did not make a written offer to settle the dispute before an arbitrator was selected, you will be entitled to receive the alternative payment if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits. In assessing whether an award that includes attorneys' fees or expenses is greater than the value of our last written settlement offer, the calculation shall include only the portion of the award representing attorneys' fees or expenses that you reasonably incurred pursuing the arbitration through the date of our settlement offer.

Although under some laws we may have a right to an award of attorneys' fees and expenses if we prevail in an arbitration, we agree that we will not seek such an award.

F. Requirement of Individual Arbitration:

The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.** Further, unless both you and we agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief sought with respect to a particular claim), then that claim or request for relief shall be severed , and all other claims and requests for relief shall be arbitrated.

G. Future Changes to Arbitration Provision:

Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address) following your use of this Service, you may reject any such change by sending us written notice within 30

2-ER-213

days of the change to the arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

# 17. General Terms

## A. *Governing Law and Venue*

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California, as they are applied to agreements entered into and to be performed entirely within California and without regard to conflict of law principles, except to the extent that law is inconsistent with or preempted by federal law. To the extent that a dispute is not subject to arbitration under Section 16 (Dispute Resolution) of this Agreement, that action shall be brought in the appropriate state or federal court located in Los Angeles County, California; and we both irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts in Los Angeles County, California for the adjudication of all non-arbitral claims.

## B. *Force Majeure*

Warner will not have any liability to you by reason of any delay or failure to perform any obligation hereunder if the delay or failure to perform is occasioned by force majeure, which refers to any act of God, storm, fire, casualty, unanticipated work stoppage, power outage, satellite failure, strike, lockout, labor dispute, civil disturbance, riot, war, national emergency, Governmental action, or other cause beyond its control.

## C. *No Waiver*

No failure or delay by Warner in exercising its rights under this Agreement will constitute a waiver of those rights, nor will any partial assertion of any such rights preclude further assertion of the same.

## D. *Severability*

Except as specified in Section 16 (Dispute Resolution), if any provision of this Agreement shall be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this Agreement and shall not affect the validity and enforceability of any remaining provisions.

## E. *Construction*

The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise:(a) references to the plural include the singular, the singular the plural, and the part the whole; (b) "or" has the inclusive meaning frequently identified with the phrase "and/or;" (c) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation;" and (e) references to "hereunder," "herein," or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation, or agreement, including this Agreement, will be deemed to include such statute, rule, regulation, or agreement as it may be modified, varied, amended, or supplemented from time to time. 2-ER-214

F. *Survival*

Any provision herein which by its nature contemplates your continued observance following termination of this Agreement will survive termination of this Agreement.

G. *Entire Agreement*

This Agreement, including any applicable Additional Terms, is the entire agreement between the parties relating to the matters contained herein.

## 18. Copyright Agent

If you believe that any User Content or other material on the Service infringes your copyright rights, please forward the following information in writing to our Copyright Agent at the address listed below, in conformance with the Digital Millennium Copyright Act of 1998 ("DMCA"):

A. Your name, address, telephone number, and (if available) email address;
B. A description of the copyrighted work that you claim has been infringed;
C. The exact URL or a description of each place where alleged infringing material is located;
D. A statement by you that you have a good faith belief that the disputed use has not been authorized by you, your agent, or the law;
E. Your electronic or physical signature or the electronic or physical signature of the person authorized to act on your behalf; and
F. A statement by you that the information in your notice is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The above information must be submitted to Warner's Copyright Agent at the following address:

Warner Bros. Entertainment Inc.
Attention: Copyright Agent
4000 Warner Boulevard
Burbank, CA 91522
Tel: (818) 977-0018
Fax: (818) 977-7929
Email: copyright@wb.com (mailto:copyright@wb.com)

If we are notified that any User Content infringes another's intellectual property rights, we may remove such User Content pursuant to the DMCA. In accordance with the DMCA, we have a repeat infringer policy and reserve the right to terminate your Account for submitting infringing User Content in violation of these Terms once or on a repeated basis.

## 19. Accessibility

We strive to make the content on this website usable by all visitors, including those with disabilities. If you are having difficulty using this website, with or without assistive technology, please contact us at accessibility@wb.com (mailto:accessibility@wb.com). To enable us to respond in a manner most helpful

2-ER-215

to you, please indicate the nature of your difficulty using the website, the specific web address (URL link) at issue, and your full contact information, including email address and phone number. Thank you for helping us make your online experience more enjoyable.

## 20. Contact Us

You may contact us at the addresses specified herein for specific requests, or contact Customer Service (https://www.warnerbros.com/customer-service) with general inquiries. Please do not send us any Unsolicited Submissions.

IF YOU DO NOT AGREE TO BE LEGALLY BOUND BY ALL OF THE FOREGOING TERMS, PLEASE DO NOT ACCESS OR USE THE SERVICE.

TM & © 2020 Warner Bros. Entertainment Inc. All rights reserved.

Privacy Policy (https://www.warnerbros.com/privacy) Terms of Use (https://policies.warnerbros.com/terms/en-us) Ad Choices (https://www.warnerbros.com/privacy#adchoices) Accessibility

# EXHIBIT 4

# TERMS OF USE

Updated date: April 11, 2022

FIRST, AN IMPORTANT MESSAGE: PLEASE READ THESE TERMS OF USE ("Terms", "Terms of Use", or "Agreement") CAREFULLY BEFORE USING THIS ONLINE ENTERTAINMENT SERVICE, AS THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, INCLUDING, BUT NOT LIMITED TO, WAIVERS OF RIGHTS, LIMITATION OF LIABILITY, AND YOUR INDEMNITY TO US. **THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN COURTS, JURY TRIALS, OR CLASS ACTIONS, AND LIMITS THE REMEDIES AVAILABLE IN THE EVENT OF A DISPUTE**.

Welcome and thank you for using a service provided by Warner Bros. Entertainment Inc. or its subsidiaries or affiliates ("Warner," "we," "us," or "our"). These Terms of Use are a legally binding agreement between you and Warner and govern your use of our online, digital, or mobile services, including our websites, software, applications, games, and any of our other products and services in connection with which these Terms of Use are posted or from which they are linked (collectively, the "Service").

Certain aspects of the Service may be subject to additional terms and conditions, which may include, among other things, particularized age requirements, codes of conduct, sweepstakes and contest rules, and payment or subscription terms (collectively, "Additional Terms"). When Additional Terms are made available in connection with any aspect of the Service, those Additional Terms also apply to your use of that aspect of the Service and control in the event of a conflict with these Terms.

By accessing or using the Service, you agree to be bound by these Terms and any applicable Additional Terms (which are incorporated herein by reference) and acknowledge our collection and use of your information as described in the Privacy Policy(ies) applicable to the Service ("Privacy Policy"). If you do not wish to be bound by these Terms or Additional Terms, do not access or use the Service.

## 1. Changes to these Terms

We reserve the right, in our sole discretion, to modify these Terms (including applicable Additional Terms) from time to time. You agree that we may notify you of modified terms or policies by posting them on the Service, and agree that your continued use of the Service after such notice constitutes your agreement to the modified terms, which will govern your ongoing use of the Service. Thus, you should review the posted Terms of Use and applicable Additional Terms each time you use the Service. Any modifications to these Terms will supersede the prior version for all activity occurring after the revised version has been made available.

## 2. Your Representations

Exhibit 4, Page 48

By accessing, previewing, or otherwise using the Service in any manner, you represent and warrant that you have sufficient legal capacity to enter into this Agreement or, if you lack such capacity (for instance, if you are a minor), that you have obtained parental or guardian consent to do so. You represent and warrant that you have read, understand, and agree to abide by these Terms and any applicable Additional Terms, and that you have read, understand the data collection and use practices set forth in the Privacy Policy.

## 3. The Warner Service

Warner grants you a limited, non-exclusive, non-sublicensable, non-transferable, and fully revocable license to access, view, and use the Service for your personal, non-commercial use solely as provided by these Terms and as expressly permitted by the features and functionality of the Service, subject to your complete compliance with these Terms of Use and all applicable Additional Terms. The Service may allow you to view, preview, select, stream, and access certain content, including video, audio, graphics, photos, and text (collectively, "Content"). Such use may be limited (for example, to supported devices or by number of simultaneous streams per account; by geographic region; by time window; by subscription level; or otherwise, and access will require your use of an approved device with sufficient connectivity).

The Service and Content are protected by copyrights, trademarks, service marks, or other intellectual property rights that are owned by Warner or its licensors. Warner respects the intellectual property rights of others and asks that you do the same. Any unauthorized use of Content or any other aspect of the Service, or any portion thereof, will constitute a violation of copyright or other intellectual property rights, and Warner reserves the right to fully prosecute such violations and enforce its rights to the fullest extent of the law, including seeking both civil and criminal penalties. Violation of this Agreement in any manner automatically terminates the license granted to you herein and obligates you to cease all use of the Service and Content. Any authorization to copy material granted by Warner in any part of the Service for any reason is restricted to viewing a single copy for non-commercial, personal, entertainment use only, unless otherwise specified, and is subject to your keeping intact all copyright, trademark, and other proprietary notices.

Except as expressly provided herein, Warner does not grant you any other express or implied right or license in or to the Service or Content and all right, title, and interest that Warner has in the Service and Content are retained by Warner, including the right to modify, discontinue, or temporarily suspend any or all of the Service at any time, with or without notice.

No aspect of the Service constitutes legal, financial, medical, or other category of professional advice.

## 4. User Accounts

### A. *Account Creation*

You may be required or permitted to create user accounts (each an "Account") in order to access or use certain aspects of the Service. If you open an Account or otherwise access the Service on behalf of a company, organization, or other entity (a "Business User"), then you represent and warrant that you have the authority to also bind the Business User to these Terms, and hereby do so, and both you and the Business User will be responsible for any breach of this Agreement. You acknowledge and agree that you have no ownership or other proprietary interest in any Account. You agree that all of the details you provide in connection with your Account are about yourself or an applicable Business User and not about another individual or entity (whether real or fictitious), and that such details will be maintained by you as correct, current, and complete.

## B. *Investigations, Suspensions, and Termination*

You agree that Warner has the right, in our sole discretion, to investigate any actual or suspected violation of these Terms and to suspend or terminate your Account and refuse you access to your Account, the Service, or the Content (or any portion thereof) for any reason, including if Warner believes the information you provide is not correct, current, or complete, or that you have otherwise violated this Agreement or any applicable law. You agree that Warner may report your conduct, activity, or identity to law enforcement or other appropriate authorities, take appropriate legal action against you, respond to subpoenas or other requests for information regarding your Account or use of the Service, or otherwise take action to protect our rights and the rights of any third party. BY ACCEPTING THESE TERMS, YOU WAIVE ANY CLAIMS RESULTING, DIRECTLY OR INDIRECTLY, FROM ANY ACTION TAKEN BY WARNER DURING OR AS A RESULT OF THESE INVESTIGATIONS.

## C. *Account Security*

You may not use anyone else's Account at any time and you may not allow anyone else to use your Account at any time. You are responsible for all activity occurring under your Account, including all activities or transactions conducted through the use of your Account. You are responsible for maintaining the confidentiality of your Account username and password, and agree not to disclose your username and password to anyone. You agree not to transfer, resell, or otherwise convey your Account or the right to use your Account to anyone. You agree that Warner will not be liable for any loss you may incur as a result of someone else using your Account, either with or without your knowledge. You also agree that any information you provide is offered at your own risk, and that Warner cannot guarantee its protection from unauthorized access. If you have reason to believe that your Account is no longer secure, you must: (i) promptly change your password; and (ii) immediately notify us of the problem through our Customer Service (https://www.warnerbros.com/customer-service) contact page. Warner may require you to change your Account username and password.

## 5. Mobile Devices

### A. *Wireless Charges*

You are solely responsible for all charges from your wireless provider including any data and messaging fees that you may incur if you use mobile devices to interact with the Service or to receive communications from Warner.

## B. *Mobile Software*

Warner may make certain mobile software applications ("Apps") available for download in connection with the Service. You may only use Apps on approved devices, for personal use. You are not permitted to modify, transfer, or distribute any Apps. Warner does not guarantee that the Apps will be compatible with your device. Warner may choose to make available updates, bug fixes, or other changes or enhancements to the Apps from time to time; such updates may be automatic, at your election, or mandatory if you wish to continue using the Apps, at Warner's discretion. You may not use or otherwise export or re-export the Apps, or any other software provided as part of the Service, except as authorized by United States law and the laws of the jurisdiction in which the software was obtained. In particular, but without limitation, neither the Apps, nor any other software, may be exported or re-exported into any U.S. embargoed countries or to any persons listed as prohibited under applicable law or regulation. If you download or use any software, you represent and warrant that you (i) are not located in a country that is subject to a U.S. Government embargo, or that has been designated by the U.S. Government as a "terrorist supporting" country; and (ii) are not listed on any U.S. Government list of prohibited or restricted parties.

## C. *iTunes App Store*

The additional terms in this Section 5.C apply only to your use of Apps downloaded through Apple Inc.'s ("Apple") iTunes App Store ("iTunes Apps"). You agree that this Agreement is solely between you and Warner, not Apple, and that Apple is not responsible for iTunes Apps or their content. Apple has no obligation whatsoever to furnish any maintenance or support services in connection with iTunes Apps. You will not involve Apple in any claims relating to your use of iTunes Apps, or in any third-party claims alleging infringement of intellectual property rights by the iTunes Apps. You agree to comply with all third-party agreements in connection with your use of iTunes Apps (for example, your wireless provider agreement). Finally, you agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the Agreement solely for the purpose of enforcing the applicable Terms against you in connection with your use of iTunes Apps.

## 6. Paid Services

Certain aspects of the Service may require payments. If you use those aspects of the Service, you agree to the applicable pricing and payment terms. Such terms will be displayed in connection with that aspect of the Service requiring payment. Warner may update pricing and payment terms at any time and in its sole discretion, with any changes to subscription fees taking effect upon the conclusion of your current subscription term unless otherwise specified. The transaction is with the specific Warner entity identified by the aspect of the Service used to make the purchase.

2-ER-221

All payment transactions are administered by a third-party payment processor or third-party store (for example, Google Play). Warner expressly disclaims any liability for the processing of any transactions by a third party, including any errors in invoicing or payment processing or any breach in security with respect to your payment information associated with the third-party's handling of the transaction. Warner is not responsible or liable to you for any credit card, bank-related, or other financial service charges and fees related to your transactions. You represent and warrant that all payment information you provide is correct, current, and complete. You agree to pay all applicable charges (including any applicable taxes) billed to your chosen payment method. We reserve the right to refuse or cancel transactions, including due to pricing or other typographical errors.

All purchases are final and **no refunds are available** unless otherwise specified in applicable Additional Terms, including where your account is terminated or suspended preventing your access to paid aspects of the Service, such as any remaining subscription terms. Subscriptions have no monetary value and are purchases of only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to access the applicable portion of the Service. Unless otherwise specified (at initial sign-up or subsequently), **subscriptions may renew automatically** for up to the initial subscription term at a rate not exceeding the rate for the prior subscription period. If you sign up for a free trial subscription (if available), you will be automatically billed at the then-current rate at the conclusion of the free trial. You may cancel any automatically renewing subscription by using that aspect of the Service you used to set up your subscription, unless another cancellation method is specified in applicable Additional Terms.

The name and contact information of the service provider is set forth herein in conformance with Cal. Civ. Code § 1789.3. If you are a California resident, you may report any complaints to the Consumer Information Division of the California Department of Consumer Affairs at 1625 North Market Blvd., Suite N 112, Sacramento, CA 95834, or by telephone at (800) 952-5210.

## 7. Virtual Items

The Service may feature fictional credits, items, rewards, points, currency, or the like (collectively, "Virtual Items"). The Virtual Items may be used exclusively within the Service. You receive only a limited, personal, non-transferrable, non-exclusive, non-sublicensable, non-assignable, and fully revocable license to use the Virtual Items in connection with the Service and as governed by these Terms. You have no right, title, interest, or ownership in or to any Virtual Items. Virtual Items have no monetary value and are not redeemable for any sum of money. You will receive no compensation for any Virtual Items that are deleted, modified, or to which you lose access if your Account is terminated, suspended, or otherwise limited. Warner has the absolute right to manage, regulate, control, modify, or eliminate Virtual Items as we see fit in our sole discretion, and Warner will have no liability to you or anyone else for the exercise of such rights. For example, Virtual Items may be immediately lost, deleted from your Account, or otherwise forfeited if your Account is terminated or closed for any reason or when Warner discontinues, modifies, or updates an applicable aspect of the Service (for example, discontinuing a game featuring Virtual Items).

All purchases of licenses to Virtual Items are final and governed by the terms of Section 6 (Paid Services); by indicating your desire to purchase a license to any Virtual Items through the Service, including by clicking or tapping the relevant purchase button, you confirm that you want said items

credited to your Account and in so doing you lose any cancellation rights you may have under applicable laws.

Any unauthorized transferring, trading, selling or exchanging of any Virtual Items to anyone, including other users of the Service, is strictly prohibited. Warner may take action it deems appropriate in response, including deletion of the Virtual Items or termination or suspension of any Account involved. You acknowledge and agree that Warner will have no liability for the use or loss of Virtual Items for any reason, including due to any unauthorized third-party activity, such as hacking, phishing, password mining, social engineering, or any other unauthorized activity. Warner may replace such lost Virtual Items under certain circumstances, in our sole discretion and on a case-by-case basis, without incurring any obligation or liability. If Warner revokes your license to Virtual Items, Warner will not have any liability to you for any time or money spent by you on Virtual Items, any Virtual Items associated with your Account, or for any other reason whatsoever.

## 8. Third-Party Services

The Service may link to, integrate with, or incorporate third party content, sites, services, or platforms, including advertisers, online merchants, and social networks (collectively, "Third Party Services"). Warner does not endorse and is not responsible for Third Party Services, whether in terms of their correctness, accuracy, validity, propriety, reliability, legality, security, or otherwise, and Warner disclaims all liability in connection therewith. References to Third Party Services do not imply endorsement of any Third Party Services by Warner or any association with its operators. Your dealings with Third Party Services are solely between you and the applicable Third Party Services. To learn more about Third Party Services, consult the Third Party Services' respective terms of use and privacy policies.

## 9. User Content

From time to time, certain aspects of the Service may invite or otherwise allow you to submit or post a variety of content to the Service, such as text (including comments and reviews), images, videos, music, and other information, either directly to the Service or through a Third Party Service (collectively, "User Content"). Your User Content remains your own, unless as otherwise may be provided in Additional Terms. Please be aware, however, that User Content is not confidential and may be accessible by other users and the public. Moreover, by submitting or posting User Content to the Service (either directly or through a Third Party Service) you grant Warner a royalty-free, perpetual, irrevocable, non-exclusive, sublicensable, assignable, unrestricted, worldwide license to use the User Content, together with all consents or waivers including a publicity rights waiver and a waiver of moral rights (if any) in favor of Warner necessary to reproduce, distribute, publicly perform, publicly display, transmit, communicate to the public, modify and make derivative works of the User Content, by any means and in all media formats and channels now known or hereafter devised in perpetuity, and to advertise and promote such use, without further notice to, or permission from, you or any other person, and without compensation or reference to you or any other person.

Please retain copies of all User Content as Warner is under no obligation to store or return any User Content to you. Your submission of User Content will not be subject to any obligation of confidentiality, attribution, or otherwise. You are solely responsible for your User Content. Warner only acts as a passive conduit for User Content, and will not be liable for any use, disclosure, or exposure of any User Content, including possibly objectionable or offensive User Content, to you, any other user, or any third party. Warner is under no obligation to monitor User Content or use of the Service. However, Warner has the right to monitor or moderate User Content, in our sole discretion, and to enforce our or a third party's intellectual property rights in any User Content. Warner reserves the right to discard or remove User Content from the Service in its sole discretion and without any liability whatsoever.

You represent and warrant the following as to your User Content:

A. You have obtained the written consent of every identifiable individual featured in your User Content (or, in the case of minors, consent of the minor's parent or guardian) to use that person's name, voice, and/or likeness (as applicable) in connection with the Service and pursuant to these Terms.
B. Your User Content does not infringe, violate, or misappropriate any third-party intellectual property rights, including copyrights, trade secrets, or trademarks.
C. Your User Content, as used in connection with the Service, will not violate any applicable laws or regulations or infringe or violate any rights of a third party, including third-party publicity or privacy rights.
D. Warner may exercise the rights to your User Content granted herein without any liability, including for payment of royalties, residuals, guild fees, or the like, to you or any third party.

## 10. Code of Conduct

You agree that you will not use the Service to upload, post, or otherwise distribute any User Content that:

- constitutes or promotes illegal activity;
- is infringing, libelous, defamatory, abusing, harassing, or threatening;
- contains any obscene, pornographic, racist, or otherwise offensive material;
- exploits or harms children, directly or indirectly, including by exposing them to inappropriate material or asking them for any personal information;
- promotes any commercial activity, including promoting goods or services or soliciting donations, except as may be specifically authorized by applicable Additional Terms;
- is subject to confidentiality or non-disclosure obligations;
- includes any visible logos or trademarks that belong to third parties;
- disguises its source or origin, or misrepresent its author, by modifying metadata or other identifiers; or
- links to any third-party sites or services that would violate the standards contained in this list.

In using the Service you also agree not to:

- attempt to interfere with the operation of the Service in any way;

- copy, reproduce, distribute, transfer, sell, license, publish, enter into a database, display, perform publicly, modify, create derivative works of, upload, edit, post, link to, frame, transmit, rent, lease, lend or sublicense, scrape, crawl, or in any way exploit any part of the Service (except: (a) as authorized herein; or (b) in the case of public search engines, which are granted a revocable right to crawl publicly accessible portions of the Service in compliance with instructions posted on applicable "robots.txt" files and without circumventing any technical barriers, for the sole purpose of creating public searchable indexes, but not caches or archives);
- use any viruses, worms, bug exploits, or similar data-gathering and extraction tools on the Service, or frame any portion of the Service, or attempt to tamper, hack, corrupt, or impair the administration or security of the Service;
- assign, sublicense, pledge or transfer any of your rights or obligations under this Agreement to any person or entity without Warner's prior written consent which may be withheld in Warner's sole discretion (and any such purported assignment, pledge, or transfer without such prior written consent will be null and void);
- use any tools designed to compromise security or digital rights management technology (including password guessing programs, cracking tools, or network probing tools) in connection with the Service;
- use the Service for any commercial purposes, including sending "spam" or any malicious or disruptive communications;
- decompile, reverse engineer, disassemble, or otherwise reduce the code used in any Apps, other software, or digital rights management feature on the Service into a readable form in order to examine the construction of such software or to copy or create other products based (in whole or in part) on such software or any feature of the Service or piece of Content available on the Service; or
- intercept, record, or modify network communications transmitted between any Apps, software, or digital rights management features and Warner's networks or systems.

## 11. Unsolicited Submissions and Feedback

Please be aware that Warner does not accept unsolicited submissions of concepts, creative ideas, suggestions, stories, scripts, or other potential creative content ("Unsolicited Submissions"). This is to avoid the possibility of future misunderstanding when projects developed by Warner staff or representatives might seem to others to be similar to their submitted concepts, creative ideas, suggestions, stories, scripts, or other potential creative content. Therefore, please do not send Warner any Unsolicited Submissions. In the event you do send us an Unsolicited Submission, you understand and agree that your Unsolicited Submission does not create any fiduciary relationship between you and Warner and that we are under no obligation to refrain from using the Unsolicited Submission (in whole or in part), to keep it confidential, or to compensate you for our use of it.

## 12. International Use

Warner makes no representation that every aspect of the Service is appropriate or available for use in any particular jurisdiction. When you choose to access and use the Service, you agree that:

A. you do so on your own initiative and at your own risk;

2-ER-225

Exhibit 4, Page 55

B. you will not use the Service if you are prohibited from receiving products, services, or software originating from the United States;

C. you are responsible for complying with local laws and regulations, if and to the extent local laws and regulations are applicable; and

D. you specifically agree to comply with all applicable laws and regulations concerning the transmission of technical data exported from the country in which you reside.

If there is a conflict between any of the terms herein and your rights in your place of residence, your rights under applicable law will control as to those specific terms.

13. # Disclaimer of Warranties

YOUR USE OF THE SERVICE IS AT YOUR OWN RISK. THE SERVICE IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, WARNER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. WARNER DOES NOT WARRANT THAT THE SERVICE WILL BE AVAILABLE, UNINTERRUPTED, SECURE, OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THE SERVICE OR THE SERVERS THAT MAKE THE SERVICE AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. WARNER DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, PLATFORM, OR SERVICE LINKED TO THE SERVICE, WHETHER IN TERMS OF THEIR CORRECTNESS, ACCURACY, VALIDITY, PROPRIETY, RELIABILITY, LEGALITY, SECURITY, OR OTHERWISE. WARNER MAKES NO WARRANTIES THAT YOUR USE OF THE SERVICE, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY WEBSITE, APP, OR SERVICE LINKED TO FROM THE SERVICE WILL NOT INFRINGE THE RIGHTS OF OTHERS; AND WARNER ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ERRORS OR OMISSIONS IN SUCH SERVICES, INFORMATION, SOFTWARE, CONTENT, OR OTHER MATERIALS AVAILABLE THROUGH THE SERVICE OR ANY OTHER WEBSITE, APP, PLATFORM OR SERVICE LINKED TO THE SERVICE. IF APPLICABLE LAW DOES NOT ALLOW THE EXCLUSION OF SOME OR ALL OF THE ABOVE IMPLIED WARRANTIES TO APPLY TO YOU, THE ABOVE EXCLUSIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

14. # Limitation of Liability and Time Limitation for Claims

WARNER DOES NOT ACCEPT ANY LIABILITY FOR ANY LOSS OR DAMAGE (DIRECT, INDIRECT, PUNITIVE, ACTUAL, CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, OR OTHERWISE) ARISING FROM YOUR USE OR INABILITY TO USE THE SERVICE. IN NO EVENT WILL WARNER'S AGGREGATE LIABILITY TO YOU IN CONNECTION WITH THE SERVICE OR THESE TERMS EXCEED THE GREATER OF THE AMOUNT (IF ANY) PAID BY YOU TO WARNER IN THE SIX MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $100. THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION APPLY TO THE

ALL ACTIONS, WHETHER FOR BREACH OF CONTRACT, TORTIOUS BEHAVIOR, NEGLIGENCE, OR UNDER ANY OTHER CAUSE OF ACTION, REGARDLESS OF THE BASIS UPON WHICH LIABILITY IS CLAIMED AND EVEN IF WARNER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE. IF APPLICABLE LAW DOES NOT ALLOW ALL OR ANY PART OF THE ABOVE LIMITATION OF LIABILITY TO APPLY TO YOU, THE LIMITATIONS WILL APPLY TO YOU ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

TO THE EXTENT PERMITED BY APPLICABLE LAW, ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING IN ANY WAY TO THE SERVICE OR YOUR USE OF THE SERVICE, THESE TERMS OF USE, OR THE RELATIONSHIP BETWEEN US, MUST BE COMMENCED WITHIN ONE YEAR OF THE RELEVANT EVENTS. A DISPUTE IS COMMENCED IF IT IS FILED IN AN ARBITRATION OR, IF THE DISPUTE IS NON-ARBITRABLE, A COURT WITH JURISDICTION, DURING THE ONE-YEAR PERIOD. IF YOU OR WE PROVIDE NOTICE OF A DISPUTE UNDER SECTION 16 (DISPUTE RESOLUTION), THE ONE-YEAR PERIOD IS TOLLED FOR 60 DAYS FOLLOWING RECEIPT OF THE NOTICE OF DISPUTE. YOU AND WE EACH WAIVE—THAT IS, GIVE UP—THE RIGHT TO PURSUE ANY DISPUTE, CLAIM OR CONTROVERSY THAT IS NOT FILED WITHIN ONE YEAR AND ANY RIGHT YOU OR WE MAY HAVE HAD TO PURSUE THAT DISPUTE, CLAIM OR CONTROVERSY IN ANY FORUM IS PERMANENTLY BARRED.

## 15. Indemnity

You agree to indemnify and hold harmless Warner and its directors, officers, shareholders, parents, subsidiaries, affiliates, partners, agents, and licensors (collectively, the "Indemnified Parties") from and against all losses, expenses, damages and costs, including reasonable attorney fees and costs, resulting from: (i) your breach of any of the representations, warranties, and agreements made hereunder; (ii) your use of the Service; (iii) your placement or transmission of any User Content onto the Service; (iv) any use of your Account in violation of this Agreement or your failure to fulfill any obligations incurred through the use of your Account by you or a third party; or (v) your willful misconduct.

## 16. Dispute Resolution

### Summary:

Our customer-service department can resolve most customer concerns quickly and to the customer's satisfaction. Please contact us via email to legal@wb.com (mailto:legal@wb.com?subject=Informal%20Resolution) so that we may attempt to resolve the dispute informally. **In the unlikely event that you're not satisfied with customer service's solution (or if Warner has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction**.

Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Unless expressly limited by this Dispute Resolution provision, arbitrators can award the

same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted**. For any non-frivolous claim that does not exceed $75,000, we will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from us to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), we will pay you more than the amount of the arbitrator's award if the arbitrator awards you an amount that is greater than what we have offered you to settle the dispute.

## ARBITRATION AGREEMENT

### A. Claims Subject to Arbitration:

Warner and you agree to arbitrate all disputes and claims between us, except for claims arising from bodily injury or that pertain to enforcing, protecting, or the validity of your or our intellectual property rights (or the intellectual property rights of any of our licensors, affiliates and partners). This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory;
- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
- claims for mental or emotional distress or injury not arising out of physical bodily injury;
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this Agreement.

References to "Warner," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, licensees, licensors, and providers of content as of the time your or our claim arises; our respective predecessors in interest, successors, and assigns (including Warner Bros. Discovery, Inc. and its subsidiaries and affiliates); and all authorized or unauthorized users or beneficiaries of Service under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed or appealed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action**. This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

B. Pre-Arbitration Notice of Disputes:

A party who intends to seek arbitration must first send to the other a written Notice of Dispute ("Notice"). The Notice to Warner should be sent by certified mail to: General Counsel, Warner Bros. Entertainment Inc., 4000 Warner Blvd., Burbank, CA 91522("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand").

If we and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or us is entitled. You may download a form to initiate arbitration at:
adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf
(https://adr.org/sites/default/files/Consumer_Demand_for_Arbitration_Form_1.pdf)

C. Arbitration Procedure:

The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org, by calling the AAA at 1-800-778-7879, or by requesting them in writing at the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless we and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided in subsection (F) below, the arbitrator can award the same damages and individualized relief that a court can award under applicable law.

D. Arbitration Fees:

After we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000 in value. (The filing fee currently is $200 but is subject to change upon receiving a

written request at the Notice Address.) We will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies we previously paid that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $75,000 (either to you or to us), the payment of these fees will be governed by the AAA rules.

### E. Alternative Payment:

If you initiated arbitration in accordance with the notice requirements above in subsection (B) and the arbitrator issues an award in your favor that is greater than the value of our last written settlement offer made before an arbitrator was selected, then we will pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater.

If we did not make a written offer to settle the dispute before an arbitrator was selected, you will be entitled to receive the alternative payment if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits. In assessing whether an award that includes attorneys' fees or expenses is greater than the value of our last written settlement offer, the calculation shall include only the portion of the award representing attorneys' fees or expenses that you reasonably incurred pursuing the arbitration through the date of our settlement offer.

Although under some laws we may have a right to an award of attorneys' fees and expenses if we prevail in an arbitration, we agree that we will not seek such an award.

### F. Requirement of Individual Arbitration:

The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING**. Further, unless both you and we agree otherwise, the arbitrator may not consolidate more than one person's claims and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular

request for relief (such as a request for injunctive relief sought with respect to a particular claim), then that claim or request for relief shall be severed , and all other claims and requests for relief shall be arbitrated.

G. Future Changes to Arbitration Provision:

Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address) following your use of this Service, you may reject any such change by sending us written notice within 30 days of the change to the arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

# 17. General Terms

A. *Governing Law and Venue*

This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of California, as they are applied to agreements entered into and to be performed entirely within California and without regard to conflict of law principles, except to the extent that law is inconsistent with or preempted by federal law. To the extent that a dispute is not subject to arbitration under Section 16 (Dispute Resolution) of this Agreement, that action shall be brought in the appropriate state or federal court located in Los Angeles County, California; and we both irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts in Los Angeles County, California for the adjudication of all non-arbitral claims.

B. *Force Majeure*

Warner will not have any liability to you by reason of any delay or failure to perform any obligation hereunder if the delay or failure to perform is occasioned by force majeure, which refers to any act of God, storm, fire, casualty, unanticipated work stoppage, power outage, satellite failure, strike, lockout, labor dispute, civil disturbance, riot, war, national emergency, Governmental action, or other cause beyond its control.

C. *No Waiver*

No failure or delay by Warner in exercising its rights under this Agreement will constitute a waiver of those rights, nor will any partial assertion of any such rights preclude further assertion of the same.

D. *Severability*

Except as specified in Section 16 (Dispute Resolution), if any provision of this Agreement shall be unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this Agreement and shall not affect the validity and enforceability of any remaining provisions.

### E. *Construction*

The titles of the sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement. Unless the context of this Agreement clearly requires otherwise:(a) references to the plural include the singular, the singular the plural, and the part the whole; (b) "or" has the inclusive meaning frequently identified with the phrase "and/or;" (c) "including" has the inclusive meaning frequently identified with the phrase "including but not limited to" or "including without limitation;" and (e) references to "hereunder," "herein," or "hereof" relate to this Agreement as a whole. Any reference in this Agreement to any statute, rule, regulation, or agreement, including this Agreement, will be deemed to include such statute, rule, regulation, or agreement as it may be modified, varied, amended, or supplemented from time to time.

### F. *Survival*

Any provision herein which by its nature contemplates your continued observance following termination of this Agreement will survive termination of this Agreement.

### G. *Entire Agreement*

This Agreement, including any applicable Additional Terms, is the entire agreement between the parties relating to the matters contained herein.

## 18. Copyright Agent

If you believe that any User Content or other material on the Service infringes your copyright rights, please forward the following information in writing to our Copyright Agent at the address listed below, in conformance with the Digital Millennium Copyright Act of 1998 ("DMCA"):

A. Your name, address, telephone number, and (if available) email address;
B. A description of the copyrighted work that you claim has been infringed;
C. The exact URL or a description of each place where alleged infringing material is located;
D. A statement by you that you have a good faith belief that the disputed use has not been authorized by you, your agent, or the law;
E. Your electronic or physical signature or the electronic or physical signature of the person authorized to act on your behalf; and
F. A statement by you that the information in your notice is accurate and, under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

The above information must be submitted to Warner's Copyright Agent at the following address:

2-ER-232

Warner Bros. Entertainment Inc.
Attention: Copyright Agent
4000 Warner Boulevard
Burbank, CA 91522
Tel: (818) 977-0018
Fax: (818) 977-7929
Email: copyright@wb.com (mailto:copyright@wb.com)

If we are notified that any User Content infringes another's intellectual property rights, we may remove such User Content pursuant to the DMCA. In accordance with the DMCA, we have a repeat infringer policy and reserve the right to terminate your Account for submitting infringing User Content in violation of these Terms once or on a repeated basis.

## 19. Accessibility

We strive to make the content on this website usable by all visitors, including those with disabilities. If you are having difficulty using this website, with or without assistive technology, please contact us at accessibility@warnermedia.com (mailto:accessibility@warnermedia.com). To enable us to respond in a manner most helpful to you, please indicate the nature of your difficulty using the website, the specific web address (URL link) at issue, and your full contact information, including email address and phone number. Thank you for helping us make your online experience more enjoyable.

## 20. Contact Us

You may contact us at the addresses specified herein for specific requests, or contact Customer Service (https://www.warnerbros.com/customer-service) with general inquiries. Please do not send us any Unsolicited Submissions.

IF YOU DO NOT AGREE TO BE LEGALLY BOUND BY ALL OF THE FOREGOING TERMS, PLEASE DO NOT ACCESS OR USE THE SERVICE.

---

TM & © 2022 Warner Bros. Entertainment Inc. All rights reserved.

Privacy Policy (https://www.warnerbros.com/privacy)   Terms of Use (https://policies.warnerbros.com/terms/en-us)
Ad Choices (https://www.warnerbros.com/privacy#adchoices)   Accessibility

# EXHIBIT 5



# EXHIBIT 6



# EXHIBIT 7



**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112)
karl@KRInternetLaw.com
Katherine E. Hollist (Admitted *pro hac vice*)
kate@KRInternetLaw.com
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**JAY KUMAR LAW**
Jay Kumar (Admitted *pro hac vice*)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

**POLLOCK COHEN LLP**
Raphael Janove (Admitted *pro hac vice*)
rafi@pollockcohen.com
Adam Pollock (Admitted *pro hac vice*)
adam@pollockcohen.com
60 Broad St., 24th Fl.
New York, NY 10004
Telephone: (212) 337-5361

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON,** and **P.W.**, by and through his Guardian **JOIE WEIHER**; on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>**WARNER BROS. ENTERTAINMENT INC.,** a Delaware corporation,<br><br>        Defendant. | Case No. 2:22-cv-01272<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs P.W., by and through his Guardian Joie Weiher (the "Minor Plaintiff"), and Charissa Keebaugh ("Keebaugh"), Stephanie Neveu ("Neveu"), Heather Mercieri ("Mercieri"), and Sophia Nicholson ("Nicholson") (collectively with the Minor Plaintiff, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, for their Complaint against Warner Bros. Entertainment Inc. ("Defendant" or "Warner Bros.") allege, on knowledge as to their own actions, the investigation of Plaintiffs' counsel, and otherwise upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.      This is a class action lawsuit against Warner Bros. for falsely advertising price discounts for in-game purchases in its mobile application game (or "app"), Game of Thrones Conquest ("GOTC"). GOTC has spent 105 weeks as one of the top 25 highest grossing applications on Apple's App Store, and is the number three highest grossing strategy game across both Apple and Android devices, with over 20 million downloads and approximately 300,000 active users as of December 2020.

2.      GOTC has generated over $750 million in revenue since its 2017 inception by offering players "microtransactions"—the ability, while in the game, to make discrete in-app purchases of gold, building material, crafting material, armor, and other valuables necessary to level up one's account. These in-app purchases, most frequently in the form of "packs," range in price from $0.99 to $99.99 each.

3.      However, in its direct marketing to consumers (including representations made at the time of purchase), Warner Bros. advertises false former prices for these packs to induce players into believing they must act quickly to take advantage of a limited-time sale price.

4.      For years, Warner Bros. has deceived consumers by offering specific limited-time "bonuses" that purported to massively discount the price

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

of its in-game goods. It uses strikethrough pricing and statements like "Limited Time! 2000% Bonus Gold!" or "Black Friday Sale" to trick consumers into believing they were benefitting from limited-time promotions that substantially increased the value of their in-game purchases, especially in relation to purchases made by competing players. These purported savings were false, however, because the original pricing that these ads referenced are fabricated.

5.  These advertisements have run for years. But at no point, let alone within three months of the advertised discounts, have these in-game items ever been actually offered at a non-discounted price—*i.e.*, **without** their "limited time" bonuses. In other words, Warner Bros. never sells these items at their "original" price. It just offers false discounts from an original price that did not exist, and its players bought packs on "sale" that were the same prices they would ordinarily pay.

6.  Furthermore, the advertised "original" pricing does not reflect the prevailing market retail pricing for these virtual in-game items, which have no real-world value and whose pricing is entirely determined by Warner Bros.

7.  The Federal Trade Commission ("FTC") describes false former pricing schemes as deceptive:

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious – for example, where an artificial, inflated price was established for the purpose of

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects.

16 C.F.R. §233.1(a).

8.    California statutory and regulatory law also expressly forbid such pricing schemes. Specifically, Cal. Bus. & Prof. Code §17501 states:

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

9.    Defendant knows, or should reasonably have known, that its comparative price advertising is false, deceptive, misleading, and unlawful.

10.    Defendant has fraudulently concealed from and intentionally failed to disclose to Plaintiffs and the putative class members the truth about its advertised price discounts and former prices.

11.    Through this false and deceptive marketing, advertising, and pricing scheme, Warner Bros. has violated California law prohibiting the advertisement of goods for sale as discounted from false former prices, and prohibiting misleading statements about the existence and amount of price reductions.

12.    The claims and issues asserted herein are governed by California state law. The State of California has the greatest interest in policing corporate conduct occurring within the State.

13.    Upon information and belief, the false advertisements and misleading statements emanated from the State of California, where Warner

2-ER-243

1 Bros. is situated.

2      14.    Plaintiffs, individually and on behalf of all others similarly situated,

3 hereby seek restitution, injunctive relief, punitive damages, attorney's fees,

4 and all other relief which the Court may deem appropriate.

5                 **JURISDICTION**

6      15.    This Court has jurisdiction over this action under the Class Action

7 Fairness Act of 2005. Pursuant to 28 U.S.C. §§1332(d)(2), this Court has

8 original jurisdiction because the aggregate claims of the putative class

9 members exceed $5 million, exclusive of interest and costs, and at least one

10 of the members of the proposed classes is a citizen of a different state than

11 Defendant.

12      16.    This Court has personal jurisdiction over Warner Bros.

13 Entertainment Inc., because its principal place of business is in Burbank,

14 California, it conducts substantial business in this District, and a substantial

15 part of the acts and omissions complained of occurred in this District.

16                   **VENUE**

17      17.    Venue is proper in this District under 28 U.S.C. §1391(b)(2), in

18 that a substantial part of the events or omissions giving rise to the claim

19 occurred in this District.

20      18.    In addition, venue is proper in this District under 28 U.S.C.

21 §1391(b)(1) and §1391(b)(3), in that Defendant resides in this District and is

22 subject to this Court's personal jurisdiction.

23                 **PARTIES**

24      19.    Plaintiff Charissa Keebaugh is an individual who resides in

25 Vancouver, Washington. She began playing GOTC during May of 2020,

26 having downloaded the game from the Apple App Store. She purchased

27 several False Gold Strikethrough packs (defined below), which she otherwise

28 would not have purchased had she known about the deceptive advertising

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   which she reasonably relied upon in making those purchases.

2       20.   Plaintiff Stephanie Neveu is a resident of Waddell, Arizona. She
3   began playing GOTC during June 2019. Ms. Neveu purchased numerous
4   False Gold Strikethrough packs and False Sale Packs (defined below) from
5   June or July 2019 until October 2021, which she otherwise would not have
6   purchased had she known about the deceptive advertising which she
7   reasonably relied upon in making those purchases.

8       21.   Plaintiff Heather Mercieri is a resident of Dover, New Hampshire.
9   She began playing GOTC during July 2018. She purchased False Gold
10  Strikethrough Packs and False Sale Packs, which she otherwise would not
11  have purchased had she known about the deceptive advertising which she
12  reasonably relied upon in making those purchases.

13      22.   Plaintiff Sophia Nicholson is a resident of New York, New York.
14  She began playing GOTC around June 2020. She purchased False Gold
15  Strikethrough Packs and False Sale Packs, which she otherwise would not
16  have purchased had she known about the deceptive advertising which she
17  reasonably relied upon in making those purchases.

18      23.   Minor Plaintiff P.W., and his Guardian Joie Weiher, are residents
19  of Virginia. Minor Plaintiff P.W. purchased False Gold Strikethrough Packs
20  and False Sale Packs, which he otherwise would not have purchased had he
21  known about the deceptive advertising which he reasonably relied upon in
22  making those purchases.

23      24.   Upon information and belief, Defendant Warner Bros.
24  Entertainment Inc. is a corporation that is incorporated in Delaware and has
25  its principal place of business in Burbank, California.

26                      **FACTS**

27      25.   GOTC is a mobile application strategy game developed by
28  Defendant Warner Brothers Entertainment, Inc., available on iPhone and

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

Android devices through the Apple App Store and Google Play platforms, respectively. GOTC is based upon the HBO television series "Game of Thrones" and the "A Song of Ice and Fire" book series by George R.R. Martin.

26. GOTC has spent 105 weeks as one of the top 25 highest grossing applications on Apple's App Store, and was the number three highest grossing strategy game across both Apple and Android devices, with over 20 million downloads and approximately 300,000 active users, as of December 2020.

27. Though it is free to initially download, GOTC has generated over $750 million in revenue since its 2017 inception. It makes this revenue by offering players "microtransactions," or discrete in-app purchases to help players advance in the game. These purchases include gold, building material, crafting material, armor, and other valuables, and the add-ons are necessary to level up one's account. An "in-app purchase" refers to a financial transaction initiated from within the mobile application itself. These in-app purchases, or "packs," range in price from $0.99 to $99.99 each.

28. Once a player creates an account and starts playing, she is able to begin upgrading the level of her "Keep," or castle, and the buildings within it. She does this to strengthen her combat abilities and therefore maintain a competitive position in the coming battles for Seats of Power.

29. In order to progress past a certain level in the game, it is necessary to purchase in-app "packs" that contain gold, building materials, crafting materials, research materials, dragon food, upgrade speed-ups, bubble shields, teleports, and other items that are essential to progress in the game. These essential items require spending real money, as they are otherwise only available in insufficient amounts through in-game labor alone.

30. After a few days of playing and regularly making upgrades, the costs to purchase materials to make subsequent upgrades suddenly increase

2-ER-246

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   exponentially. For example, the cost of upgrading one's Keep to level 8 is only

2   approximately 5,000 wood and 5,000 food. But shortly after, the cost of

3   upgrading a Keep from level 29 to level 30 is astronomical in comparison,

4   requiring nearly 900 million wood, 900 million food, 75 million stone, 23 million

5   iron, 90,000 brick, 24,000 soldier pine, and 11,000 keystones. Acquiring the

6   rare resources necessary to make this upgrade alone would cost

7   approximately $600 in Advanced Building Packs, and a player must upgrade

8   several other buildings in their Keep at a similar cost in order to grow this

9   Keep level.

10      31.   These upgrades all cost gameplayers significant, real currency.

11  The packs necessary for these upgrades each have a version that is offered

12  at $99.99, $49.99, $19.99, $9.99, $4.99, and $0.99. The advertisements for a

13  particular pack at different pricing levels are identical in all respects except

14  cheaper levels display and contain less gold and resources. However,

15  progressing one's Keep to level 35, the maximum level, requires

16  approximately over $25,000 in pack purchases, assuming perfectly optimal

17  purchasing decisions and maximizing items obtained only through gameplay.

18      32.   Each and every time a player logs into the game, a pop-up

19  advertisement for a $99.99 pack fills the entire screen, prompting the player

20  to either accept the purchase or close the advertisement by clicking an "X" in

21  the corner to continue playing the game.

22      33.   Each and every displayed pack, whether located on the login pop-

23  up ad, or on the right corner, has an hourglass timer counting down the time

24  that the pack is still available, from the maximum of 59 minutes to a minimum

25  of one second.

26      34.   The hourglass timer creates a sense of urgency and scarcity to

27  induce a player to purchase a pack immediately.

28      35.   The pack advertisements consist of a graphical image which has,

in writing, a name of the pack. The graphical image also contains any relevant descriptions of sales or special offers in which a higher quantity of items is offered for the same price compared to normal versions of those packs.

36.    However, these advertisements are actually false, deceptive, and intended to mislead players into making in-app purchases that they otherwise would not have made. Defendant falsely promotes these packs as being on sale or discounted by misrepresenting that such packs include limited-time bonuses that purport to substantially increase the value of the packs. Since the game pits players against each other, there is significant pressure on players to take advantage of these limited-time offerings so that they can gain a competitive edge against opponents who presumably are left to pay full price.

37.    Additionally, the advertisements mislead players into believing they will find themselves at a competitive *disadvantage* if they do not purchase packs now, since they will be left paying full price for items their opponents were able to purchase at a discount.

38.    Warner Bros. uses false reference pricing schemes to increase sales because they know these reference prices influence purchasing decisions, as consumers want bargains. Fake discounting and false reference prices are widely recognized to be powerful tools in convincing customers to make purchases, and this issue has been studied repeatedly. As one recent research study from the Harvard Business School summarized:

> Taken together, evidence from our analysis of observational transaction data and our laboratory experiment suggests that fake prices provide sellers with a powerful tool to enhance demand, but one that may come at the expense of misleading consumers about products' true initial selling prices. Consumers take initial prices as signals of product quality and rate offers as being better deals the higher these initial

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

prices are with respect to present selling prices. Accordingly, fake prices have the highest influence on purchase likelihood for less-informed consumers.[1]

. . .

By definition, a fake price offers a fake discount—a discount that does not represent a decrease from some previous selling price but, rather, the difference between the current selling price and a fake introductory price. There is much existing literature on the impact of discounts on consumer behavior beyond

. . .

39.     Warner Bros.'s use of false discounting is particularly effective in influencing purchasing decisions because GOTC, like other freemium games, is already highly addictive. As an editorial in the Society for the Study of Addiction has observed:[2]

Predatory monetization schemes in video games are purchasing systems that disguise or withhold the long-term cost of the activity until players are already financially and psychologically committed. Such schemes contribute to the increasing similarity of gaming and gambling and the potential for financial harm for those with Internet gaming disorder.

. . .

Game monetization schemes have become increasingly sophisticated and have been featured more prominently within popular on-line games. In our view, some of these schemes could be considered predatory. Predatory monetization schemes typically involve in-game purchasing systems that disguise or withhold the true long-term cost of the activity until players are already financially and psychologically committed. Such schemes are designed to encourage

[1] Donald Ngwe, *Fake Discounts Drive Real Revenues in Retail,* Harvard Business School Working Paper (2018) (available at https://www.hbs.edu/ris/Publication%20Files/18-113_16977967-84c0-488d-96e5-ffba637617d9.pdf)

[2] https://onlinelibrary.wiley.com/doi/epdf/10.1111/add.14286 (Nov. 27, 2018).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

2-ER-249

repeated player spending using tactics or elements that may involve, either singularly or in combination, limited disclosure of the product; intrusive and unavoidable solicitations; and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play. Such strategies may exploit inequalities in information between purchaser and provider, such as when the industry uses knowledge of the player's game-related preferences, available funds and/or playing and spending habits, to present offers predetermined to maximize the likelihood of eliciting player spending.

40.     There are two primary categories of deceptive pack advertisements: (a) packs that offer the illusion of gold discounts through the strikethrough graphics, hereafter referred to as "False Gold Strikethrough Packs," and (b) packs that falsely advertise that a pack contains extra value by virtue of being on sale because of a holiday or as part of some other event, hereafter referred to as "False Sale Packs." Any deceptively advertised pack can belong to more than one of these categories simultaneously, or may be deceptive for a separate reason outside of the ones belonging to the two main categories.

## A.     False Gold Strikethrough Packs

41.     The False Gold Strikethrough Packs display a small amount of gold, with a strikethrough line, and then in bold typeface display a larger amount of gold, implying that the pack once formerly contained the smaller amount of gold. For example, a $99.99 pack may have "10,000" gold with a strikethrough line over that number, and display in bigger, bolder letters "120,000" gold. The intended message is that the pack formerly contained 10,000 gold but now is equipped with 120,000 gold, making it significantly more valuable.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

42.     However, these packs were in fact never offered for the smaller amount of gold at all.



43. There are dozens of False Gold Strikethrough Packs sold at the $99.99 price tier, including: Dragon Research Packs, Advanced Building Packs, Advanced Teleport Packs, Troop Training Boost Packs, Enhancement Packs, Crafting Materials Packs, and several more types of packs. None of these packs were ever offered with 10,000 gold at the $99.99 pricing tier despite having "10,000" struck through on the graphics of their respective ad copies.

44. All of the above packs were offered at the $49.99 price tier as well. Among those packs, the struck through value was 5,000 gold next to a larger gold amount in bold. However, these packs were also never previously offered with 5,000 gold.

45. Similarly, all of the above packs were also offered in the smaller pricing tiers of $19.99, $9.99, $4.99, and $0.99—all with identical ad copies

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   with the gold amounts correspondingly smaller in both the strikethrough
2   portion and the bolder typeface. However, in all cases the smaller
3   strikethrough price was never previously offered.

46.   Defendant Warner Bros. had actual knowledge that the False
Gold Strikethrough Packs contained false or misleading misrepresentations
as to their prior gold values. Warner Bros. specifically represented in
advertising the False Gold Strikethrough Packs that the packs contained
"400%" or "2000%" bonus gold for a "Limited Time", while having actual
knowledge that these quantitative representations were false. Warner Bros.
designed and promoted these advertisements from 2018 until present day,
where the practice of offering these deceptive packs continues.

47.   For context, gold is the most valuable resource in the game. The
average player can expect to earn approximately 1,000–3,000 gold per day
through in-game labor alone, such as participating in events. However,
players usually do not net a surplus of gold per day because they must also
spend it, either to progress in the game or to maintain their accounts. Players
also require more gold as they level up, and a lack of gold stagnates growth
and in fact precludes a player's ability to do almost any task in the game
whatsoever.

48.   Defendant Warner Bros. promotes these advertisements to
induce players to purchase the packs all the while knowing that the packs
contained quantitative misrepresentations with respect to the gold value
displayed.

49.   The amount of gold included in a pack, and whether a gold offer
represents an increase in the amount of gold a player could purchase with the
corresponding pack, is a material consideration when a player decides
whether to purchase that pack.

50.   Plaintiffs and the Classes reasonably relied on the "strikethrough"

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  pricing when purchasing numerous False Gold Strikethrough Packs. Had

2  Plaintiffs known the "strikethrough" pricing was false, Plaintiffs would not have

3  purchased many of the False Gold Strikethrough Packs that they purchased.

**B.  False Sale Packs**

5  51.  The False Sale Packs misrepresent the existence of a sale

6  whereby players can allegedly purchase more items and gold from a pack

7  than they normally could for the same price. These are described as having

8  a unique value relative to normal packs because of the words "Sale" or "Black

9  Friday Special" or "Father's Day Special" prominently displayed. These False

10  Sale Packs communicate to the reasonable GOTC player that the pack

11  contains extra gold and items relative to the normally bi-weekly version of the

12  packs.

13  52.  For example, the Black Friday Training Pack displays the words

14  "Black Friday Sale." However, this pack is identical in the quantity of both gold

15  and items as a Training Pack that was otherwise in circulation, across all

16  pricing tiers that the two packs were offered in. Therefore, there was no

17  difference whatsoever in the two pack offerings, and the players were not

18  receiving the packs on "sale" in any capacity.

19

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





53.  Other False Sale Packs include Father's Day Advanced Building packs, Father's Day Building Enhancement packs, "Flash Sale" Advanced Building packs, and dozens of other packs.

54.  Defendant Warner Bros. intentionally designed the packs to mislead players into believing that the packs represented a sale value, including an increase in items and gold, to induce those players to purchase the packs. Defendant Warner Bros. knowingly took those ordinary item packs

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  and simply placed a "Sale" graphic on the ad copies without altering anything
2  else.

3  　　55.　Defendant Warner Bros. has been promoting these False Sale
4  Packs from 2018 through the present day.

5  　　56.　Plaintiffs all reasonably relied on the "Sale" graphics on the False
6  Sale Packs as a material consideration in purchasing those packs. Had the
7  Plaintiffs known the packs were not actually on sale in the manner
8  represented, they would not have purchased the False Sale Packs.

9  **C.　Effect on Minors**

10  　　57.　This system of False Sale Packs and False Gold Strikethrough
11  Packs was intentionally created to capitalize on and encourage addictive
12  behaviors by fabricating an illusion of scarcity and urgency. Minors are
13  especially susceptible to these elements of the game's design. The
14  experience of obtaining "limited" and "discounted" in-game items holds a
15  strong appeal for minors and reinforces their desire to keep playing and
16  spending money.

17  　　58.　Warner Bros. specifically targets minors with its advertisements.
18  To this day, the game is advertised in the Apple App Store and on Google
19  Play as for players aged "12+:"

20

21

22

23

24

25

26

27

28

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

59.     After advertising to and then recruiting players who are minors, Warner Bros then induces these minors to make in-game purchases by promoting its False Sale Packs and False Gold Strikethrough Packs.

60.     Minors make their in-game purchases without understanding the amounts involved in terms of actual money spent to date, that week, or that month. Warner Bros does not allow players to see the total amount they have spent on the game. As the Society for the Study of Addiction notes, "[y]ounger players may be particularly less equipped to critically appraise the value proposition of these [in-game purchase] schemes."

61.     As seen in the above screenshots, nothing at the time of purchase indicates that the purchase will be non-refundable, and minors are generally unaware of the non-refundability of these purchases. Minor Plaintiffs and Class members are not buyers who would look for refund policy options at the

2-ER-258

1   time of purchase.

2       62.    Warner Bros. induces in-game purchases by allowing one-click
3   purchase options within GOTC.

4       63.    It further induces frequent in-game purchases by pushing newer
5   content every week, and comprehensive updates with limited-time events.
6   Any purchase already made quickly becomes stale. Minor players are
7   induced to make purchases to keep up with their peers on whatever the
8   current trend or fad may be.

9       64.    In short, Warner Bros. does not give minors enough information
10  to make reasonable and prudent choices with their in-game purchases.

11      65.    The game nevertheless fails to provide any right to obtain refunds
12  of any in-game purchases made by minors.

13      66.    Minors make these purchases using their parents' credit and debit
14  cards, as stored on the gaming platforms. In many instances, a minor's parent
15  or guardian may not review their credit cards, debit cards, and/or bank
16  account information until months after the purchases occurred and thus would
17  not know of the amounts spent at the time of purchase.

18      67.    P.W., a minor, used his parents' credit card to make
19  approximately $6,200 in in-app purchases on GOTC in a short three-week
20  period. His aim in making the purchases was to take advantage of what he
21  believed were special deals among the pack offerings to enhance his account
22  and thus be more useful to his clanmates.

23      68.    His parents heavily monitored his phone usage and only allowed
24  him access to one app, Game of Thrones Conquest, because they believed,
25  based on Warner Bros.'s representations, that it was safe for kids 12 and over.
26  Despite their vigilance, P.W. quickly bought dozens and dozens of packs.
27  After his parents found out, they restricted his phone usage and prevented
28  him from playing GOTC or using any other apps.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

69.     Despite these efforts, P.W. and his parents were unable to obtain a refund, despite the fact that he has a legal right to disaffirm a contract and obtain refunds on any in-app purchase.

70.     Warner Bros. misrepresents this right by claiming that all purchases are final and non-refundable, without making any allowances for minors, specifically to deter minor players and their parents from exercising these rights to obtain refunds.

71.     Upon information and belief, Warner Bros. is aware that in the state of California (as well as in other states, including North Carolina, Illinois, Washington, Kansas, Texas, and most other states nationwide) the law allows minors to disaffirm contracts without restrictions.

72.     Despite this, Warner Bros. operates a no-refund policy that misleads, misrepresents, and fails to acknowledge a minor's right to get a refund.

73.     Upon information and belief, the Warner Bros. customer support team routinely sends emails to minor players and/or their parents, stating that in-app purchases are non-refundable, in violation of applicable law.

74.     Prior to making his purchases, Minor Plaintiff and the Class Members were unaware that Warner Bros. had a no refund policy for in-game purchases.

75.     Minor Plaintiff made purchases after viewing the purported discounted offerings in the False Sale Packs and False Gold Strikethrough Packs.

76.     He made these purchases without understanding the amounts of actual money involved in purchases to date. These purchases were made without parental knowledge or consent.

77.     Subsequent to making these purchases, Minor Plaintiff and his parents sought refunds, but were unable to obtain them.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

**CLASS ALLEGATIONS**

78.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of themselves and the following proposed "Global Class":

> All persons, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

79.    Within the Global Class, Minor Plaintiff P.W. brings also brings this action on behalf of himself and on behalf of the following subclass (the "Minor Subclass"):

> All persons, within the applicable statute of limitations, who, while under the age of 18, purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

80.    Plaintiff Charissa Keebaugh also brings this action on behalf of herself and on behalf of the following subclass (the "Washington Class"):

> All persons in Washington, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

81.    Plaintiff Stephanie Neveu also brings this action on behalf of herself and on behalf of the following subclass (the "Arizona Class"):

> All persons in Arizona, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

82.    Plaintiff Heather Mercieri also brings this action on behalf of herself and on behalf of the following subclass (the "New Hampshire Class"):

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

All persons in New Hampshire, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

83.    Plaintiff Sophia Nicholson also brings this action on behalf of herself and the following subclass (the "New York Class"):

All persons in New York, within the applicable statute of limitations, who purchased False Gold Strikethrough Packs or False Sale Packs, and/or such subclasses as the Court may deem appropriate.

84.    Excluded from the proposed Classes are Defendant and its employees, officers, directors, legal representatives, heirs, successors, subsidiaries, and affiliates, and the judicial officers and their immediate family members and associated court staff assigned to this case, as well as all persons who make a timely election to be excluded from the proposed class.

85.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence they would use to prove those elements in individual actions alleging the same claims.

86.    This action meets all applicable standards of Fed. R. Civ. P. 23 for class certification, in that Plaintiffs can demonstrate the elements delineated below.

87.    <u>Numerosity</u>. The members of the proposed Classes are so numerous and geographically dispersed that individual joinder of all proposed class members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). While Plaintiffs believe that there are hundreds of thousands of members of the proposed Classes, the precise number of class members is unknown, but may be ascertained from Warner Bros.'s books and records. On information and belief, Warner Bros. maintains a list of users that includes personal

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    information for the user including their email addresses, whether they have
2    made in-app purchases, and which in-app purchases they have made.

3    88.    Applying a reasonable and prudent person standard to the users
4    of Game of Thrones Conquest under the same or similar circumstances, each
5    user would qualify to be a class member requesting the right to cancel and
6    get refunds on their in-app purchases. Any reasonable and prudent person
7    under the same or similar circumstances wants to have the flexibility to
8    disaffirm an in-app purchase that was made while believing that the packs
9    they purchased were part of a sale or promotion but, in reality, were not.

10   89.    Ascertainability. The Classes are ascertainable because their
11   members can be readily identified using business records, and other
12   information kept by Defendant in the usual course of business and within its
13   control or Plaintiffs and the class members themselves. Plaintiffs anticipate
14   providing appropriate notice to the Classes to be approved by the Court after
15   class certification, or pursuant to court order.

16   90.    Commonality and Predominance. This action involves common
17   questions of law and fact, which predominate over any questions affecting
18   individual class members. See Fed. R. Civ. P. 23(a)(2) and (b)(3). These
19   include, without limitation:

20        a.    Whether Warner Bros. engaged in the conduct alleged in
21              this Complaint;

22        b.    Whether Warner Bros. violated the applicable statutes
23              alleged herein;

24        c.    Whether Warner Bros. designed, advertised, marketed,
25              distributed, sold, or otherwise placed Game of Thrones
26              Conquest into the stream of commerce in the United States;

27        d.    Whether Warner Bros.'s conduct emanated from the State
28              of California;

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

e.   Whether Plaintiffs and the class members are injured and harmed directly by Warner Bros.'s false advertising designed to entice users into making in-app purchases they otherwise would not have made;

f.   Whether Plaintiffs and the class members are entitled to damages due to Warner Bros.'s conduct as alleged in this Complaint, and if so, in what amounts; and

g.   Whether Plaintiffs and members of the Classes are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint.

91.   <u>Typicality</u>. Plaintiffs' claims are typical of the putative class members' claims because, among other things, all such class members were comparably injured through Warner Bros.'s wrongful conduct as described above. *See* Fed. R. Civ. P. 23(a)(3). Warner Bros.'s creation and display of its misleading advertisements is uniform for all Plaintiffs and class members.

92.   <u>Adequacy</u>. Plaintiffs are adequate proposed class representatives because their interests do not conflict with the interests of the other members of the proposed Classes they seek to represent; because they have retained counsel competent and experienced in complex class action litigation; and because they intend to prosecute this action vigorously. The interests of the proposed Classes will be fairly and adequately protected by Plaintiffs and their counsel. *See* Fed. R. Civ. P. 23(a)(4).

93.   <u>Declaratory and Injunctive Relief</u>. Warner Bros. has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the proposed Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the proposed Classes as a whole. *See* Fed. R. Civ. P. 23(b)(2). Warner Bros.'s wrongful conduct alleged herein is grounded in the creation and dissemination

of Warner Bros.'s pack offerings in-game, which are displayed uniformly. Plaintiffs' and the class members' injuries are real, immediate, and ongoing. Plaintiffs and class members seek injunctive and declaratory relief from Warner Bros.

94.     Superiority. A class is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Warner Bros., so it would be impracticable for members of the proposed Classes to individually seek redress for Defendant's wrongful conduct.

95.     Applying the principles of equity or balance of equities, expecting an individual Plaintiff who is at a disadvantage with limited resources and spending capacity, and with minimal negotiating power, if any, to litigate claims against Warner Bros., a multibillion-dollar corporation that has immense resources and deep pockets, would be unfair. Class actions are a necessary and essential means to provide for public interest litigations with checks and balances to curtail deceptive practices by powerful private corporations, including Warner Bros.

96.     There is no special interest in class members individually controlling the prosecution of separate actions. And even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. *See* Fed. R. Civ. P. 23(b)(3).

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

# CALIFORNIA LAW APPLIES TO THE ENTIRE GLOBAL CLASS

97.  California's substantive laws apply to every class member, regardless of where the class member resides.

98.  Warner Bros. purports to bind GOTC's players to its Terms. While Plaintiffs contend these Terms fail to create a binding agreement with the players, the Terms require that any dispute be interpreted under California law. Thus, regardless of whether the Terms are binding, Warner Bros. has evidenced a clear intent to subject itself to California law.

99.  California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

100.  Warner Bros.'s United States headquarters and principal place of business is located in California. Warner Bros. also owns property and conducts substantial business in California. Therefore, California has an interest in regulating Warner Bros.'s conduct under its laws. Warner Bros.'s decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

101.  California is also the state from which Warner Bros.'s alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiffs and all other class members.

102.  The application of California laws to the Classes is also appropriate under California's choice of law rules because California has

2-ER-266

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  significant contacts to the claims of Plaintiffs and the proposed Classes, and

2  California has a greater interest in applying its laws here than any other

3  interested state.

**FIRST CLAIM FOR RELIEF**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Business & Professional Code §17200 *et seq.***

**(By Plaintiffs, individually and on behalf of the Global Class)**

8  103.  Plaintiffs incorporate by reference all allegations in this Complaint

9  and restate them as if fully set forth herein.

10  104.  The UCL defines unfair business competition to include any

11  "unlawful, unfair or fraudulent" act or practice, as well as any "unfair,

12  deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

13  105.  A business act or practice is "unlawful" under the UCL if it violates

14  any other law or regulation.

15  106.  A business act or practice is "unfair" under the UCL if the reasons,

16  justifications, and motives of the alleged wrongdoer are outweighed by the

17  gravity of the harm to the alleged victims.

18  107.  A business act or practice is "fraudulent" under the UCL if it is

19  likely to deceive members of the consuming public.

20  108.  Warner Bros. has violated the "unlawful" prong under the UCL and

21  has engaged in "unfair, deceptive, untrue or misleading" advertising.

22  109.  The Federal Trade Commission Act prohibits "unfair or deceptive

23  acts or practices in or affecting commerce" (15 U.S.C. §45(a)(1)) and

24  specifically prohibits false advertisements. 15 U.S.C. §52(a). FTC

25  Regulations describe false former pricing schemes—similar to Warner Bros.'s

26  False Sale Packs and False Gold Strikethrough Packs in all material

27  respects—as deceptive practices that would violate the FTC Act.

28  110.  16 C.F.R.§233.1 states:

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction— the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

111. California law also prohibits false former pricing schemes. Cal. Bus. & Prof. Code §17501, entitled "Value determinations; Former price advertisements," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such

2-ER-268

advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

112. As further detailed in the Second Claim for Relief below, California's False Advertising Law also prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," Cal. Civ. Code §1770(a)(9), and prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." *Id.* §(a)(13)

113. The False Gold Strikethrough Packs violate the unlawful prongs of the UCL since they violate 16 C.F.R. §233.1, Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §§1770(a)(9) and (a)(13).

114. The False Sale Packs misrepresent the existence of a sale whereby players can allegedly purchase more items and gold from a pack than they normally could for the same price.

115. Warner Bros.'s use of the False Sale Packs violates 15 U.S.C. §45(a)(1), 15 U.S.C. §52(a), and the FTC Guidelines published in Title 16, Code of Federal Regulations, Section 233.

116. It also violated and continues to violate Cal. Bus. & Prof. Code §17501, and Cal. Civ. Code §1770, sections (a)(9) and (a)(13), by advertising false discounts from purported former prices that were, in fact, not the prevailing market prices within three months preceding the publication and dissemination of advertisements containing the false former prices.

117. Warner Bros. has also violated the "unlawful" prong of the UCL by

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1  prohibiting minors, such as Minor Plaintiff and individuals in the Minor

2  Subclass, from disaffirming their contracts and obtaining refunds, in violation

3  of California law permitting minors to disaffirm contracts.

4      118.  Warner Bros. has also violated the "unfair" prong of the UCL by

5  falsely representing that its consumers received a discount from a referenced

6  "original" former price of its False Gold Strikethrough Packs where, in fact,

7  Warner Bros. set an arbitrary price for the goods contained in these packs

8  and then falsely pretended the packs had ever been offered for sale without

9  their "limited time bonus" contents.

10      119.  Additionally, Warner Bros. has violated the "unfair" prong of the

11  UCL by falsely representing that its False Sale Packs contained unique, time-

12  sensitive discounts when, in fact, they contained the same resources and in-

13  game items as other packs not connected with specific sales events (*e.g.*,

14  Black Friday).

15      120.  These acts and practices are unfair because they were likely to

16  cause consumers to falsely believe that Warner Bros. was offering value,

17  discounts, or bargains from the prevailing market value or worth of the

18  products sold that do not, in fact, exist. As a result, purchasers (including

19  Plaintiffs) reasonably understood that they were receiving valuable price

20  reductions on purchases of in-game items. This, in turn, has induced

21  reasonable purchasers to buy such products from Warner Bros. that they

22  would not have otherwise purchased.

23      121.  Warner Bros. has also violated the "unfair" prong of the UCL by

24  inducing minors, such as Minor Plaintiff and individuals in the Minor Subclass,

25  into purchases by concealing key information, such as the lifetime spend of a

26  player on the game and the non-refundability of purchases.

27      122.  Warner Bros. has also violated the "unfair" prong of the UCL by

28  targeting minor players, advertising the game to users ages 12 and older, and

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

1    then failing to implement parental controls or age verifications (including when

2    making purchases in its game).

3        123.  Warner Bros. has also violated the "unfair" prong of the UCL by

4    concealing from minors and their parents their right, under California law, to

5    disaffirm purchases made.

6        124.  The gravity of the harm to Plaintiffs and members of the Classes

7    resulting from these unfair acts and practices outweighs any conceivable

8    reasons, justifications, or motives that Warner Bros. may have had for

9    engaging in such deceptive acts and practices.

10       125.  Additionally, Warner Bros. has violated the "fraudulent" prong of

11   the UCL because its marketing and advertising materials included false

12   "original" prices for its False Gold Strikethrough Packs, and because these

13   same materials also suggested that the offers in the False Sale Packs were

14   unique, limited, and would no longer be available at those price points

15   following the conclusion of its sale events. In actuality, the packs never

16   contained the "limited time" deals they purported to offer.

17       126.  Warner Bros.'s acts and practices deceived Plaintiffs and the

18   Classes at large. Specifically, Plaintiffs and the Classes relied on these

19   misleading and deceptive representations regarding the limited-time bonuses

20   they could expect to receive in the packs. Each of these representations and

21   deceptions played a substantial role in Plaintiffs' decisions to purchase the

22   packs, and Plaintiffs would not have done so in the absence of such

23   representations.

24       127.  Plaintiffs and the Classes never received the benefit of their

25   bargains with Warner Bros., in that the "discounted" resources offered for sale

26   in the packs did not give them the anticipated competitive edge against their

27   opponents. Competitors could simply purchase packs at the same false sale

28   pricing after the alleged sales expired, notwithstanding the representation that

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    these were limited-time offers.

2    128. Similarly, players who purchased the False Sale Packs and the
3    False Gold Strikethrough Packs defensively (to protect against becoming
4    overpowered by opponents who they believed had been able to take
5    advantage of the purportedly limited-time bonuses) were deprived of the
6    benefit of their bargains, because the threat itself was a fabrication. There
7    was never a risk of falling behind due to a player's failure to purchase items
8    at their discounted price, because the price was always discounted.

9    129. As a result of these violations under each of the fraudulent, unfair,
10   and unlawful prongs of the UCL, Defendant has been unjustly enriched at the
11   expense of Plaintiffs and members of the proposed Classes. Specifically,
12   Warner Bros. has been unjustly enriched by obtaining revenues and profits
13   that it would not otherwise have obtained absent its false, misleading, and
14   deceptive conduct

15   130. Through its unfair acts and practices, Warner Bros. has
16   improperly obtained money from Plaintiffs and the class members. As such,
17   Plaintiffs request that this Court cause Warner Bros. to restore this money to
18   Plaintiffs and all class members, and to enjoin Warner Bros. from continuing
19   to violate the UCL, and/or from violating the UCL in the future. Otherwise,
20   Plaintiffs, the class members, and members of the general public may be
21   irreparably harmed and/or denied an effective and complete remedy if such
22   an order is not granted.

23   **SECOND CLAIM FOR RELIEF**

24   **Violation of California's False Advertising Law ("FAL")**

25   **Cal. Business & Professional Code §17500 *et seq.***

26   **(By Plaintiffs, individually and on behalf of the Global Class)**

27   131. Plaintiffs incorporate by reference all allegations in this Complaint
28   and restate them as if fully set forth herein.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

132. The FAL prohibits unfair, deceptive, untrue, or misleading advertising, including, but not limited to, false statements as to worth, value, and former price.

133. Furthermore, the FAL provides that: "No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." Cal. Bus. & Prof. Code §17501.

134. The False Gold Strikethrough Packs and the False Sale Packs misrepresent the existence of a sale whereby players can allegedly purchase more items and gold from a pack than they normally could for the same price.

135. Through its unfair acts and practices, Warner Bros. has improperly obtained money from Plaintiffs and the class members. As such, Plaintiffs request that this Court cause Warner Bros. to restore this money to Plaintiffs and all class members, and to enjoin Warner Bros. from continuing to violate the FAL, and/or from violating the FAL in the future. Otherwise, Plaintiffs, the class members, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

### THIRD CLAIM FOR RELIEF

**Violation of the California Consumers Legal Remedies Act ("CLRA")**

**Cal. Civ. Code. §1750 *et seq.***

**(By Plaintiffs, individually and on behalf of All Classes)**

136. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

137. Plaintiffs and the other class members are consumers within the meaning of Cal. Civ. Code §1761(d) and have engaged in a transaction within

2-ER-273

1  the meaning of Cal. Civ. Code §§1761(e) and 1770.

2  138. Defendant is a "person" within the meaning of Cal. Civ. Code
3  §§1761(c) and 1770 and sells "goods or services" within the meaning of Cal.
4  Civ. Code §§1761(b) and 1770.

5  139. GOTC and the in-app purchases are a "good" or "service" within
6  the meaning of Cal. Civ. Code. §§1761(a) and (b).

7  140. Warner Bros. has violated §1770(a)(13)'s proscription against
8  making false or misleading statements of fact concerning reasons for,
9  existence of, or amounts of, price reductions by misrepresenting the existence
10  of gold discounts via False Gold Strikethrough Packs and misrepresenting the
11  existence of holiday sales through its False Sale Packs.

12  141. On April 19, 2022, Plaintiffs, through counsel, sent a CLRA
13  demand to Warner Bros. that provided notice of Warner Bros.'s violation of
14  the CLRA and demanded that it correct, repair, replace, or otherwise rectify
15  the unlawful, unfair, false, and deceptive practices complained of herein. The
16  letter also stated that if Defendant refused to do so, Plaintiffs would seek
17  damages in this action pursuant to the CLRA.

18  142. Warner Bros. failed to rectify the problems associated with the
19  actions detailed above. Thus, pursuant to § 1782, Plaintiffs now seek actual,
20  punitive, and statutory damages, as appropriate, against Warner Bros.
21  pursuant to the CLRA.

22  143. Plaintiffs and the other class members suffered actual damages
23  as a direct and proximate result of Warner Bros.'s actions, concealment,
24  and/or omissions in the advertising, marketing, and promotion of its bait apps,
25  in violation of the CLRA, as evidenced by the substantial sums Warner Bros.
26  pocketed.

27  144. Plaintiffs, on behalf of themselves and the class members,
28  demand judgment against Warner Bros. for injunctive relief and attorney's

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1   fees.

2        145. Additionally, Plaintiffs, on behalf of themselves and the class

3   members, seek compensatory damages for losses sustained as a result of

4   Warner Bros.'s actions.

5        146. Additionally, Plaintiffs, on behalf of themselves and the class

6   members, seek enhanced and punitive damages as authorized under the

7   CLRA.

8   **FOURTH CLAIM FOR RELIEF**

9   **Fraud**

10   **(By Plaintiffs, individually and on behalf of All Classes)**

11       147. Plaintiffs incorporate by reference all allegations in this Complaint

12   and restate them as if fully set forth herein.

13       148. Defendant represented to all Plaintiffs that various purchased

14   packs were on sale in that they gave a higher amount of gold than normal,

15   that holiday or "sale" versions of the packs were not identical in item quantities

16   to their normal counterparts, and that pack purchases bestowed a certain

17   outcome upon purchase.

18       149. These representations were false because the packs were never

19   offered with smaller amounts of gold; the "sale" versions of the packs were

20   identical to their normal counterparts.

21       150. Defendant designed the graphical images on the advertisements

22   in a way that intentionally attracted Plaintiffs to the enticing but false claims

23   regarding gold amounts and the existence of sales

24       151. Plaintiffs reasonably relied upon the claims made in the

25   advertisements in deciding to purchase the aforementioned packs.

26       152. Upon purchasing the packs, Plaintiffs were harmed because, had

27   Plaintiffs known the claims were false, they would not have made those

28   purchases.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

153.   Plaintiffs' reliance on Defendant's misrepresentations in its pack advertisements was a substantial factor in causing harm to Plaintiffs.

154.   Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and the class members and will continue to both damage Plaintiffs and the class members and deceive the public unless enjoined by this Court.

## FIFTH CLAIM FOR RELIEF

## Negligent Misrepresentation

## (By Plaintiffs, individually and on behalf of All Classes)

155.   Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

156.   Defendant represented to all Plaintiffs that various purchased packs were on sale in that they gave a higher amount of gold than normal and that holiday or "sale" versions of the packs were not identical in item quantities to their normal counterparts.

157.   These representations were false because the packs were never offered with smaller amounts of gold and the "sale" versions of the packs were identical to their normal counterparts.

158.   Defendant designed the graphical images on the advertisements in a way that intentionally attracted Plaintiffs to the enticing but false claims regarding gold amounts and the existence of sales.

159.   Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and the class members, and will continue to both damage Plaintiffs and the class members and deceive the public unless enjoined by this Court.

## SIXTH CLAIM FOR RELIEF

## Declaratory Judgment on Minors' Rights to Disaffirm

## (By Minor Plaintiff, individually and on behalf of the Minor Subclass)

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

160.  Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

161.  On information and belief, GOTC is marketed to players 12 years and older. Warner Bros. enters into a contract with a minor when an in-game purchase by the minor is confirmed, and then accepted. Warner Bros. gives the consideration of digital content and entertainment service of in-game purchases, exchanged for the consideration of their purchase value in the form of actual money obtained from the minor.

162.  Under Cal. Fam. Code §6710, a minor or their guardian may disaffirm a contract before that minor reaches majority or within a reasonable period thereafter.

163.  Minor Plaintiff and his guardians have, by no later than the date of this First Amended Complaint, disaffirmed all in-game purchases made through GOTC to date and requested a refund.

164.  Minor Plaintiff seeks injunctive relief on behalf of himself and the Minor Subclass for future and prospective transactions in GOTC, and to require Warner Bros. to allow for refunds on all in-game purchases made by minors, without restriction.

165.  The contracts between Warner Bros. and the Minor Subclass are voidable, a fact which Warner Bros. denies.

166.  Thus, there is an actual controversy between the parties, requiring resolution by a declaratory judgment.

167.  Accordingly, Minor Plaintiff seeks a determination by the Court that: (a) this action may proceed and be maintained by a class action; (b) the sales contracts between Warner Bros. and members of the Minor Subclass are voidable at the option of those minors and/or their guardians; (c) if the members of the Minor Subclass elect to void these contracts, they will be entitled to restitution and interest thereon; and (d) an award of attorney's fees

2-ER-277

and costs of suit to Minor Plaintiff and the Minor Subclass is appropriate; and (e) such other and further relief as is necessary and just may be appropriate as well.

### SEVENTH CLAIM FOR RELIEF

### Violation of New Hampshire's Regulation of Business Practices for Consumer Protection Act

### (By Plaintiff Heather Mercieri, individually, and on behalf of the New Hampshire Class)

168. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

169. In the alternative, or to the extent California law does not apply, Plaintiff Heather Mercieri brings this Count on behalf of herself and the New Hampshire Class.

170. New Hampshire's Regulation of Business Practices for Consumer Protection, §358-A:1, is also known as the state's Consumer Protection Act.

171. Warner Bros. qualifies as a "Person" under §358-A:1 of the Act.

172. §358-A:2(VII) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

173. §358-A:2(IX) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

174. §358-A:2(XI) prohibits "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."

175. Warner Bros. violated (VII), (IX), and (XI) of §358-A:2 by advertising False Gold Strikethrough Packs and False Sale Packs, which Plaintiffs purchased.

176. Plaintiff Heather Mercieri and the New Hampshire Class were injured by Warner Bros.'s violations because, if not for Warner Bros.'s

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

deceptive representations that the packs contained increased amounts of gold than normally offered, and that the packs contained more items than usual because of holiday sales, Plaintiffs would not have made the purchases.

177. Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and the class members, and will continue to both damage Plaintiffs and the class members and deceive the public unless enjoined by this Court.

### EIGHTH CLAIM FOR RELIEF

**Violation of Washington's Consumer Protection Act (RCW 19.86.020)**

**(By Plaintiff Charissa Keebaugh, individually, and on behalf of the Washington Class)**

178. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

179. Plaintiff Charissa Keebaugh hereby brings this Claim, under Washington's Consumer Protection Act, Revised Code of Washington ("RCW") 19.86.020, against Warner Bros. on behalf of herself and the Washington Class.

180. Defendant Warner Bros. engages in acts and practices that had or have the capacity to deceive substantial portions of the public, during trade or commerce.

181. Warner Bros.'s marketing of its False Gold Strikethrough Packs and False Sale Packs had the capacity to deceive substantial portions of the public because Warner Bros.'s advertisements create the illusion of sales and/or discounts with respect to their False Gold Strikethrough Packs and False Sale Packs.

182. Defendant's deceptive advertising acts and practices significantly affected the public interest as thousands of consumers made purchases based on the representations in the advertisements.

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

183. Defendant's practices brought injury to Plaintiffs in that they made purchases they otherwise would not have made.

184. There is causation between the deceptive advertising and the injury suffered by Plaintiffs because, if not for Defendant's deceptive claims made in the advertisements of False Gold Strikethrough Packs and False Sale Packs, Plaintiffs would not have purchased those packs.

185. Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiffs and the class members, and will continue to both damage Plaintiffs and the class members and deceive the public unless enjoined by this Court.

### NINTH CLAIM FOR RELIEF

### Violation of N.Y. Gen. Bus. Law §§ 349 & 350
### (By Sophia Nicholson, individually, and on behalf of the New York Class)

186. Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

187. Plaintiff Sophia Nicholson hereby brings this Claim, under New York General Business Law §§ 349 & 350, against Warner Bros. on behalf of herself and the New York Class

188. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair by virtue of offering False Gold Strikethrough Packs and False Sale Packs as in-app purchases for sale through the GOTC app.

189. Defendant caused to be disseminated through New York state and elsewhere, through advertising, marketing, and other publications, statements that were untrue and misleading, and which it knew were untrue and misleading.

190. Defendant's misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at

KRONENBERGER ROSENFELD

150 Post Street, Suite 520 San Francisco, CA 94108

large. Consumers were and continue to be exposed to Defendant's material misrepresentations.

191.   Plaintiffs and the class members have been injured by Defendant's deceptive acts or practices.

192.   Plaintiffs and the class members have no adequate remedy at law.

193.   Defendant's conduct has caused and is causing immediate and irreparable injury to Plaintiffs and the Classes and will continue to both damage Plaintiffs and the Classes and deceive the public unless enjoined by this Court.

194.   Any person who has been injured by reason of any violation of NY GBL §349 may bring an action in his or her own name to enjoin such unlawful acts or practices, an action to recover their actual damages or $50, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not exceeding three times the actual damages, in addition to $1,000 per violation, if the court finds that a defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

195.   Pursuant to NY GBL §350(e) Plaintiff and the New York Class seek monetary damages (including actual damages, or $500, whichever is greater, and minimum, punitive, or treble and/or statutory damages pursuant to NY GBL §350(a1)), injunctive relief, restitution, and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorney's fees and costs.

### III.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Classes, pray for relief and judgment against Defendant as follows:

2-ER-281

A. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Classes, and designating Plaintiffs' counsel as class counsel;

B. Awarding Plaintiffs and the class members compensatory damages and actual damages in an amount exceeding $5,000,000, to be determined by proof;

C. Awarding Plaintiffs and the class members appropriate relief, including actual and statutory damages;

D. For punitive damages;

E. For civil penalties;

F. For declaratory and equitable relief, including a declaration that Defendant violated and continues to violate California's UCL, the FAL, and the CLRA and an injunction requiring Defendant to comport with California Business & Professions Code §§ 17200, *et seq*., and restitution and disgorgement;

G. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H. Awarding Plaintiffs and the class members the costs of prosecuting this action, including expert witness fees;

I. Awarding Plaintiffs and the class members reasonable attorney's fees and costs as allowable by law;

J. Awarding Plaintiffs and the class members reasonable attorney's fees pursuant to Cal. Civ. Proc. Code 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorney's fees;

K. Awarding Plaintiffs and the class members reasonable attorney's fees and costs, as well as injunctive relief, pursuant to the CLRA;

KRONENBERGER ROSENFELD
150 Post Street, Suite 520 San Francisco, CA 94108

1    L.    Awarding Plaintiffs and the class members punitive and enhanced

2         damages, pursuant to the CLRA;

3    M.    Awarding pre-judgment and post-judgment interest; and

4    N.    Granting any other relief as this Court may deem just and proper.

5                    **IV.    JURY TRIAL DEMANDED**

6    Plaintiffs hereby demand a trial by jury on all issues so triable.

7

8    Respectfully Submitted,

9    DATED: May 23, 2022          **KRONENBERGER ROSENFELD, LLP**

10

11         By:  _Karl S. Kronenberger_

12              Karl S. Kronenberger
                karl@KRInternetLaw.com
13              Katherine E. Hollist *(Pro hac vice*
                *forthcoming)*
14              kate@KRInternetLaw.com
                150 Post Street, Suite 520
15              San Francisco, CA 94108
                Telephone: (415) 955-1155
16

17

18              **POLLOCK COHEN LLP**
                Raphael Janove
19              rafi@pollockcohen.com
                Adam Pollock
20              adam@pollockcohen.com
                60 Broad St., 24th Fl.
21              New York, NY 10004
                Telephone: (212) 337-5361
22

23              Admitted *pro hac vice*

24

25

26

27

28

**JAY KUMAR LAW**
Jay Kumar
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903
Admitted *pro hac vice*
*Attorneys for Plaintiffs and the*
*Proposed Classes*