No. 22-55982

**United States Court of Appeals
for the Ninth Circuit**

_____

CHARISSA KEEBAUGH, et al.,

individually and on behalf of those similarly situated,

*Plaintiffs-Appellees,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the Central District of California
Case No. 2:22-cv-01272, Hon. Maame Ewusi-Mensah Frimpong

**ANSWERING BRIEF OF PLAINTIFFS-APPELLEES**

RAPHAEL JANOVE
**POLLOCK COHEN LLP**
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103
(215) 667-8607
*rafi@pollockcohen.com*

LIANA ROZA VITALE
ALISON BOROCHOFF-PORTE
ADAM POLLOCK
**POLLOCK COHEN LLP**
111 Broadway, Ste 1804
New York, NY 10006
(212) 337-5361

KARL S. KRONENBERGER
**KRONENBERGER
ROSENFELD, LLP**
150 Post St., Ste. 250
San Francisco, CA 94108
(415) 955-1155

JAY KUMAR
**JAY KUMAR LAW**
73 W. Monroe St., Ste. 100
Chicago, IL 60603
(312) 767-7903

*Counsel for Plaintiffs-Appellees Charissa Keebaugh, et al.*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF THE ISSUES .............................................................5

STATEMENT OF THE CASE .................................................................5

    A.    Warner Bros.' false and deceptive advertising. ..........................5

    B.    The context in which users encounter Warner Bros.' purported terms of use...............................................................8

    C.    The visual elements of the launch screen and inconspicuous presentation of the terms. ......................................10

    D.    The onerous arbitration clause.................................................12

        1.    Warner Bros.' one-sided arbitration clause as it existed before this appeal. ..........................................12

        2.    While this appeal was pending, Warner Bros. made the arbitration clause more inequitable. ...............................13

    E.    Procedural history and the district court's denial of the motion to compel arbitration................................................15

SUMMARY OF THE ARGUMENT .....................................................18

STANDARD OF REVIEW ...................................................................21

ARGUMENT .......................................................................................22

    I.    THE DISTRICT COURT CORRECTLY APPLIED CALIFORNIA AND NINTH CIRCUIT PRECEDENT TO CONCLUDE THERE WAS NO ENFORCEABLE ARBITRATION AGREEMENT .........22

    A.    Legal standards of inquiry notice and mutual assent as applied to online agreements................................................22

    B.    Warner Bros.' terms were not reasonably conspicuous. ..........24

        1.    The context of the transaction. ......................................24

a) Free software makes consumers less likely to be on notice for a link to terms of use. ...........................24

b) The district court correctly found that the context of the transaction made it less likely that a user would look for terms and conditions. ..................29

2. The notice itself: the visual and design elements of the GOTC launch screen are not sufficiently conspicuous. .31

a) The GOTC launch screen directs users' attention *away* from assent to the terms.............................31

b) Warner Bros. provides even less notice than what was found insufficient in cases involving a similar transactional context—*Sellers* and *Berman*. ........34

c) Even if the transactional context were similar to *Blizzard* or *Oberstein*, Warner Bros. still provides insufficient notice..................................................39

d) Warner Bros.' incorrect word choice further undercuts notice. .................................................41

C. Plaintiffs did not unambiguously manifest their consent to be bound by the terms of use..........................................44

D. The district court did not create a "bright-line" rule requiring a formal sign-up process. ...........................................45

II. THIS COURT SHOULD REFUSE TO COMPEL ARBITRATION ON OTHER GROUNDS ....................................................46

A. Plaintiffs can seek public injunctive relief in court. .................47

B. Warner Bros.' terms are unconscionable.................................49

C. Minor Plaintiff P.W.'s claims cannot be arbitrated. .................51

CONCLUSION ........................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Michaels Stores, Inc.*,
  59 F.4th 1011 (9th Cir. 2023) ........................................................................21

*B.D. v. Blizzard Ent., Inc.*,
  76 Cal. App. 5th 931 (2022) ...................................................................*passim*

*Barrios-Aguilar v. Holder*,
  386 F. App'x 587 (9th Cir. 2010) ..................................................................12

*Berman v. Freedom Fin. Network, LLC*,
  30 F.4th 849 (9th Cir. 2022) ...................................................................*passim*

*Blair v. Rent-A-Ctr., Inc.*,
  928 F.3d 819 (9th Cir. 2019) ....................................................................47, 48

*Bohannon v. Facebook, Inc.*,
  82 F. Supp. 3d 1115 (N.D. Cal. 2015) .........................................................53

*Boy Blue, Inc. v. Brown*,
  74 Va. Cir. 4 (2007) .......................................................................................53

*Celli v. Sports Car Club, Inc.*,
  29 Cal. App. 3d 511 (1972) ...........................................................................53

*Cerneka v. Russell No. 8 Santa Monica Properties, LLC*,
  2018 WL 3154565 (Cal. Ct. App. June 28, 2018) ........................................43

*Chavarria v. Ralphs Grocery Co.*,
  733 F.3d 916 (9th Cir. 2013) .........................................................................50

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013) .........................................................................4

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ......................................................27, 42, 43

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) .....................................................................48, 49

*Interstate Nat. Gas Co. v. S. Cal. Gas Co.*,
  209 F.2d 380 (9th Cir. 1953) .........................................................................12

*Johnson v. Walmart Inc.*,
  57 F.4th 677 (9th Cir. 2023) .........................................................................21

*Kilgore v. KeyBank, Nat'l Ass'n*,
    718 F.3d 1052 (9th Cir. 2013)........................................................49

*Long v. Provide Commerce, Inc.*,
    245 Cal. App. 4th 855 (2016) .....................................................43

*McGill v. Citibank, N.A.*,
    2 Cal. 5th 45 (2017) ...................................................................47

*McKee v. Audible, Inc.*,
    2017 WL 4685039 (C.D. Cal. July 17, 2017) ............................42

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017).....................................................27, 28

*Morgan v. Sundance, Inc.*,
    142 S. Ct. 1708 (2022) ...............................................................21

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014)...................................................3, 33

*Oberstein v. Live Nation Ent., Inc.*,
    2021 WL 4772885 (C.D. Cal. Sept. 20, 2021)............................41

*Oberstein v. Live Nation Ent., Inc.*,
    60 F.4th 505 (9th Cir. 2023) ................................................*passim*

*Planned Parenthood v. U.S. Dep't of Health & Hum. Servs.*,
    946 F.3d 1100 (9th Cir. 2020)..................................................4, 47

*Selden v. Airbnb, Inc.*,
    4 F.4th 148 (D.C. Cir. 2021) ......................................................27

*Sellers v. JustAnswer LLC*,
    73 Cal. App. 5th 444 (2021) ................................................*passim*

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    498 F.3d 976 (9th Cir. 2007)......................................................49

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002)..........................................................28

*Starke v. SquareTrade, Inc.*,
    913 F.3d 279 (2d Cir. 2019)...................................................27, 28

*T. K. v. Adobe Sys. Inc.*,
    2018 WL 1812200 (N.D. Cal. Apr. 17, 2018) ............................53

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003)....................................................49

iv

*U.S. v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003)...........................................................12

*Vaughn v. Tesla, Inc.*,
  87 Cal. App. 5th 208 (2023) .........................................................49

*Viamontes v. Adriana's Ins. Servs., Inc.*,
  2016 WL 826148 (Cal. Ct. App. Mar. 3, 2016)............................43

*West v. Uber Techs.*,
  2018 WL 5848903 (C.D. Cal. Sept. 5, 2018)................................27

*Wherry v. Award, Inc.*,
  192 Cal. App. 4th 1242 (2011) .....................................................50

*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019)......................................................53

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.*,
  485 F. Supp. 3d 1168 (N.D. Cal. 2020) ........................................50

## Other Authorities

*Bringing Dark Patterns to Light*,
  Fed. Trade Comm'n Staff Report (Sept. 2022).......................11, 12

*Fees For Disputes When One of the Parties is A Consumer*,
  Nat'l Arbitration and Mediation (Dec. 22, 2022) .........................14

Maxwell Strachan,
  *'Game of Thrones: Conquest' and 'State of Survival' Players Say They Felt
  Addicted and Pressured To Spend*, Vice (Oct. 20, 2022) ...............7

## Statutes & Rules

16 C.F.R. § 233.1 .................................................................................7

Cal. Fam. Code § 6710...........................................................................52

## INTRODUCTION

Defendant-Appellant Warner Bros.' Entertainment Inc. has made over $750 million from selling virtual items to its players in its supposedly "free" mobile application, Game of Thrones: Conquest ("GOTC"). The game is highly addictive and contains rampant false advertising. Warner Bros. seeks to shield itself from responsibility by forcing GOTC players into arbitration. However, as the district court correctly found, the GOTC launch screens did not provide players, including Plaintiffs-Appellees, with reasonably conspicuous notice that by simply clicking a large, eye-catching "Play" button on their mobile device, they were agreeing to Warner Bros.' terms.

The GOTC launch screens vary, but follow nearly identical patterns of graphic design. One, for example, is dominated by a large graphic of fiercely battling dragons. Beneath the battle, a large, bright blue "Play" button with three-dimensional shading stands out in high contrast against the black background. The "Play" button is centrally positioned, where it is easy and natural for a mobile user's thumb to press. If the user clicks "Play," they are taken directly to the game.

If a user does not immediately click "Play," but instead searches the screen below this bright, three-dimensional button—in the area where a typical mobile user's hand would cover the display—a sentence in much smaller white font states that "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy

1

Policy." The phrases "Terms of Use" and "Privacy Policy" in this sentence are not hyperlinked.

Even further below are two black rectangles labeled "Privacy Policy" and "Terms of Service." Unlike the large, bright blue "Play" button, these black "ghost buttons" are barely distinguishable from the black background. They are set apart by only a thin rectangle of white outlining, which makes it difficult to tell that they operate as hyperlinks. One does link to the Privacy Policy; the other is mislabeled— it takes users to a document labeled "Terms of *Use*," instead of "Terms of *Service*."

It requires no expertise in gaming design to see that Warner Bros. knows exactly how to make something reasonably conspicuous to users. The dragon graphic and outsized blue "Play" button are clearly designed to draw a user's attention and entice them to click "Play." It requires equally little expertise to see that Warner Bros. has presented the Terms of Use in a manner designed to escape notice. The placement below the "Play" button instead of above it, the tiny font, the use of black-on-black ghost buttons, and the confusing incongruence between the references to Terms of *Use* and Terms of *Service* all substantially increase the likelihood that users will not notice these terms.

The GOTC launch screen design reflects Warner Bros.' deliberate decision to direct users' attention away from the terms it now argues should bind them. Warner Bros. has therefore failed to give adequate notice of its terms. *See, e.g.*, *Berman v.*

*Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("Far from meeting the requirement that a webpage must take steps 'to capture the user's attention and secure her assent,' the design and content of these webpages draw the user's attention away from the most important part of the page.") (quoting *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1178 n.1 (9th Cir. 2014)).

That conclusion is all the more obvious when the design elements are considered in "'the context of the transaction,'" as California law requires. *See Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021)). Here, Plaintiffs—including a child who spent over ***$6,200*** on in-game purchases in just a few weeks—downloaded a free app on their mobile devices and clicked a button to "Play" on a screen where Warner Bros. is not even mentioned. In this context, involving software that is free to access, users are less likely to be "on notice for a link to the terms." *Oberstein*, 60 F.4th at 517.

Warner Bros.' opening brief misunderstands the district court. The court did not create "a novel bright-line rule that users cannot be on notice of a mobile app's terms '[i]n the absence of a formal sign-up process' within the app." Appellant's Opening Br. ("WB Br.") at 2, ECF No. 10 (quoting 1-ER-13). All the district court held—consistent with this Court's and California precedents on contract formation—was that the GOTC launch screen did not conspicuously disclose the

existence of the terms, considering that the game was marketed as free and accessed with merely a click of the "Play" button.

Ultimately, because Warner Bros. has "complete control over the design" of its game, the "onus" is on it "to put users on notice of the terms." *Berman*, 30 F.4th at 857. Warner Bros., however, "did not take that obligation to heart." *Id.* There are countless ways in which the terms could have been presented more conspicuously, including better placement, larger font, brighter colors, capital letters, clearer hyperlinks, in a pop-up screen, using clickwrap, or during a formal sign-up process. Instead, Warner Bros. chose to present its terms in a manner designed to make them inconspicuous. The district court therefore rightly concluded that this approach does not provide reasonable notice. That decision should be affirmed.

## JURISDICTIONAL STATEMENT

Plaintiffs generally agree with Warner Bros.' jurisdictional statement. Plaintiffs further note, however, that this Court may affirm "on any ground raised below and fairly supported by the record." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013) (citation and quotations omitted). It has discretion to reach issues even if the district court declined to consider them. *See Planned Parenthood v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1110–11 (9th Cir. 2020).

## STATEMENT OF THE ISSUES

1.     Did the district court correctly find that Warner Bros. failed to provide reasonably conspicuous notice of its terms and conditions (a) in the context of a free gaming application where a user would not have an expectation of a continuing relationship with Warner Bros. and therefore be unlikely to anticipate or look for a link to terms, and (b) where the GOTC launch screen used design features that were obviously intended to draw a user's attention *toward* a bright blue "Play" button and *away* from the small, non-descript language regarding its terms?

2.     Should Plaintiffs' claims for public injunctive relief be allowed to proceed in court?

3.     Is Warner Bros.' one-sided arbitration clause unconscionable?

4.     Did Warner Bros. provide minor Plaintiff P.W. with reasonably conspicuous notice of terms considering his age and circumstances, and may P.W., in any event, be allowed to disaffirm Warner Bros.' terms because, as a minor, it is his legal right to do so?

## STATEMENT OF THE CASE

### A.     Warner Bros.' false and deceptive advertising.

On February 24, 2022, Plaintiffs Charissa Keebaugh, Stephanie Neveu, and Heather Mercieri sued Warner Bros. for its pervasive false and misleading advertising in the GOTC mobile game. 3-ER-286. On May 23, 2022, Plaintiff Sophia Nicholson and Minor Plaintiff P.W. joined the lawsuit in an amended complaint

("FAC"). 2-ER-240. Plaintiffs and the putative class members bring claims under California and other state laws to remedy the injuries Warner Bros. has caused by its deceptive and manipulative sales tactics in GOTC.

GOTC has been downloaded over 20 million times and has hundreds of thousands of active users. 2-ER-246 (FAC ¶ 26). Despite being a "free" game to download and, theoretically, play, GOTC has generated Warner Bros. over $750 million in revenue. 2-ER-246 (*Id.* ¶ 27). Warner Bros. makes this money by pushing GOTC players to engage in "microtransactions"—a repeated series of discrete in-app purchases of "packs" that contain virtual resources to allow players to advance in the game. 2-ER-246–47 (*Id.* ¶¶ 27–30). These in-app purchases, or "packs," range in price from $0.99 to $99.99 each. 2-ER-246–47 (*Id.* ¶¶ 27, 31). Warner Bros. markets these packs aggressively: every time a player launches the game, a pop-up advertisement to purchase a level-up pack fills the entire screen. 2-ER-247 (*Id.* ¶ 32).

Warner Bros. uses a variety of deceptive tactics to induce users to purchase these packs. For example, each pop-up ad has an hourglass timer counting down the time that the pack is still available, creating a sense of urgency and scarcity. 2-ER-247 (FAC ¶¶ 33–34). The timer creates the false impression that the offer is only available during a specific and limited time window, and that users will miss this opportunity if they do not purchase it immediately. 2-ER-247 (*Id.* ¶ 34).

There are two primary categories of deceptively marketed packs: (1) packs that offer the illusion of discounts through strikethrough graphics (*i.e.*, the pack is falsely presented as previously costing a higher price, which is struck out and a "new" lower price is presented); and (2) packs that falsely advertise that they contain extra value because of a special sale (*i.e.*, the pack is presented as containing extra "bonus" items that would not otherwise be included). 2-ER-250 (*Id.* ¶ 40).

Warner Bros. knows these deceptive pricing schemes influence purchasing decisions, as consumers are enticed by purported bargains. 2-ER-249 (*Id.* ¶ 38); *see* 2-ER-242–43 (*Id.* ¶¶ 7–8); *see also* 16 C.F.R. § 233.1(a). Plaintiffs made in-app purchases relying on the false and deceptive advertising. 2-ER-244–45 (FAC ¶¶ 19–23).

Warner Bros.' false discounting is particularly effective because GOTC itself is designed to be highly addictive, like other ostensibly "free" online games. 2-ER-249 (*Id.* ¶ 39).[1] Worse, even though minors are especially susceptible to these elements of the game's design, Warner Bros. specifically markets the game to children, advertising that the game is for young players aged "12+." 2-ER-257–260 (*Id.* ¶¶ 57–60, 63–69).

---

[1] After the filing of the Complaint, the news outlet Vice interviewed some of Plaintiffs and detailed their experiences with addiction. *See* Maxwell Strachan, *'Game of Thrones: Conquest' and 'State of Survival' Players Say They Felt Addicted and Pressured To Spend*, Vice (Oct. 20, 2022), https://tinyurl.com/3ubpwvdr.

This is how Minor Plaintiff P.W. fell victim to Warner Bros.'s scheme despite his parents' best efforts to monitor his phone usage. They allowed him access to GOTC only because they believed that the app was safe for kids 12 and over. 2-ER-259 (FAC ¶ 68). P.W. spent more than *$6,200* in just three weeks in mid-March to early April 2022, purchasing dozens of packs. 2-ER-259 (*Id.* ¶¶ 67–68); *see also* 2-ER-144. Minor Plaintiff P.W. and his parents asked for refunds but were refused. 2-ER-260 (*Id.* ¶ 69). Contrary to their experience, Warner Bros.' brief disingenuously asserts that its terms actually "*protect* children by requiring players to represent" that they have legal capacity or parental permission to agree to the terms. WB Br. at 9 (emphasis added). A child only need hit "Play" without reading Warner Bros. dense terms that purportedly "protect" them.

### B. The context in which users encounter Warner Bros.' purported terms of use.

GOTC is advertised as free to download in the Apple App Store and the Google Play Store. It is not clearly advertised as a Warner Bros. product. Depending on the version a user sees in the App Store, a user would have to scroll to the left of the screen to see Warner Bros.' full name:

 

2-ER-258 (FAC ¶ 58); 2-ER-60, 65.

After downloading GOTC, a user is *not* asked to provide any information, such as a name, email address, or credit card information, to Warner Bros. Instead, the user needs only to click one button, labeled "Play," to begin playing the game, as shown on the launch screen:



*See, e.g.*, 2-ER-69. Warner Bros. presented no other evidence that users ever saw notice of the terms again, even when making in-app purchases in the game.

### C.   The visual elements of the launch screen and inconspicuous presentation of the terms.

As shown above, the GOTC launch screen uses a bright blue button to entice users to click "Play" and to draw their attention away from the far less conspicuous language that links to a waiver of users' rights to seek redress in court. If a user does not immediately press "Play"—and if their thumb does not block the bottom of the

screen—they might see below, in much smaller black and white text: "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy."

Below that, at the bottom right, is a hyperlink provided in a "ghost button"—a black rectangle on a black background—containing the plain white text, "Terms of Service." This link appears to be deliberately placed where a right-handed user is most likely to have their thumb or palm covering the screen, with their thumb conveniently over the "Play" button.

The GOTC launch screen uses "dark patterns"—a term coined to describe various ways in which websites use graphic design to covertly influence user decision-making—to make it less likely users will see the language about its terms. For instance, the launch screen contains a textbook example of a "misdirection" dark pattern, as described by the United States Federal Trade Commission ("FTC") in a recent staff report. *See Bringing Dark Patterns to Light*, Fed. Trade Comm'n Staff Report, at 23 (Sept. 2022), *available at* https://tinyurl.com/yuzstu86. Misdirection is where a company "us[es] style and design to focus users' attention on one thing in order to distract their attention from another," such as where a company wants users to click "a bright green highlighted box" and then puts text "below in a non-highlighted section." *See id*. The Warner Bros. launch screen also falls within the "false hierarchy" dark pattern identified by the FTC: "using contrasting visual prominence to steer users into making a certain selection" by, for example, using a

"bright orange button" while putting the company's lesser designed option below "as a smaller font, pale gray hyperlink." *See id.*[2]

Notably, a user who evades these dark patterns and manages to find and follow the ghost button link will not be taken to "Terms of Service," to which a user is supposedly agreeing by pressing "Play." Instead, a user will encounter a document labeled "Terms of Use." Warner Bros. has offered no evidence concerning how or why the terms were presented under an incorrect label. The placement is further obscured because, while the above statement describes the "Terms of Use" and "Privacy Policy," the ghost buttons are presented in the opposite order. As a result, the "Terms of Service" button falls on the right-hand side of the screen where it is most likely to be obscured by a user's thumb.

### D. The onerous arbitration clause.

#### 1. Warner Bros.' one-sided arbitration clause as it existed before this appeal.

Warner Bros. asserts that its "terms of use require bilateral arbitration." WB Br. at 12. But it is not "bilateral." And since this appeal was filed, Warner Bros. has attempted to make it far more one-sided.

---

[2] The FTC released the staff report after the motion to compel arbitration was fully briefed and only a few weeks before the district court heard oral argument. Plaintiffs-Appellees respectfully note that the Court may take judicial notice of administrative body reports. *See Barrios-Aguilar v. Holder*, 386 F. App'x 587, 590 (9th Cir. 2010); *U.S. v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003) (citing *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)).

Warner Bros. contends that its terms "protect [its] valuable intellectual-property rights." WB Br. at 8. However, as of December 2019, Warner Bros. began excluding from arbitration "claims . . . that pertain to enforcing, protecting, or the validity of [its] intellectual property rights." *See* 2-ER-182; 2-ER-196; 2-ER-211; 2-ER-228. Worse, the terms try to artificially shorten the statute of limitations to one year, prevent consumers from seeking punitive and other damages, and limit liability to a maximum of $100. 2-ER-182; 2-ER-195; 2-ER-210; 2-ER-226–27. But the terms do not impose such terms reciprocally on Warner Bros.' IP claims. So while Warner Bros. reserves access to the courts to protect its IP—apparently because Warner Bros. acknowledges the inadequacy of its arbitration scheme to protect legal rights—it nonetheless seeks to force arbitration upon the consumers who spent over $750 million on the game.

### 2. While this appeal was pending, Warner Bros. made the arbitration clause more inequitable.

Not content with its already one-sided arbitration provision, Warner Bros. made its arbitration provision far more lopsided before filing its opening brief.

Though Warner Bros. states that "[t]he later versions of the terms are much the same as to arbitration," WB Br. at 10, its January 30, 2023 updates seek to impose a radically different and even more unfair arbitration procedure. WB Br. at 8 (citing https://tinyurl.com/WB-TOU). Among other significant changes, Warner Bros. will no longer pay for arbitration or reimburse fees. Thus, in an individual arbitration

where Warner Bros. has capped recovery at $100, each consumer would have pay at least $85 just to initiate the arbitration. *See Fees For Disputes When One of the Parties is A Consumer*, at 5, Nat'l Arbitration and Mediation (Dec. 22, 2022), https://tinyurl.com/55wxxe33. On top of the filing fee, the consumer would be subject to substantial additional fees, including payment for the arbitrator's time, and would ultimately have to share costs equally with Warner Bros. *See id.* at 5–7.

These changes notably contrast with Warner Bros.' statements to the district court that the arbitration agreement "operates bilaterally and shifts fees to Warner Bros., which ensures that arbitration will not be 'overly harsh or one sided.'" 2-ER-81; *see, e.g.*, 2-ER-229 ("[W]e will promptly reimburse you for your payment of the filing fee . . . . We will pay all AAA filing, administration, and arbitrator fees."). In addition, the new Warner Bros. terms require a 60-day waiting period from a consumer's initiation of a dispute.

Even more unfair, the new terms contain a strict "Mass Filing" protocol that serves only to further delay an individual's rights to bring claims by requiring adjudication of claims in stages of no more than 200 arbitrations at once, which must now be resolved before other claims may proceed. *See* https://tinyurl.com/WB-TOU, at § 16. For a game that has been downloaded ***over 20 million*** times and had at least 300,000 active users as of December 2020, 2-ER-246 (FAC ¶ 26), Warner Bros.' new mass arbitration protocol prevents the timely adjudication of claims.

In sum, after making representations to the district court about its supposedly fair arbitration clause—including Warner Bros.' "agree[ment] to pay the arbitral fees . . . which ensures no good-faith claimant could face 'prohibitive arbitration costs' relative to the value of their claims," 2-ER-164—Warner Bros. changed the rules while this appeal was pending so that if it prevails here, it will effectively never have to answer for the false and deceptive advertising scheme that made it over $750 million.

### E. Procedural history and the district court's denial of the motion to compel arbitration.

On June 13, 2022, Warner Bros. moved to compel arbitration. 2-ER-145. Plaintiffs responded on July 21, 2022, arguing, among other things, that Warner Bros. had not shown that Plaintiffs were on inquiry notice of the arbitration agreement. 2-ER-101–08. Plaintiffs also argued that, in any event, the terms are unconscionable, including because they impermissibly seek to bar public injunctive relief. 2-ER-101–112. Finally, Minor Plaintiff P.W. argued that notice was particularly insufficient as to him because he is a child, but that in any event, as a minor, he exercised his right to disaffirm Warner Bros.' terms. 2-ER-107, 112–17.

On August 11, 2022, Warner Bros. filed its reply, in which it impermissibly argued for the first time that Virginia law applied as to the minor Plaintiff. 2-ER-70.[3]

On October 6, 2022, the district court held oral argument. 2-ER-17. After that, at the district court's request, the Parties submitted additional images of the GOTC launch screen and of how GOTC appears in the App Store on an iPhone. 2-ER-60.

On October 13, 2022, the district court denied Warner Bros.' motion. 1-ER-2. The district court began its thorough analysis by observing that arbitration is a matter of contract, and by reviewing "the various manners in which online providers seek to impose contractual terms of on consumers." 1-ER-7. The district court applied the two-part test from this Court's recent decision in *Berman*. 1-ER-7 (quoting *Berman*, 30 F.4th at 856). After carefully analyzing the relevant factors, the district court correctly determined that there was "no mutual assent to the Arbitration Agreement" at issue here because the GOTC launch screen "failed to provide reasonably conspicuous notice" of the terms. 1-ER-10.

Essentially predicting this Court's explanation of the inquiry notice test in its subsequent decision in *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023), the district court applied California Court of Appeal decisions and

---

[3] In addition, in connection with its reply in support of its motion to compel arbitration, Warner Bros. manually lodged an actual iPhone 12 Pro containing the GOTC game. 2-ER-90.

observed that "in order to determine whether there is mutual assent, the Court must look at the context of the transaction, in addition to the visual elements of the Opening Screen." 1-ER-11 (citing *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 477 (2021)); *accord. Oberstein*, 60 F.4th at 516–517 (evaluating "'the context of the transaction' and the placement of the notice") (quoting *Sellers*, 73 Cal. App. 5th at 480)).

The district court observed that "a GOTC player is not required to create an account before playing the game." 1-ER-12. While a GOTC player would first have to access the App Store to download the game, at most that meant users might have an expectation of a continuing relationship with the App Store, but not Warner Bros. *Id.* The court therefore found that these circumstances were most analogous to the facts in *Sellers*, where due to the lack of a "'some sort of continuing relationship,'" Plaintiffs "'would not likely be scrutinizing the [launch] page for small text outside the payment box or at the bottom of the screen linking them to 26 pages of contractual terms.'" 1-ER-12 (quoting *Sellers*, 73 Cal. App. 5th at 480). The district court also observed the mislabeled hyperlink on the GOTC launch screen—"'I accept the **Terms of *Use*** . . .' while the hyperlink below is entitled, '**Terms of Service**'"—further undercut inquiry notice. 1-ER-112(court's emphasis).

In other words, the district court correctly considered both the context of the transaction and the placement of the notice in the GOTC launch screen's design. It

concluded that based on these factors—including the lack of "a formal sign-up process, . . . the Court [could not] reasonably expect GOTC users to click the link to the TOU and be placed on inquiry notice." 1-ER-13. In so holding, the district court did not invent a "bright-line requirement of a formal sign-up process," as Warner Bros. repeatedly protests. *See, e.g.*, WB Br. at 42. It simply held that in the context of this free gaming app, the small sentence below the big, three-dimensional blue "Play" button, coupled with a mislabeled ghost button linking to the terms, did not provide users with sufficient notice. 1-ER-13.

The district court then granted the Parties' joint limited stipulation of a stay pending appeal, which allows some discovery to proceed while this appeal is pending. 2-ER-15.

## SUMMARY OF THE ARGUMENT

In a thorough decision that analyzed current California state and Ninth Circuit law, the district court correctly concluded that "[a] valid arbitration agreement does not exist between the parties" because Warner Bros. did not provide reasonably conspicuous notice of its terms. 1-ER-9. The court used the exact "two-part test for contract formation through inquiry notice under California law"—the same test that Warner Bros.' opening brief bizarrely asserts that the lower court "disregarded." WB Br. at 19. Indeed, the lower court's opinion quoted this test in full and repeatedly referred to it, analyzing whether "'(1) the website provides reasonably conspicuous

notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" 1-ER-7 (quoting *Berman*, 30 F.4th at 856); *see also* 1-ER-10–11.

In evaluating whether Warner Bros. had provided reasonably conspicuous notice of the arbitration agreement, the district court also considered "the context of the transaction, in addition to the visual elements of the Opening Screen." 1-ER-11. This is consistent with the approach of both Ninth Circuit and California court decisions on inquiry notice. *See, e.g.*, *Oberstein*, 60 F.4th at 517 (citing *Sellers*, 73 Cal. App. 5th at 477). Context matters because, as this Court in *Oberstein* recently explained, in a transaction "requiring a full registration process," a user is more likely to contemplate "some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 516–17 (quotations omitted). In other words, whether terms are reasonably conspicuous depends, in part, on whether a user has any reason to expect that such terms exist and look for them.

The district court correctly found that the transactional context here was most "akin to the transaction in *Sellers*" because "a GOTC player is not required to create an account before playing the game." 1-ER-11–12. The district court considered the visual elements of the launch screen in that context, and correctly determined that

19

Warner Bros. "failed to provide reasonably conspicuous notice" of the terms. 1-ER-10. That is because the launch screen is unquestionably designed to draw users' attention toward the large blue "Play" button and away from other language that might put users on notice of some sort of agreement.

Warner Bros. deliberately buried notice of the terms in small font and "ghost buttons" at the bottom of the screen, and failed to incorporate the design elements this Court has identified as fundamental to meet its "reasonably conspicuous" standard including "underlined" hyperlinks, "color-contrasting text," bright blue font, and use of capital letters. In notable contrast, Warner Bros. did use several of these eye-catching design elements to get users to quickly hit "Play" before they even noticed the potential existence of, let alone read, Warner Bros' onerous terms. Thus, "[f]ar from meeting the requirement that a webpage must take steps 'to capture the user's attention and secure her assent,' the design and content of [the GOTC launch screens]" draw the user's attention away from the most important part of the page." *Berman*, 30 F.4th at 857 (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178 n.1 (9th Cir. 2014)).

A careful comparison of the GOTC launch screen with the screens at issue in the leading authorities confirms that the district court was correct. Warner Bros. presented its terms in a manner that was even less conspicuous than what courts have found to be insufficient in cases involving a similar transactional context—*Sellers*

20

and *Berman*. And even if the transactional context were more similar to *Blizzard* or *Oberstein*, Warner Bros. provided far less conspicuous notice here than what those courts found was reasonably conspicuous.

This Court may also affirm on the alternate grounds that Plaintiffs may seek public injunctive relief in court and that the arbitration agreement is unconscionable. Finally, if nothing else, this Court should still hold that there is no agreement with the minor Plaintiff P.W. for lack of notice and that, in any event, P.W. has disaffirmed the terms.

## STANDARD OF REVIEW

"No longer is there a 'special' rule favoring arbitration." *Armstrong v. Michaels Stores, Inc*., 59 F.4th 1011, 1014 (9th Cir. 2023). Arbitration agreements are enforceable only "as other contracts, but not more so." *Id.* (quoting *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022)). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855.

A party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). The judge, in "considering such a motion must 'give to the opposing party the benefit of all reasonable doubts and inferences that may arise.'" *Oberstein*, 60 F.4th at 517 (citation omitted). This Court

"review[s] de novo a district court's decision to grant a motion to compel arbitration." *Id.* at 510. But "underlying factual findings are reviewed for clear error." *Berman*, 30 F.4th at 855.

## ARGUMENT

I. **THE DISTRICT COURT CORRECTLY APPLIED CALIFORNIA AND NINTH CIRCUIT PRECEDENT TO CONCLUDE THERE WAS NO ENFORCEABLE ARBITRATION AGREEMENT**

### A. **Legal standards of inquiry notice and mutual assent as applied to online agreements.**

"To form a contract under California law . . . there must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein*, 60 F.4th at 512–13; *see Berman*, 30 F.4th at 855–56 ("[E]lemental principles of contract formation apply with equal force to contracts formed online."). Here, Warner Bros. does not argue that Plaintiffs had actual notice of its terms. So the key issue on appeal is whether the GOTC launch screen provided users with inquiry notice of the terms.

When assessing notice, courts are mindful that "[u]sers are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. And because companies like Warner Bros. have "complete control over the design" of their applications or websites, the "onus" is on them "to put users

on notice of the terms to which they wish to bind consumers." *Id.* (citation and quotations omitted).

To evaluate notice, and "[t]o avoid the unfairness of enforcing contractual terms that consumers never intended to accept," courts in the Ninth Circuit apply a "fact-intensive" two-prong test. *Berman*, 30 F.4th at 856. Online agreements are enforceable on an inquiry notice theory "only if": (1) there is "reasonably conspicuous notice of the terms to which the consumer will be bound," and (2) "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*[4]

In applying this two-pronged test, courts apply an "objective, totality-of-the-circumstances standard," which requires them to "consider[] 'the context of the transaction.'" *Oberstein*, 60 F.4th at 514, 516 (quoting *Sellers*, 73 Cal. App. 5th at 480); *see also id.* (citing *Berman*, 30 F.4th at 856–58); *Berman*, 30 F.4th at 856 ("[T]o be conspicuous in this context, a notice must be displayed in a font size and

---

[4] The district court correctly identified different types of online agreements recognized under California law. *See* 1-ER-7. At one end of the spectrum is a "clickwrap" agreement—where "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed," *Berman*, 30 F.4th at 856, which courts are more likely to find enforceable, *Oberstein*, 60 F.4th at 513. On the other end of the spectrum lie browsewrap agreements—similar to the GOTC launch screen—where "'a website offers terms that are disclosed only through a hyperlink . . . .'" *Id.* (quoting *Berman*, 30 F.4th at 856). Courts are "reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered." *Berman*, 30 F.4th at 856 (citation omitted).

format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."). As further explained, context matters because terms that may be reasonably conspicuous in a context where the user should anticipate and look for terms and conditions, may not be reasonably conspicuous in a context where the very existence of terms and conditions would likely come as a surprise to the user.

### B. Warner Bros.' terms were not reasonably conspicuous.

#### 1. The context of the transaction.

##### a) Free software makes consumers less likely to be on notice for a link to terms of use.

This Court in *Oberstein* explained that California courts have "considered" both "'the context of the transaction'" as well as "the placement of the notice" in assessing whether notice was reasonably conspicuous. *Oberstein,* 60 F.4th at 516 (quoting *Sellers*, 73 Cal. App. 5th at 480).

"[T]he transactional context is an important factor to consider and is key to determining the expectations of a typical consumer." *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 947 (2022) (citation and quotations omitted). Thus, "when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship, such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer is less likely to be looking for contractual terms." *Id*. (citations and quotations omitted). In contrast, in a transaction "requiring a full registration process," a user is more

likely to contemplate "some sort of continuing relationship that would have put *users on notice for a link* to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 516–17 (emphasis added, quotations omitted).

A brief overview of the transactional context in four key cases, two from this Court (*Berman* and *Oberstein*), and two from the California appellate courts (*Sellers* and *Blizzard*), demonstrates why the district court was correct to conclude that there was no inquiry notice here. *Berman* and *Sellers*, which both involved items marketed as free and where a consumer would not have an expectation of a continuing relationship with a defendant, found that the notice provided was not reasonably conspicuous in that context. *See, e.g.*, *Sellers*, 73 Cal. App. 5th at 480 (observing that in this context a consumer "would not likely be scrutinizing the page for small text outside the payment box"). In contrast, *Oberstein* and *Blizzard*, where the transactional context originated with a deliberate purchase by the consumer, held that the notice—which was also more robust than the notice provided by Warner Bros. here—was reasonably conspicuous.

Specifically, in *Berman*, where the Ninth Circuit affirmed denial of a motion to compel arbitration, the plaintiff had visited a:

> webpage [that] proclaimed, 'Getting Free Stuff Has Never Been Easier!' and asked for personal information in order to obtain free product samples and promotional deals. She also visited a different Fluent website, . . . using a mobile phone . . . while registering to receive a free gift card.

25

30 F.4th at 853–54.

The context was similar in *Sellers*:

> [A] consumer on the JustAnswer website [wa]s not asked to 'sign up' for an account but is instead invited to 'Start my trial' and get the answer to a single question for a one-time fee of $5. This is not a situation in which the registration process clearly contemplated some sort of continuing relationship that would require some terms and conditions.

*Sellers*, 73 Cal. App. 5th at 480 (cleaned up).

In contrast, in *Oberstein*, which found inquiry notice, the plaintiff purchased concert tickets using the Ticketmaster website. This "require[ed] a full registration process" and the terms were referenced at "three independent stages [of the transaction]—when creating an account, signing into an account, and completing a purchase." 60 F.4th at 515, 517.

And in *Blizzard*, which also found inquiry notice, the plaintiff purchased Blizzard's online game for about $40 and had to go through a full registration process:

> To play any of its online games, make in-game purchases, or interact with other online players, [plaintiff] needed an account on Blizzard's online platform, "Battle.net." To create an account, a user was required to enter certain information (e.g., name, age, email address) and click a button titled "Create a Free Account."

76 Cal. App. 5th at 936.

In direct contrast to *Oberstein* and *Blizzard*, where the plaintiffs were presented with notice to terms of use during a formal account-creation process and when making purchases, GOTC users are only ever presented with inadequate notice one time: the first time they ever click "Play." They are never presented with terms of use at any subsequent point, and never at any point of purchase. That is to say, users are only ever presented with inconspicuous terms at the point where they still believe the game is free.

Notably, the precedents Warner Bros. cites in its brief are consistent with the pattern described above, where inquiry notice more often exists where consumers create a formal account or directly purchase a product. *See Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020) (tax return account); *West v. Uber Techs.*, 2018 WL 5848903, at *3 (C.D. Cal. Sept. 5, 2018) ("three step" registration process); *Selden v. Airbnb, Inc.*, 4 F.4th 148 (D.C. Cir. 2021) (Airbnb account); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) (Uber account); *Starke v. SquareTrade, Inc.*, 913 F.3d 279 (2d Cir. 2019) (receiving terms post-*sale*). Also consistent with this pattern, Warner Bros. cites one out-of-circuit appellate case that denied arbitration in the context of a transaction that did not involve account creation or immediate

financial payment. *See generally Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002) ("free" use of software).[5]

This does not mean that the district court created a formal sign-up requirement, as Warner Bros. now argues. Nor are Plaintiffs advocating for such a rule on appeal. Instead, the point is simply that a sign-up process is one of many factors that courts regularly consider in evaluating whether notice was reasonably conspicuous—where the transaction asks no more of consumers than a click of a button at no cost, terms are easier to overlook and the law requires more to demonstrate inquiry notice. *See Oberstein*, 60 F.4th at 516–17 ("[I]n contrast with the noncommittal free trial offered in *Sellers*, the context of this transaction, *requiring a full registration process*, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship.") (emphasis added).

---

[5] To further illustrate, in *Meyer*, which Warner Bros. heavily relies upon, a user actually "registered for an account." *See Starke*, 913 F.3d at 294 (distinguishing *Meyer*). The screen contained a link to the terms of service link but also asked the user to create an account and enter in their credit information. *Meyer*, 868 F.3d at 78. The relevant hyperlinks were "blue and underlined." *Id.* The screen in *Meyer* would necessarily cause a user to pause for a period of time and contemplate that through payment, they might be entering into an agreement with Uber. And the court in *Meyer* realized as much—noting that the user was "signaling that their acceptance of the benefit of registration would be subject to contractual terms." *Id.* at 79.

**b)** **The district court correctly found that the context of the transaction made it less likely that a user would look for terms and conditions.**

The district court appropriately considered the context of the transaction as the courts did in *Berman*, *Sellers*, *Oberstein*, and *Blizzard*. The court observed that GOTC is free to download and "Players could freely play GOTC by simply pressing the 'Play' button." 1-ER-13. It therefore reasoned that the transactional context "is more akin to the transaction in *Sellers*" and unlike the context in *Blizzard*. 1-ER-11.

Addressing an argument Warner Bros. did not raise in its briefs but only for the first time at oral argument, the district court further observed that even though a GOTC player would have to create an Apple or Google account to download the game, at most that meant users might have an expectation of a continuing relationship with Apple or Google platform, but not Warner Bros.:

> At the October 6 hearing, Warner Bros. argued that it was sufficient that GOTC players were prompted to create accounts in the App Store, before downloading GOTC. The Court finds the creation of App Store accounts irrelevant to the issue of whether the *Warner Bros.'* Opening Screen put users on sufficient notice of *Warner Bros.'* TOU. While creating this account may have allowed users to "contemplate[] some sort of continuous relationship" with the App Store, this association would not have carried over to Warner Bros. and its specific TOU.

29

1-ER-12 (alteration in original). Indeed, depending on how the App Store displayed GOTC for download, a user might not even see Warner Bros.' name. *See* 2-ER-258 (FAC ¶ 58); *see also* 2-ER-60, 65.

Warner Bros. contends that the context of the transaction here is actually more like *Blizzard* instead of *Sellers* because Plaintiffs here also "accessed a multiplayer strategy game." WB Br. at 48–49. This simplistic analysis ignores the relevant factual distinctions: the *Blizzard* plaintiff initially purchased a game for $40, then installed it and accepted the terms and conditions—which were presented in a pop-up window so that the plaintiff could not have been unaware of their existence. *See* 76 Cal. App. 5th at 936.[6]

In sum, the district court below correctly found that this context of the transaction made it unlikely that player would have anticipated "some sort of continuing relationship . . . that would require some terms and conditions," 1-ER-11

---

[6] Warner Bros. also repeats its mistaken argument below that "[t]he relevant context [in *Sellers*] was that the plaintiffs had brought claims under [California's] Automatic Renewal Law." WB Br. at 43. As the district court rightly concluded, the principles announced in *Sellers* were not unique to this statute. *See* 1-ER-11 (noting that *Berman* "references *Sellers* in its discussion of inquiry notice") (citing *Berman*, 30 F.4th at 857); *see Oberstein*, 60. F.4th at 517 (discussing *Sellers*). Although *Sellers* discusses the Automatic Renewal Law, the applicable "context of the transaction" was the lack of a continuing relationship because a user "[was] not asked to 'sign up' for an account." *Sellers*, 73 Cal. App. 5th at 480; *see Blizzard*, 76 Cal. App. 5th at 948 ("Second, apart from the ARL, the *Sellers* court found the sign-in wrap notices were 'not sufficiently conspicuous even when considering the more subjective criteria applied in the more recent federal cases'").

(citing *Sellers*, 73 Cal. App. 5th at 480). It therefore correctly found that, in this context, the GOTC launch screen did not provide conspicuous notice of the terms.

### 2. The notice itself: the visual and design elements of the GOTC launch screen are not sufficiently conspicuous.

#### a) The GOTC launch screen directs users' attention *away* from assent to the terms.

Warner Bros.' notice regarding its terms of use appears on the launch screen for its mobile game. These screens are dominated by large, dramatic images—of fighting dragons, a famous actor, and an iron throne. *See* 2-ER-234–39. The images take up most of a mobile phone's screen and are overlaid by the title of the game in large, all capital letters: GAME OF THRONES CONQUEST. *See id.* Centrally underneath that, with shading that makes it three-dimensional and appear to pop out of the display, is a bright blue button inviting the player to "Play." *See id.* Warner Bros. is well-versed in the use of graphic design to make an item conspicuous—the blue "Play" button is impossible not to notice.

  

*See* 2-ER-234–39.

Further underneath that—in an area of the screen where a mobile user's thumbs or hand might cover the display—appears a grayscale sentence in small nondescript font, the most complete version of which reads: "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy." This is followed by two ghost buttons, at the very bottom of the screen, which operate as hyperlinks to the "Privacy Policy" and "Terms of Service." That these are actual hyperlinks is hard to tell because they have none of the features that commonly identify hyperlinks, and Warner Bros.' deliberate use of black buttons against a black background obscures the fact that they function as clickable buttons.

"To be conspicuous . . . a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *See Berman*, 30 F.4th at 856. But the small font, the grayscale colors,

the low placement, and the ghost buttons blending into the background of the very screen itself do not "draw the user's attention." *Sellers*, 73 Cal. App. 5th at 481. The textual notice is, unlike the game title and "Play" button, "in smaller print" and "contrasts with the dark background significantly less than the" GOTC's bright blue and inviting "Play" button. *See id.* And the text linking to the Warner Bros.' terms is not even bolded or underlined, common features that, while alone are often insufficient, at least attempt to alert users to the presence of hyperlinks. *See Berman*, 30 F.4th at 857 ("Simply underscoring words or phrases, as in the webpages at issue here, will often be insufficient to alert a reasonably prudent user that a clickable link exists.").

In sum, even a cursory review of the launch screens leads to the inescapable conclusion that, "[f]ar from meeting the requirement that a webpage must take steps 'to capture the user's attention and secure her assent,' the design and content of these [launch screens] draw the user's attention away from the most important part of the page"—the small text about Warner Bros.' terms. *Id.* (quoting *Nguyen*, 763 F.3d at 1178 n.1).

Warner Bros. nonetheless incorrectly argues that the GOTC launch screen is "uncluttered" and so its design "sufficiently draws a user's attention to the only sentence on the screen (the notice of terms)." WB Br. at 28 (citation and quotations omitted). Although the GOTC launch screen has fewer words than the screens at

issue in some other cases, anyone can see that the focal point of the GOTC launch screen is the "Play" button and the striking graphics, not the lone sentence presented in small non-descript font below them. These other visual elements serve the same function as "clutter" on the page—they draw the user's eye away from the terms and make it less likely that users will notice their existence.

> **b)** **Warner Bros. provides even less notice than what was found insufficient in cases involving a similar transactional context—*Sellers* and *Berman*.**

As discussed above, the district court correctly analogized these facts to the transactional context in *Sellers*, because a GOTC player would not have anticipated "some sort of continuing relationship . . . that would require some terms and conditions." 1-ER-12 (quoting *Sellers*, 73 Cal. App. 5th at 480).

And Warner Bros.' notice is even less conspicuous than the inadequate notice provided in *Sellers*. In *Sellers*, a user on a mobile device was first presented with a sign-up screen that asks for credit card information:



*Sellers*, 73 Cal. App. 5th at 455. The notice at the bottom of the screen was insufficient because "[i]t [] appears in smaller print than any other print on the page and in a grey shade that contrasts with the dark background significantly less than the other text on the page." *Id.* at 481. And although "the hyperlink to the terms of service is underlined," it did "not otherwise draw the user's attention in any way." *Id.*

Warner Bros.' notice is even less conspicuous. At least in *Sellers*, a user would have to spend some time on the sign-up screen to enter in credit card information and make a payment before "starting their trial." This makes it more likely that a user would see the disclaimer language, unlike a GOTC user, who could just hit "Play" immediately without looking below the large button to see the disclaimer language. And in *Sellers*, unlike GOTC, after the users signed up and received a free

answer, they were presented with yet another screen with a check box next to the statement "'I agree to the <u>Disclaimer and re-agree to the Terms of Service</u>.'" *Id.* at 456 (emphasis in original). Even two sets of notice together were insufficient.

The Ninth Circuit's decision in *Berman*, which, as noted above, also involved a similar transactional context where a user received a free product, is similarly instructive. 30 F.4th at 853–54. The plaintiffs in *Berman* were twice presented with notice of terms. Each screen contained large, brightly colored "continue" buttons in contrast to "two lines of text in tiny gray font stating, 'I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy.'" *Id.* at 854. "The hyperlinks were underlined but again appeared in the same gray font as the rest of the sentence." *Id.* Like with GOTC, the disclaimer text in *Berman* "is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements." *Id.* at 856. And "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." *Id.* at 857.

Further, unlike in GOTC, in *Berman*, the sign-up screen shown on the mobile phone asked for a user's information and included the disclaimer language and hyperlink *above* the bright green "Continue" button that purported to bind users to the terms.



*See id.* at 853 & App'x B. Again, in contrast with GOTC, at least a user would spend time on the sign-up screen entering information and would have to look past the key language regarding terms *before* clicking continue. Although the font is small, at least the text would be in a user's line of sight. Even so, the Ninth Circuit held that this notice was insufficient.

The other insufficient notice in *Berman* appeared after the user had previously visited the website and entered some of their contact information, so that their name appeared and their zip code:



*See id.* at 853 & App'x A. Similar to the other sign-in screen in *Berman*, the disclaimer language was above the continue button, so unlike GOTC, at least the disclaimer would have been in a user's line of sight. Moreover, a user would have to view the ZIP code and take action to confirm it was accurate, making it more likely that they would spend additional time looking at the sign-in screen, rather than a user in GOTC who just had to click "Play" on the launch screen and nothing else.

Since even two sets of more robust notice in *Berman* was still insufficient to deem plaintiff on inquiry notice, *see id.* at 857 ("The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else."), the district court here correctly found that the less-conspicuous notice in GOTC was legally insufficient.[7]

_____

[7] Warner Bros. attempts to distinguish *Berman* by claiming that GOTC's launch screen is clear that by clicking "Play," a user is agreeing to Terms of Service,

(continued…)

**c)** **Even if the transactional context were similar to *Blizzard* or *Oberstein*, Warner Bros. still provides insufficient notice.**

As explained above, Warner Bros. incorrectly contends that the transactional context is analogous to *Blizzard*. There, the plaintiff purchased Blizzard's online game for about $40 and had to go through a full registration process before using it. 76 Cal. App. 5th at 936. Here, GOTC is free to play, no account sign-up is required, and Warner Bros. presented no evidence that it provided notice to players of its terms when they later made purchases in the game or at any other time.

Nonetheless, even if *Blizzard*'s context was analogous, the notice in *Blizzard* was far more conspicuous: The terms were "presented to users in an online pop-up window that contained the entire agreement within a scrollable text box." *Id.* at 935. The immediately visible agreement advised users in bold, capitalized text to read the text and in all caps advised users to "read the section . . . titled 'dispute resolution' because it contains an arbitration agreement and class action waiver that affect users' legal rights":

---

whereas in *Berman*, "the Court found insufficient a 'continue' button that did not inform the users of the 'legal significance' of the button." WB Br. at 39–40 (quoting *Berman*, 30 F.4th at 858). This confuses *Berman*'s reasonably conspicuous holding with its independent holding on mutual assent. There, defendant failed to carry its burden on both prongs of the *Berman* test. *See Berman*, 30 F.4th at 856–58. Since Warner Bros. fails to carry its burden on *Berman* prong one, its arguments about *Berman* prong two are immaterial.



*Id.* So in *Blizzard*, there was no way for a user to access the game without being clearly presented with the actual terms and the existence of the arbitration clause.

Similarly, Warner Bros. mistakenly argues that "the webpages in *Oberstein* . . . show that the sign-in screens here clear 'the baseline requirements for constructive notice.'" WB Br. at 32 (citation omitted). But in *Oberstein*, users were presented with notice of terms "[a]t *three* independent stages." 60 F.4th at 516–17 (emphasis added). They viewed the key language regarding the terms when "creating an account, signing into an account, *and* completing a purchase." *Id.* (emphasis added). And the relevant language was repeatedly presented *above* the action button, not below it, increasing the likelihood that a user would notice it before clicking through to the next page. *See id.* at 515–16.

Moreover, in each of these three screens, a user would spend time filling out forms before continuing and would necessarily glance over the key language and hyperlinks to the terms before continuing, as illustrated by the account registration screen:



*See* Appellant's Opening Brief, *Oberstein v. Live Nation Ent., Inc.*, No. 21-56200, ECF No. 18 at 9 (9th Cir. Feb. 7, 2022); *see also Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *2 (C.D. Cal. Sept. 20, 2021) (images of sign-in and purchase screens).

To be clear, *Oberstein* was not endorsing the form of notice as ideal or necessarily sufficient. This Court was clear that the notice was "not without its risks and invite[d] second-guessing." 60 F.4th at 517. But the notice in GOTC was substantially less conspicuous, and does not meet the standard set by *Oberstein*.

### d) Warner Bros.' incorrect word choice further undercuts notice.

For the reasons above, Warner Bros. provided insufficient notice. But even worse than the notices in *Sellers*, *Blizzard*, *Berman*, and *Oberstein*, the GOTC launch

screen mislabels its terms in ways that make notice even less conspicuous. As the district court observed, the wording mismatch on the GOTC launch screen—"'I accept the **Terms of Use**' . . . while the hyperlink below is entitled, '**Terms of Service**'"—further undercuts inquiry notice. 1-ER-11 (court's emphasis).

GOTC's method of notice requires a user to not only (a) skip past the eye-catching "Play" button to scrutinize the plain white text below, then (b) intuit that the black on black "buttons" actually served as hyperlinks, but also (c) "surmise that [Warner Bros.] really meant" Terms of Use when it wrote Terms of Service. *McKee v. Audible, Inc.*, 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017). Thus, even in the unlikely event that a user did not immediately hit the bright blue "Play" button and looked below it, they would have to understand that Warner Bros.—for reasons it has never explained—apparently intended that "Terms of *Use*" and "Terms of *Service*" mean the same thing. This simply asks too much and flies in the face of this Court's teaching that the "onus" is on Warner Bros. to provide adequate notice and make sure it uses clear language and labels its hyperlinks correctly, and not on users to decipher Warner Bros.' confusing terminology. *See Berman*, 30 F.4th at 857.

Warner Bros. claims that this Court has "upheld contract formation despite a similar discrepancy." *See* WB Br. at 64 (citing *Dohrmann*, 823 F. App'x 482). To the extent this unpublished decision—which not only predates *Sellers*, *Blizzard*, *Berman*, and *Oberstein* but also does not even discuss the incorrect wording

42

problem—is given any weight, it is easily distinguishable based on the context of the transaction. There, unlike playing GOTC, the transaction required the creation of an account and the sharing of sensitive personal information required to fill out tax returns. *See Dohrmann*, 823 F. App'x at 483.[8]

Warner Bros. also mistakenly contends that the mislabeling in the launch screen "would affect only those plaintiffs who first signed in after December 2019." WB Br. at 62. But the other version of the GOTC launch screen that Warner Bros. submitted to the district court also suffers from a mislabeling error, albeit somewhat different.

Although the district court did not reach this issue, Plaintiffs raised in their opposition brief that even the launch screen that purportedly existed before December 2019 also uses incorrect language. 2-ER-108. The other launch screen similarly featured large, striking graphics and the same, three-dimensional prominent blue "Play" button. Beneath all of that, in small non-descript font it stated:

---

[8] The other authorities cited by Warner Bros. in defense of its failure to use clear and consistent language to refer to its terms either *denied* a motion to compel arbitration on an inquiry notice theory, *see* WB Br. at 62–63 (citing *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016)), or involved obvious typos *within* the arbitration agreement—not whether the error affected mutual assent, *see id.* at 63 (citing *Viamontes v. Adriana's Ins. Servs., Inc.*, 2016 WL 826148, at *2 n.1 (Cal. Ct. App. Mar. 3, 2016) (also denying motion to compel arbitration) and citing *Cerneka v. Russell No. 8 Santa Monica Properties, LLC*, 2018 WL 3154565, at *7 (Cal. Ct. App. June 28, 2018) (arbitration paragraph had "a pervasive typographical error concerning its own paragraph number")).

"By tapping 'Play' I agree to the Terms of Service." 2-ER-235. Although the obscured hyperlink matched this text as it was labeled "Terms of Service," the link created another mismatch as it linked a user to the Warner Bros. "Terms of *Use*," and not service. 2-ER-173.

### C. Plaintiffs did not unambiguously manifest their consent to be bound by the terms of use.

The district court's decision can easily be affirmed on prong one of the *Berman* test for lack of conspicuous notice. For those reasons, the district court did not reach prong two of the *Berman* test—that "the consumer takes some action, such as clicking a button or checking a box, that *unambiguously* manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (emphasis added). But the district court's decision can also be affirmed on the second prong, too.

For a user to "unambiguously manifest" their consent, "the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Oberstein*, 60 F.4th at 515 (alteration omitted) (quoting *Berman*, 30 F.4th at 858). As to the launch screens that existed after 2019, there is not an "explicit notif[ication]" nor anything "unambiguous" about a user who is advised that by clicking "Play," they are assenting to "Terms of *Use*," but then are only provided with a link that is labeled Terms of *Service*. 2-ER-172, 237. And as to the launch screen that existed *before* 2019, there is nothing unambiguous or explicit about telling users that by clicking "Play," they are assenting to "Terms

of Service" but then are taken to a document labeled "Terms of Use." 2-ER-172, 218, 235.

### D. The district court did not create a "bright-line" rule requiring a formal sign-up process.

Ignoring the district court's actual reasoning, Warner Bros. asserts that the district court invented a "novel" and "bright-line requirement of a formal sign-up process," and that this amounts to an impermissible "special arbitration-disfavoring rule[]." *See* WB Br. at 41–42, 59.

There is no such rule or requirement in the district court's decision. The decision simply and correctly applied the precedents discussed above by analyzing the GOTC launch screen in light of the context of the transaction. The district court observed that, "[a]s in *Sellers*, where the consumer was not asked to sign-up for an account before starting a trial, a GOTC player is not required to create an account before playing the game." 1-ER-12. So, the terms here were less conspicuous because there was no expectation of "'some sort of continuing relationship'" with Warner Bros. that would signal to a user that terms and conditions might apply. *See* 1-ER-12 (quoting *Sellers*, 73 Cal. App. 5th at 480). Thus, the court's ruling means only that while Warner Bros. does not need to use a registration process, it just has to make sure its notice is reasonably conspicuous given that transactional context.

Notably, the district court did not have the benefit of this Court's recent decision in *Oberstein*. But its analysis of the context of the transaction aligns

perfectly with *Oberstein*'s conclusion that "in contrast with the noncommittal free trial offered in *Sellers*, the context of [the *Oberstein*] transaction, *requiring a full registration process*, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." 60 F.4th at 517 (emphasis added).

Warner Bros.' contrived parade of horribles that would result from this imaginary "bright-line requirement of a formal sign-up process," such as "destabiliz[ing] the app marketplace," is equally baseless. WB Br. at 42, 50. Warner Bros. is more than capable of using graphic design to make information reasonably conspicuous, with or without a sign-up process. The simplest course would be for Warner Bros. to make the disclaimer language and the link to the Terms of Use the same size, just as bright, and prominently featured as the "Play" button, or use a version of clickwrap that courts have previously found enforceable. *See Oberstein*, 60 F.4th at 513 ("Courts routinely find clickwrap agreements enforceable."). It did none of the above and instead "chose to gamble on whether its users would have notice of its Terms." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019).

## II. THIS COURT SHOULD REFUSE TO COMPEL ARBITRATION ON OTHER GROUNDS

Although the district court did not reach the other issues Plaintiffs raised because of its ruling on inquiry notice, Plaintiffs respectfully request that, in the

event this Court disagrees with the reasoning of the district court below, it affirm the decision on other grounds.

### A. Plaintiffs can seek public injunctive relief in court.

This Court should exercise its equitable discretion and decide the "purely legal issue," of whether Plaintiffs must arbitrate their claims for public injunctive relief. *See Planned Parenthood*, 946 F.3d at 1111. This is a pure legal question based on the Warner Bros. arbitration clause and Plaintiffs' claims, and requires no further factual development. *See id.*

As Plaintiffs argued to the district court, Warner Bros. asks to compel arbitration *individually* and proscribe anything but relief on an individual basis. 2-ER-146. This is impermissible "under California law," because of the so-called *McGill* rule, which "prohibits the waiver of the right to pursue public injunctive relief in any forum." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 827 (9th Cir. 2019) (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 45 (2017)). This rule does not violate the FAA because it "is a generally applicable contract defense derived from long-established California public policy." *Id.* at 828.

Here, Plaintiffs, on behalf of class members, seek an injunction barring Warner Bros. from engaging in deceptive advertising practices and violating California law. 2-ER-244, 263–64, 274, 277 282 (FAC ¶¶ 14, 90(g), 93, 144, 164 III.F). This is precisely "the sort of injunctive relief sought in *McGill* itself, where

the plaintiff sought an injunction against the use of false advertising" and "[t]he paradigmatic example" of public injunctive relief. *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021). Indeed, "[w]aiver of the right to seek public injunctive relief under" the California statutes upon which Plaintiffs seek relief "would seriously compromise the public purposes the statutes were intended to serve." *Blair*, 928 F.3d at 824 (citation and quotations omitted). "Therefore, such waivers are invalid and unenforceable under California law." *Id.* (citation and quotations omitted).

Warner Bros. argued below that "because the 'primary beneficiaries' would be putative class members (*i.e.*, GOTC players), there is at best 'an incidental public benefit from what is otherwise class-wide private injunctive relief.'" 2-ER-84 (quoting *Hodges*, 21 F.4th at 546). But GOTC targets every person in the state of California with a mobile device. The injunction Plaintiffs seek here will put an end to the false advertising (a) in a game that has been downloaded *over 20 million times* with *hundreds of thousands* of users, (b) that has made Warner Bros., a California company, over $750 million in revenue, and (c) which game's terms mandate California choice of law. 2-ER-246, 266 (FAC ¶¶ 26–27, 97–102).

The proposed injunction therefore fits squarely within the category of relief that cannot be waived under the *McGill* rule, as described by this Court in *Hodges*: *i.e.*, "prospective injunctive relief that aims to restrain future violations of law for

48

the benefit of the general public as a whole." *Hodges*, 21 F.4th at 548. Warner Bros.'

ongoing deceptive advertising practices pose a danger to the public at large, not just

to those players who have already been deceived by them. *See Vaughn v. Tesla, Inc.*,

87 Cal. App. 5th 208, 231 (2023) ("It is enough that the requested relief has the

purpose and effect of protecting the public from [the defendant]'s ongoing harm.")

(alteration in original).

Thus, at the very least, this Court should refuse to compel arbitration as to the

public injunctive relief Plaintiffs seek. *See id.*

### B. Warner Bros.' terms are unconscionable.

This Court can also exercise its discretion to reach the pure legal issue of

unconscionability because it is apparent from the terms itself. As Plaintiffs argued

below, Warner Bros.' terms are both procedurally and substantively unconscionable.

*See* 2-ER-108; *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058–59 (9th Cir.

2013).

The terms are procedurally unconscionable because they amount to an

oppressive, non-negotiable "take it or leave it" contract of adhesion. *See*

*MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022) (citing

*Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)). It does not matter that other

online games exist as alternatives. *See Shroyer v. New Cingular Wireless Servs.,*

*Inc.*, 498 F.3d 976, 985 (9th Cir. 2007) ("[W]e have consistently . . . reject[ed] the

notion that the existence of 'marketplace alternatives' bars a finding of procedural unconscionability.") (collecting cases). Further, the notice defects described above ensure that Warner Bros.' terms come as a surprise to consumers. *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) ("Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party.") (citation omitted).

The terms are also substantively unconscionable. The arbitration agreement's purported ban on public injunctive relief violates clear California law. *See MacClelland*, 609 F. Supp. 3d at 1038. The game is openly marketed to minors but asks *only* that the minor—and not a parent or guardian—agree to the terms. *See, e.g.*, 2-ER-219. The terms unconscionably require claims to be brought within one year, even though Plaintiffs' claims have three-to-four-year statutes of limitations. 2-ER-226–27; *see Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011). Further, the terms contain a substantively unconscionable limitation of liability, precluding punitive and capping damages at $100. 2-ER-226–27; *see MacClelland*, 609 F. Supp. 3d at 1037 (collecting cases).

Worse, as further detailed in Part C.1.2 in the Statement of the Case, above, despite representing to this Court that that "[t]he later versions of the terms are much the same as to arbitration," WB Br. at 10, Warner Bros. does not disclose that while this appeal was pending, on January 30, 2023, it updated its terms with significant

changes that would make it substantially more difficult for consumers to seek redress. WB Br. at 8 (citing https://tinyurl.com/WB-TOU). It now seeks to force claimants to pay costs instead of reimbursing them, makes other significant increases to the cost of arbitration, and imposes a new mass arbitration protocol that drastically limits the number of claims, and impedes timely adjudication of them.

Below, Warner Bros. contended that Plaintiffs "misquot[ed] *MacClelland*, which held that a *mass arbitration provision* could prevent consumers from even '*fil[ing] a claim in arbitration* for years and possibly ever.'" 2-ER-83 (second alteration and emphasis in original). However, it is apparent that while this appeal was pending, Warner Bros. was inspired by the defendant's mass arbitration protocol in *MacClelland* and decided to adopt it to try to prevent GOTC's players—who netted Warner Bros. more than $750 million in revenue—from ever seeking legal redress.

**C.    Minor Plaintiff P.W.'s claims cannot be arbitrated.**

In only three weeks, Minor Plaintiff P.W., without his parent's permission, spent over $6,200 on GOTC. 2-ER-144. This Court should exercise its equitable discretion and resolve the pure legal issue raised below of whether Plaintiff P.W. (1) had adequate notice of Warner Bros.' terms, or in any event, (2) can disaffirm them. 2-ER-112.

*First*, the GOTC launch screen fails to provide inquiry notice to minor Plaintiff P.W. As *Sellers* explains,

> Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children know how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked 'terms of use.'

73 Cal. App. 5th at 475; *see Doe v. Roblox Corp.*, 602 F. Supp. 3d 1243, 1256 (N.D. Cal. 2022) ("Even if the notice would be sufficiently conspicuous and understandable for an adult, it is not for a child."). Further, since Warner Bros. markets GOTC to minors, and "California 'law shields minors from their lack of judgment and experience,'" this Court should take into account P.W.'s minor status in assessing whether Warner Bros. provided reasonable notice. *See Roblox*, 602 F. Supp. 3d at 1257 (citation omitted); *see also id.* ("When it comes to contract formation or interpretation, courts often take into account particular features of individuals doing the contracting.") (collecting cases).

*Second*, P.W. has disaffirmed the Warner Bros. terms under California law.[9] *See* Cal. Fam. Code § 6710 ("Except as otherwise provided by statute, a contract of

---

[9] It is appropriate to apply California law to claims by P.W. and the minor subclass because Warner Bros. is located in this State, Warner Bros.' terms require that any dispute be interpreted under California law, and Warner Bros.' unlawful conduct and false statements emanated from California. *See* 2-ER-266 (FAC ¶¶ 97–

(continued…)

a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards."); *see also Roblox*, 602 F. Supp. 3d at 1257 ("California law (like the common law) permits minors to disaffirm most contracts, rendering them void.").

P.W. has made it clear that he has disaffirmed the contract by the act of filing this lawsuit and, in addition, explicitly alleging so. 2-ER-259–60, 277 (FAC ¶¶ 68, 69, 77, 164, 167). Further, in opposition, P.W. submitted a declaration from his parent confirming that P.W. disavows and disaffirmed the terms and that he no longer plays GOTC. 2-ER-144. These statements and P.W.'s actions more than sufficiently disclose his "'unequivocal intent to repudiate'" any purported agreements with Warner Bros., including to arbitrate. *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1036 (N.D. Cal. 2020) (quoting *Celli v. Sports Car Club, Inc.*, 29 Cal. App. 3d 511, 517 (1972)).

---

102); *see, e.g.*, *T. K. v. Adobe Sys. Inc.*, 2018 WL 1812200, at *6 (N.D. Cal. Apr. 17, 2018); *I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1121 (N.D. Cal. 2015).

In its motion to compel arbitration, Warner Bros. never argued that anything other than California law should apply and, indeed, advocated for application of California law. 2-ER-160. It was only in its reply brief that Warner Bros. argued for application of different state laws. 2-ER-84. That argument is waived. *See, e.g.*, *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019). Regardless, Virginia law mandates the same conclusion. *See Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4, 5 (2007) ("The right of an infant to void his contract is an absolute and paramount right.").

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order denying Warner Bros.' motion to compel arbitration.

Dated: June 15, 2023

Respectfully submitted,

**POLLOCK COHEN LLP**

By: /s/ *Raphael Janove*

Raphael Janove
**POLLOCK COHEN LLP**
1617 John F. Kennedy Blvd., 20th Fl.
Philadelphia, PA 19103
(215) 667-8607
Rafi@PollockCohen.com

Liana Roza Vitale
Alison Borochoff-Porte
Adam Pollock
**POLLOCK COHEN LLP**
111 Broadway, Ste 1804
New York, NY 10006
(212) 337-5361
Liana@PollockCohen.com
Alison@PollockCohen.com
Adam@PollockCohen.com

Karl S. Kronenberger
**KRONENBERGER ROSENFELD, LLP**
150 Post St., Ste. 250
San Francisco, CA 94108
(415) 955-1155
Karl@kr.law

Jay Kumar
**JAY KUMAR LAW**
73 W. Monroe St., Ste. 100
Chicago, IL 60603
(312) 767-7903
Jay@JayKumarLaw.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32-1 and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,096 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using a proportionally spaced typeface in Times New Roman 14-point font.

Dated:  June 15, 2023     By: */s/ Raphael Janove*