No. 22-55982

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

CHARISSA KEEBAUGH, et al.,

*Plaintiffs-Appellees,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Central District of California
Case No. 2:22-CV-01272 | Honorable Maame Ewusi-Mensah Frimpong

———————————

## APPELLANT'S REPLY BRIEF

———————————

Christopher Chorba
Jeremy S. Smith
Patrick J. Fuster
Adrienne M. Liu
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

———————————

*Attorneys for Defendant-Appellant Warner Bros. Entertainment Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 3

I.  Warner Bros.' screen put Plaintiffs on inquiry notice of terms
    and conditions.............................................................................. 3

    A.  Plaintiffs received reasonably conspicuous notice of the
        terms. .................................................................................. 4

        i.    The notice of terms was visually conspicuous. .............. 4

        ii.   Plaintiffs misunderstand the role of transactional
              context. ........................................................................ 12

        iii.  The minor typographical discrepancies did not
              negate the conspicuous notice. ................................... 19

        iv.   Plaintiffs' arguments about "dark patterns" are
              legally irrelevant and factually unpersuasive............. 23

    B.  Plaintiffs unambiguously assented by tapping the
        "Play" button. .................................................................. 28

II. Plaintiffs' other grounds to avoid arbitration are
    inadequately developed and meritless. ...................................... 29

    A.  Plaintiffs do not seek valid public injunctive relief............. 29

    B.  The arbitration terms are not unconscionable. ................... 31

    C.  P.W. cannot disaffirm the terms of use............................... 34

CONCLUSION ................................................................................ 36

CERTIFICATE OF COMPLIANCE ....................................................... 38

# TABLE OF AUTHORITIES

Page(s)

## Cases

*A.V. v. iParadigms, Ltd. Liab. Co.*,
    544 F. Supp. 2d 473 (E.D. Va. 2008) ............................................ 35, 36

*Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*,
    143 S. Ct. 1258 (2023) .......................................................................... 28

*Arena v. Intuit Inc.*,
    444 F. Supp. 3d 1086 (N.D. Cal. 2020) ................................................ 22

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) .............................................................................. 29

*B.D. v. Blizzard Ent., Inc.*,
    76 Cal. App. 5th 931 (2022) ....................................................... 9, 16, 19

*Belton v. Comcast Cable Holdings, LLC*,
    151 Cal. App. 4th 1224 (2007) ............................................................. 32

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ....................................................... *passim*

*Blair v. Rent-A-Center, Inc.*,
    928 F.3d 819 (9th Cir. 2019) ................................................................ 30

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) .............................................................................. 33

*Cal. State Auto Ass'n Inter-Ins. Bureau v. Barrett Garages, Inc.*,
    257 Cal. App. 2d 71 (1967) .................................................................. 17

*Cerneka v. Russell No. 8 Santa Monica Properties, LLC*,
    2018 WL 3154565 (Cal. Ct. App. June 28, 2018) ................................ 20

*Cunningham v. Int'l Comm. of Young Men's Christian Ass'ns*,
    51 Cal. App. 487 (1921) ....................................................................... 17

*Doctor's Assocs., Inc. v. Casarotto*,
  517 U.S. 681 (1996) ........................................................................... 9, 17

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) .................................................. 21, 22

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021) ............................................................... 30

*Hooper v. Jerry Ins. Agency LLC*,
  2023 WL 3992130 (N.D. Cal. June 1, 2023)........................................ 9

*Larrus v. First Nat'l Bank of San Mateo County*,
  122 Cal. App. 2d 884 (1954)............................................................ 6, 17

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ................................................................. 31

*Long v. Provide Commerce, Inc.*,
  245 Cal. App. 4th 855 (2016) .............................................................. 20

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 945 (2017)............................................................................ 30

*McKee v. Audible, Inc.*,
  2017 WL 4685039 (C.D. Cal. July 17, 2017)................................. 22, 23

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ......................................................... 6, 11, 21

*Nagrampa v. MailCoups, Inc.*,
  469 F.3d 1257 (9th Cir. 2006)............................................................. 31

*Oberstein v. Live Nation Ent., Inc.*,
  2021 WL 4772885 (C.D. Cal. Sept. 20, 2021)................................ 23, 24

*Oberstein v. Live Nation Ent., Inc.*,
  60 F.4th 505 (9th Cir. 2023) ...................................... 6, 7, 11, 19, 24, 28

*PacifiCare Health Systems, Inc. v. Book*,
  538 U.S. 401 (2003).............................................................................. 33

*Poublon v. C.H. Robinson Co.*,
 846 F.3d 1251 (9th Cir. 2017) ........................................................ 31, 32

*R.A. v. Epic Games, Inc.*,
 2019 WL 6792801 (C.D. Cal. July 30, 2019) ...................................... 35

*Selden v. Airbnb, Inc.*,
 4 F.4th 148 (D.C. Cir. 2021) ................................................ 5, 11, 12, 25

*Sellers v. JustAnswer LLC*,
 73 Cal. App. 5th 444 (2021) ............................................... 7, 12, 15, 16

*Soltani v. Western & Southern Life Ins. Co.*,
 258 F.3d 1038 (9th Cir. 2001) ............................................................ 33

*Specht v. Netscape Commc'ns Corp.*,
 306 F.3d 17 (2d Cir. 2002) ................................................................ 14

*Stover v. Experian Holdings, Inc.*,
 978 F.3d 1082 (9th Cir. 2020) ............................................................ 30

*Taussig v. Bode & Haslett*,
 134 Cal. 260 (1901) .................................................................... 10, 17

*Tompkins v. 23andMe, Inc.*,
 840 F.3d 1016 (9th Cir. 2016) ............................................................ 33

*Trans-Tec Asia v. M/V Harmony Container*,
 518 F.3d 1120 (9th Cir. 2008) ............................................................ 35

*Viamontes v. Adriana's Ins. Servs., Inc.*,
 2016 WL 826148 (Cal. Ct. App. Mar. 3, 2016) .................................... 20

*West v. Uber Techs.*,
 2018 WL 5848903 (C.D. Cal. Sept. 5, 2018) ....................................... 11

*Wherry v. Award, Inc.*,
 192 Cal. App. 4th 1242 (2011) .......................................................... 33

## Statutes

Cal. Fam. Code § 6700 .............................................................................. 36

## Other Authorities

N. Babich, *Ghost Buttons in UX Design*, UX Planet (May 17, 2016),
https://tinyurl.com/uxghost ................................................................. 25

S. Scacca, *Ghost Button Design: Is This Really Still a Thing (and Why?)*,
Smashing Magazine (Jan. 8, 2018), https://tinyurl.com/scacca ......... 24

Statista, *Distribution of Free and Paid Apps in the Apple App Store and
Google Play* (July 2023), https://tinyurl.com/339fcke9 ...................... 18

*Terms of Use*, Warner Bros. (last updated Jan. 30, 2023),
https://tinyurl.com/WB-TOU ................................................................. 34

*Why Mobile Menus Belong at the Bottom of the Screen*, UX Movement
(July 4, 2017), https://tinyurl.com/UXmov ......................................... 26

## INTRODUCTION

Contract formation is not, as Plaintiffs see it, a series of technicality traps. Perhaps courts once did invalidate contracts for trivial oversights, such as missing wax seals. But that is not the law anymore—and has not been for a long time. This Court should reiterate that inquiry notice is a flexible totality-of-the-circumstances standard and reject the invitation to develop new arbitration-disfavoring rules of the sort that the Supreme Court has rejected time and again.

By any reasonable measure, Warner Bros. put Plaintiffs on notice that terms governed their use of *Game of Thrones: Conquest*. The sign-in screen told users how to accept those terms (by tapping "Play"), placed that notice right below the "Play" button, included a hyperlink to the terms right below the notice, used white font against a black background to ensure readability, and minimized clutter with a streamlined layout. This screen in fact contained *no text* other than the language relating to the terms and their acceptance (and, of course, the game's name). Under the totality-of-the-circumstances test that this Court applied just earlier this year, Plaintiffs had inquiry notice of the terms and accepted them by playing the game.

1

Because Plaintiffs cannot dispute any of these visual features, they offer a very different take on inquiry notice that would have courts act as graphic designers. First, they say that the notice was not visually conspicuous solely because the "Play" button was larger and brighter. Second, they argue that a reasonable user would have overlooked that the screen's only sentence was a notice of terms because Warner Bros. did not also require users to register for an account or pay upfront to play *Game of Thrones: Conquest*. Third, they contend that, because of a minor typographical discrepancy, a reasonable user would have believed she was accepting a terms of *use* but that Warner Bros. had inexplicably linked a different terms of *service*. And fourth, they (and their amici) use the charged rhetoric of "dark patterns" to criticize what are commonplace design features that did not undermine the screen's conspicuous notice as a matter of law. None of these nitpicking objections detract from the screen's plain and conspicuous notice of terms.

In a few pages at the back of their brief, Plaintiffs also raise three affirmative defenses to arbitration. The district court addressed none of these issues, and Plaintiffs' presentation of them is abbreviated to say the least. For that reason, the simplest disposition would be to set the

record straight on contract formation and remand for the district court to consider the other defenses in the first instance. But this Court also can (and should) reject Plaintiffs' defenses as meritless.

Because Plaintiffs accepted the terms of use, this Court should vacate the denial of the motion to compel arbitration and remand to the district court. Alternatively, this Court should reject Plaintiffs' other minimally briefed defenses to arbitration and remand with instructions for the district court to grant Warner Bros.' motion to compel.

## ARGUMENT

## I. Warner Bros.' screen put Plaintiffs on inquiry notice of terms and conditions.

Plaintiffs accepted Warner Bros.' terms of use for *Game of Thrones: Conquest* under the well-settled test for inquiry notice: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). The district court short-circuited its analysis of the first requirement, pointing to "the absence of a formal sign-up process." 1-ER-13. Plaintiffs do not defend this bright-line rule,

and none of their alternative arguments undermines the conspicuous notice of terms on the sign-in screen.

## A. Plaintiffs received reasonably conspicuous notice of the terms.

In their answering brief, Plaintiffs make four main arguments for why the notice of terms was not reasonably conspicuous. First, they insist that the notice of terms must be identical in size and color to the most prominent textual feature—here, the "Play" button. Second, they contend that the transactional context erodes the visually conspicuous notice because users are not required to register for an account with Warner Bros. or otherwise spend considerable time on the sign-in screen. Third, they dwell on two trivial typographical discrepancies. And fourth, they accuse Warner Bros. of employing so-called "dark patterns" to trick users into overlooking the notice of terms. Plaintiffs are mistaken on all counts.

### i. The notice of terms was visually conspicuous.

Plaintiffs saw one of the two sign-in layouts below when accessing *Game of Thrones: Conquest* for the first time:

 

2-ER-235; 2-ER-69.

As shown above, "a reasonably prudent Internet user would have seen" the notice of terms. *Berman*, 30 F.4th at 856. The screen has only one sentence: the affirmation that "By tapping 'Play' I agree to the Terms of Service" or "accept the Terms of Use." *See Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021) (approving similarly "simple design"

5

under California law).  This notice "clearly denote[d] 'that continued use will act as a manifestation of the user's intent to be bound.'"  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023).  And as a matter of law (and common sense), no reasonable user could have overlooked that the "only sentence" on the screen "was an express acceptance" of the terms of use. *Larrus v. First Nat'l Bank of San Mateo County*, 122 Cal. App. 2d 884, 889 (1954).

The screen told users not only *how* to accept the terms (tap the "Play" button) but also *where* to find them (tap the "Terms of Service" button).  This latter button, which "disclose[d] terms and conditions through a hyperlink," fulfilled Warner Bros.' duty to provide a reasonable opportunity to review the terms. *Berman*, 30 F.4th at 857.  And both the notice and hyperlink inevitably came within Plaintiffs' field of vision because they are next to the "action button" for accepting the terms. *Oberstein*, 60 F.4th at 517; *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (inquiry notice where, as here, notice is "spatially coupled" and "temporally coupled" with "mechanism for manifesting assent").

Warner Bros. also called attention to the notice and hyperlink through "[c]ustomary design elements," including "contrasting font color." *Berman*, 30 F.4th at 857. The text is in white font against a black background below the background art, which does not "clutter or otherwise obscure the textual notice." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 473 (2021). So unlike the insufficient screens in *Sellers* and *Berman* on which Plaintiffs rely (at 34–38), the screen here did not use clutter or a "barely legible" font size or color to distract users from noticing the terms. *Berman*, 30 F.4th at 856–57; *see* OB-34 (reproducing *Berman* screens); OB-45 (reproducing *Sellers* screen).

Together, these design elements made sure that the notice of terms would "'capture the user's attention and secure her assent'" before she proceeded past the screen. *Berman*, 30 F.4th at 857. In fact, this Court approved of a similar layout in *Oberstein*, which also involved a notice of terms that was "conspicuously displayed directly above or below the action button" and a high-contrast hyperlink to those terms. 60 F.4th at 516.

Just as the district court did not dispute the visual elements providing a plain notice of terms, neither can Plaintiffs. So they resort

to shrinking the sign-in screens to a fraction of their size. AB-32. This ruse sets up their argument that the affirmation "appears [as] a grayscale sentence in small nondescript font," AB-32, and that the buttons are "barely distinguishable from the black background" when "set apart by only a thin rectangle of white outlining," AB-2. A review of the images at their actual size dispels these arguments. *Supra*, p. 5.

Even when properly sized, the images tell only half the story. People hold smartphones much closer to their faces than the distance between a computer monitor and a person sitting at a desk. OB-37. More still, the sign-in screen's resolution on a smartphone is much better than copies of the images submitted by the parties. 2-ER-88. That is why Warner Bros. lodged an iPhone preloaded with *Game of Thrones: Conquest* as evidence in the district court—to provide an accurate understanding of the clarity and visibility of the white-text-on-black-background affirmation and hyperlinks, to the extent it mattered to the analysis. 2-ER-90. Although the district court was unable to access the game (apparently due to courthouse internet restrictions, 2-ER-20), the court took no issue with the clarity or size of the affirmation and hyperlinks on the sign-in screen, 1-ER-10–13.

8

Nevertheless, Plaintiffs seek to elevate one consideration above all others. They eventually tip their hand, arguing that Warner Bros. had to require users to check an "I agree" box or else "make the disclaimer language and the link to the Terms of Use the same size, just as bright, and prominently featured as the 'Play' button." AB-46. This approach can't be squared with *Oberstein*, which involved a large green "Place Order" button next to a smaller blue hyperlink disclosing the terms. OB-32; *see also, e.g.*, *Hooper v. Jerry Ins. Agency LLC*, 2023 WL 3992130, at *3 (N.D. Cal. June 1, 2023) (finding inquiry notice under *Oberstein* where notice was "in a 'tiny light font,' while the surrounding text is in 'comparatively larger font'"). Nor can this approach explain the result in *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal. App. 5th 931 (2022), where a large blue "Continue" button was next to a smaller white-text disclosure of the terms—the same blue/white color combination used by the screens here. *Id.* at 935; *see* AB-40 (reproducing *Blizzard* screen).

Plaintiffs' novel all-the-same-font-size-and-color rule would also violate the Federal Arbitration Act. Courts cannot impose special typeface rules on online arbitration agreements. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 684, 687 (1996). And under California law, the

notice of terms need not be the largest and most prominent visual element for a paper contract. The California Supreme Court, for example, upheld the condensed and vertically displayed limitation on liability below as "printed plainly on the face of the receipt," which was "extremely brief" as a "whole":



*Taussig v. Bode & Haslett*, 134 Cal. 260, 265–66 (1901). *Game of Thrones: Conquest* has a much more conspicuous notice of terms than the receipt in *Taussig*.

Plaintiffs raise four more objections to visual conspicuousness, but none has any basis in precedent:

- First, they say that hyperlinks must be "bolded or underlined." AB-33. But a "stand-alone rectangular box" signifies a hyperlink

to a reasonable smartphone user just as much, if not more, than underlined text. *E.g.*, *West v. Uber Techs.*, 2018 WL 5848903, at *3–4 (C.D. Cal. Sept. 5, 2018).

- Second, they argue that graphic art "serve[s] the same function as 'clutter' on the page" in distracting users from noticing the terms. AB-34. They tellingly cite no authority that background art and a conspicuous notice of terms cannot coexist, so long as the image (as here) does not obscure the notice. OB-29.

- Third, they declare that the notice of terms should be "*above* the action button, not below it," AB-40, even though this Court has endorsed layouts where the notices "were located directly on top of *or below* each action button," *Oberstein*, 60 F.4th at 517 (emphasis added); *accord Selden*, 4 F.4th at 156; *Meyer*, 868 F.3d at 81–82.

- And fourth, they attempt to distinguish *Oberstein* as a case where the website displayed the notice of its terms on three different screens. AB-40–41. Yet this Court never said that the notice had to be displayed more than once, 60 F.4th at 516, which

11

would be inconsistent with the mine-run case where the app displays the notice of terms only once, *e.g.*, *Selden*, 4 F.4th at 152.

In short, there is no legal support for Plaintiffs' principal argument that the notice of terms is conspicuous only if identical in color and equal in size to the largest design element on a screen. This Court's settled test for inquiry notice establishes that the affirmation (again, the sign-in screen's only sentence) and hyperlinks were visually conspicuous.

### ii.   Plaintiffs misunderstand the role of transactional context.

Below, the district court focused almost all of its attention on "the context of the transaction" rather than the "visual elements" of the sign-in screen. 1-ER-11. The court held that, because Plaintiffs were "not required to create an account before playing the game," the app did not involve the "'sort of continuing relationship . . . that would require some terms and conditions.'" 1-ER-12 (quoting *Sellers*, 73 Cal. App. 5th at 480). "In the absence of a formal sign-up process," the court refused to find that Plaintiffs could be on notice of the terms of use. 1-ER-13. Warner Bros. explained that this requirement has no basis in *Sellers* (OB-45–46), conflicts with generally applicable principles of contract

12

formation under California law (OB-56–58), and would violate the Federal Arbitration Act's equal-footing principle (OB-59–61).

In their brief, Plaintiffs retreat from the district court's decision and disclaim any "formal sign-up requirement." AB-28. The court, as they read its decision, mentioned the lack of a registration process as only one "factor[]" and "considered the visual elements of the launch screen in that context." AB-18–19. But the decision itself plainly refutes that reading. The district court stated explicitly its view that "both Warner Bros. and the Plaintiffs only address the visual elements of the Opening Screen to argue the issue of notice" and then never addressed any of those arguments other than the typographical discrepancy between "Terms of Use" and "Terms of Service." 1-ER-11–13; *see infra*, pp. 19–23. Because review is de novo, the parties will sink or swim on their arguments' own merits. *Berman*, 30 F.4th at 855. Yet Plaintiffs are simply wrong to say that the district court analyzed the screen's "visual elements," AB-19, when the decision below expressly did not address that issue.

Plaintiffs also offer their own spin on the relevant transactional context. Building on the decision below, they seem to argue that the context of *Game of Thrones: Conquest* cuts against inquiry notice because

users don't go through "a formal account-creation process" (the district court's rule) or pay money before accepting the terms (Plaintiffs' add-on). AB-24–28. Yet this hybrid account-or-payment requirement recreates many of the same defects that plagued the district court's original version.

To start, Plaintiffs have misread the cases as applying a different test for inquiry notice in the context of "'free' use of software." AB-28. The case they cite, *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002), held that principles from "the world of paper transactions" should "apply equally to the emergent world of online [contracting]." *Id.* at 31. Under those principles, the Second Circuit held that "a reasonably prudent offeree" would have been unaware of the terms for downloading the free software because the website did not have "an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms," instead requiring users to "scroll through multiple screens" to find the terms. *Id.* at 31–32. In other words, the website did not comply with the ordinary *Berman* two-part test. 30 F.4th at 856. *Specht* does not support Plaintiffs' supercharged notice requirement for free downloads.

14

Plaintiffs also rely (at 25–26) on *Berman* and *Sellers*, which both involved bait-and-switch websites.  In *Berman*, the digital marketing company advertised "rewards like gift cards and free product samples as an enticement to get consumers to provide their contact information and answer survey questions."  30 F.4th at 853.  In *Sellers*, the website touted a $5 trial period for its service but in fact enrolled users in a $46/month subscription.  73 Cal. App. 5th at 454–55.  The connecting thread is that both websites masqueraded as one-off transactions (which are less likely to have terms) rather than as ongoing relationships (which are more likely be governed by terms).  *Id.* at 476; *Berman*, 30 F.4th at 868 (Baker, J., concurring).

That backdrop helps explain why the transactional context, as one consideration in the overall mix, further enhances the inquiry notice here.  Before ever accessing the game on their phones, Plaintiffs had to seek out *Game of Thrones: Conquest* for download in an app store.  2-ER-67.  Plaintiffs, upon opening the app, were confronted with the notice of terms, a hyperlink to them, and the "Play" button for accepting them.  2-ER-235; 2-ER-69.  And as the California Court of Appeal held in *Blizzard*, a reasonably prudent user would expect terms to govern their

15

"'continuing, forward-looking relationship'" with a strategy game where users can play for countless hours, access highly recognizable intellectual property, purchase virtual items to enhance the gameplay experience, and interact with other players. 76 Cal. App. 5th at 950–51.

Plaintiffs confuse the facts when they attempt to distinguish *Blizzard* on the ground that the user went "through a full registration process" and paid upfront for the game. AB-39. The Court of Appeal compelled arbitration not under the terms the user accepted immediately following the initial purchase and registration process, but under the terms that the player accepted three years later when accessing the game. 76 Cal. App. 5th at 937–40, 949–50. That makes this case just like *Blizzard*, where the relevant transactional context was that the user had "accessed Blizzard's online platform to interact with other players in a videogame he alleges he 'spent approximately 50 hours playing . . . over the course of approximately two years'"—the type of "'continuing, forward-looking relationship' governed by terms and conditions." *Id.* at 950–51 (quoting *Sellers*, 73 Cal. App. 5th at 471).

Plaintiffs' account-or-payment requirement also defies generally applicable principles of contract formation, just as the district court's

16

standalone account-creation requirement does. Under California law, parties can form contracts through conspicuous notice of terms even absent registration for an account or upfront payment for services. *E.g.*, *Cal. State Auto Ass'n Inter-Ins. Bureau v. Barrett Garages, Inc.*, 257 Cal. App. 2d 71, 74, 77 (1967) (airport-parking check binding if consumer had "'actual notice of circumstances sufficient to put a prudent man upon inquiry'"); *Cunningham v. Int'l Comm. of Young Men's Christian Ass'ns*, 51 Cal. App. 487, 489–91 (1921) (enforcing terms on baggage-claim receipt issued by charitable organization). And even those cases that did involve an upfront payment, *e.g.*, *Taussig*, 134 Cal. at 265–66, or account registration, *e.g.*, *Larrus*, 122 Cal. App. 2d at 889–90, did not suggest that a different test applies when the consumer pays, if at all, only after accepting the terms.

Plaintiffs have no answer to these cases that Warner Bros. previously identified. OB-56–58. That silence is unsurprising because these longstanding principles put Plaintiffs in a bind: They cannot argue that arbitration agreements are subject to a "special notice requirement not applicable to contracts generally," *Doctor's Assocs.*, 517 U.S. at 687, but they also cannot deny that "elemental principles of contract

formation apply with equal force to contracts formed online," *Berman*, 30 F.4th at 855–56. If arbitration agreements are to remain on equal footing with other contracts, and if parties are allowed to form online contracts the same way as paper contracts, then nothing underpins Plaintiffs' account-or-payment requirement.

Even if the law did not foreclose it, an account-or-payment requirement would have perverse consequences as a policy matter. The end result would be, as Plaintiffs urge, that online services would have to ask consumers to "enter in credit card information," AB-35, or share "sensitive personal information," AB-43. But one of the chief benefits of the Apple and Google platforms is that users don't need to share sensitive personal or financial information with third-party app developers to use their applications. OB-51. Still, reasonably prudent smartphone users know that their ongoing relationships with third-party developers typically are subject to terms and conditions even under the free-to-download model that covers 97% of apps in the Google Play Store and 94.5% of the apps in the Apple App Store. Statista, *Distribution of Free and Paid Apps in the Apple App Store and Google Play* (July 2023), https://tinyurl.com/339fcke9.

18

Plaintiffs' account-or-payment requirement would also paradoxically encourage the deceptive practices disavowed in *Berman* and *Sellers*. Consider that the terms in those cases were not conspicuous in part because the online services tricked consumers into providing personal information for targeted marketing and recurring subscriptions that were disguised as one-off transactions. *See supra*, p. 15. Yet Plaintiffs invert those cases when they reconceptualize inquiry notice in a way that *credits* the online services for soliciting the sensitive information that made those practices possible. AB-35–38.

These perverse results confirm the wisdom of "the objective, totality-of-the-circumstances standard." *Oberstein*, 60 F.4th at 514. While a "full registration process" can signal an ongoing relationship governed by terms, *id.* at 517, so does the nature of *Game of Thrones: Conquest* as an immersive multiplayer game, *Blizzard*, 76 Cal. App. 5th at 950–51. There is no basis in law or reality to give talismanic significance to account creation or upfront payment.

### iii. The minor typographical discrepancies did not negate the conspicuous notice.

Plaintiffs also latch onto two typographical discrepancies. The first, which the district court stressed, was that one layout told users that "'I

accept the Terms of *Use*'" by tapping the "Play" button, but labeled the hyperlink button as "'Terms of *Service*.'" AB-42 (bolding omitted) (quoting 1-ER-12). The second, which the district court did not endorse, is that the "Terms of Service" button led to a webpage titled "Terms of Use." AB-44. According to Plaintiffs, a reasonable user would be too confused by these "wording mismatch[es]" to understand that the affirmation referred to the hyperlink right below and that the hyperlink led to the same terms described right above. AB-42–44.

This hyperliteral approach wildly underestimates the reasonable user and flouts the well-settled rule that courts apply an "objective standard" that looks to "the reasonable meaning" of the words and phrases at issue. *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016) (quotation marks omitted). Even "obvious typographical errors clearly cannot be the basis for invalidating an agreement to arbitrate" if the reader could otherwise glean the intended meaning from context. *Viamontes v. Adriana's Ins. Servs., Inc.*, 2016 WL 826148, at *2 n.1 (Cal. Ct. App. Mar. 3, 2016); *accord Cerneka v. Russell No. 8 Santa Monica Properties, LLC*, 2018 WL 3154565, at *7 (Cal. Ct. App. June 28, 2018). Although Plaintiffs attempt to distinguish these cases based on

20

irrelevant procedural distinctions (AB-43 n.8), they don't deny that contract formation depends on a reasonable reading of words in context, not an obtuse reading of words in isolation.

That principle, applied here, establishes that a reasonable smartphone user would have understood that the button was a link to the same terms described in the affirmation one quarter-inch directly above the button. Only an *unreasonable* user could reach the conclusion that the "linked terms" do *not* "pertain to the action the user is about to take." *Meyer*, 868 F.3d at 80. In fact, Plaintiffs' added objection that the "Terms of Service" button leads to the webpage titled "Terms of Use" only reinforces that "terms of use" and "terms of service" are interchangeable in this context. OB-63–64.

Plaintiffs' response to *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482 (9th Cir. 2020), further undermines their position. There, this Court upheld contract formation in the face of a similar discrepancy: The app had two hyperlinks labeled "Turbo Terms of Use" and "TurboTax Terms of Use," the latter of which led to a webpage called "Intuit Terms of Service." *Id.* at 484. Plaintiffs put *Dohrmann* to one side because this Court did "not even discuss the incorrect wording problem." AB-42–43.

21

Sometimes silence speaks louder than words. Even though the district court relied on this typographical discrepancy, *Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1092 (N.D. Cal. 2020), this Court deemed the triviality unworthy of mention in its reversal, 823 F. App'x at 484.

The lone case Plaintiffs say (at 42) supports them, *McKee v. Audible, Inc.*, 2017 WL 4685039 (C.D. Cal. July 17, 2017), confirms the adequacy of the notice here. In *McKee*, the sign-in screen told users that "[b]y completing your purchase you agree to Audible's Conditions of Use and authorize us to charge your designated credit card or another available credit card on file." *Id.* at *7. But to proceed past the sign-in page, a user did not have to complete a purchase; the user could just click a button labeled "Start Now." *Id.* Worse still, the user would have to "scroll down" to the next page to view the hyperlink titled "Terms of Use." *Id.* at *8. The district court held that the "linguistic imprecision" about how to accept the terms (clicking "Start Now" versus completing a purchase) and the location of the hyperlink on a separate screen together defeated inquiry notice. *Id.* at *8–9. But in so holding, the court distinguished cases (like this one) "where buttons appeared next to or

22

above disclosure that explicitly tied pressing the button to terms of service." *Id.* at *8.

All told, Plaintiffs elevate dogmatic semantics over reasonable meaning. The sign-in screen provided reasonably conspicuous notice that terms governed *Game of Thrones: Conquest* and could be accessed via hyperlink.

> ### iv. Plaintiffs' arguments about "dark patterns" are legally irrelevant and factually unpersuasive.

As a last resort, Plaintiffs and their amici conjure a narrative where Warner Bros. used "dark patterns" to obscure the conspicuousness of the terms. AB-11–12; Professors Br. 14–16. But this overblown rhetoric neither changes the legal test for inquiry notice nor has any merit even on its own terms.

This is not the first time that a plaintiff has invoked "dark patterns" in an attempt to raise the conspicuousness baseline. The plaintiffs in *Oberstein* submitted an expert declaration opining that the defendants had "purposefully employed 'dark patterns' in designing" their websites. *Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *2 (C.D. Cal. Sept. 20, 2021). The district court found this declaration "immaterial" because, even if "several suggestions" proposed by the expert were "likely

23

to improve visibility," the "websites already provide[d] adequate constructive notice as is." *Id.* at *6. This Court affirmed, explaining that the testimony on dark patterns "could not mitigate the uncontested existence of features that, by themselves, establish constructive notice as a matter of law." 60 F.4th at 518. The same is true here: Even if other design changes could have improved visibility of the notice even more, the sign-in screen for *Game of Thrones: Conquest* already exceeds the baseline for conspicuous notice as a matter of law.

Plaintiffs' discussion of supposed "dark patterns" is also unpersuasive as a factual matter. For example, they repeatedly refer to the hyperlinks as "ghost buttons," presumably to imply an almost-imperceptible notice that tricks users' eyes. *E.g.*, AB-11–12. But periodicals on website design have reported "similar clickthrough rates" for so-called ghost buttons—a supernatural name for an otherwise ordinary button that is the same color as the background but demarcated by a contrasting border. *E.g.*, S. Scacca, *Ghost Button Design: Is This Really Still a Thing (and Why?)*, Smashing Magazine (Jan. 8, 2018), https://tinyurl.com/scacca. While the only evidence Plaintiffs cite—an FTC report, AB-11—does not even mention ghost buttons, others who

24

have addressed the topic advocate that ghost buttons can "create focal points" and "attract[] attention," so long as the background art does not interfere with the text's readability, *e.g.*, N. Babich, *Ghost Buttons in UX Design*, UX Planet (May 17, 2016), https://tinyurl.com/uxghost.

Labels aside, the focus is whether the hyperlink is "sufficiently 'set apart' from the surrounding text." *Berman*, 30 F.4th at 857. Plaintiffs themselves note that *Game of Thrones: Conquest* used "plain white text" for the buttons, AB-42, which made high-contrast hyperlinks that draw the user's eye against the black background, *see supra*, p. 5. Because the hyperlinks were visually conspicuous, there is no hard-and-fast rule for where the "hyperlinked text" or the button's shading "falls on the color wheel." *Selden*, 4 F.4th at 157.

Plaintiffs see another conspiracy in the location of the "Terms of Service" button. They say that the "link appears to be deliberately placed where a right-handed user is most likely to have their thumb or palm covering the screen, with their thumb conveniently over the 'Play' button." AB-11. But Plaintiffs again cite nothing in support of their armchair theorizing on graphic design. AB-11–12. In fact, some design

25

experts have argued that buttons should be at the bottom of the screen
for easy thumb access:



*Why Mobile Menus Belong at the Bottom of the Screen*, UX Movement
(July 4, 2017), https://tinyurl.com/UXmov.

As with a button's color, the point is not that the law requires the
buttons to be at any particular spot on the screen. Nor, for that matter,
do Plaintiffs ever suggest where the buttons *should* be. If Warner Bros.
had addressed Plaintiffs' supposed concern by putting the buttons at the
top of the screen, then Plaintiffs surely would argue that Warner Bros.

26

put the hyperlink out of thumb's reach, frustrating their ability to access the terms. These evidence-free arguments are an opportunistic game of "heads I win, tails you lose." Ultimately, competing considerations make a one-size-fits-all rule inappropriate for inquiry notice, especially because courts are not equipped to referee best practices in the ever-evolving field of graphic design.

Nor do Plaintiffs' amici aid this Court's consideration of inquiry notice. After describing dark patterns in general, the professors fail to apply their supposed insights to the screens at issue here. They assert that *Game of Thrones: Conquest* "demonstrates several manipulative qualities" but then complain only that "the 'Play' button in contrasting colors clearly invites and draws the attention of the user away from the terms one would need to be aware of to adequately consent, instead encouraging them to begin their gameplay immediately." Professors Br. 14–16. At bottom, then, the amici assume (contrary to precedent) that the notice of terms must be the same color and size as the largest object on the screen. *See supra*, p. 9.

In the end, Plaintiffs and their amici turn on its head the principle that, "[b]ecause online providers have complete control over the design of

27

their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Berman*, 30 F.4th at 857 (cleaned up). The onus being on the *designer* means that courts apply an "objective, totality-of-the-circumstances standard" open to the possibility that a sign-in screen could provide adequate notice in any number of ways. *Oberstein*, 60 F.4th at 514. In contrast, Plaintiffs would put the onus on *courts* to develop top-down rules of graphic design—a role no more appropriate for the judiciary than "'art critic.'" *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1283 (2023). The law properly limits this Court to deciding whether the notice was reasonably conspicuous in light of *all* the circumstances, not only the few that Plaintiffs cherry-pick. *Oberstein*, 60 F.4th at 517–18. Warner Bros. prevails under that test.

### B. Plaintiffs unambiguously assented by tapping the "Play" button.

Plaintiffs accepted the terms of use by tapping the "Play" button after being told the "legal significance" of that action. *Berman*, 30 F.4th at 858. This Court recently upheld a materially identical mechanism for securing unambiguous assent. *Oberstein*, 60 F.4th at 517.

28

In response, Plaintiffs double-count their flawed challenge to the typographical discrepancy, arguing that they manifested assent to the "'Terms of *Use*'" but not to the "'Terms of *Service*.'" AB-44–45. Nothing could better highlight the absurdity of Plaintiffs' argument that a reasonable user would have believed that Warner Bros. linked an irrelevant set of terms while withholding the actual terms. *Supra*, p. 21. Because Plaintiffs received reasonably conspicuous notice of the terms, they also unambiguously assented to them.

## II.    Plaintiffs' other grounds to avoid arbitration are inadequately developed and meritless.

Plaintiffs also raise three unresolved defenses to arbitration. This Court should hold that the parties formed an arbitration agreement and then remand for the district court to consider these other defenses in the first instance—an approach that is especially prudent here because Plaintiffs give the defenses only passing attention. But if this Court does address the defenses, it should reverse and remand with instructions for the district court to grant Warner Bros.' motion to compel.

### A.    Plaintiffs do not seek valid public injunctive relief.

Plaintiffs do not contest that the arbitration agreement's class-action waiver must be enforced under *AT&T Mobility LLC v. Concepcion*,

563 U.S. 333 (2011). But they contend (at 47–49) that *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), prevents the enforcement of the agreement's individualized-relief limitation as to a single remedy: a public injunction.

Plaintiffs, however, do not request valid public injunctive relief. They ask only for an injunction against Warner Bros. "continuing to engage in the [allegedly] wrongful acts and practices" related to in-app ads in *Games of Thrones: Conquest*. 2-ER-282. That relief does not qualify under *McGill* because the "primary beneficiaries" are Plaintiffs and "a defined group of similarly situated persons" (the putative class members) "rather than the general public." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 543 (9th Cir. 2021). At any rate, Plaintiffs lack Article III standing to pursue injunctive relief because they do not allege a "*desire* to purchase" packs in the future. *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1087 (9th Cir. 2020).

Even if Plaintiffs had brought a valid request for a public injunction and had standing, the case would have to be stayed pending the arbitration of their claims and remaining remedies. *McGill*, 2 Cal. 5th at 966. This Court has recognized that "[p]arties are welcome to agree to split decisionmaking between a court and an arbitrator." *Blair v. Rent-*

30

*A-Center, Inc.*, 928 F.3d 819, 831–32 (9th Cir. 2019). Here, the parties agreed that if the individualized-relief term is "unenforceable with respect to a particular claim or with respect to a *particular request for relief* (such as a request for injunctive relief sought with respect to a particular claim), then that claim or *request for relief* shall be severed, and all other claims and requests for relief shall be arbitrated." 2-ER-198 (emphasis added).

## B. The arbitration terms are not unconscionable.

Plaintiffs also argue that the arbitration agreement is unconscionable, but they strike out on both elements.

The arbitration terms are not procedurally unconscionable. Plaintiffs argue only that the terms come in a "contract of adhesion." AB-49. But such contracts are not "per se unconscionable" absent "'other indication of oppression or surprise.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261 (9th Cir. 2017). There is no surprise here because the terms' first lines disclose the arbitration provisions—in all caps no less. OB-10–11; *cf. Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1001 (9th Cir. 2021). And while market alternatives "*alone* can[not] defeat a claim of procedural unconscionability," *Nagrampa v. MailCoups, Inc.*, 469 F.3d

31

1257, 1283 (9th Cir. 2006) (en banc), they do cut against such a finding when, as here, plaintiffs had "the option of simply forgoing" the "nonessential recreational activity," *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1245 (2007).

Nor can Plaintiffs show substantive unconscionability based on any of the provisions they cite:

- *Individualized relief.* Even if the individualized-relief provision cannot foreclose public injunctive relief under *McGill*, the provision is not unconscionable—it can still be applied to "the waiver of other representative, collective, or class action claims." *Poublon*, 846 F.3d at 1264 (reasoning identically for PAGA claims).

- *Parental consent.* Plaintiffs say that Warner Bros. "asks *only* that the minor—and not a parent or guardian—agree to the terms." AB-50. But the terms expressly require minors to "obtain[] parental or guardian consent." 2-ER-202. At most, P.W.'s age goes to disaffirmance (*infra*, pp. 34–36); it does not speak at all to unconscionability.

- *Limitations period*. Plaintiffs complain that the terms of use set a one-year period for bringing claims. AB-50. But this Court has upheld periods of one year or even less. *E.g.*, *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032–33 (9th Cir. 2016); *Soltani v. Western & Southern Life Ins. Co.*, 258 F.3d 1038, 1043–44 (9th Cir. 2001); *contrast* AB-50 (citing only *Wherry v. Award, Inc.*, 192 Cal. App. 4th 1242, 1249 (2011), which invalidated a 180-day period).

- *Limitation on liability*. Plaintiffs object to the damages cap. But the FAA limits unconscionability challenges "specifically" to "the validity of the agreement to arbitrate," as opposed to other provisions that would apply in either forum. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). Here, the agreement limits damages only insofar as "permitted by applicable law," which means that Plaintiffs can raise any objections in arbitration. 2-ER-210 (capitalization omitted). The arbitrator gets the first crack at interpreting these "remedial limitations." *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401, 407 (2003).

- *New terms*.  Plaintiffs devote most of their attention to the terms of use that Warner Bros. released on January 30 of this year. AB-13–15; AB-50–51.  They grossly overstate (and at times even misstate) its provisions.  For example, they represent that "Warner Bros. will no longer pay for arbitration or reimburse fees."  AB-13.  But that is simply not true.  The new terms provide that fees will be "governed by the applicable [National Arbitration and Mediation] Rules," which provide that consumers shall pay only their portion of the filing fee (and that consumers may qualify for a "fee waiver under applicable law").  Terms of Use § 16(a)(4), https://tinyurl.com/WB-TOU.  In any event, this version of the terms was not before the district court and is not before this Court at this juncture.

## C.    P.W. cannot disaffirm the terms of use.

Plaintiffs also argue that P.W. can disaffirm the terms of use under California law.  AB-52–53.  But they've cited the wrong body of law.

Virginia law governs here.   P.W. accessed *Game of Thrones: Conquest* in Virginia.  2-ER-245.  And the relevant choice-of-law principle selects "the law of the state where the contract was formed with respect

to 'issues concerning contract formation.'" *R.A. v. Epic Games, Inc.*, 2019 WL 6792801, at *5 (C.D. Cal. July 30, 2019). Although Plaintiffs rely (at 52 n.9) on the California choice-of-law provision in the terms of use, that argument is circular—it "puts the barge before the tug," as this Court has said—because P.W. has attempted to disaffirm those same terms. *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008) (cleaned up).

P.W. cannot disaffirm the terms of use under Virginia law. He "received benefits" in accessing *Game of Thrones: Conquest* and also "gained the benefit of standing to bring the present suit" concerning in-app purchases. *A.V. v. iParadigms, Ltd. Liab. Co.*, 544 F. Supp. 2d 473, 481 (E.D. Va. 2008), *aff'd in part and rev'd in part on other grounds*, 562 F.3d 630 (4th Cir. 2009).

In response, Plaintiffs contend (at 16, 53 n.9) that Warner Bros. "impermissibly argued for the first time" below in its reply "that Virginia law applied" to P.W.'s disaffirmance defense. Nonsense. Warner Bros. stated in its motion that the state of residence has the greatest interest in application of its law, but applied California law to contract formation, as required in the absence of a conflict. 2-ER-160; *see* OB-25 n.*. And

even though a party moving to compel arbitration has no duty to pre-rebut the other side's potential defenses, Warner Bros. went above and beyond in its motion, pointing out that the "disaffirmation law of the state 'where Plaintiff was paying the game,' which is Virginia here," would apply to P.W. if he attempted to disaffirm the terms of use (as his mother later filed a declaration doing). 2-ER-166 (citing *iParadigms*, 544 F. Supp. 2d at 481); *see* 2-ER-144.

Finally, Plaintiffs try to repackage their disaffirmance defense as a challenge to contract formation for P.W. AB-51. But the test does not vary from one user to another. It's an objective test of "conspicuousness tailored to the reasonably prudent Internet user." *Berman*, 30 F.4th at 857. And California law makes clear that minors are no exception, providing that "a minor may make a contract in the same manner as an adult, subject to the power of disaffirmance." Cal. Fam. Code § 6700.

## CONCLUSION

This Court should hold that Warner Bros. and Plaintiffs formed an arbitration agreement, vacate the order denying Warner Bros.' motion to compel arbitration, and remand for the district court to consider Plaintiffs' other defenses to enforcement in the first instance. In the

36

alternative, this Court should reject those defenses, reverse, and remand with instructions for the district court to grant the motion to compel.

Dated: August 7, 2023   Respectfully submitted,

          GIBSON, DUNN & CRUTCHER LLP

          By:  /s/ Christopher Chorba

          *Attorneys for Defendant-Appellant*
          *Warner Bros. Entertainment Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Circuit Rule 32-1(b) because it contains 6,990 words, including 173 words manually counted in any visual images and excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated: August 7, 2023   Respectfully submitted,

        GIBSON, DUNN & CRUTCHER LLP

        By:   /s/ Christopher Chorba  

         *Attorneys for Defendant-Appellant*
         *Warner Bros. Entertainment Inc.*